UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. BYRD,
        Plaintiff,

v.

AVENTIS PHARMACEUTICALS, INC. and DEBRA EDMUNDS,
        Defendants.

Civil Action No. 04-11032-DPW

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Aventis Pharmaceuticals, Inc. ("Aventis") and Deborah Edmunds ("Ms. Edmunds"), move for summary judgment pursuant to Fed. R. Civ. P. 56 on Plaintiff's Complaint in its entirety. In his nine count Complaint, Plaintiff challenges his termination as a sales representative on February 4, 2002, and alleges claims of race and age discrimination and retaliation (Counts I and II); wrongful termination (Count III); breach of contract (Count IV); breach of implied covenant of good faith and fair dealing (Count V); tortiuous interference with advantageous relations (Count VI); intentional interference with advantageous relations (Count VII); violation of Massachusetts Civil Rights Act (Count VIII); and a violation of 42 U.S.C. § 1983 (Count IX). Defendants are entitled to summary judgment because there are no material facts in dispute and they are entitled to judgment as a matter of law. Defendants submit their Rule 56.1 Statement of Material Facts Not in Dispute, Declarations of Deborah Edmunds and Joan Ackerstein and Defendants' Memorandum of Law In Support of Their Motion For Summary Judgment.

### Defendants' Rule 56.1 Statement Of Material Facts Not In Dispute

Pursuant to Local Rule 56.1, Aventis and Ms. Edmunds submit their Statement of Material Facts Not In Dispute.

### The Parties

1.      Plaintiff, William M. Byrd, was employed by Aventis as a sales representative until February 4, 2002, when his employment ended. (Complaint, ¶32; Ackerstein Dec., ¶ 6, Exhibit E) He began his employment in 1997, being hired at age 48. (Complaint, ¶ 4; Ackerstein Dec., ¶ 6, Exhibit E; Pl. Tr. 10)[1]

2.      Aventis is a pharmaceutical company which manufactures and "sells" pharmaceuticals. (Complaint, ¶ 2; Ackerstein Dec., ¶ 6, Exhibit E)

3.      Ms. Edmunds is a resident of Wayland, Massachusetts. (Edmunds Tr. 7)[2] She has been employed by Aventis as an Area Manager since her hiring in May, 1999, and was Plaintiff's supervisor. (Edmunds Tr. 34; Complaint, ¶ 13; Ackerstein Dec., ¶ 6, Exhibit E)

4.      In bringing his claim of discrimination, Plaintiff contends that the employee at Aventis who discriminated against him based on his age and race is Ms. Edmunds. (Pl. Tr. 132-134)

### Plaintiff's Hiring

5.      On or about May 12, 1997, Plaintiff was hired by Hoechst Marion Roussel, Aventis' predecessor, as a Professional Sales representative. (Pl. Tr. 97). Plaintiff represented that he had a B.S. in Business Administration, as is set out in the "Field Sales New Hire Information Form." (Edmunds Dec., ¶ 3, Exhibit B). In fact, as discovered at his deposition, Plaintiff did not graduate from college and does not have a B.S. degree. (Pl. Tr. 241) Accordingly, he misrepresented his credentials and he does not meet the educational requirements for the Sales Representative position, which requires a college degree. (Edmunds Dec., ¶ 2, Exhibit A)

---

[1] Photocopies of excerpts of the deposition of Plaintiff are attached to the Declaration of Joan Ackerstein as Exhibit A.
[2] Photocopies of excerpts of the deposition of Deborah Edmunds are attached to the Declaration of Joan Ackerstein as Exhibit B.

### Plaintiff's Duties As A Sales Representative

6.   Pharmaceutical sales representatives at Aventis do not actually sell pharmaceuticals, but rather, communicate with physicians through office visits, with the goal of educating physicians regarding Aventis' products so that they prescribe those products. Accordingly, as a sales representative, Plaintiff was responsible for calling on physicians in his territory to speak with them and their staff about Aventis' products. (Pl. Tr. 98-99)  Plaintiff was primarily responsible for promoting Allegra, Amaryl and Lantus, medications prescribed for diabetes or respiratory problems. (Pl. Tr. 95-96).

7.   Aventis outlined the duties of the Sales Representative in a document entitled "Core Competencies." (Pl. Tr. 238-239; Ackerstein Dec., ¶ 7, Exhibit F)  Core competencies for the sales representative position included, for example, product knowledge, selling skills, interpersonal skills, territory management and customer targeting/analysis. (Id.)  Plaintiff was familiar with this document and the competencies required. (Pl. Tr. 239)

8.   At the time he was hired, Plaintiff's manager was Sean Flanders, an Area Manager. (Pl. Tr. 93-94)  In or about May 1999, Ms. Edmunds became an Area Manager and Plaintiff's direct supervisor. (Pl. Tr. 94-96)  At that time, Ms. Edmunds reported to Christine List, who was then Regional Sales Director. Ms. Edmunds reported to Ms. List from May 1999 through the fall of 2000 and then again after approximately November 2001. (List Tr. 19-20, 45-46;[3] Edmunds Tr. 28)

9.   As Area Manager, Ms. Edmunds had responsibility for approximately eight sales representatives, who had territories in New England. (Edmunds Tr. 22-23)  It was Ms. Edmunds' responsibility to monitor sales activities in her area, including the performance of all the sales representatives who reported to her. (Edmunds Tr. 58-59)

10.  As Regional Sales Director, Ms. List managed the eight to ten Area Managers who worked in her region, including Ms. Edmunds. (List Tr. 20-21)  Like the other Area Managers who

---

[3] Photocopies of excerpts of the deposition of Christine List are attached to the Declaration of Joan Ackerstein as Exhibit C.

reported to Ms. List, Ms Edmunds communicated with Ms. List regarding the performance of the sales representatives who worked for her. (List Tr. 23-25, 46-47) Mailet Minassian was a Human Resource Manager at Aventis in 2000 through December 2001, when she was promoted to Senior Human Resource Manager, a position she held until April, 2004. (Minassian Tr. 14)

11. At the time Plaintiff worked for Aventis, Aventis utilized a "pod" (or team) system for promoting Aventis products in a given area. Under this pod system, a group of sales representatives worked together toward common goals, calling individually on the same group of physicians. The members of pods often reported to different Area Managers. Plaintiff's pod consisted of four or five sales associates at various times, each of whom reported to a different Area Manager. (Pl. Tr. 95, 97)

### The Honor System

12. At Aventis, sales representatives work independently. They are assigned territories and they are supposed to spend their days calling on physicians in their territories. They make their own schedule of visits and they generally make their sales calls alone. (Pl. Tr. 59-60; Edmunds Tr. 318) The Area Manager has to trust the sales representative because they are working on their own. (Pl. Tr. 59-60; Edmunds Tr. 319) The Sales Representatives were on an honor system, recognizing that their managers expected them to be truthful in reporting their activities. (Pl. Tr. 60)

### Accountability As A Sales Representative

13. As a sales representative, Plaintiff had an obligation to perform "detail" calls on physicians. (Edmunds Tr. 260) Only when a sales representative actually had a face-to-face meeting with a physician, during which he or she delivered a marketing message regarding an Aventis product, would the visit qualify as a detail call. (Pl. Tr. 60, 115-116; List Tr. 113) Sales representatives were to report calls that did not rise to the level of a primary detail call as service calls. (Pl. Tr. 116; List Tr. 113)

14. Like all sales representatives, Plaintiff was required to make a record of a sales call immediately following the call, if possible, on a hand-held computerized device. (Pl. Tr. 99, 115-116;

List Tr. 86-87, 109-12, 119-20)  Sales representatives were expected to record call activity on the device as a detail call only if the call qualified as one. (Pl. Tr. 99, 115-116; List Tr. 113-115; 118-20; Minassian Tr. 32)[4]  Otherwise, the call was not to be entered as a detail call, but rather as a service call. (Pl. Tr. 99, 115-116; List Tr. 113-115, 118-120)  The call entry on the device would reflect the date of the call, the sales representatives' notes regarding the call, and whether the call constituted a primary, secondary or reminder detail call, or simply constituted a service call. (List Tr. 119-120, 125-128)

15.   Members of a pod read one another's call notes in order to educate themselves on what the others had communicated to the doctors at issue. (Pl. Tr. 202; List Tr. 120-121)

16.   In addition to reviewing each other's call notes, members of a pod were expected to communicate with one another regarding sales strategies for achieving their common goals. (Pl. Tr. 97)  Members of a pod were expected to meet monthly. (Pl. Tr. 97)

17.   Like all sales representatives, Plaintiff was required to work in his territory between 8:00 a.m. and 5:00 p.m. each day. (Pl. Tr. 183; Edmunds Tr. 104-105)  A failure to be in the territory between 8:00 a.m. and 5:00 p.m. daily could be grounds for termination of employment. (Minassian Tr. 49, 72)

18.   Sales representatives also distributed samples of Aventis' products to physicians when they made sales calls. (Pl. Tr. 116-117)  As the sales representatives distributed samples, they were to record the physician's signature on an electronic device.  The device recorded the physician's signature, the date and time of the sales call and the number of samples left with the physician. (Pl. Tr. 116-117)  If the device was not working, sales representatives were required to report their sampling activity on paper forms.  They were further expected to rectify the problem with the device so that as few paper forms as possible were utilized. (List Tr. 134-135)

---

[4] Photocopies of excerpts of the deposition of Mailet Minassian are attached to the Declaration of Joan Ackerstein as Exhibit D.

19.  Like all sales representatives, Plaintiff was required to comply with Aventis' Samples Policy. (List Tr. 94-95) The Sample Policy required that the number of samples in the sales representative's possession together with the number of samples that the sales representative distributed to physicians reconciled to the total number of samples provided to the sales representative. If the number did not reconcile, then the discrepancy was attributed a dollar value, based on the number of samples and the price of the product. This discrepancy was called a sample variance. (Edmunds Tr. 42; Edmunds Dec., ¶ 4, Exhibit C)

20.  Sales representatives were expected to keep their sample variances to a minimum and, according to Aventis' Sample Policy, sales representatives and Area Managers were held accountable for following all sample policy requirements. The sample policy further stated that compliance with it was considered in evaluating performance and that disciplinary action up to and including termination could result for sample policy violations. (Edmunds Tr. 42; Edmunds Dec., ¶ 4, Exhibit C)

21.  When sales representatives spent money on work-related expenses, they were to comply with Aventis' Promotional Guidelines, which set forth spending guidelines for their promotional sales efforts. They submitted expense reports to obtain reimbursement for the expense. The purpose of the expense report was to explain the expense, the sales effort involved, the parties in attendance or involved in the expense and the amount spent. The promotional guidelines explicitly stated that ignorance of policy was not an acceptable excuse for not following policy. (Minassian Tr. 87-88; Edmunds Dec., ¶ 5, Exhibit D) It further provided that "Aventis will not tolerate promotional guideline violations. When promotional guideline violations occur, the [sales representative] can expect disciplinary action up to and including termination." (Minassian Tr. 36-7; 140; 142-3).

22.  Plaintiff was provided with an Aventis company car. Like all sales representatives, he was expected to follow the Company Vehicle Policy. The Company Vehicle Policy states that "Drivers . . . must always operate the vehicle in a safe manner adhering to state and local laws." Violations of this policy could also result in disciplinary action up to and including termination. The

policy also required that sales representatives report the number of miles they drove the car for personal purposes each week and money was deducted from their paycheck, based on the number of personal miles they recorded. (Pl. Tr. 118, 126; Edmunds Dec., ¶ 6, Exhibit E)

23.    Sales representatives were expected to report call activity and expense reports accurately. (Pl. Tr. 60, 306-307) Indeed, Aventis' Business Conduct Policy expressly states as follows:

> ...all associates are expected to record and maintain the company's records, data and information so that they accurately reflect the company's business activities. These records, data and information are relied upon to produce reports to management...government entities, regulatory agencies and others....The following are examples of unethical (and in some cases illegal) actions with respect to company records that are strictly prohibited by company Policy:...[i]ntentionally recording false or misleading account entries (such as hours worked, or expenses to be reimbursed, or samples disbursed...[f]alsifying data....Any action that is in violation of this Policy...may result in appropriate disciplinary action up to and including termination.

(Edmunds Dec., ¶ 7, Exhibit F)

24.    Aventis had a coaching and counseling policy, which set forth corrective actions in the event an employee was not meeting performance expectations. (Minassian Tr. 21-22; Ackerstein Dec. ¶ 8, Exhibit G)

### Plaintiff's Sustained Performance Problems

25.    From the inception of his employment, Plaintiff's managers noted certain deficiencies in Plaintiff's performance. Plaintiff's 1997 and 1998 evaluations stated that he needed to improve his sales presentations and product knowledge. Moreover, his 1998 performance evaluation noted some problems with sample reconciliation and an unexplained sample variance of $1,500. (Edmunds Dec., ¶ 8, Exhibit G)

26.    Plaintiff's August 1999 evaluation reflects that he continued to have difficulties with product knowledge. This evaluation also noted another significant sample variance, this time for $7,000. (Pl. Tr. 140; Ackerstein Dec., ¶ 9, Exhibit H)

27.     Prior to Ms. Edmunds becoming Plaintiff's supervisor, Ms. List had heard about performance issues regarding Plaintiff from Sean Flanders, Plaintiff's first supervisor at Aventis. (List Tr. 62-65)  Ms. List also heard about issues with Plaintiff from Mark Miles, her predecessor as the Regional Manager. (List Tr. 62-65)

28.     Ms. Edmunds began to supervise Plaintiff in 1999.  Because she had some concerns about Plaintiff's performance, she asked her then supervisor, Regional Manager Mark Miles, to spend a day in the field with her and Plaintiff. (Edmunds Tr. 323)

29.     Plaintiff's evaluation dated May 4, 2000, reflected continuing issues. (Pl. Tr. 143, 146-147)  It counseled Plaintiff to focus on physicians who generated a relatively high volume of business.  It also noted that Plaintiff continued to demonstrate difficulty with samples management, noting that he had the most sample variances within his district in that year.  It further noted that he used the highest percentage of paper forms in the district. (Pl. Tr. 146-47; Ackerstein Dec., ¶ 10; Exhibit I)

30.     The May 4, 2000 evaluation also indicated that while on a routine field visit with Plaintiff, Ms. Edmunds observed Plaintiff speeding in a school zone and spoke with him regarding this violation of policy. (Id.)  During his deposition, Plaintiff admitted that the negative comments made by Ms. Edmunds in this evaluation were, in fact, true. (Pl. Tr. 144)

### Events Which Prompted Review of Plaintiffs Reports

31.     An event occurred in July, 2000, which caused Ms. Edmunds to have concerns about Plaintiff's truthfulness. (Edmunds Tr. 321)  Plaintiff had used his Aventis automobile to make a visit to his mother in upstate New York, but had failed to report the miles as personal miles on his mileage reimbursement form as he was required by Aventis policy to do. (Edmunds Tr. 321-322)  In fact, Plaintiff acknowledged at his deposition that he failed to report over 330 personal miles for this trip. (Pl. Tr. 127-128)

32.     At about the same time, Ms. Edmunds began to have concerns about whether Plaintiff was in his territory between 8:00 a.m. and 5:00 p.m. as he was required to be. Plaintiff lived in Milton

but his territory was Cape Cod and the South Shore between Cape Cod and Plymouth. Plaintiff told Ms. Edmunds he dropped a child at school at 8:00 a.m. thus, making it impossible for him to be in his territory at 8:00 a.m. (Edmund Tr. 224-225)

33. As a result of concerns fostered by the July 2000 failure to report miles and Plaintiff's comments about dropping off a child at school, Ms. Edmunds reviewed some of the records Plaintiff submitted to Aventis' corporate office as part of his routine reporting obligations. (Edmunds Tr. 224-225, 320-321) Ms. Edmunds had done this with other employees from time to time. (Edmunds Tr. 53-54) Ms. Edmunds worked with her supervisor, Ms. List, and her human resources representative, Mailet Minassian, in obtaining these records. (Minassian Tr. 69-70; Edmunds Tr. 222)

34. The records obtained by Ms. Edmunds showed a disturbing trend. First, an inordinate percentage of Plaintiff's calls to physicians were recorded as occurring between 10:00 a.m. and 2:00 p.m., which suggested Plaintiff was not in his territory throughout the entire day. (Edmunds Tr. 327-328; Pl. Tr. 100; Edmunds Dec., ¶ 9, Exhibit H) Second, fuel reports showed that Plaintiff had purchased gas at 3:00 p.m. in Milton, at a time when he should have been in his territory. (Edmunds Tr. 224-225; Edmunds Dec., ¶ 9, Exhibit H) Additionally, the reports showed Plaintiff had a very high use of paper forms for recording physicians' signatures when they received samples. Plaintiff used paper forms 20 to 30 percent of the time, as compared to other sales representatives who used them 2 to 5 percent of the time. (Edmunds Tr. 268-269) They were supposed to record the physicians' signatures on the electronic device, so there would be no dispute as to the date and time the signatures were recorded. (Id.)

35. As she did with other sales representatives who reported to her, Ms. Edmunds accompanied Plaintiff on some of his sales calls. These accompanied visits were called "work-withs" and they provided Ms. Edmunds the opportunity to observe Plaintiff's interactions with physicians and performance of his daily duties. (Pl. Tr. 105-106; Edmunds Tr. 45-46) Ms. Edmunds noted issues with Plaintiff which she addressed with him. For example, Ms. Edmunds spoke with Plaintiff about the

9

fact that the samples stacked in the back seat of his car were blocking his rear window. (Pl. Tr. 183) She also noted that Plaintiff had compromised safety by allowing his gas tank to overflow. (Pl. Tr. 183)

### Plaintiff's September 18, 2000 Performance Review

36. By September 2000, Plaintiff exhibited a number of performance problems that he had been counseled about in the past. These included high sample variances, concerns that he was not in his territory to the extent he should be, that he was not properly recording calls and that he had insufficient selling skills and product knowledge. (Edmunds Tr. 62, 73-74, 100-101; Pl. Tr. 148, 150; Ackerstein Dec., ¶ 11, Exhibit J) Ms. Edmunds had also heard some complaints from Plaintiff's pod-mates, for example, that Plaintiff ran out of samples and would need to ask his pod-mates for samples. (Edmunds Tr. 166-170)

37. On or about September 18, 2000, Ms. Edmunds met with Plaintiff to go over his mid-year performance evaluation. (Pl. Tr. 148) Among other issues, Plaintiff's mid-year review dated September 18, 2000, raised issues with Plaintiff's product knowledge. It noted that during a physician visit that Ms. Edmunds observed, Plaintiff confused product names and misstated appropriate usage of a certain product. During his deposition, Plaintiff claimed that he did not remember confusing product names, but that he did remember making a misstatement to a physician regarding the use of Amaryl. (Pl. Tr. 149-150)

38. The review also reflected Aventis' concerns that despite being given specific direction to focus on physicians that did a high volume of business with Aventis, Plaintiff continued to call on "low volume physicians." The review also noted the goal that sales representatives make calls on high volume physicians. During his deposition, Plaintiff admitted that he ignored Ms. Edmunds' directives about calling on high volume physicians simply because he did not agree with her approach. (Pl. Tr. 150-152) She noted that she found him "difficult to coach." (Id. at 148; Ackerstein Dec., ¶ 11, Exhibit J)

39. This review also noted that Plaintiff did not consistently record pre and post call notes immediately following a customer call, as was required of all sales associates. During his deposition, Plaintiff admitted that he, in fact, did not do so. (Pl. Tr. 100, 157) The review further indicated that Plaintiff was not sending updates on team meetings to Ms. Edmunds, as she had requested on several occasions. Again, during his deposition, Plaintiff acknowledged that the meeting notes were not getting to Ms. Edmunds. (Pl. Tr. 154, 182)

40. Finally, the review noted that Plaintiff had made some inappropriate remarks during a field visit. (Pl. Tr. 304) During his deposition, Plaintiff admitted that he had, in fact, made the remarks regarding which Ms. Edmunds took issue. He was just of the opinion that they were not inappropriate remarks to be made. (Id.).

41. At the conclusion of their meeting, Ms. Edmunds presented Plaintiff with a Performance Action Plan that set forth specific actions to be completed, such as increasing Amaryl and Allegra product knowledge; perfecting selling skills; increasing physician calls and calling on high volume physicians; working a full day, 8:00 a.m. to 5:00 p.m.; recording calls immediately following calls; obeying traffic and speed laws; observing sample guidelines; and keeping samples in the trunk of his car. (Pl. Tr. 148; Ackerstein Dec., ¶ 12, Exhibit K) Plaintiff refused to accept this plan (Pl. Tr. 148).

### The Meeting With Ms. List September 25, 2000

42. After his meeting of September 18, 2000 with Ms. Edmunds, Plaintiff requested a meeting with Ms. List. (Pl. Tr. 106-107) Ms. List agreed to meet with him, and the meeting occurred on September 25, 2000, one week later. Ms. Edmunds joined Ms. List and Plaintiff towards the end of the meeting. (Pl. Tr. 114; List Tr. 152)

43. During the meeting, Plaintiff told Ms. List he disagreed with Ms. Edmunds' assessment of his performance. (List Tr. 156-157) They agreed that Ms. List would spend a day in the field with Plaintiff and that if Ms. List saw the same things, Plaintiff would take her word for it. (Pl. Tr. 115)

44.    Ms. List and Plaintiff also discussed a golf outing Plaintiff had reported improperly as a hospital display on his expense report. Ms. List advised him that it was improper to report a golf outing as something else. (Pl. Tr.134-135, 196; List Tr. 179, 223-225) Ms. List made clear that this was not an acceptable practice. (Pl. Tr. 134-135, 196; List Tr. 179).

45.    During the meeting with Ms. List, Plaintiff said that he "believed that Deb Edmunds was trying to get rid of [him] and that if she was going to hire someone, she wouldn't have hired [him], something like that." (Pl. Tr. 111) Ms. List asked him for specifics of why he felt that way but he did not give her any specifics. (Pl. Tr. 111)

### Ms. List's Day In The Field With Plaintiff

46.    On October 27, 2000, Ms. List spent a day in the field with Plaintiff as he had requested she do at their meeting on September 25, 2000. Plaintiff selected the physicians they would call on during that day. (Pl. Tr. 115) Ms. List identified some performance issues which she detailed in her memorandum describing the events of that day: Plaintiff was abrupt with some office personnel; was lacking in product knowledge; made one physician's assistant uncomfortable with his presentation; and was not demonstrating strong selling skills. (List Tr. 165-167; Ackerstein Dec., ¶ 13, Exhibit L)

### The November 14, 2000 Warning

47.    With Ms. List now seeing some of the same shortcomings Ms. Edmunds identified in the Performance Improvement Plan ("PIP") Plaintiff objected to on September 18, 2000, Ms. Edmunds restated those shortcomings in a warning document. Plaintiff had been offended by the PIP, which required that he perform certain tasks within a specified period, and refused to sign it. (Pl. Tr. 107) The written warning dated November 14, 2000, set forth the issues that Plaintiff had been counseled about and the expectations going forward, but did not include a set time period for accomplishment. The issues identified included:

- Lack of communication to your manager concerning activities in your territory;
- Lack of monthly team meetings and notes from your monthly Quad [pod] meetings;
- Lack of entering call notes for every detail immediately following the call;

- Lack of and inaccurate recording of personal miles;
- Violation of the anti-kickback policy in regards to your journal club;
- Safety violations with the gas tank overflow incident as well as samples stored in the back seat blocking most of your rear view window;
- Not working in your territory from 8:00 a.m. to 5:00 p.m. Monday through Friday (not including commute time);
- Daily transmission of call activity to home office;
- Weekly e-mail to your manager with the previous week's call activity;
- Satisfactory knowledge of Aventis' promoted products and their competitors, as well as appropriate verbiage during sales presentations.

The warning made clear that a "failure to dramatically improve your administrative responsibilities or to otherwise maintain a satisfactory level of performance may lead to further discipline, up to and including termination." (Pl. Tr. 181; Ackerstein Dec., ¶ 14, Exhibit M)

### The September 2001 Warning

48.    By September 2001, almost a year after the written warning of November 14, 2000, Plaintiff's performance still had not improved. Plaintiff's performance evaluation dated September 5, 2001 indicated that while Plaintiff improved in some areas, he continued to have problems performing in accordance with Aventis' guidelines and standards in other areas. (Pl. Tr. 186; Ackerstein Dec., ¶ 15, Exhibit N) The appraisal indicated that Plaintiff had not provided monthly meeting recap notes from his team meetings for several, specific months; that he was recording personal miles below 10 miles for most weeks, even though he did not live within a few miles of his territory; that his call summaries were not transmitted for specific days, though they were a daily requirement; and that he did not inform his manager of another, significant sample variance in May 2001. The evaluation also noted an expenditure that was outside Company guidelines. (Id.).

49.    On September 5, 2001, Plaintiff was issued a final written warning. (Pl. Tr. 191, Ackerstein Dec., ¶ 16, Exhibit O) The final written warning stated that while Plaintiff had met some of the expectations set forth in his November 2000 written warning, several of the expectations remained unmet. Areas mentioned as still below performance were:

- Lack of monthly team meetings and notes from monthly Quad meetings;

- Daily transmission of call activity and absent weekly call summary reports;
- Inaccurate recording of personal miles;
- Lack of recording call notes following detail calls;
- Policy violations;
- Lack of communication with your manager.

(Id.).

50. The final written warning went on to cite a large sample variance that Plaintiff did not report to Ms. Edmunds and listed several business expenses claimed by Plaintiff that were outside Aventis' expense policy. (Id.) The final written warning specifically stated that a "[f]ailure to dramatically improve and sustain your administrative responsibilities or to otherwise maintain a satisfactory level of overall performance may lead to further disciplinary action, up to and including termination of employment." (Id.)

51. On December 4, 2001, Ms. Edmunds met with Plaintiff again. (Minassian Tr. 102-103, Edmunds Dec., ¶ 9, Exhibit H; Pl. Tr. 197) That meeting, which lasted two hours, was to address again concerns about Plaintiff's willingness or ability to comply with Aventis procedures and to fulfill his responsibilities as a Sales Representative. They discussed a recent program where Plaintiff exceeded expense guidelines and failed to notify Ms. Edmunds in advance. They also discussed call notes which were not done appropriately and weeks where call notes had not been submitted. Ms. Edmunds also reviewed with Plaintiff sample signature reports that reflected Plaintiff's calls on physicians were still occurring between the hours of 10:00 a.m. and 2:00 p.m. Ms. Edmunds reiterated the meeting in an e-mail to Plaintiff, sending copies to Ms. List and Ms. Minassian. (Edmunds Dec., ¶ 9, Exhibit H)

### Events Leading To Plaintiff's Discharge From Employment

52. Plaintiff's employment was terminated after a further meeting regarding Plaintiff's rule infractions. On January 18, 2002, Ms. List and Ms Edmunds met with Plaintiff to discuss some additional infractions. They confronted him about his continuing to record sales calls inappropriately

for the purpose of appearing to meet call requirements. They also spoke with him about an additional golf outing which violated Aventis' procedures. Plaintiff recorded the outing as a lunch, which it was not, and he exceeded the guidelines regarding expenditures on social events. (Edmunds Tr. 288; Ackerstein Dec., ¶¶ 17-18, Exhibits P and Q)

53. When Ms. List and Ms. Edmunds asked Plaintiff about his expenses reported as a "hospital round table lunch item," Plaintiff admitted that the event he listed as a hospital display round table lunch was actually a golf outing. Further, Plaintiff not only mischaracterized the event on the expense report but also misrepresented the number and identity of the attendees. Additionally, the expense report listed $1,100.00 of expenses but he had receipts for only $1,036.00, something which was a violation of policy. (Ackerstein Dec., ¶ 17, Exhibit P; Pl. Tr. 281-285; List Tr. 179)

54. At the meeting on January 18, 2002, they asked Plaintiff what he would do if he were in their position. Plaintiff stated that he would fire the person. (Pl. Tr. 200; Ackerstein Dec., ¶¶ 17-18, Exhibits P and Q)

55. After considering the on-going performance issues, the belief that he was falsifying call reports and expense reports, and Plaintiff's inability to produce a satisfactory explanation, Ms. List, Ms. Minassian and Ms. Edmunds concluded that Plaintiff's employment should be terminated. (List Tr. 74, 78-80, 196-197; Minassian Tr. 77; Edmunds Tr. 72, 92, 108, 134)

### Plaintiff Was Not Treated Differently

56. Aventis has terminated employees who are Caucasian for falsification of records. It has also disciplined and/or terminated non-African American, under age 40 individuals for performance issues, not recording call activity immediately following calls, and various other policy violations. (Minassian Tr. 35-36, 73, 140, 142-143; List Tr. 82, 85, 88-91, 205)

57. While Plaintiff charges Ms. Edmunds with holding him to a higher standard due to his race and age, the fact is that Ms. Edmunds also disciplined a Caucasian sales representative under the age of 30 for various performance problems. In particular, this employee reported directly to Ms.

Edmunds and received a written warning after not performing satisfactorily. (Edmunds Dec., ¶ 10, Exhibit I; Edmunds Tr. 103, 105-107, 189, 258-259; Pl. Tr. 242).

58.    In evaluating this employee, among other things, Ms. Edmunds reviewed her call reports to determine whether she was within her territory between 8:00 a.m. and 5:00 p.m. as required. (Edmunds Tr. 64, 233; Edmunds Dec., ¶ 10, Exhibit I) The written warning reflects that Ms. Edmunds had counseled her about her lack of impact when delivering product messages; her lack of rapport with physicians; and her low call per day average. (Edmunds Dec., ¶ 10, Exhibit I). The written warning counseled this younger, Caucasian employee to meet expectations such as:

- Be in your territory from 8:00 a.m. to 5:00 p.m. Monday through Friday;
- Provide me with weekly status reports on your call activity, including doctors you detailed each day and their target level (G, S, B, E);
- Transmit weekly call notes no later than 5:00 p.m. on Fridays;

. . .

(Edmunds Dec., ¶ 10, Exhibit I).

59.    The written warning further noted that "it is imperative that you meet these expectations and avoid any other unacceptable performance or behaviors to avid further disciplinary action, up to and including termination of employment. (Edmunds Dec., ¶¶ 13-14, Exhibit I). The Caucasian employee resigned her employment shortly after receiving the written warning. (Edmunds Dec., ¶10)

60.    In addition to giving written warnings to employees who are under the age of 40, Ms. Edmunds supervises a number of long term employees, over the age of 40, who are performing well and have not received warnings. A male sales representative, E.S., has been employed since 1976 and was 51 when Plaintiff was terminated. E.S. is still employed and has not had warnings. Additionally, a male sales representative, R.M., who has been employed since 1970 has reported to Ms. Edmunds since 2003. He is 67, is performing well and has not had warnings. (Edmunds Dec., ¶ 11)

### Timing And Basis of Plaintiff's Claim of Discrimination

61.    Plaintiff has claimed in this action that Ms. Edmunds discriminated against him on the basis of age and race. However, he is not sure why she would do that. Plaintiff testified that Ms.

Edmunds treatment of him changed after she returned from maternity leave but that he "had no idea why things went 360 degrees." (Pl. Tr. 260-261)

62.     As to the timing of Plaintiff's belief that Ms. Edmunds was treating Plaintiff differently due to his age and race, Plaintiff testified that he began to believe that when she gave him his 1999 evaluation. (Pl. Tr. 141-143)  By September 18, 2000, when Ms. Edmunds gave him the PIP, he concluded she was treating him differently due to his age and race. (Pl. Tr. 141-143)

63.     Plaintiff began to think when he received the November 14, 2000 warning that it was because he complained about Ms. Edmunds on September 25, 2000. (Pl. Tr. 230-232)  He certainly concluded by the warning on September 5, 2001 that he was receiving the warning because he complained about Ms. Edmunds. (Pl. Tr. 230-232)

### Charge of Discrimination

64.     Plaintiff filed a charge of age and race discrimination with the Massachusetts Commission Against Discrimination on August 2, 2002. (Pl. Tr. 249-250; Ackerstein Dec., ¶ 19, Exhibit R)  This is the only charge Plaintiff filed in connection with his employment at Aventis.

### CERTIFICATION OF CONFERENCE

Defendants hereby certify that counsel for Defendants conferred with Plaintiff's counsel on March 17 and 18, 2005 regarding this motion but that the parties were not able to narrow the issues.

Respectfully submitted,

AVENTIS PHARMACEUTICALS, INC. and
DEBORAH EDMUNDS,

/s/ Joan Ackerstein
---
Joan Ackerstein (BBO# 549872)
Samia M. Kirmani (BBO# 634699)
JACKSON LEWIS LLP
75 Park Plaza
Boston, Massachusetts 02116
(617) 367-0025; FAX: (617) 367-2155