# EXHIBIT A

1

Volume I
Pages 1 to 315
Exhibits 1 to 28

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
WILLIAM M. BYRD,                :
          Plaintiff,            :
                                :
                                :
     vs.                        :  Civil Action
                                :  No. 04-11032-DP
                                :
AVENTIS PHARMACEUTICALS,        :
INC., and DEBRA EDMUNDS,        :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF WILLIAM M. BYRD, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Ken A. DiFraia, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jackson Lewis LLP,
75 Park Plaza, Boston, Massachusetts, on Monday,
October 18, 2004, commencing at 10:05 a.m.

PRESENT:

    Flavin & Koslowsky
         (by John C. Koslowsky, Esq.)
         424 Adams Street, Milton, MA 02186,
         for the Plaintiff.

    Jackson Lewis LLP
         (by Joan Ackerstein, Esq.,
         and Samia Kirmani, Esq.)
         75 Park Plaza, Boston, MA 02116,
         for the Defendants.

              *   *   *   *   *

1      A.    Not that I'm aware of.

2      Q.    Are you taking any medication today which

3  would interfere with your ability to testify

4  truthfully?

5      A.    No.

6      Q.    Have you ever testified in a courtroom?

7      A.    No.

8      Q.    What is your date of birth?

9      A.    10/29/48.

10     Q.    Do you have children?

11     A.    Yes.

12     Q.    How many children do you have?

13     A.    Two.

14     Q.    Who is the oldest child?

15     A.    You want her name?

16     Q.    Yes.

17     A.    Mercedes.

18     Q.    Last name is Byrd?

19     A.    Yes.

20     Q.    What is her date of birth?

21     A.    4/19.  She's 21.  I can't do the math.

22     Q.    1983.

23     A.    Yes, around there.

24     Q.    Is she working or in school?

1        Q.    Mr. Byrd, did you not understand me when I

2    asked if you had any other employment?

3        A.    I didn't interpret it that way.

4        Q.    When you worked as a sales rep at Foster

5    Grant and Dictaphone and Universal Hospital Services

6    and Ross Labs, you generally worked without

7    supervision on a day-to-day basis; isn't that true?

8        A.    That's correct.

9        Q.    That's the way it was at Aventis?

10       A.    Yes.

11       Q.    You planned your days as a sales rep and

12   called on physicians, and generally throughout the

13   day, you worked on your own; is that fair to say?

14       A.    That's correct.

15       Q.    Wouldn't you agree with me that the

16   employer of somebody working on their own has to

17   have confidence in the integrity of the person who's

18   working on their own?

19       A.    Yes.

20       Q.    More so than the employee who comes to an

21   office every day and sits as a receptionist because

22   the manager walking by can see what the receptionist

23   is doing, wouldn't you agree with that?

24       A.    Yes.

1      Q.    Would you agree with me that when you

2    worked as a sale rep at Aventis, you were on

3    something of an honor system?

4      A.    Yes.

5      Q.    You had to do reports of your activity

6    during the day?

7      A.    Yes.

8      Q.    Your manager had you on an honor system,

9    understanding that you would do your best to tell

10    the truth?

11      A.    Yes.

12      Q.    Did you interpret policy at Aventis the way

13    you just interpreted my question?

14      A.    No.

15      Q.    You didn't want to tell me about that

16    part-time job, did you?

17      A.    Part-time job doesn't pay me.  There are no

18    1099's.

19      Q.    The question is you did not want to tell me

20    about that part-time job, did you?

21      A.    That's not true.  You asked what I did for

22    a living.  What I do for a living is I drive a

23    limousine.  That's what pays me.

24      Q.    I said to you do you currently have any

93

1    Q.    The summer of 2004?

2    A.    Yes.

3    Q.    Is that the only job fair that you went to?

4    A.    No.

5    Q.    What other job fairs have you gone to?

6    A.    I went to a minority job fair at the Hynes

7    Auditorium.

8    Q.    What year was that?

9    A.    I think 2003.

10   Q.    Any other job fairs?

11   A.    The ones in Waltham.

12   Q.    Did you get any leads from the Reggie Lewis

13   job fair?

14   A.    No.

15   Q.    How about the minority one at the Hynes

16   Auditorium?

17   A.    No.  Companies that were supposed to show

18   did not show.

19   Q.    When did you start working at Aventis?

20   A.    May of '97.

21   Q.    What position did you get?

22   A.    Senior sales position.  I think it was

23   senior.

24   Q.    Who was your manager?

1      A.    Sean Flanders.

2      Q.    Who was an area manager?

3      A.    He was a district manager, which now they

4  call it an area manager.

5      Q.    Was there a period of time between

6  Mr. Flanders and Deb Edmunds when you didn't have a

7  direct manager?

8      A.    There was an interim manager.

9      Q.    There was a what?

10     A.    Interim manager.

11     Q.    Who was that?

12     A.    Dave Pearlstein.

13     Q.    Is that because Mr. Flanders was reassigned

14  and Ms. Edmunds hadn't yet come?

15     A.    Yes.

16     Q.    What was that period of time between

17  Mr. Flanders and Ms. Edmunds?

18     A.    What do you mean?

19     Q.    You said David Pearlstein was the interim

20  manager.  How long was that for?

21     A.    Until Deb Edmunds filled in the job.

22     Q.    I'm trying to figure out how long a period

23  of time that was.

24     A.    It could have been a couple of months.  I

95

1    don't know.

2        Q.    When Deb Edmunds came, were you on a team

3    of some sort?

4        A.    They called it a "pod."

5        Q.    Who were your pod mates at the time?

6        A.    At the time -- excuse me one second -- Dave

7    Thorell, Brenda Hurvinicki... Let me ask you this.

8    Are you talking about at this particular time?

9    Because there were other pod members that came on

10   and left.

11       Q.    Let's say in '99, when Deb came, who were

12   the pod members?

13       A.    Brenda Hurvinicki, Dave Thorell, Mike

14   Thibeault.  I can't remember if Julie was there or

15   not.

16       Q.    Julie Nelson?

17       A.    Yes.  It could have been Marcia Boland.  I

18   don't know the dates that they came.

19       Q.    What products were you involved with

20   selling at that time?

21       A.    At that time Allegra, Amaryl, and later on

22   Lantus.

23       Q.    What are these for?

24       A.    Upper respiratory, Allegra; diabetes for

1    Amaryl and Lantus.

2        Q.    When Deb Edmunds came and she became

3    your -- was it area manager when she arrived in '99?

4        A.    It was district manager.  They changed it

5    later.  It was the same, though.

6        Q.    Your pod members did not report to

7    Ms. Edmunds, did they?

8        A.    No.

9        Q.    They reported to different area managers?

10       A.    Yes.

11       Q.    Did you have a territory?

12       A.    Yes.

13       Q.    What territory was it?

14       A.    South Shore.

15       Q.    That's what it was called?

16       A.    Yes.  It was actually called "South

17   Boston."

18       Q.    What did it consist of?

19       A.    Starting from Norwell, Whitman, Abington,

20   down to the Cape, over to Dartmouth.

21       Q.    Did it also include New Bedford?

22       A.    Yes, same area.

23       Q.    Did it include Fall River?

24       A.    No.

97

1    Q.    Your pod mates were calling on the same

2    physicians that you were generally?

3    A.    No.

4    Q.    Who were they calling on?

5    A.    I can't tell you each physician they were

6    calling on.  With diabetes, I called on

7    endocrinologists.  They wouldn't call on

8    endocrinologists.  I called on some cardiovascular

9    people, which I don't believe they did either.

10    Q.    What was the concept of the pod, Mr. Byrd?

11    A.    More voice, more volume, more business.

12    The more people you have talking about a product,

13    the more business you should get.

14    Q.    Did you have monthly meetings with your pod

15    mates?

16    A.    Yes.

17    Q.    The purpose of the meetings was to talk

18    about what?

19    A.    To talk about strategy.

20    Q.    Strategy for selling?

21    A.    Yes, territories, situations.

22    Q.    You worked for Aventis from May of 1997

23    until your termination in 2002?

24    A.    Yes.

98

1      Q.    Are you aware of any other employees at

2  Aventis who were terminated while you were there?

3      A.    Terminated, no; quit, yes.  I take that

4  back.  There was a gentleman, but I can't think of

5  the name.  I believe he was from Connecticut.  I

6  don't know.

7      Q.    Do you have a recollection that he was

8  terminated?

9      A.    No.  I just knew that he was.

10     Q.    That's what I'm asking you.  You understood

11  that somebody got terminated?

12     A.    Yes.

13     Q.    Do you know why he got terminated?

14     A.    No.

15     Q.    Do you know his name?

16     A.    No.

17     Q.    Do you know his race?

18     A.    White.

19     Q.    He was a sales rep?

20     A.    Yes.

21     Q.    You heard that he was terminated, but you

22  don't know why?

23     A.    Right.

24     Q.    When you went out into your territory on a

99

1   daily basis, it was your responsibility to call on

2   various medical practices to talk to the doctors and

3   their staff about the drugs that you were selling?

4        A.   Yes.

5        Q.   You had a device to record those calls?

6        A.   Uh-huh.

7        Q.   Does that device have a name?

8        A.   I believe it was Velo.

9        Q.   Sorry?

10       A.   Velo.  There were two different types.

11       Q.   How are you spelling that?

12       A.   I believe it was spelled V-e-l-o.  I'm not

13   sure.

14       Q.   The device enabled you to put in

15   information about the call you had just made?

16       A.   Yes.

17       Q.   And you know as an electronic device, it

18   recorded the time that you entered the call?

19       A.   I would assume so.

20       Q.   Well, you knew that, didn't you?

21       A.   No.  I knew there was a signature stamp,

22   but I didn't know it recorded the time of my putting

23   in the information.

24       Q.   You knew you were supposed to record the

1    information immediately after the call, didn't you?

2         A.    That's not necessarily true, no.    If you

3    look at the policy, it says something similar to --

4    how can I put this -- at the earliest means

5    possible.

6         Q.    So you acknowledge that you did not

7    immediately record your calls?

8         A.    Sure.

9         Q.    Is this the first you are hearing that the

10   time of the recording shows up?

11        A.    Yes.

12        Q.    Didn't Ms. Edmunds --

13        A.    I can't hear you.

14        Q.    Didn't Ms. Edmunds talk to you about the

15   fact there was concern that your calls were being

16   recorded between 10:00 a.m. and 2:00 p.m.?

17        A.    She mentioned that, yes.

18        Q.    Didn't you understand at that time that the

19   time of the calls were showing up --

20        A.    I didn't put that together.    I'm not that

21   type of devious person to start thinking about how

22   she knew what the times were.    I didn't even ask

23   her.

24        Q.    She said to you that you are recording your

1    I can't remember what you just said.  Continue.

2        Q.   The question is if your calls are only

3    showing up between ten and two and your job is to

4    call on physicians, wouldn't it be a reasonable

5    concern that your supervisor could have if you don't

6    appear to be calling on anybody between eight and

7    ten and two and five?

8        A.   Are you saying every day?

9        Q.   Can you answer the question.

10       A.   Or is it just that one day?

11       Q.   Can you answer the question I just asked.

12       A.   I'm trying to.  You are implying that was

13   every day ten to two.  That's not true.  That's why

14   I asked you.

15       Q.   So there were some days --

16       A.   I didn't say that either.  That's what she

17   said.

18       Q.   Please let me ask the questions.  Let me

19   cut to the chase here, Mr. Byrd.

20       A.   Go ahead.

21       Q.   Is it fair to say that you believe you were

22   doing a good job as a sales rep?

23       A.   Yes.

24       Q.   You believe that to be the case even though

1    job.  I told her that was insulting.  I asked her if

2    we were done.

3             Actually, she asked me to sign the reviews.

4    I refused.  I asked if we were done with the

5    meeting.  She said, "Yes."

6        Q.    And you got up and left?

7        A.    Yes.

8        Q.    Do you recall anything else she said to you

9    in that half hour?

10       A.    No.

11       Q.    Is it your testimony that in your years as

12   working as a sales rep, that was the first negative

13   performance review that you got?

14       A.    Totally negative, yes.

15       Q.    Oh, there were other negative reviews?

16       A.    From where?

17       Q.    I'm asking you.

18       A.    Not that I know of.

19       Q.    So the question is was that the first

20   negative review that you got?

21       A.    Yes.

22       Q.    Prior to September of 2000, Mr. Byrd, you

23   and Ms. Edmunds had been on some work-withs

24   together?

1      A.   I believe so.

2      Q.   She had the opportunity to spend the day in

3  the field with you?

4      A.   Yes.

5      Q.   Had you also spent a day in the field with

6  Mr. Miles and Ms. Edmunds?

7      A.   Mark Miles, yes.

8      Q.   Did you have confidence in Mr. Miles, by

9  the way?

10     A.   Did I have confidence?

11     Q.   Yes.

12     A.   I don't understand what you mean.

13     Q.   Did you think he was fair?

14     A.   I didn't know him.  He was a regional

15 manager.  I couldn't tell if he was fair or not.

16     Q.   To this day, you don't know if he's fair or

17 not?

18     A.   True.

19     Q.   When did you conclude that Ms. Edmunds was

20 not being fair to you?

21     A.   With the negative review.

22     Q.   When you met with her on September 18,

23 2000, as a result of that negative review, you

24 decided that she was not being fair to you?

107

1      A.    Yes.

2      Q.    The performance improvement plan that she

3  was going to put you on had certain tasks that you

4  needed to perform?

5      A.    Right.

6      Q.    There was a period of time that you were to

7  perform them?

8      A.    Yes.

9      Q.    You were very offended by that?

10     A.    Yes.

11     Q.    You said to her, "I don't want to be on a

12 performance improvement plan," didn't you?

13     A.    I don't recall saying that.

14     Q.    But that was your feeling?  You didn't want

15 to be on a performance improvement plan?

16     A.    That's true.  I said I was not going to

17 sign that.

18     Q.    As a result of the meeting with

19 Ms. Edmunds, you requested to meet with Ms. List?

20     A.    As a result of the meeting, I called and

21 left a message I believe that Monday for Chris List.

22     Q.    Did you know Ms. List?

23     A.    Yes.

24     Q.    You thought Ms. List was fair, didn't you?

1      A.    No, I didn't.

2      Q.    Did you bring any notes to the meeting with

3   you?

4      A.    No, I didn't.

5      Q.    Do you recall anything that you said to

6   Ms. List?

7      A.    I recall stating that I believed that Deb

8   Edmunds was trying to get rid of me, and that if she

9   was going to hire someone, she wouldn't have hired

10  me, something like that.

11     Q.    Do you recall anything else that you said?

12     A.    No.

13     Q.    Do you recall Ms. List asking you for

14  specifics about why you felt that way about Deb?

15     A.    Yes.

16     Q.    You didn't really give her anything

17  specific, did you?

18     A.    No, I didn't.

19     Q.    Is there anything you can tell me about the

20  meeting with Ms. List other than what you've already

21  told me?

22     A.    Let's see, we scheduled a ride-along with

23  her and I.  I don't recall anything else.

24     Q.    A ride-along would be a day where she would

114

1      A.    No.

2      Q.    You tell me.  What was it?

3      A.    Chris List and I, and Amy Turpin was in the

4  office.

5      Q.    Who was Amy Turpin?

6      A.    Chris' secretary or administrative

7  assistant.

8      Q.    How about when Deb Edmunds came in?

9      A.    Same.

10     Q.    Then it was the four of you?

11     A.    Yes.

12     Q.    What do you recall about the conversation

13  once Ms. Edmunds entered the room?

14     A.    Mostly the same as previously.

15     Q.    You don't recall anything specific that

16  Ms. Edmunds said or that you said?

17     A.    No.

18     Q.    It was your understanding when you left,

19  that Ms. List was going to ride with you for a day

20  in the field?

21     A.    Yes.

22     Q.    And that did happen?

23     A.    Yes.

24     Q.    Didn't you say to Ms. List that you were

1    interested in seeing whether she had some of the

2    same observations that Ms. Edmunds did?

3         A.    Oh, yes.

4         Q.    And that if Ms. List saw some of the things

5    that Ms. Edmunds saw, that you would be willing to

6    take Ms. List's word for it?

7         A.    I might have said that.  I don't recall

8    those exact words.

9         Q.    When she spent a day in the field with you,

10   Ms. List, you laid out how the day would be spent?

11        A.    Yes.

12        Q.    You selected the physicians that you were

13   going to call on?

14        A.    Yes.

15        Q.    Then she accompanied you on those calls?

16        A.    Are you asking did she accompany me?

17        Q.    Yes.

18        A.    Yes.

19        Q.    Then you and she had lunch at some point

20   together during the course of the day?

21        A.    Uh-huh.

22        Q.    As a sales rep, you were required to do

23   these call reports that we already talked about on

24   the electronic device; is that right?

1        A.    Yes.

2        Q.    You were required to identify whether you

3    were making a primary call or a secondary call?

4        A.    I believe so.

5        Q.    The primary was the principal drug you were

6    talking to a physician about?  That was a primary

7    call?

8        A.    You could look at it that way, but it

9    depended on the physician.  If the physician was,

10   let's say, an endocrinologist, then you would switch

11   to primary call.

12       Q.    It might depend on which doctor it was?

13       A.    Yes.

14       Q.    But some drug would be the primary drug you

15   spoke about, and some drug would be the secondary

16   drug?

17       A.    Yes.

18       Q.    You were supposed to make a note of what

19   happened when you talked to the doctor?

20       A.    Yes.

21       Q.    If you left a sample, you had to indicate

22   that you were leaving a sample, and you would get

23   the physician's signature?

24       A.    Right.

1     Q.   The physician obviously would sign the

2  document, the form at the time you dropped off the

3  sample?

4     A.   Sign the Velo, the computer.

5     Q.   You didn't object to Aventis requiring the

6  sales reps to prepare these reports, did you?

7     A.   Excuse me?

8     Q.   You didn't object to the Aventis

9  requirement that you fill out these call reports?

10     A.   No.

11     Q.   It was a reasonable thing for them to do,

12  wasn't it?

13     A.   Yes.

14     Q.   If you just went to an office and left a

15  sample, that was not actually a call, was it?

16     A.   Not according to the written policy, no.

17     Q.   If you went to the practice but the

18  physician was not there and so all you had was a

19  nurse that said, "I'm sorry, he's not here," that

20  did not count as a call, did it?

21     A.   No.

22     Q.   Even if you left some literature for the

23  doctor, that didn't count as a call then?

24     A.   That's true.

127

1    to whether you were reporting all the personal

2    miles?

3         A.    You could say that.

4         Q.    If somebody knows you've gone to visit your

5    mother in New York on a week when there are no

6    personal miles recorded or not substantial miles,

7    someone may have a concern as to whether you were

8    honestly reporting the miles?

9         A.    You could say that.

10        Q.    In fact, on that occasion, didn't you tell

11   Ms. Edmunds that you forgot about the trip?

12        A.    No.

13        Q.    What did you say?

14        A.    I said I forgot to put the miles in.  And

15   that was corrected.

16        Q.    How many miles is it to where your mother

17   was in New York?

18        A.    167.

19        Q.    One way?

20        A.    Yes.

21        Q.    That would be about 330 miles round trip?

22        A.    Yes.

23        Q.    You drove it in the Aventis car?

24        A.    Yes.

128

1    Q.    You forgot to record those miles?

2    A.    Yes.

3    Q.    Who did you turn the expense reports in to?

4    A.    They were sent electronically to Aventis.

5    Q.    The call reports the same way?

6    A.    Yes.

7    Q.    What other reports did you do other than

8    the expense reports and the call reports?

9    A.    I think it was a daily activity report.

10    Q.    What was in the daily activity report?

11    A.    I can't recall right now.

12    Q.    Is that where you made notes of what

13    happened when you spoke with a physician?

14    A.    No.  This is I think just the number of

15    calls you made -- I'm not sure.  I would have to see

16    the computer.

17    Q.    Were those also electronic?

18    A.    Yes.

19    Q.    Are there any other reports that you recall

20    doing?

21    A.    Sample reporting.

22    Q.    Because you were given samples of various

23    prescription medications so that you could provide

24    them to physicians?

132

1    Q.    Is there anybody else at Aventis that you

2   think discriminated against you based on your being

3   African-American other than Deb Edmunds?

4    A.    I could say that discriminating, but

5   implying -- discriminating no, but implying sexual

6   preferences.

7    Q.    Who had sexual preference?

8    A.    Who had sexual preferences?

9    Q.    Yes.

10   A.    No.  I said, "implied."

11   Q.    Who?

12   A.    You want names?

13   Q.    I guess I don't understand.

14   A.    I drink Zinfandel.  There were a couple of

15   instances where people implied only homosexuals

16   drink Zinfandel.

17   Q.    You think somebody at Aventis thought that

18   you were homosexual?

19   A.    I don't know if they thought that or not.

20   They implied.

21   Q.    Did Ms. Edmunds do that?

22   A.    No.

23   Q.    I'm interested.  Ms. Edmunds we know about.

24   Now you think there were some people that were

133

1    implying or perhaps thinking that you were

2    homosexual?

3        A.    Remarks were made.  Whether they meant it

4    or not, I don't know.

5        Q.    When were they made?

6        A.    I can't tell you the dates.

7        Q.    Can you tell me who made them?

8        A.    They still work for the company.  I don't

9    think it was malicious, so I would rather not say.

10       Q.    Is it possible they were joking?

11       A.    Yes.

12       Q.    Because you ordered a Zinfandel and

13   somebody would say, "Hey, Bill, how about having a

14   beer like the rest of us guys"?

15       A.    No.  That's not what was said.

16       Q.    What was said?

17       A.    It was implied that only homosexuals drink

18   white Zinfandel.

19       Q.    Did you complain to anybody at Aventis

20   about this?

21       A.    No.  I talked to the individual myself.

22       Q.    What did the individual say?

23       A.    They didn't like my reply.

24       Q.    Other than Ms. Edmunds --

134

1    A.    No.

2    Q.    I have to finish.

3    A.    Sorry.

4    Q.    Other than Ms. Edmunds and the person who

5  made the comment about the white Zinfandel, you are

6  not charging any other person at Aventis with

7  discriminating against you?

8    A.    No.

9    Q.    Ms. Riley and Mr. Simone both reported to

10  Ms. Edmunds?

11    A.    Right.

12    Q.    You are saying she treated Mr. Simone

13  better than you?

14    A.    I didn't say, "better."  I said,

15  "differently."

16    Q.    By the mannerisms?

17    A.    Yes, you could say that.

18    Q.    Ms. Riley was treated differently than you?

19    A.    Yes.

20    Q.    When you met with Ms. List in September of

21  2000, she talked to you about an expense report

22  where you had listed a golf outing as a hospital

23  display, do you recall that?

24    A.    Yes.

1    Q.    You told her that Mr. Flanders, your prior

2    supervisor, had told you to do it that way?

3    A.    That was the way it was done.

4    Q.    Ms. List told you not to do that, didn't

5    she?

6    A.    Yes.  She said there was another way of

7    doing it.

8    Q.    She said not to do what you had done, list

9    a golf outing as something else?

10    A.    I did that once.

11    Q.    It would have been improper to do it again?

12    A.    Not unless I made an error.  Yes.

13    Q.    But if after being told not to list a golf

14    outing as a hospital display you did it again,

15    surely you could understand that your supervisor

16    would feel that you were not complying with the

17    rules?

18    A.    No, not if I could explain it.

19    Q.    Go ahead.

20    A.    I answered the question.  You want me to

21    explain it?

22    Q.    Oh, if you said, I forgot.

23    A.    If it was human error, if it happened

24    again.

140

1          AFTERNOON SESSION   1:53 p.m.

2              WILLIAM M. BYRD, Resumed

3      BY MS. ACKERSTEIN:

4      Q.   Mr. Byrd, I'm going to show you this

5  document after it's marked.

6              (Document marked as Byrd

7              Exhibit 4 for identification)

8      Q.   Exhibit 4 is a photocopy of what I believe

9  is an evaluation from 1999 done by Ms. Edmunds.

10  Have you seen this previously?

11     A.   (Witness reviews document)  Yes.

12     Q.   Is that what this is?  It looks like an

13  evaluation she did of you in about August of 1999?

14     A.   It could have been, yes.  It says it here,

15  yes.

16     Q.   The last page, does that have a photocopy

17  of your signature?

18     A.   Yes.

19     Q.   It looks like the evaluation period is

20  January of 1999 to July of 1999.  Is that how it

21  appears to you in the front?

22     A.   I guess you could say that was it, yes.

23     Q.   Since you signed this and Ms. Edmunds

24  signed this, I'm assuming that she gave this to you

141

1    in 1999 and you reviewed it at the time?

2       A.    Yes.

3       Q.    Is it fair to say that you considered this

4    evaluation to be a positive one?

5       A.    Not in all aspects, no.

6       Q.    You considered it to be more positive than

7    the one in September of 2000?

8       A.    Yes.

9       Q.    Did you think Ms. Edmunds was being unfair

10   in this evaluation?

11      A.    I believe I explained to her that some of

12   her observations were wrong, very subjective.  I

13   think I used those words.

14      Q.    You told her at the time that you disagreed

15   with this?

16      A.    Yes.

17      Q.    Did you think that this evaluation was a

18   reflection of Ms. Edmunds treating you differently

19   because you are African-American?

20      A.    I think this was part of the beginning of

21   it, yes.

22      Q.    Is it also a part of her treating you

23   differently because you are in your fifties?

24      A.    I believe so.

142

1     Q.   With respect to this evaluation that we

2  marked as Exhibit 4, you didn't complain to anybody

3  above Ms. Edmunds?

4     A.   No.

5     Q.   When you got this at the time in 1999, were

6  you thinking then that she was treating you

7  differently due to your race?

8     A.   The thought process started then, yes.

9     Q.   Likewise, that she was treating you

10  differently due to your age?

11     A.   I can't say if it was my age or not.

12     Q.   Do you now believe that she treated you

13  differently due to your age?

14     A.   Yes.

15     Q.   In 1999 when you got this evaluation, you

16  thought maybe it was your age, but you had not yet

17  decided it was your age?

18     A.   You could say that.

19     Q.   When did you conclude that Deb Edmunds was

20  treating you differently because of your age?

21     A.   At the midyear review.

22     Q.   The one in September 2000?

23     A.   Yes.

24     Q.   Is there something about that review that

1   you thought she was treating you differently because

2   of your age?

3       A.   It was just the total negativity of the

4   review.

5       Q.   So your reaction was "It must be, because

6   it's not truthful, it must be because of my age"?

7       A.   Or race, yes.

8               (Document marked as Byrd

9               Exhibit 5 for identification)

10      Q.   Exhibit 5 is a photocopy of a performance

11   review of rating period 1999.  This is signed by you

12   it appears in May of 2000.  Have you seen this

13   document previously?

14      A.   (Witness reviews document)  Yes, I have.

15      Q.   What is this?

16      A.   This?

17      Q.   Yes.

18      A.   I believe it's the period for 1999, for

19   that year.

20      Q.   This is a review that Deb Edmunds did with

21   you?

22      A.   Yes.

23      Q.   It says on the first page, "My signature

24   indicates that my supervisor has discussed this

1   evaluation with me and that I have had the

2   opportunity to ask any questions and make comments"?

3       A.   Yes.

4       Q.   Is that true, you did have the opportunity

5   to speak with her about the review?

6       A.   Yes.

7       Q.   Did you also feel that this review was an

8   example of her treating you differently due to your

9   race?

10      A.   Let's see here...  I would have to reread

11  it.

12      Q.   Take your time.

13      A.   (Witness reviews document)  Okay.

14      Q.   Is there something in this review that is

15  negative that is not truthful?

16      A.   Not that I can say.

17      Q.   Do you think Ms. Edmunds was treating you

18  differently in this review because of your race or

19  age?

20      A.   No, I wouldn't say that, not reading this,

21  no, but I think you have to understand the ongoing

22  process that I felt that I was under from Deb.

23      Q.   Is there anything that she was doing to you

24  at the time of this review on May 4, 2000 that led

1    experience in telesales.  Where was that?

2        A.    Where?

3        Q.    Page 69 at the bottom under Leadership.

4        A.    Okay, I see it.

5        Q.    "Bill comes to Aventis with previous

6    management experience in telesales."

7        A.    I have no idea where she got that from.

8        Q.    You don't have any management experience in

9    telesales?

10       A.    No.

11       Q.    You did have sample variances in 1999,

12   didn't you?

13       A.    Yes, I did.

14       Q.    That means that you didn't have an adequate

15   accounting for the samples that had been given you?

16       A.    At that particular time, yes.

17       Q.    She notes that you had the most sample

18   variances within the district in 1999.  You have no

19   information other than that, do you?

20       A.    That I had the most variances?

21       Q.    Yes.

22       A.    No, I wouldn't know.

23       Q.    Likewise, she writes that you had the

24   highest percentage of paper forms used in the

1    district, 34 percent.  You have no ability to say

2    that's incorrect, do you?

3        A.    No.

4        Q.    Do you know what she means by "paper

5    forms"?

6        A.    Yes.

7        Q.    That's when you have the physician sign his

8    name on a piece of paper that he received a sample,

9    as opposed to using the electronic recording device?

10       A.    Correct.  Well, it's a form.

11       Q.    The electronic recording device you just

12   had difficulty operating; is that it?

13       A.    No.  It wouldn't work.

14       Q.    How did you fix that problem?

15       A.    Let's see here...  You had to call in to

16   Aventis to see if they could fix it on line, or you

17   sent it back and they sent you a new computer.

18       Q.    When she talked to you about this problem

19   in May of 2000, how did you solve that issue?

20       A.    How did I solve what issue?  Is this the

21   paper form issue?

22       Q.    Yes.

23       A.    Well, some of it was the new computer.

24   That was fixed.

1    Q.    Did you solve the problem so that you
2    wouldn't have to use this much paper?
3    A.    I think so, yes.  I don't remember.
4                (Document marked as Byrd
5                Exhibit 6 for identification)
6    Q.    Exhibit 6 is a photocopy of a midyear
7    assessment.  It's dated September 18, 2000.  This is
8    the review that Ms. Edmunds gave you at the Dedham
9    Hilton?
10   A.    (Witness reviews document)  I believe so.
11               (Document marked as Byrd
12               Exhibit 7 for identification)
13   Q.    Exhibit 7 is a photocopy of the 45-day
14   performance improvement plan that was accompanying
15   this review.  Is this Exhibit 7 the plan that she
16   showed you at the Dedham Hilton that you said you
17   were not going to sign?
18   A.    Yes.
19   Q.    I take it at the Dedham Hilton, you met
20   with her in the lobby of the hotel?
21   A.    Yes.
22   Q.    Did she give you a chance to read the
23   midyear performance plan assessment that she had
24   completed?

1      A.   Yes.

2      Q.   The way this works is that you actually

3  prepare the Associate Assessment section first?

4      A.   I don't know if I prepared it first, but I

5  prepared part of this, yes.

6      Q.   The part that says, "Associate Assessment"

7  is the part that you did?

8      A.   Yes.

9      Q.   You make that assessment of yourself, and

10 then you give it to your manager?

11     A.   Yes.

12     Q.   And she incorporates it into the review?

13     A.   Yes.

14     Q.   On the first page at the bottom, she says

15 that she was on a field visit with you and you

16 referred to a clinical trial or report as Allegra

17 versus Loratadine when it was really Allegra versus

18 Sertazine.  Did that happen?

19     A.   She said it happened, yes.

20     Q.   You have no recollection of it?

21     A.   No.  That's why I asked her, "Did I say

22 that?"  She took offense to it.

23     Q.   At the time when she corrected you, you

24 didn't realize what you had done; is that it?

1     A.   I didn't think I said it the way she said

2  it.

3     Q.   How about on the next page, she said that

4  you said a physician could use Amaryl in connection

5  with insulin or Amaryl instead of saying in

6  conjunction with insulin or Metphormin.  Do you

7  recall doing that?

8     A.   Yes.

9     Q.   You made a misstatement?

10    A.   Uh-huh.

11    Q.   You have to say yes, if that's true.

12    A.   Yes.

13    Q.   On Page 177, at the bottom she said she

14  didn't feel you are being persistent in targeting

15  the key physicians.

16       It is the case, isn't it, that you were

17  provided with information about the physicians who

18  you were better off targeting than others?

19    A.   Yes.

20    Q.   But you did sometimes have your own opinion

21  on that, didn't you?

22    A.   Yes.

23    Q.   On occasion, you would call on doctors that

24  you felt were more appropriate targets rather than

1    what you were being asked to do?

2        A.    I called on -- yes, yes.

3        Q.    That's because you felt you knew the

4    territory, you knew the doctors, and you were

5    confident of your opinions?

6        A.    Yes.

7        Q.    She said during a field visit, you called

8    on a Decile 3 physician.  What's a Decile 3

9    physician?

10       A.    That's, according to marketing, a physician

11   who is low on the scale for being called on.  The

12   range is from 1 to 10.

13       Q.    The physician said that, in fact, he was

14   losing a lot of his business due to managed care?

15       A.    Uh-huh.

16       Q.    Yes, he said that?

17       A.    Yes, he did.

18       Q.    She said that the physician should not be

19   one of your primary targets?

20       A.    That's what she said.

21       Q.    Did you disagree with that?

22       A.    Yes, I did.

23       Q.    Why is that?

24       A.    This physician, Dr. Kulicha, was a high

152

1      volume Amaryl user, which is one of my main

2      products.  That's why I was calling on him.

3          Q.   You and Ms. Edmunds disagreed about the

4      usefulness of this particular physician, and you

5      felt that your view ought to govern?

6          A.   Yes.

7          Q.   At the bottom of Page 178, she said that

8      you had built some strong rapport with certain

9      physicians in the territory.  I assume that you

10     agree that that's true?

11         A.   Yes.

12         Q.   She also said that you don't always listen

13     well and that you are difficult to coach.  Don't you

14     agree that sometimes you are somewhat firm in your

15     own opinion?

16         A.   In my own opinion, yes.

17         Q.   Might not that make you difficult to coach?

18         A.   No.

19         Q.   If she says, "Don't call on this physician

20     and you" --

21         A.   She didn't say that.

22         Q.   You must let me finish the question.

23         A.   Sorry.

24         Q.   If she says to you, "I don't think you

153

1   ought to spend time on this physician," and you say,

2   "But I think I know that he's a good target, and so

3   I'm going to do it anyway," wouldn't you agree that

4   that makes you difficult to coach?

5           MR. KOSLOWSKY:  Objection to form.  You can

6   answer.

7       A.   If she said that, I would agree, but she

8   didn't say that.

9       Q.   What did she say?

10      A.   She said he was a Decile 3, losing

11  50 percent of his business.  That was it.  She asked

12  why I called on him.  As I said to you, he was a

13  high volume Amaryl user, looking at other

14  physicians.

15      Q.   You don't think you are difficult to coach?

16      A.   No.

17      Q.   On the bottom of Page 179, she said you and

18  your team have not had consistent monthly meetings

19  as directed by the area managers.  By "your team,"

20  she's talking about your pod?

21      A.   Yes.

22      Q.   Was that true, that you were not having

23  consistent monthly meetings?

24      A.   No, it is not true.

154

1      Q.    She also says that you were not sending

2   updates on the meetings to her as she had requested.

3   That's true, isn't it?

4      A.    At the beginning it was, but in our pods,

5   we had designated secretaries to send the

6   information to all the area managers.

7      Q.    So you were not objecting to providing

8   Ms. Edmunds with the reports of the monthly

9   meetings?

10     A.    No.

11     Q.    She says that you are first or second in

12  the district for the amount of opportunity funds

13  spent.  I'm assuming that opportunity funds are

14  Aventis money that's used to either host an event

15  for some physicians or a display table; is that what

16  it means?

17     A.    Entertainment, yes.

18     Q.    Did you disagree with that, that you were

19  first or second in the district?

20     A.    I didn't question it.

21     Q.    When she says that she has not seen clear

22  documentation of ROI on these programs, what's ROI?

23     A.    Return on investment I believe.  And I

24  believe you did, if you look at -- where is it

157

1    physician said, "I don't want a particular sales rep
2    calling on me"?
3         A.    It could happen.  This is the only one that
4    I know.
5         Q.    You deny that there was a meeting with Joe
6    Forney, together with you and Deb Edmunds and
7    Ms. Johnson?
8         A.    No, right.
9         Q.    It never happened?
10        A.    No.
11        Q.    Look at the bottom of page 182.  It says,
12   "Bill does not consistently recall pre/post call
13   notes immediately following a call."  That's true,
14   isn't it?
15        A.    Occasionally.
16        Q.    "His notes seldom include pertinent
17   detailed information."  That's true, isn't it?
18        A.    Occasionally.
19        Q.    Ms. Edmunds did talk to you about that
20   during your work-withs with her?
21        A.    Yes.
22        Q.    Sometimes your administrative work was not
23   always timely; isn't that true?
24        A.    Probably due to the computers, yes.

1    not performing adequately, that she might say to

2    him, "Here are some things I would like you to do"

3    and perhaps not ask other performers who are doing

4    well to do; that would be reasonable, wouldn't it?

5         A.    Yes.

6         Q.    I just want to be sure I understand

7    something.  When you got the review and the

8    performance improvement plan in September of 2000

9    and Deb Edmunds gave them to you in the Dedham

10   Hilton, by then you concluded she was treating you

11   differently both because of your race and your age?

12        A.    No, not by then.  It was during previous

13   conversations that I had with her, previous

14   indications to me, and this confirmed to me that she

15   was trying to eliminate me from the company.

16        Q.    Due to your race and age?

17        A.    Yes.

18        Q.    Ms. List has a recollection that when you

19   met with her on September 25th, you had notes

20   regarding your performance.  You don't have a

21   recollection of going to that meeting with notes?

22        A.    Notes?  I went to the meeting with the

23   reviews.

24        Q.    That's it?

1        A.    Before.

2        Q.    How about since you left Aventis, are you

3    working in any volunteer activities since you left?

4        A.    No.

5        Q.    What about with your brother that lives

6    locally, do you do any volunteer or charity

7    activities with him?

8        A.    No.

9        Q.    Do your siblings know about this lawsuit?

10        A.    No.

11        Q.    Is there a reason that you have not told

12    them?

13        A.    It's none of their concern.

14        Q.    What did you tell your brother George about

15    the reason that your employment ended at Aventis?

16        A.    Being discriminated against.

17        Q.    How about the fellow that runs Mapleleaf,

18    did you tell him about this lawsuit?

19        A.    Yes, I did.

20        Q.    What Aventis employees or former employees

21    have you been in contact with since your employment

22    ended?

23        A.    I have not been in contact with them.  I

24    occasionally see a sales rep out in the field, but

1  wanted to transfer?

2      A.    Right.

3      Q.    Other than Bill and Jim, you didn't talk to

4  anybody else about Deb Edmunds?

5      A.    No.  I didn't discuss Deb Edmunds in detail

6  either.  It was just that I was having a problem.

7      Q.    Then did you say you had some meeting with

8  your pod mates where they said they thought you were

9  fired?

10     A.    It was our quad meeting.  As I arrived,

11 they said they thought I was fired.

12     Q.    You don't know where they heard that from,

13 do you?

14     A.    No, I don't know where they heard the rumor

15 from.

16                (Document marked as Byrd

17                Exhibit 8 for identification)

18     Q.    Exhibit 8 is a photocopy of the warning

19 dated 11/14/00.  I take it you have seen this

20 before?

21     A.    (Witness reviews document)  Yes.

22     Q.    How did you get this?

23     A.    I believe at a meeting with Deb Edmunds and

24 Chris List.  I don't remember exactly.

182

1    Q.    You didn't sign this, did you?

2    A.    I don't believe I was asked to sign it.

3    Q.    Did they give you a copy?

4    A.    Yes.

5    Q.    You agree that an employer has a right to

6    give an employee a written warning?

7    A.    Yes.

8    Q.    You just don't think this was justified; is

9    that it?

10   A.    True.

11   Q.    You disagreed with the first bullet point

12   here.  You didn't think that there was a lack of

13   communication with Deb Edmunds concerning your

14   activities?

15   A.    No.

16   Q.    You didn't believe that there was a lack of

17   monthly team meetings or notes from your quads?

18   A.    No, I don't believe there was a lack of

19   team meetings.  I know some of the notes from the

20   quad meetings did not reach her, due to what I

21   stated before.

22   Q.    How about the violation of the

23   anti-kickback policy in regards to your journal

24   club, what's that in reference to?

183

1       A.    They are saying I had a journal club.

2       Q.    You are saying you never had a journal

3    club?

4       A.    True.

5       Q.    You are denying that you ever claim to have

6    paid a physician to come and speak at a journal

7    club?

8       A.    True.

9       Q.    It just never happened?

10      A.    Never happened.

11      Q.    Do you recall the incident with the gas

12   tank overflowing?

13      A.    Yes.

14      Q.    That did happen, didn't it?

15      A.    Yes.

16      Q.    Ms. Edmunds had also told you not to store

17   your samples in the back seat of your car blocking

18   the rear view window?

19      A.    Yes, she did say that.  It was corrected.

20      Q.    They told you to be in your territory from

21   eight to five, Monday through Friday?

22      A.    Yes.

23      Q.    They asked you to transmit your call

24   activity on a daily basis?

186

1      A.    No.

2      Q.    What warning was he present for?

3      A.    Whatever warning they gave me at that time,

4   whatever Deb wanted to give me, if she gave me

5   anything.  I don't have any memory that she gave me

6   anything.

7      Q.    Do you have any specific recollection of

8   the meeting with Mr. Kaisel present?

9      A.    Yes.

10     Q.    What happened?

11     A.    He said he was there to observe.  Basically

12  that was it.

13     Q.    Do you remember what Ms. Edmunds said to

14  you at the meeting?

15     A.    No, I don't.  It might have been a review

16  or a warning.  I don't remember.

17                    (Document marked as Byrd

18                    Exhibit 9 for identification)

19     Q.    Exhibit 9 is a photocopy of something

20  called "Performance Status Discussions."  It's dated

21  September 5, 2001.  Have you seen this document

22  before?

23     A.    (Examines document)  Yes.

24     Q.    Are those your initials on the front page?

1      A.     Where does it say, "call reports"?

2      Q.     Well, what do you think it is?

3      A.     Transmission of daily activities, whatever

4    is on the Velo.

5      Q.     Aren't you saying that if you didn't do it,

6    it's because you were having computer errors; that's

7    what you would say?

8      A.     That's what happened, yes.

9      Q.     She then says that you had a variance of

10   3,500 in May of 2001 and you didn't tell her that.

11   Do you have a recollection of that?

12     A.     Yes.

13     Q.     You did, in fact, have a sample variance,

14   didn't you?

15     A.     Yes.

16     Q.     Wouldn't that have been appropriate to tell

17   your area manager?

18     A.     She was in Spain at the time.

19     Q.     That's why you didn't tell her?

20     A.     That's right.

21     Q.     Would you agree that's a significant

22   variance?

23     A.     Yes, I would.

24     Q.     Then you ordered some stamps from Staples.

1  That was a violation of Aventis policy, wasn't it?

2       A.    I received approval from Deb to do that.

3       Q.    Deb told you it was okay?

4       A.    Yes.

5       Q.    When did she do that?

6       A.    At our certification for Lantus.  I asked

7  permission.

8       Q.    What did you say to her?

9       A.    I asked her if I could have the stamps made

10 up.

11      Q.    She said, "Yes"?

12      A.    She said, "Yes."  She said she liked the

13 proactivity.

14      Q.    Is it also true you didn't inform her of an

15 overdue parking ticket until it was copied on an

16 E-mail?

17      A.    That ticket had been paid.  What I did was

18 send a copy of that to Aventis to show it had been

19 paid, but the person there wanted me to pay Aventis,

20 so...

21                  (Document marked as Byrd

22                   Exhibit 10 for identification)

23      Q.    Exhibit 10 is a photocopy of the

24 September 5, 2001 warning.  I take it you have seen

1      Q.    Then you listed the expense incorrectly
2    under General Selling instead of labeling it as a
3    specific group selling event with an explanation; is
4    that right?
5      A.    I would have to see the expense report.
6      Q.    If you did that, then it would be wrong; is
7    that right?
8      A.    I really don't know if that would be wrong.
9      Q.    Didn't Ms. List tell you in September of
10   2000 that you couldn't list a golf outing as
11   something like a general selling event?
12     A.    That's not what she said.
13     Q.    What did she say?
14     A.    I believe she said a display.
15     Q.    You didn't know that this was wrong to do?
16     A.    Wrong to?
17     Q.    To list it as a general selling other --
18     A.    No.
19     Q.    Did you believe when you got this final
20   written warning that Ms. Edmunds was still trying to
21   get you terminated because you were African-American
22   and over 50?
23     A.    Yes.
24           MS. ACKERSTEIN:  Let's take a short break.

1              (Recess at 3:10 p.m.)

2         BY MS. ACKERSTEIN:  (3:22 p.m.)

3         Q.    Mr. Byrd, after the warning was given to

4    you, the warning in September of 2001, you had a

5    long meeting with Ms. List in December of 2001,

6    didn't you?

7         A.    I believe so.

8         Q.    What do you recall about that meeting?

9         A.    Geez, I think expectations.  Again, I'll

10   have to read something to jog my memory.

11        Q.    You don't recall anything in particular?

12        A.    Not at this time, no.

13        Q.    She says that she showed you some call

14   notes of your September and October calls and the

15   daily activity and told you that you were not doing

16   it properly.  Do you have any recollection of that?

17        A.    No, I don't.

18        Q.    She also says that she had reviewed samples

19   of your activities spreadsheet and that, again, most

20   calls were occurring between 10:00 a.m. and

21   2:00 p.m.  Do you recall that discussion?

22        A.    We had that before.

23        Q.    You had it before in 2000, and now you were

24   having it again in December of 2001, do you recall

200

1   2002 of discussing a golf tournament with

2   Ms. Edmunds and Ms. List?

3       A.    Yes.

4       Q.    You do?

5       A.    Yes.

6       Q.    Do you recall at this meeting that they

7   expressed frustration that issues kept repeating

8   themselves with you?

9       A.    They said something, yes.  I don't know if

10  I would call it "frustration."

11      Q.    Didn't Chris List say, "Bill, what would

12  you do if you were us?"

13      A.    Yes, she did ask that question.

14      Q.    Didn't you say, "I would fire me"?

15      A.    No.

16      Q.    What did you say?

17      A.    I said, "I would fire the person."

18      Q.    Then they met with you on December 4th?

19      A.    To be fired.

20      Q.    The meeting in mid January 2002, when they

21  were discussing ongoing issues with you, you

22  understand that they are trying to decide what's

23  going to happen?

24      A.    I understood that it probably already had

1   been decided.

2       Q.    Why would you have fired the person?

3       A.    Putting it in that context the way you put

4   it, they were not meeting the expectations.

5       Q.    So if an employee is not meeting

6   expectations after having been met with in September

7   of 2000, gotten a warning in November of 2000,

8   gotten a final written warning in September of 2001,

9   they are still not meeting expectations, you would

10  say it's time to fire that person?

11      A.    I would say that, but in reference to

12  myself, I would not have because I explained each

13  incident.  I explained the computer glitches to

14  them.

15          I think they already made up their minds

16  before that to get rid of me.  There were a number

17  of things that other people were doing in the

18  company -- you probably have the notes with you

19  there -- if you look at, for instance, that did not

20  meet call expectations, and they were not

21  reprimanded.

22      Q.    So you acknowledge you said to Ms. List on

23  that day when she said, "What would you do," and you

24  said, "I would fire the person"; you acknowledge

202

1    saying that?

2        A.    Yes, I did.

3        Q.    Now you are saying you think there were

4    other people who were engaging in the same

5    activities as you?

6        A.    Yes.  I know so.

7        Q.    Tell me who they are.

8        A.    Brenda Hurvinicki.

9        Q.    What is it that Brenda did?

10       A.    Call notes.

11       Q.    What about them?

12       A.    They didn't meet company policy.

13       Q.    How do you know that?

14       A.    Because I read them.

15       Q.    When did you do that?

16       A.    Each and every day when I was working for

17   the company.

18       Q.    Where did you read them?

19       A.    On my Velo.

20       Q.    You read them on your machine?

21       A.    Yes.

22       Q.    In what way did they not comply with

23   company policy?

24       A.    The way that Deb Edmunds stated that it

1      Q.    That's what I'm asking you about.

2      A.    Excuse me?

3      Q.    That's what I asked.  You met with Deb on

4   September 18th.  You met with Chris List on

5   September 25th.  At that meeting you complained

6   about Deb.  Are you saying that this warning,

7   Exhibit 8, was because you complained about Deb?

8      A.    I believe so.  It's part of it.

9      Q.    Did you think that when you got the

10  warning?

11     A.    No.  I thought about that later on.

12     Q.    When did you decide --

13     A.    I couldn't tell you when I thought about

14  it.

15     Q.    When you got the warning on November 14,

16  2000, you accepted it as you were having some

17  performance issues, and this was an effort to help

18  you?

19     A.    Save my job.

20     Q.    When you got this document on September 5,

21  2001, this warning, did you think this was because

22  you had complained about Deb?

23     A.    Yes.  I think the whole process was, yes.

24     Q.    I'm trying to find out when you came to

1    that conclusion.

2         A.    I can't tell when you I came to that

3    conclusion.  All I can tell you is the circumstances

4    that started to pop up not meeting all the

5    expectations that they stated, that I had thought I

6    was, and each time I went back for a meeting, I was

7    getting closer and closer to the door.

8         Q.    When you got this final warning on

9    September 5, 2001, did you think at the time you got

10   this that this was because you had complained about

11   Deb?

12        A.    Yes.

13        Q.    Somewhere between 11/14/00 and September 5,

14   2001, you reached that conclusion?

15        A.    No.  I thought -- well, it was probably

16   sometime during that time, yes.

17        Q.    That's what I said.

18        A.    Maybe before.  I'm not sure.

19        Q.    Somewhere between 11/14/00 --

20        A.    Or before.

21        Q.    Or before, but before September 5, 2001?

22        A.    What?

23        Q.    Before you got this (indicating).  By the

24   time you got this document, Mr. Byrd, I assume you

1    thought it was because you had complained about Deb?

2        A.    Yes, before these two documents.

3        Q.    Before getting both of them?

4        A.    No, when I got them.

5        Q.    That's what I'm trying to understand.

6        A.    Well, I'm trying, also.

7        Q.    When you got this document on November 14,

8    2000, you didn't think this written warning was

9    justified?

10        A.    True.

11        Q.    You thought you were written up because you

12    complained about Deb?

13        A.    Yes.

14        Q.    You thought at the time you got it, you

15    never thought this was justified?

16        A.    I never did, right.

17        Q.    When you got it, you thought it was because

18    you complained?

19        A.    Eventually, yes, not at the same time.

20        Q.    That's what I'm trying to find out.

21        A.    I don't think that way.  It takes me some

22    time.

23        Q.    I said to you did you at least come to that

24    conclusion by September 5, 2001?

238

1    Milton?

2        A.    Yes.

3        Q.    Did these kids get a T-shirt that said,

4    "Milton"?

5        A.    Yes.

6        Q.    Did the families have to pay for their kids

7    to belong to the team?

8        A.    I believe so, yes.

9        Q.    Who supervised these practices?

10       A.    Supervised what practices?

11       Q.    I'm sorry.  Who supervised the league?

12       A.    Joe McMann.

13       Q.    Does Joe McMann live in Milton?

14       A.    Yes.

15       Q.    Do you know where he lives?

16       A.    I think Pleasant Street.

17       Q.    If I talk to Mr. McMann, would he confirm

18   that these teams had no practices?

19       A.    Yes.

20                (Document marked as Byrd

21                Exhibit 12 for identification)

22       Q.    The document marked as Exhibit 12 is a copy

23   of a document your counsel produced to us.  I take

24   it you had this document?

239

1      A.    (Examines document)  Yes.

2      Q.    What is it?

3      A.    Expectations.

4      Q.    Of what?

5      A.    Of doing your job.

6      Q.    This is an Aventis document?

7      A.    Looks like it.

8      Q.    These are the core competencies of the

9   position that you held as a sales representative?

10     A.    Yes.

11     Q.    Was it your understanding that this is what

12   Aventis expected you to do?

13     A.    Yes.

14     Q.    Were you generally familiar with these

15   while you were employed?

16     A.    Oh, yes.

17              (Document marked as Byrd

18                Exhibit 13 for identification)

19     Q.    Exhibit 13 is a photocopy of an E-mail,

20   again, your counsel provided this to us.  I take it

21   you have seen this E-mail previously?

22     A.    (Examines document)  Yes.

23     Q.    The top E-mail is December 3, 2001.  It is

24   Deb Edmunds telling you that you need to notify her

241

1          A.    It's a typo.

2          Q.    It's the same thing?

3          A.    Yes.

4          Q.    Where it says, "Selected Awards,

5    Achievements, Aventis," these are all awards that

6    you received in your capacity as a sales rep?

7          A.    I believe so, yes.

8          Q.    You would not put these here if you didn't

9    get them, would you?

10         A.    No, I would not.

11         Q.    Down at the bottom where it says,

12   "Education, B.S., business administration New Mexico

13   State University," that is not true, is it?

14         A.    No, it is not true.

15         Q.    You are using a resume which has a degree

16   which you don't have?

17         A.    True.

18         Q.    You don't think that's inappropriate?

19         A.    Oh, yes, I do.

20         Q.    But you are doing it anyway?

21         A.    Yes.

22         Q.    Because you want to get a job, so you put

23   down that you have a B.S.?

24         A.    True.

242

1              (Document marked as Byrd

2              Exhibit 15 for identification)

3        Q.   Exhibit 15 is a photocopy of this document

4    that your counsel provided to us.  Is this a

5    document you got from Ms. Daniels?

6        A.   Yes.

7        Q.   When did you get this?

8        A.   I don't know.

9        Q.   I assume you got it sometime after June 28,

10   2004?

11       A.   I believe so.

12       Q.   But you don't have any of the attachments?

13       A.   No.

14       Q.   Have you ever seen any of the attachments?

15       A.   No.

16       Q.   I take it that you think Ms. Daniels is

17   credible?

18       A.   Yes.

19       Q.   Do you know a Megan Mackel?

20       A.   I met her.

21       Q.   Who is Megan Mackel?

22       A.   A sales rep.

23       Q.   What race is she?

24       A.   White.

1      A.    She wouldn't.  I would use it.

2      Q.    It's your testimony I guess that you really

3   don't know what this profit and loss from business

4   form is?

5      A.    I don't remember, no.

6      Q.    Were you operating any business in 1989

7   other than Aventis?

8      A.    I didn't operate the Aventis business.  I

9   believe I had this Byrd Enterprises.

10      Q.    The Herbalife business?

11      A.    Yes, but I'm not sure.

12      Q.    While you were working as a sales rep for

13   Aventis in 1999, you also had your own business

14   selling Herbalife products?

15      A.    As I said mentioned, it was not a business.

16      Q.    What was it?

17      A.    I never sold any Herbalife.

18      Q.    It's on your return in 1999.  It's on your

19   return in 2003.

20      A.    That's right.

21      Q.    Did you have a business or didn't you?

22      A.    No.

23                (Document marked as Byrd

24                Exhibit 17 for identification)

1       Q.    Exhibit 17 is a photocopy I believe of the

2   charge of discrimination that you filed in this

3   action.   I take it you have seen this previously?

4       A.    (Examines document)  Yes.

5       Q.    Is that your signature that appears in the

6   bottom left-hand corner?

7       A.    I don't have that.

8       Q.    Pardon?

9       A.    Where are you?

10      Q.    The second page, I believe it is.  Do you

11   see it on the second page?

12      A.    (Examines document)  No.

13      Q.    Let me pull it out for you.

14      A.    (Examines document)  Oh, okay.

15      Q.    Is that your signature?

16      A.    Yes.

17      Q.    You were already represented by counsel

18   when you did this?

19      A.    Yes.

20      Q.    This is an affidavit you prepared, or that

21   you signed?

22      A.    What?

23      Q.    This is an affidavit that went with the

24   charge?

1    A.    Before.

2    Q.    In Paragraph 31, you say at the national

3    sales meeting during the week of January 8th, you

4    were one of three sales reps who received the market

5    share award on Allegra, do you see that?

6    A.    (Examines document)  Yes.

7    Q.    Who were the other two reps?

8    A.    That's a misnumber actually.  David Thorell

9    got one I believe and Brenda Hurvinicki and I think

10   Kathy Gross.

11   Q.    Dave and Brenda were your pod mates?

12   A.    Yes.

13   Q.    So your scores, your sales were calculated

14   together as a whole pod?

15   A.    As a team effort, yes.

16   Q.    Were there just three of you on that team?

17   A.    Yes, if I remember correctly.

18   Q.    You and Dave and Brenda qualified as a

19   team?

20   A.    Well, with the other reps, too, but they

21   didn't have Allegra responsibility.

22   Q.    Look at Paragraph 39, which is Count I of

23   your complaint on Page 5, do you see that?

24   A.    (Examines document)  Yes.

1      Q.    In that claim, you are making a claim of

2    race and age discrimination and retaliation, do you

3    see that?

4      A.    Yes.

5      Q.    I take it the claim you are making is that

6    Ms. Edmunds selectively enforced the policies

7    against you due to your race and age?

8      A.    Yes.

9      Q.    You are also contending that you got this

10   warning in November 2000 in retaliation for

11   requesting a meeting with Ms. List?

12     A.    After the meeting, yes.

13     Q.    Is that what the count is about?

14     A.    Excuse me?

15     Q.    Have I said correctly what the count is

16   about?

17     A.    I believe so.

18     Q.    Then look at Count III.

19     A.    III?

20     Q.    Yes, Paragraph 57 on Page 7.  This is a

21   claim for wrongful termination.  Again, you talk

22   about selective enforcement of the policies and

23   retaliation for requesting a meeting.

24          Is it fair to say that you are making the

1  claim here that you were discriminated against based

2  on your race and age and that you were retaliated

3  against?

4      A.   Yes.

5      Q.   In Count IV, you are alleging a breach of

6  contract.  You say that there was selective

7  enforcement of policies and there was retaliation

8  and that this is a breach of contract.  What

9  contract was breached?

10      A.   Let's see here...  In the policy against

11  sexual harassment and race discrimination, they

12  violated that policy.  That's the contract that I'm

13  talking about.

14      Q.   They violated the policy because you think

15  you were discriminated against based on your race?

16      A.   Oh, I know I was.  I don't think it.  I

17  know I was.

18      Q.   That's the policy you are talking about?

19      A.   I believe so.

20      Q.   Then you have Count V, Breach of the

21  implied covenants of good faith and fair dealing.

22  You say they breached that.  Again, you are saying

23  that they discriminated against you and they

24  retaliated against you?

1    A.   Yes.

2    Q.   Next you have a claim of tortious

3 interference, and you say Ms. Edmunds, Paragraph 73,

4 Ms. Edmunds improperly interfered with your

5 relationship with Aventis.  What are you talking

6 about there?

7    A.   I'm talking about her selectively targeting

8 me for termination.

9    Q.   Is that the same thing in Count VII, where

10 you allege that she improperly interfered with the

11 advantageous and/or contractual relations?

12   A.   Yes, by being discharged.

13   Q.   You think that she had it out for you?

14   A.   I think she discriminated against me.

15   Q.   You know, Mr. Byrd, I guess I'm not clear

16 on something.  I know you think that she selectively

17 enforced policies against you.  Why do you conclude

18 that it's because of your race and age?  Is it

19 because she did not selectively enforce the policies

20 against the white people she supervised?

21   A.   It's part of the reason.

22   Q.   Is there something else?

23   A.   I really couldn't tell you right now.  It

24 was an ongoing thing with her.  As I mentioned

261

1    earlier, starting from the maternity leave, when she

2    returned, I had no idea why things went 360 degrees.

3        Q.    From before the maternity leave to

4    afterwards?

5        A.    That's right.

6        Q.    It's just that her treatment of you seemed

7    to change?

8        A.    It didn't seem to change.  It did change.

9        Q.    Look at Count VIII, Violation of the

10   Massachusetts Civil Rights Act.  You say here that

11   Aventis and/or Ms. Edmunds interfered or attempted

12   to interfere with your rights under the Constitution

13   and the laws.  Are you talking about your right to

14   work at Aventis as a sales rep; is that what it is?

15       A.    Yes.

16       Q.    Is that the same thing in Count VII, where

17   you talk about a violation of the Federal Civil

18   Rights Law?

19       A.    (No response)

20       Q.    You feel that they interfered with your

21   ability to work as a sales rep at Aventis?

22       A.    Yes.

23                  (Document marked as Byrd

24                   Exhibit 19 for identification)

281

1      A.   Electronically.

2      Q.   Did you have a laptop?

3      A.   Yes.

4      Q.   You would complete this electronically and

5  send it off to headquarters; is that it?

6      A.   Yes.

7      Q.   Did a copy of this go to your area manager?

8      A.   I don't know if it does or not.

9      Q.   Look at the receipt on the next page.

10  There's a receipt here for $1,000 to the Sandy Burr

11  Country Club in Wayland, Mass, do you see that?

12     A.   Yes.

13     Q.   Is that the NFL alumni golf outing?

14     A.   Yes, it is.

15     Q.   It appears that the date on that receipt is

16  6/8/01, do you see that?

17     A.   Yes.

18     Q.   On this form it says, "Group selling."  It

19  says, "6/8 product miscellaneous expense round

20  table, project hospital, speaker Bill Byrd, topic

21  diabetes, explain insulin, Lantus."  Is that how you

22  expensed the golf outing?

23     A.   Yes, I did.

24     Q.   That's not simply pressing one key, is it,

282

1    to get out all that information?

2        A.    No.  You had to type in some of the

3    information.

4        Q.    You actually typed in the information?

5        A.    No, not all of it.

6        Q.    What did you type in?

7        A.    I'm trying to remember.  If I had the

8    laptop in front of me, I could probably show you,

9    but I believe it's a drop down, but I can't say for

10   sure.  You hit a button, and it drops down different

11   sections.

12       Q.    Don't you have to fill in the information,

13   Bill Byrd is the speaker, the topic?  Don't you have

14   to put in diabetes?  Don't you have to put in the

15   information?

16       A.    I'm trying to remember.  On the computer, I

17   think all you have to do is drop down, press the

18   button in each section, and it gets filled in.

19       Q.    How would it know to fill in diabetes?

20       A.    There would be a section for that.  Again,

21   you have to have the computer in front of you.

22   There was one for Allegra, for upper respiratory,

23   oncology...

24       Q.    So is it fair to say at the moment, you

283

1    really don't remember how all this information gets

2    inserted?

3         A.   Yes, basically.

4         Q.   Now at this golf outing, you told us

5    Dr. Mackler, the father, and Dr. Mackler, son, were

6    at the golf outing?

7         A.   Along with the daughter.

8         Q.   Look down at the bottom.  Here you have

9    lunch on June 7, Dr. S. Mackler, E. Mackler, Brown,

10   Caplan, do you see that?

11        A.   Yes.

12        Q.   Who is Brown?

13        A.   Dr. Brown.

14        Q.   Who is Caplan?

15        A.   Dr. Caplan.

16        Q.   Did they work with the Mackler's?

17        A.   No.

18        Q.   Do you think it's a good use of

19   expenditures to have lunch with the two

20   Dr. Mackler's on June 7 and--

21        A.   It didn't happen.

22        Q.   What does that say?

23        A.   It was all on June 8.  Again, it's an

24   error.

284

1      Q.   Dr. Brown and Dr. Caplan were at the golf

2  outing?

3      A.   No.  They did not show up.

4      Q.   You say, "Lunch, Thursday, June 7, on

5  Lantus with Dr. S. Mackler, E. Mackler, Brown,

6  Caplan."  What you are really saying is that this is

7  a mistake and that you meant to describe this as the

8  golf outing?

9      A.   Yes.

10     Q.   Dr. Brown and Dr. Caplan did not show up?

11     A.   That's correct.

12     Q.   Were they invited to the golf outing?

13     A.   Yes.

14     Q.   At the golf outing, it was you, the

15  father/son Mackler combination and their daughter

16  and your brother?

17     A.   Yes.

18     Q.   Were you planning on having seven in your

19  four some?

20     A.   Yes, I was.

21     Q.   So there are actually two mistakes then on

22  this expense report?

23     A.   Yes, that's what it looks like.

24     Q.   You see on Friday, 6/8, there's an entry of

285

1    $1,100, do you see that?

2         A.    (Examines document)    Uh-huh.

3         Q.    I see the $1,000 from the Sandy Burr

4    Country Club.    I see $36 also from Sandy Burr

5    Country Club.    How do you get to $1,100?

6         A.    That I couldn't answer when you asked me

7    that question.    I don't know.

8         Q.    So there were actually three errors on this

9    expense report?

10        A.    Yes.

11        Q.    This is a report that Ms. List and

12   Ms. Edmunds talked to you about in January of 2002?

13        A.    They might have spoke to me about it before

14   that, but it could have been.

15        Q.    You have lunch on June 6, Lantus,

16   Drs. Henderson, Pearl, Sawyer and Gulbright, do you

17   see that?

18        A.    (Examines document)    Yes.

19        Q.    Is that the $140 that's listed up here on

20   6/6?

21        A.    It could have been.    That is a total for

22   1,240.    I couldn't answer that.

23        Q.    Is that different than this group selling

24   event on 6/6, this round table?

303

1   you have?

2       A.   Yes, all the ones except Career Builder,

3   which is on the Internet.  That was just recently.

4       Q.   What happened at Career Builder?

5       A.   Nothing.  I just filed my resume there.

6       Q.   But other than that, I have everything?

7       A.   Yes, you do.

8       Q.   When Deb Edmunds did a work-with with you,

9   she gave you some notes?

10      A.   She gave me a copy of the work-with.

11      Q.   Those are the notes she would make of your

12  efforts during the day?

13      A.   Yes.

14      Q.   Do you recall the incident where she

15  contends that you were speeding in a school zone?

16      A.   Oh, yes.

17      Q.   She says that when she told you not to

18  speed in a school zone, you said something like,

19  "Well, there's not a cop around"?

20      A.   Yes, I did.

21      Q.   Did that actually happen?

22      A.   Yes, it did.  Now, the school zone, there

23  was no school.  It was around four or 4:30 in the

24  afternoon.  I was making a joke with her about no

304

1   cop being around.

2       Q.    How would she know that that was a joke?

3       A.    Well, I couldn't tell you.  I believe I

4   told her it was a joke.

5       Q.    She also says that you described in detail

6   a sexual harassment case that was pending against

7   one of the physicians you dealt with, do you recall

8   that?

9       A.    Yes.

10      Q.    Mr. Miles was in the car at the time?

11      A.    Yes.

12      Q.    She said she thought it was inappropriate?

13      A.    That's what she said afterwards.  She did

14  ask me what he did to that female patient.

15      Q.    You told her in detail, didn't you?

16      A.    I don't know if it was in that great

17  detail.  I just told her about one incident.

18      Q.    Do you also recall making a joke about

19  brown sugar melting in the rain?

20      A.    Sure.

21      Q.    Did you think that was appropriate?

22      A.    It was raining.  I was joking about myself.

23  I thought it was appropriate.

24      Q.    You were making a statement about your

306

1      A.    No, she wouldn't know that.

2      Q.    Would looking at your gas receipts to see

3  where you were filling up your car be a reasonable

4  way to see where you were during the day?

5      A.    Yes.

6      Q.    Would looking at the times that you

7  recorded the calls to the doctors be a reasonable

8  way to find out where you were?

9      A.    I would guess so.

10     Q.    Would looking at when the doctors signed

11 for the samples be a reasonable way to tell when you

12 were there?

13     A.    Yes.

14     Q.    Would you agree with me that if a manager

15 had issues with whether somebody was in their

16 territory from eight to five every day, that one way

17 to test that periodically would be to do things like

18 look at the times the call reports were entered?

19     A.    Yes.

20     Q.    Also to look at the gas receipts?

21     A.    Yes.

22     Q.    You already agreed with me today, Mr. Byrd,

23 that the sales reps at Aventis were on an honor

24 system, do you recall that?

307

1   A.   Yes.  Well, you called it an honor system,
2   but yes.
3   Q.   I thought you agreed with me it was an
4   honor system?
5   A.   For lack of a better word, yes.
6   Q.   So the area managers really had to have
7   trust in the sales representatives, wouldn't you
8   agree with me?
9   A.   Well, you mentioned that before.
10   Q.   And you agree with me, don't you?
11   A.   Uh-huh.
12   Q.   Would you agree with me that if an area
13   manager loses trust in the sales representative,
14   it's hard for that sales representative to get that
15   trust back?
16   A.   I would say it depends on the
17   circumstances, what the motivation of the district
18   manager is.
19   Q.   I know you believe that Ms. Edmunds
20   selectively enforced the policies against you.  Did
21   you ever consider, Mr. Byrd, that maybe you were
22   doing things to her that were making her feel
23   uncomfortable?
24   A.   No.