# EXHIBIT B

Volume:    1
Pages:     1 - 312
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. BYRD,                )
          Plaintiff,            )
                                )
       v.                       )  C.A. 04-11032-DPW
                                )
AVENTIS PHARMACEUTICALS, INC.   )
and DEBRA EDMUNDS,              )
          Defendants.           )

DEPOSITION OF **DEBORAH A. EDMUNDS**, a

Witness called on behalf of the Plaintiff, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Maureen

Nashawaty, a Notary Public within and for the

Commonwealth of Massachusetts, held at the

offices of Flavin & Koslowsky, 424 Adams Street,

Milton, MA, on Tuesday, October 26, 2004,

commencing at 10:10 a.m.

*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

**DISK ENCLOSED**

1    Stenographer can take down my entire question and
2    then you can respond.
3        A.   Okay.
4        Q.   Are you under the influence of any
5    drugs or alcohol today which would impair your
6    ability to testify truthfully?
7        A.   No.
8        Q.   What is your present residential
9    address?
10       A.   92 Lincoln Road in Wayland.
11       Q.   How long have you resided there for?
12       A.   One month.
13       Q.   Where did you live before?
14       A.   308 Concord Road, Wayland.
15       Q.   How long did you reside there for?
16       A.   About seven years.
17       Q.   I want to show you a document that has
18   been previously marked as Exhibit No. 1.   Will
19   you take a look at that?   Have you seen that
20   document before?
21       A.   It looks like the one that was
22   delivered to my home.
23       Q.   All right.  Is there two documents
24   there actually stapled together?

22

1       Q.    What position did you take?

2       A.    Area Manager.

3       Q.    In all of the jobs that you have had

4    since college, have you left on good terms?

5       A.    Absolutely.

6       Q.    And you have provided notice to them?

7       A.    Absolutely.

8       Q.    Have you ever had a claim of

9    discrimination brought against you?

10       A.    Never.

11       Q.    When you took over -- as I understand

12    it, there is Area Manager and District Manager,

13    are they the same?

14       A.    Interchangeable.

15       Q.    Interchangeable?

16       A.    Yes.

17       Q.    When you took over as Area Manager in

18    May of 1999, did you supervise employees?

19       A.    Yes.

20       Q.    Who did you supervise?

21       A.    Bill Byrd, Dave Pearlstein, Rebecca

22    Cable, Jen Riley, Bob Santori, Ernie Simone, who

23    am I missing?  How many people is that?

24       Q.    That is six.

23

1          A.    I am probably missing a person or two,

2     but I can't recall right now.

3          Q.    What is Rebecca's last name again?

4          A.    Cable, C-a-b-l-e.

5          Q.    Okay.

6          A.    I think I am missing a person.  I don't

7     recall.

8          Q.    Is there a designation for this group

9     of people that you supervised?

10         A.    That is my district.

11         Q.    That is your district?

12         A.    Yes.

13         Q.    Are you still employed with Aventis?

14         A.    Correct.

15         Q.    Are you still employed in the same

16    capacity?

17         A.    Yes.

18         Q.    Do you still supervise these

19    individuals?

20         A.    Some I do.  Some I don't.

21         Q.    Which ones do you supervise, Bill Byrd,

22    obviously you don't supervise?

23         A.    Correct.

24         Q.    David Pearlstein?

28

1    supervisor?

2         A.    Again this is a guesstimate of a couple

3    of years and in between that time another

4    gentleman was my boss for six months and it was

5    Chris and then another guy named Gary Kiesel and

6    then it was Chris again over a two or three year

7    period -- two I think.

8         Q.    And Gary Kiesel was your manager or

9    direct supervisor for approximately six months?

10        A.    For approximately six months.

11        Q.    And do you know the time frame?

12        A.    I don't.

13        Q.    So Christine List was your direct

14   supervisor for approximately a two-year period

15   but in the middle --

16        A.    In the middle Gary Kiesel was.

17        Q.    In the middle Gary Kiesel was?

18        A.    Yes.

19        Q.    So Christine List was your direct

20   supervisor approximately between 2000 and 2002?

21             MS. ACKERSTEIN:  Objection.

22        A.    I don't recall.

23        Q.    Who was your direct supervisor after

24   Christine List?

1        Q.    What does that actually mean?

2        A.    He called on endocrinologists and

3    hospitals.

4        Q.    Since you were hired in May of 1999,

5    has your position with Aventis been changed?

6        A.    Could you clarify as far as --

7        Q.    Has your job -- have you always been an

8    Area Manager?

9        A.    Yes, I am Area Manager or District

10   Manager managing people, yes.  I mean products

11   change if that is what you want to know.

12       Q.    When products change, do your sales

13   reps change?

14       A.    Not usually, it can.

15       Q.    Who are your present sales reps?

16       A.    Russ Mayo, M-a-y-o, Sari Pomponio.

17       Q.    Could you spell that.

18       A.    S-a-r-i P-o-m-p-o-n-i-o, Bob Santori,

19   Amy Turpin, Tim Zerbe.

20       Q.    How do you spell the last name?

21       A.    Z-e-r-b-e.

22       Q.    Okay.

23       A.    Kevin Sturtevant.

24       Q.    Can spell the last name?

1     stated, Sample Policy 500, it tells you you have

2     to be within a certain variance percentage or

3     dollar allocation and a rep is required to do a

4     quarterly variance throughout our company, and

5     once a year a manager is required to go out and

6     physically count the samples at each rep's site

7     and if there is a variance above what the company

8     allows, then our Sample Department contacts the

9     rep as well as the manager and asks them to work

10    with them to fix that.

11         Q.    How do they notify you of sample

12    variances?

13         A.    Usually through e-mail or regular mail.

14         Q.    Do you maintain those records?

15         A.    If it is an e-mail, I might keep it in

16    my folder.  They do it all e-mail now.  It used

17    to be paper and e-mail.

18         Q.    For your sales reps that work for you,

19    do you maintain a file for each individual sales

20    rep?

21         A.    Yes, I do.  But it is mostly e-mails.

22    Almost everything is electronic.  There is very

23    little paper.

24         Q.    What type of information do you

1    pieces and certain studies.

2                    They give us basically a road map to

3    follow and then the rep needs to incorporate

4    those things into their sales call.

5        Q.    And you also testified a management

6    coaching session?

7        A.    Yes.

8        Q.    How often do you have these coaching

9    sessions?

10       A.    That would be during work-withs.

11                   So I usually spend a day to two days

12   with each rep, usually two days in the field.

13   Once every -- it depends on the rep. --

14   generalization -- I mean newer reps I spend more

15   time with.  Maybe once every six to eight weeks I

16   am out with a rep.

17       Q.    You are out once with a rep --

18       A.    Two days every six weeks approximately

19   say.

20                   That is an average depending on

21   meetings and holidays and vacations for

22   everybody.

23       Q.    Are you required, you personally

24   required to be in the territory during any time

1    period?

2         A.    You mean certain days?

3         Q.    Just in your daily job performance?

4         A.    Yes, I am supposed to be with reps four

5    days a week and in the office one day a week.

6         Q.    So with reps four days a week?

7         A.    Yes, again this is an average in a

8    perfect world with no meetings.

9         Q.    And in the office one day?

10        A.    Right.

11        Q:    Now the four days a week that you are

12   with reps, what would you be doing with them?

13        A.    I would be there to coach and counsel

14   them on their presentations to physicians.

15        Q.    Is that considered a work-with?

16        A.    Yes.

17        Q.    So four days a week you would do

18   work-withs?

19        A.    Yes.

20        Q.    Would you do anything else during those

21   four days outside of work-withs?

22        A.    Yes, depending on the week,

23   conventions, meetings, you know, vacation.

24        Q.    As I understand it, four days during

*C O N F I D E N T I A L   T E S T I M O N Y*    53

1    A.    Because it is still an honor system of

2    him being in territory.  Everyone is supposed to

3    be out there.  It is just due diligence.

4        Q.    How many people have you pulled records

5    on to determine whether or not they are in the

6    territory?

7        A.    I can't recall.

8        Q.    More than five?

9        A.    Just at Aventis?

10       Q.    Yes.

11       A.    Probably about five.

12       Q.    Can you name them?

13       A.    In the beginning, I pulled Ernie

14   Simone.  I can't think of the others, maybe Bob I

15   pulled.  I can't recall.

16       Q.    When you say Bob?

17       A.    Santori, it is possible.  Tim I am in

18   the process and, of course, Bill, so maybe four.

19       Q.    Did these records that you pulled for

20   Ernie Simone, did they indicate that he was in

21   the territory on every day between 8:00 and 5:00?

22       A.    I don't recall.  It was years ago.

23   They must have been fine because I didn't go

24   through any warning process with him.

*C O N F I D E N T I A L    T E S T I M O N Y*    54

1        Q.    With Bob Santori?

2        A.    Same thing.

3        Q.    What led you to believe that they

4    weren't in the territory between 8:00 and 5:00?

5        A.    I don't recall.  It was years ago when

6    I first started -- it was four or five years ago.

7        Q.    With regard to Tim Zerbe, have you

8    contacted Human Resources?

9        A.    Yes.

10       Q.    Who have you spoken with?

11       A.    Kevin Phox.

12       Q.    What is his last name?

13       A.    Phox, P-h-o-x.

14       Q.    Is he assisting you in developing the

15   45-day plan?

16       A.    Yes, he just e-mailed me the template

17   and I am working on it now and I need to send it

18   back to him and B.J. who is my interim R.D. to

19   look over before I give it to Tim.

20       Q.    I'm sorry, Kevin e-mailed you the

21   template?

22       A.    Yes, and I am filling it out, I am in

23   the process this week and I will then send it to

24   B.J. who is my boss and Kevin to review before

*CONFIDENTIAL  TESTIMONY*    58

1          A.     Sturtevant, yes.

2          Q.     Have you had any performance issues

3     with him?

4          A.     No.

5          Q.     Tasha?

6          A.     No.

7          Q.     Marrieti?

8          A.     No.

9          Q.     Ernie Simone?

10         A.     No.

11         Q.     Mike McNamara?

12         A.     No.

13         Q.     Annette Bohan?

14         A.     No.

15         Q.     Nancy Barnett?

16         A.     No.

17         Q.     Kathy Grose?

18         A.     No.

19         Q.     Can you describe for me what your

20    duties are with Aventis?

21         A.     To hire appropriate people, to coach

22    and counsel reps, to motivate, to review business

23    plans with them, teach them how to run their

24    territories, use the databases, act correctly,

*C O N F I D E N T I A L   T E S T I M O N Y*    59

1    pinpoint their business, help with sales

2    verbiage, and then there is a lot of

3    administrative duties as well.

4        Q.    Other than Tim Zerbe, Bill Byrd and

5    Meghan Markle, none of the other sales reps that

6    work for you had failed to follow company

7    policies and guidelines?

8            MS. ACKERSTEIN:   Objection.

9        A.    Specifically what policy or guideline?

10       Q.    Any of them?

11       A.    I don't -- I mean that that is such a

12   broad question as far as has there been minor

13   sample variances with a couple of reps, yes.

14       Q.    Who are they?

15       A.    I couldn't tell you.   They are very

16   minor ones usually worked out directly with the

17   Sample Department and the rep.   And the Sample

18   Department makes sure they fix it, and it is done

19   and it is not an FDA violation of a major

20   quantity, but there may have been some minor

21   sample variations and those have been resolved.

22       Q.    Who are the reps that had these sample

23   variance problems?

24       A.    I honestly -- let me think...

*C O N F I D E N T I A L   T E S T I M O N Y*  62

1    A.    Yes, except for Bill.

2         Q.    He is the only sales rep that had

3    problems?

4    A.    Major -- major violations.

5         Q.    When you say major violations, can you

6    tell me --

7    A.    I recall it was around $6,000.00.

8         Usually they are hundreds of dollars or

9    some nominal amount that you can work out.

10   Usually it is an error in sample, shipping or

11   something that can be worked out relatively

12   easily.

13        Q.    Do you know or recall whether or not

14   the $6,000.00 variance was worked out with Bill

15   Byrd?

16   A.    I remember it took a long time.

17        Q.    How long did it take?

18   A.    If I recall correctly, it took a month.

19        Q.    Do you recall when this occurred?

20   A.    Near the beginning of when I started

21   with Aventis or Hoechst at the time.

22        Q.    So 1999 or 2000?

23   A.    1999 or 2000 I am assuming.

24        Q.    Okay.

1                    by Stenographer.)

2        Q.    Other than Bill Byrd, are you aware of

3    any other of your sales reps that were not

4    working in the territory full time?

5        A.    Not that I was aware of.

6        Q.    Not that you are aware of?

7        A.    Yes.

8        Q.    And the only ones you did an

9    investigation into was Ernie Simone and Bob

10   Santori?

11       A.    Yes, years ago that I recall.

12       Q.    But you have done no other

13   investigation into any other sales reps?

14       A.    I probably did Meghan's because I did a

15   performance plan on her.  I probably pulled hers

16   as well.

17       Q.    Is that standard operating procedure

18   for you if you are going to do a performance

19   review, strike that, either a plan or a written

20   warning that you pulled, whether or not they are

21   in the territory full time?

22       A.    It is part of it.  It depends on the

23   individual.

24       Q.    When you say it is part of it, what

*C O N F I D E N T I A L    T E S T I M O N Y*    72

1    Byrd was terminated?

2        A.    Somewhat.

3        Q.    Do you recall who made the decision to

4    terminate Bill Byrd?

5        A.    It was a mutual decision.

6        Q.    Who was involved in the decision?

7        A.    Christine List, Mailet Minassian and

8    myself.

9        Q.    Who was the first to recommend

10   termination of Bill Byrd?

11       A.    It was a mutual decision really.

12       Q.    Are you saying all three of you had the

13   thought at the same time?

14       A.    No.  We don't have the thought at the

15   same time but we all recognized that there were

16   competencies that we tried to work with Bill to

17   get better on and they never improved or they

18   didn't improve to the standard that we needed.

19       Q.    When did you recognize this?

20       A.    I don't know what date.

21       Q.    Approximately?

22       A.    I believe the beginning of the process

23   to the end of the process was about a year

24   and-a-half.

*C O N F I D E N T I A L    T E S T I M O N Y*    73

1     Q.    Did you recognize it at the beginning

2     of the process?

3     A.    Probably sometime in 2000 I recognized

4     that there were standards that he was not

5     meeting.

6     Q.    That there were standards?

7     A.    Yes.

8     Q.    Was there anyone else involved with the

9     process?

10     A.    Besides Chris List, Mailet and myself?

11     Q.    Correct.

12     A.    Not that I -- oh, Mark Miles who was my

13     other Regional Director was the first one who

14     came and did what we call a piggyback ride to

15     make sure my observations were correct.

16     Q.    Do you recall when the piggyback ride

17     was?

18     A.    I don't have a date.

19     Q.    Was that before you provided a 45-day

20     plan?

21     A.    I don't recall.  I believe it was.

22     Q.    And what was Mark Miles' observations?

23     A.    The same as mine.  He agreed.

24     Q.    What were your original observations?

*C O N F I D E N T I A L    T E S T I M O N Y*    74

1        A.    That Bill's selling skills were not

2    adequate.  His product knowledge was not

3    adequate.  He had administrative issues, and he

4    was very difficult to coach to try to bring those

5    issues up.

6            We were trying to help him meet certain

7    standards and he was very reluctant to do that,

8    to take any feedback.

9            So that is when I asked my boss to come

10   out and make sure that what I was doing was

11   correct and see if there was anything else I

12   could do to help.

13       Q.    Is there a policy with Aventis when an

14   Area Manager or District Manager wants to

15   terminate an employee -- the method that they

16   must follow?

17       A.    That would probably be more of an H.R.

18   question.

19           What usually happens is if a manager

20   sees consistent behaviors or areas that a rep is

21   leading towards termination, the first thing they

22   will do is talk with their boss, the Regional

23   Director and then also get H.R. involved.

24           So all three people are involved

92

1    Bill Byrd?

2                  MS. ACKERSTEIN:   Objection.

3         A.    It was on the written warning -- on the

4    final written warning.

5         Q.    But that is a basis for your

6    termination, is that correct?

7                  MS. ACKERSTEIN:   Objection.

8         A.    No, it is a combination of him not

9    following through consistently on all of these

10   areas including expense reports violations as

11   well.

12        Q.    I understand that.

13              So what I am getting at, I am trying to

14   find out it is my understanding that you were

15   involved in the decision to termination Bill

16   Byrd, is that correct?

17        A.    Correct.

18        Q.    And I am trying to find out what the

19   basis of that decision was?

20        A.    Lack of meeting these performances that

21   were written out on the written warning.

22        Q.    All right.  So these were the bases of

23   your terminating Bill Byrd, is that correct?

24                  MS. ACKERSTEIN:   Objection.

1    and they put them in after.

2              It is a company policy. When I am with

3    them, they know to put in their call notes

4    immediately following the call.

5              And if I am not with them, I don't know

6    what they are doing. But I always, when I get

7    into their car, I check their computer and it

8    will tell me what their call notes are and their

9    teammates call notes and I do check that on

10   people.

11   Q.    Are there occasions when a sales rep

12   cannot -- it is not in violation of the policy

13   for a sales rep not to input it immediately after

14   the call?

15   A.    No, that is okay. I mean if you are in

16   a multiple group practice and you are talking to

17   two doctors at once and one comes out of the

18   hallway and you have to talk to two of them, just

19   when you leave the office, you put it down so it

20   is fresh in your memory.

21   Q.    And what were the examples of Bill Byrd

22   not doing it -- specific examples?

23   A.    When you would look in the Jornada,

24   there would be call entered and no notes or very

1    vague notes that would not be helpful for the

2    teammates.

3        Q.    Can you give me an example?

4        A.    It is two years ago, I can't recall

5    exactly, but if you pull the report which you

6    probably have in there, it will probably show

7    you -- it says detail and there is no call notes.

8        Q.    If you recognize that there are no call

9    notes, is there a method that you go through to

10   investigate a sales rep?

11       A.    Well, like I said, it first starts in

12   the car with the sales rep when I am out with

13   them and if they are not putting in the call

14   notes after and when we do pre-call planning,

15   that means before we go into visit the physician,

16   I pull up their notes as well as their team

17   notes, and if I see that they have either no

18   notes or very bad notes, I bring it to the rep's

19   attention and tell them it is not acceptable.

20           And if it continues, then I can pull a

21   call report if I feel it is appropriate after

22   talking with my manager.

23       Q.    Other than Bill Byrd, do you have any

24   memory of any other sales reps where you had to

1    A.    I don't know.  I have to talk to H.R.

2    and my boss.

3    Q.    Have you had any other sales reps who

4    stacked sample boxes in the back seat of the

5    vehicle?

6    A.    Not so that they could not look out of

7    the window, blocking the view, no.

8    Q.    But stacked it in the back seat?

9    A.    The issue was Bill stacked it so he

10   couldn't see out of the back window.

11   Q.    You have to listen.  I am asking you a

12   question.  I am not asking you if it blocked the

13   window.

14        I am asking you have you had occasion

15   where any of the sales reps stacked the samples

16   in the back seat?

17   A.    They put samples in their back seat

18   sometimes  -- most of the time in the truck.  It

19   depends on the vehicle.

20   Q.    Can you identify for me any sales reps

21   who have stacked it in the back seat?

22   A.    I don't recall any stacking.  They do

23   sometimes put samples in the back seat.

24   Q.    But Bill is the only one that comes to

1  mind who stacked it so that in your opinion you

2  could not see out of the rear window?

3      A.   You absolutely could not see out of the

4  rear window, correct.

5      Q.   When did you first believe that Bill

6  Byrd was not working in the territory between

7  8:00 and 5:00 Monday through Friday?

8      A.   Like I said, when he told me his son,

9  he drops his son off at school at 8:00 at

10 Xaverian.

11     Q.   But you have no specific recollection

12 as to what time period that was?

13     A.   Sometime after I started in early 2000

14 after maternity leave I am assuming, mid 2000.

15     Q.   Have you had any other problems with

16 sales reps not being in the territory between

17 8:00 and 5:00 p.m.?

18     A.   Meghan Markle I believe wasn't.

19     Q.   If a sales rep is not going to be in

20 the territory between 8:00 and 5:00 p.m., Monday

21 through Friday, is there a method in which they

22 report that to people?

23     A.   Yes, they just leave me a voice mail or

24 an e-mail and let me know if they are taking

*C O N F I D E N T I A L    T E S T I M O N Y*    105

1    vacation or they have a display or something is

2    going on.

3        Q.    Did you have any sales rep that had an

4    ongoing issue with whether they reported it to

5    you or not being in the territory between 8:00

6    and 5:00 p.m.?

7        A.    Not that I know of.  If they didn't

8    report it to me, I wouldn't know because I don't

9    see them.

10        Q.    The daily transmission of call

11    activities to home office, did you have any other

12    sales reps that had an issue with that?

13        A.    Again, I wouldn't know unless I pulled

14    the reports on that.  That was expectation.

15        Q.    Now, do you recall any sales rep that

16    you pulled a report on?

17        A.    Meghan.

18        Q.    What about Tim?

19        A.    I haven't done it yet.

20        Q.    Do you plan on doing it?

21        A.    I don't know.  I have to talk again to

22    my H.R. and to my boss.

23        Q.    So other than Tim Zerbe and Meghan

24    Markle and Bill Byrd, you don't have any

*C O N F I D E N T I A L    T E S T I M O N Y*  106

1   recollection of pulling daily reports on any

2   other sales reps of any other person that reports

3   to you?

4        A.    Not that I recall for transmissions.

5        Q.    How long does Aventis keep these

6   records for -- the call activity?

7        A.    I don't know.  That would be a Computer

8   Systems Department thing.

9        Q.    Satisfactory knowledge of Aventis

10  promoted products and their competitors.

11       A.    Yes.

12       Q.    Any other sales reps have issues with

13  that other than Bill Byrd?

14       A.    As far as being able to articulate the

15  proper verbiage for that bullet point?

16       Q.    Yes.

17       A.    Sometimes newer reps do but that is

18  understandable but people with Bill's tenure at

19  that point should know the promoted products

20  very, very well is the expectation.

21       Q.    So other than Bill Byrd and new --

22       A.    Newer reps.

23       Q.    -- and newer reps, Bill was the only

24  one that had an issue with that?

*C O N F I D E N T I A L   T E S T I M O N Y*   107

1        A.      Well, Meghan.

2        Q.      Meghan had an issue with that?

3        A.      Yes.

4        Q.      How about Tim?

5        A.      Well, he is brand new.  He is six

6    months in so...

7        Q.      But he does have a problem with that?

8        A.      He can't get the information out.  He

9    knows it but he can't sell.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

108

1      Q.    Now I want to jump to actually the

2  final written warning.

3           You put in here and I think one of the

4  reasons that you stated for his termination was

5  that you learned that Bill Byrd recently exceeded

6  Aventis entertainment expense guidelines?

7           MS. ACKERSTEIN:  Objection.

8      Q.    As well as recording the expenses

9  inaccurate, is that true?

10           MS. ACKERSTEIN:  Objection.

11     A.    It was a combination of everything in

12  this final written warning.

13     Q.    Is that one of the reasons for the

14  termination?

15           MS. ACKERSTEIN:  Objection.

16     A.    Expense guidelines?

17     Q.    Yes.

18     A.    If I recall correctly, yes.

19     Q.    Can you identify for me what

20  specifically you are talking about in this final

21  written warning?

22     A.    I believe it was the golf outing.

23     Q.    When you say the golf outing, what do

24  you mean by that?

1    receipt is.  Can you see the copy?   Stop & Shop

2    it says.

3             Do you see a date on this receipt, the

4    last page?

5             MR. KOSLOWSKY:  I don't see it but

6    this is the document that Aventis produced in

7    response to a Request for a Production of

8    Documents.

9        A.    It appears to be this receipt for the

10    $125.90 I assume is going towards the June 6th

11    Stop & Shop round table.

12        Q.    Is that an error?  Are you trying to

13    say --

14        A.    Where does $140.44 come from if the

15    receipt says $125.90?

16        Q.    So as I understand it, one of the

17    reasons that you terminated Mr. Byrd was because

18    of this expense report, is that correct?

19        A.    Falsifying expense report and call

20    activity.

21        Q.    You believe that he falsified this

22    expense report?

23        A.    Let me look at it.

24             On the first page of the receipts, the

*C O N F I D E N T I A L    T E S T I M O N Y*    166

1    said, I was able to observe enough.

2         Q.    Are these sales reps, are they being

3    supervised by other area managers?

4         A.    Yes.                                            •

5         Q.    Okay, were there any complaints

6    submitted to you regarding Bill Byrd?

7         A.    Formal complaints or just word of

8    mouth?

9         Q.    Any complaints?

10        A.    Yes.

11        Q.    Any formal complaints?

12        A.    Not that I know of.  No one filed it

13   with H.R.

14        Q.    Who made a complaint to you?

15        A.    Mike Thibault.

16        Q.    Who else?

17        A.    Julie Nelson had issues with him.

18        Q.    She had a complaint?

19        A.    She complained to John Ferney and I at

20   the time and that was probably a year or two

21   later.  They were having very big teamwork

22   issues.

23        Q.    Anyone else?

24        A.    That was basically it for the team.

1   Two out of four people.

2       Q.   And what was Mike Thibault's complaint?

3       A.   Numerous things.  Bill wasn't allowed

4   in certain offices --

5       Q.   I'm sorry, Bill wasn't allowed in

6   certain offices -- I believe you said that Mike

7   Thibault identified to you which offices he

8   wasn't allowed in?

9       A.   Yes, and I don't recall the names.

10      Q.   When did this conversation with Mike

11  Thibault take place?

12      A.   I don't recall the date.

13      Q.   Was it before this review?

14      A.   I don't recall.

15      Q.   Was it after this review?

16      A.   I don't recall.

17      Q.   Was it after Mr. Byrd was terminated?

18      A.   It was while Mr. Byrd was employed with

19  us.

20      Q.   All right.  Was it during -- after the

21  45-day plan?

22      A.   I don't have a date.

23      Q.   So you have absolutely no recollection?

24      A.   Sometime between 1999 and 2001.

*C O N F I D E N T I A L   T E S T I M O N Y*   168

1       Q.   How many occasions did you speak with

2   Mike Thibault regarding --

3       A.   Mike Thibault sought me out to explain

4   issues such as samples, Bill ran out of samples

5   one time and they happened to bump into each

6   other at some location and Bill said I have no

7   samples, do you have some that you can give to

8   me.

9       Q.   It that uncommon --

10      A.   Yes.

11      Q.   -- for one rep to take samples from

12   another rep?

13      A.   You plan -- it is not uncommon to

14   transfer samples but you do that ahead of time

15   knowing that you are going to be running out.

16      Q.   Other than samples, did Mike Thibault

17   complain to you about Bill about anything else?

18      A.   Like I said, access to some physician's

19   offices that Bill wasn't allowed access to.

20      Q.   Anything else?

21      A.   Not that I can recall.

22      Q.   Did you discuss with Bill these

23   statements that Mike Thibault made to you?

24      A.   The sample one I believe I did -- why

1    he ran out of samples and didn't plan.

2         Q.    The physicians' access -- the access to

3    some physicians' offices -- you didn't discuss

4    that with Bill?

5         A.    I might have.  I don't recall.

6         Q.    Would that be a concern of yours that

7    one of your sales reps didn't have access?

8         A.    Absolutely.

9         Q.    And that would be something that you

10   want to address?

11        A.    Yes, absolutely.  I just can't recall

12   if I did or not.  It was three years ago.

13        Q.    And again interpersonal skills, when

14   you met with him in May of 2000, you state that

15   Bill treats customers and his peers with dignity

16   and respect?

17        A.    Yes, that is what I observed, Bill was

18   always kind to people and nice to other people.

19   That is correct.

20        Q.    Again he has a good rapport with his

21   Quad teammates and actually participates and

22   initiates programs within the territory, is that

23   true?

24        A.    Yes.

*C O N F I D E N T I A L    T E S T I M O N Y*    170

1    Q.    Did that change at some point?

2    A.    Yes, I think I heard complaints from

3    mostly Julie Nelson and Mike Thibault over time.

4    Q.    What complaints did you hear from Julie

5    Nelson?

6    A.    She had difficulty with him just on

7    teamwork issues -- not responding or not

8    communicating if I recall correctly.

9    Q.    Can you give me a specific example?

10    A.    It was just a general lack of team work

11    between the two of them.

12    Q.    But you can't think of any specific --

13    A.    No, not off the top of my head.

14    Q.    And it was your belief that Bill Byrd

15    was the problem as opposed to Julie Nelson?

16    A.    It appeared that way from the examples.

17    Q.    But you don't recall the examples?

18    A.    Programming effort -- she would do a

19    lot of the programming I think was one of her

20    issues.

21        Just lack of communication basically.

22    It was a big one.

23    Q.    Did you discuss with Bill Byrd these

24    concerns that Julie Nelson had?

*C O N F I D E N T I A L    T E S T I M O N Y*    189

1      A.    Mid 30's.

2      Q.    Kathy Grose?

3      A.    Grose -- very strong.  She is now a

4  manager at the company.

5      Q.    What is her race?

6      A.    White.

7      Q.    Did you hire her?

8      A.    Yes.

9      Q.    Did you hire Nancy Barrett?

10      A.    Yes.

11      Q.    Okay.

12      A.    And I also hired Sari Pomponio who is

13  50.

14      Q.    Meghan Markle -- did you hire her?

15      A.    Yes, I hired her.

16      Q.    What is her race?

17      A.    White.

18      Q.    And how old was she?

19      A.    She was around 30 -- late 20's.

20      Q.    And again you hired her?

21      A.    Yes.

22      Q.    What was her background?

23      A.    Pharmaceuticals.

24      Q.    And what company?

*C O N F I D E N T I A L   T E S T I M O N Y*   211

1    remember he got so angry that he stormed out.

2         Q.    When you state he stormed out, did

3    Mr. Byrd have a disagreement as to the contents

4    of this review?

5         A.    If it was this review or the other one,

6    I don't know.

7         Q.    I am referring to now --

8         A.    Number 10, right?

9         Q.    No, Exhibit 9?

10        A.    I'm sorry, what was the question?

11        Q.    Did you have a disagreement with Bill

12   Byrd over this?

13        A.    If I recall correctly, this is the one

14   that we did at the Dedham Hilton, this mid-year,

15   I think this is the one that he got upset and he

16   disagreed with and I can't remember if I did the

17   performance plan at the same time or not but he

18   got so angry that he didn't agree with it and he

19   wouldn't sign it and he left.

20        Q.    I am going to ask you to look at the

21   last page of Exhibit No. 9?

22        A.    Yes.

23        Q.    Is that Bill Byrd's signature there?

24        A.    Do not agree, yes.

*C O N F I D E N T I A L    T E S T I M O N Y*   222

1    were discussing earlier?

2        A.    Yes.

3        Q.    Whose idea was it to request these

4    reports?

5        A.    Chris and I, I believe at that point,

6    and Mailet.

7        Q.    And Mailet?

8        A.    Mailet, yes, I don't recall

9    specifically, but usually we bounce everything

10   off of Mailet.

11       Q.    And what was the purpose of requesting

12   these reports?

13       A.    This was again because of Bill's

14   telling me he visited his mom, didn't record the

15   miles and then he was dropping his child off at

16   school at 8:00 and not getting into territory so

17   I started pulling call activity reports and gas

18   reports to do a due diligence on --

19       Q.    Do you recall when you requested these

20   reports?

21       A.    Let's see if there is a date on it.

22             It says it was generated on September

23   18th, 2000 and it takes usually a few weeks for

24   them to get them.

*C O N F I D E N T I A L   T E S T I M O N Y*  224

1     first page I have circled it which is 3:00 he is

2     in Milton and I assume June 30th was because it

3     was a weekday when he was supposed to be in

4     territory down the Cape.

5          Q.    Where was Bill Byrd's territory?

6          A.    Cape Cod and South Shore.

7          Q.    How far up South Shore?

8          A.    Just to -- I think it went to Plymouth

9     maybe.

10          Q.    And what is the New Bedford area -- is

11     there an area known as the New Bedford area?

12          A.    Yes, it goes to New Bedford as well, it

13     goes west there and then down the Cape.

14          Q.    So you circled the indications where

15     you believed that he is out of territory?

16          A.    Well, these are indications that show

17     he gassed up -- I am assuming again that June

18     30th was a weekday -- that is why I circled it --

19     at 3:00 in his home town of Milton.

20          Q.    Other than gassing up at 3:00 in

21     Milton, is there any reason that you believe that

22     other than gassing up that he was out of his

23     territory beyond just gassing up?

24          A.    Well, dropping his son off at school

*C O N F I D E N T I A L    T E S T I M O N Y*   225

1    every morning at 8:00, that wouldn't get him into

2    territory on time.

3        Q.    And if you keep flipping through there,

4    there is a handwritten for 6/30, 3:00 p.m., do

5    you know what that indicates -- strike that.

6            Is that your writing?

7        A.    Yes, yes.  That I believe goes back to

8    this first page.  It looks like it reference

9    because there are two different logs -- it says

10   June 30th at 3:00 and here is June 30th at 15:08

11   which is 3:00 --

12       Q.    All right.

13       A.    Worked 9:00 to 11:30 and then went back

14   home and gassed car and I had a question mark

15   whether he had a dinner program that night.

16       Q.    Do you know if he had a dinner program

17   that night?

18       A.    I don't recall.

19       Q.    Was this based on a conversation you

20   had with Mr. Byrd -- these notes?

21       A.    No, this is just my own reading of this

22   report.

23       Q.    All right, so you are saying he worked

24   9:00 to 11:30 and then went home and gassed car

*C O N F I D E N T I A L   T E S T I M O N Y*  233

1       Q.    And Hyannis?

2       A.    Yes.

3       Q.    East Freetown?

4       A.    I don't know.

5       Q.    Again Plymouth I believe you testified

6    is?

7       A.    Yes.

8       Q.    Hyde Park?

9       A.    No.

10      Q.    Canton?

11      A.    No.

12      Q.    Buzzards Bay?

13      A.    Yes.

14      Q.    And it is my understanding that other

15   than Bill Byrd you have never requested fuel

16   reports on any other sales rep for Aventis,

17   correct?

18      A.    I may have with Meghan Markle -- I

19   don't recall.

20              MR. KOSLOWSKY:  Mark this please.

21                  (Exhibit No. 12, Reservation

22                  Confirmation, was so marked.)

23      Q.    Do you recall being in a telephone

24   conference with Christine List on September 21st,

1    that is why I had those pulled.  That was odd to

2    me.

3         Q.    But they checked out?

4         A.    They apparently checked out.

5         Q.    They were authentic?

6         A.    Yes.

7         Q.    Although it may seem unusual, you have

8    no reason to dispute that Bill Byrd obtained

9    these signatures of these doctors during these

10   times?

11        A.    It appears that way.

12        Q.    Or if there is some type of computer

13   glitch that the clock was set up wrong?

14        A.    Exactly, right, but it is, you know,

15   something that I need to look into as a manager

16   with any other rep.

17        Q.    Have you looked at that with any other

18   rep?

19        A.    If it comes up I do -- again with

20   Meghan it came up.

21        Q.    It came up at night?

22        A.    It came up -- her work ethic -- she was

23   commuting from Boston.

24        Q.    All right.

1        A.     So I really wanted to know what time

2    she was in territory and she told me she really

3    didn't get into territory until later and I told

4    her 8:00 to 5:00 was the rule and I am pretty

5    sure I pulled reports on her as well.

6        Q.     What policy is the rule 8:00 to 5:00,

7    do you recall?

8        A.     In your territory 8:00 to 5:00.

9               So if you have to commute a long time,

10   that means you have to leave your house at 7:00

11   to be in your territory at 8:00.

12       Q.     Is the policy for Aventis that you have

13   to be in there at 8:00 or is it that you have to

14   be in there for eight hours?

15       A.     Again, it is 7:00 to 4:00 if you are a

16   hospital rep or 8:00 to 5:00, you know, 8:30 to

17   5:30.  You try to stay within those parameters

18   because that is when the doctors are in their

19   offices.  You catch them in their office.  It

20   does no good to do 10:00 to 8:00 at night because

21   no one is in the office.

22       Q.     What if you have to do paperwork?

23       A.     You don't have to do paperwork too much

24   with this company.

1        Q.    With the computer?

2        A.    It is not paperwork.  It just gets

3    transmitted in.

4        Q.    In other words, if you are doing your

5    calls and notes --

6        A.    You should do them right after a call.

7        Q.    Let's say you go into one facility --

8        A.    Yes.

9        Q.    -- and you meet with several doctors,

10   all right?

11       A.    Yes.

12       Q.    And it is getting later in the day and

13   you know that to get to the other portion for

14   another call -- if you start doing your call

15   there, you won't get your other calls in for the

16   rest of the day, so you won't meet your quota of

17   8.5 a day?

18       A.    It is not really a quota.  It is a

19   target or goal.

20       Q.    A goal?

21       A.    Yes.

22       Q.    In that situation do you want the sales

23   rep to disregard the goal and input their calls

24   and notes at that point?

1    there?

2            Is there anything else other than

3    sample variance?  You said you had discussions

4    with --

5        A.    Paper forms, he had more paper forms

6    than anyone, and the company gives clear

7    directions to use the Jornada as much as

8    possible -- use the computer as much as possible.

9        Q.    If someone is having problems with the

10   computer --

11       A.    For two years?

12       Q.    What is the down side -- I don't want

13   to say the down side.

14           Is there any implication with a sales

15   rep using paper forms as opposed to the computer?

16       A.    It can cause variances which is a major

17   issues as well.

18       Q.    Just tracking it makes it more

19   difficult and it is easier with a computer?

20       A.    If it is entered into the computer, you

21   can track everything and more accurately, of

22   course.

23       Q.    All right.

24       A.    In terms of paper forms, they don't

*C O N F I D E N T I A L   T E S T I M O N Y*   269

1   want you to deal with the paper forms.  It is

2   more costly for the company to process.

3        Q.   You could potentially lose the paper

4   forms and compilations?

5        A.   Yes, I guess.  He had the highest in

6   the district, somewhere around 20 to 30 percent

7   using paper forms.  Everyone else had, you know,

8   2 to 5 percent -- so it was again another policy.

9        Q.   Did he change that?

10       A.   No, not throughout his time there not

11   that I recall.  He possibly dropped it somewhat.

12            MR. KOSLOWSKY:  Can we get that

13   marked.

14            (Exhibit No. 18, Order Counts, was so

15                 marked.)

16       Q.   Do you recognize that?

17       A.   This is from my Director Mark Miles

18   giving me direction to tell Bill to stop using so

19   many paper forms.

20       Q.   Stop using so many paper forms?

21       A.   Yes, he -- that is what I said, around

22   25/30 percent -- here it is 21 percent and 34

23   percent.

24       Q.   And this is in the first quarter of

*C O N F I D E N T I A L   T E S T I M O N Y*   288

1    Q.    Did you say David Thurell reported to

2    you?

3    A.    No, he does not.

4    Q.    How about Carolyn Poulin?

5    A.    No.

6         MR. KOSLOWSKY:  Mark that.

7         (Exhibit No. 21, Letter 1/18/02, was

8                  so marked.)

9    Q.    I am going to show you a document that

10   has been marked as Exhibit No. 21.

11        Do you recognize this document?

12   A.    Yes.

13   Q.    Do you recall that meeting?

14   A.    Yes.

15   Q.    Is this the final meeting before Bill

16   Byrd was terminated?

17   A.    I believe so.

18   Q.    Is it fair to say that Bill disagreed

19   with the assessments contained in the written

20   warnings you provided him?

21   A.    No.  It says right here.  It says Chris

22   asked Bill if he would call, I'm sorry, where is

23   it -- when asked if Bill was in our shoes, what

24   would he do -- he said he would not accept the

312

1                    C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    Norfolk, ss.

5

6         I, Maureen Nashawaty, a Registered

7    Professional Reporter and Notary Public in and

8    for the Commonwealth of Massachusetts, do hereby

9    certify that the foregoing transcript of the

10   deposition of **DEBORAH A. EDMUNDS**, having been

11   duly sworn, on Tuesday, October 26, 2004, is true

12   and accurate to the best of my knowledge, skill

13   and ability.

14        IN WITNESS WHEREOF, I have hereunto set

15   my hand and seal this 11th day of November, 2004.

16

17

18                    Maureen R. Nashawaty
                      Registered Professional Reporter

19

20

21   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
22   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
     DIRECTION OF THE CERTIFYING REPORTER.
23

24

# DISK ENCLOSED

313

Volume:    II
Pages:     313 - 227
Exhibits:  None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. BYRD,                    )
            Plaintiff,             )
                                   )
        v.                         ) C.A. 04-11032-DPW
                                   )
AVENTIS PHARMACEUTICALS, INC.      )
and DEBRA EDMUNDS,                 )
            Defendants.            )


CONTINUED DEPOSITION OF **DEBORAH A. EDMUNDS**,

a Witness called on behalf of the Plaintiff,

taken pursuant to the applicable provisions of

the Federal Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

offices of Flavin & Koslowsky, 424 Adams Street,

Milton, MA, on Friday, November 19, 2004,

commencing at 10:10 a.m.


*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

318

1          A.    No.

2          Q.    So the products have changed between

3    2000 and today?

4          A.    Correct, I only have Amaryl and Lantus

5    right now.

6          Q.    And you also have some different reps

7    reporting to you now than you did then?

8          A.    Yes.

9          Q.    Is it fair to say a lot has happened in

10   the past four years?

11         A.    Yes.

12         Q.    The job of being a sales rep is very

13   much involved with an honor system, isn't it?

14              MR. KOSLOWSKY:  Objection.

15         A.    Correct.

16         Q.    When the sales rep is spending the day

17   in his territory, he generally is calling on

18   physicians and physicians' offices by himself?

19              MR. KOSLOWSKY:  Yes.

20         A.    Yes, generally.

21         Q.    Does he make his own schedule of

22   visits?

23         A.    Yes.

24         Q.    And he doesn't have his Area Manager

319

1    with him every day?

2         A.    Yes.

3         Q.    So I take it as an Area Manager, you

4    have to trust your sales reps to be in their

5    territory every day and you really can't tell

6    whether they are or not?

7                   MR. KOSLOWSKY:  Objection.

8         Q.    Is that accurate?

9         A.    Yes.

10        Q.    A sales rep could leave his territory

11   in the middle of the day and you might not know

12   about it, right?

13                  MR. KOSLOWSKY:  Objection.

14        A.    Correct.

15        Q.    I take it that as an Area Manager, when

16   you begin supervising a sales rep, you believe

17   that the rep is being truthful in what he tells

18   you he is doing?

19                  MR. KOSLOWSKY:  Objection.

20        A.    Yes.

21        Q.    And so you in effect are giving your

22   sales reps the benefit of the doubt?

23        A.    Yes.

24        Q.    And that is what you did with Mr. Byrd?

1        A.    Correct.

2        Q.    In 1999 when you began supervising him,

3    you believed that he was being truthful when he

4    reported on his activities to you?

5              MR. KOSLOWSKY:  Objection.

6        A.    Yes.

7        Q.    And then at some point he told you he

8    was dropping off his child at school at 8:00?

9              MR. KOSLOWSKY:  Objection.

10       A.    Yes.

11       Q.    And did that give you some doubt about

12   whether he was actually in his territory at that

13   time?

14             MR. KOSLOWSKY:  Objection.

15       A.    Yes.

16       Q.    What was the impact on you when you

17   learned that he hadn't excluded as personal miles

18   those miles when he went to see his mother in

19   upstate New York?

20             MR. KOSLOWSKY:  Objection.

21       A.    What do you mean by the impact on me?

22       Q.    Well, should he have reduced, should he

23   have deleted those miles or indicated that they

24   were personal miles?

321

1        A.    Oh, absolutely -- that was company

2    policy to record personal mileage.

3        Q.    Did he do that?

4        A.    No.

5        Q.    Did it cause you to have any suspicions

6    about whether he was being truthful?

7        A.    Oh, yes.

8        Q.    And so I take it, it is after you

9    learned about that, that you began to look at his

10    gas receipts?

11        A.    Yes.

12        Q.    So is it fair to say that you have your

13    sales reps on an honor system and that if you

14    have some reason to doubt whether they are being

15    truthful, that you might then begin to look at

16    some of their documentation to see if it is

17    accurate?

18                MR. KOSLOWSKY:  Objection.

19        A.    Absolutely.

20        Q.    You also told us about the plan for

21    area managers that there is an expectation that

22    managers will do 120 days a year in the field, is

23    that right?

24                MR. KOSLOWSKY:  Objection.

1        A.    That is a goal.

2        Q.    Okay.  And if you actually do the math

3    and calculate four days a week times 50 weeks,

4    you would get out to 200 days, so I take it that

5    the goal is only 120 because there is a

6    recognition of the other activities that the Area

7    Manager is going to be involved in?

8        A.    Yes, we get 20 vacation days, four

9    floating holidays, many meetings, holidays, etc.

10        Q.    So the things that would be excluded

11    from the 120 days would be if you had conferences

12    or you were called to New Jersey?

13             MR. KOSLOWSKY:  Objection.

14        A.    Exactly.  We have many managers'

15    meetings and many district meetings.

16        Q.    Now, you said that the -- that if

17    somebody was having a problem, a rep was having a

18    problem, that you might tend to have more time

19    with them, do you remember that?

20             MR. KOSLOWSKY:  Objection.

21        A.    Yes.

22        Q.    And I assume that that would depend on

23    what other things were going on, whether you had

24    meetings or conferences or were called to

323

1    New Jersey?

2                    MR. KOSLOWSKY:  Objection.

3         A.    Correct.

4         Q.    Would it be accurate that as a manager,

5    it is also easier to provide coaching to a rep if

6    you believe the rep is receptive to it?

7                    MR. KOSLOWSKY:  Objection.

8         A.    Correct, absolutely.

9         Q.    Did you find Mr. Byrd receptive to your

10   coaching?

11        A.    No.

12        Q.    And you told us, do you remember you

13   told us last time that you had called Mark Miles

14   who was then your Regional Director to go on a

15   day with you and Mr. Byrd?

16        A.    Yes, it is called a piggyback because I

17   was having issues with Mr. Byrd.

18        Q.    And isn't it the case that often times

19   on a piggyback, the Regional Director will remain

20   in the car because you don't want three people to

21   go in to call on a physician?

22                    MR. KOSLOWSKY:  Objection.

23        A.    That can happen, yes.

24        Q.    So the Regional Director would still

1          MR. KOSLOWSKY:  Objection.

2     A.    Yes, yes.

3     Q.    And if you see a pattern of a rep

4    reporting calls principally let's say between

5    10:00 a.m. and 2:00 p.m., do you reach any

6    conclusions?

7          MR. KOSLOWSKY:  Objection.

8     A.    Yes.

9     Q.    What do you believe?

10    A.    That the rep is not working the full

11   day as required.

12    Q.    What would you expect to see from a rep

13   who is in his territory between 8:00 and 5:00?

14    A.    What I would expect to see?

15    Q.    Yes.

16    A.    That it would be reflected in the call

17   activity reports, the correct times.

18    Q.    That there would be calls throughout

19   the day?

20          MR. KOSLOWSKY:  Objection.

21    A.    Correct, correct.

22    Q.    And that the signatures of physicians

23   who are signing for receiving samples would be in

24   the daytime hours?

1          MR. KOSLOWSKY:  Objection.

2     A.    Yes, yes, and they would be spread

3     throughout usually.  It is not just a couple of

4     hours with all of the signatures.  There is some

5     at 8:00 or 9:00 and some at 4:00 or 5:00 and they

6     are spattered throughout the middle.

7          Q.    And these would be daytime hours?

8          A.    Correct.

9          Q.    You also testified about the reasons

10    for the termination of Mr. Byrd's employment.  Do

11    you recall that?

12         A.    Yes.

13         Q.    And you testified throughout the day

14    Mr. Koslowsky asked you questions and so I just

15    want to make sure that I am understanding this

16    correctly -- you identified problems with

17    Mr. Byrd's performance in September of 2000 which

18    were put in this performance review?

19              MR. KOSLOWSKY:  Objection.

20         A.    Yes.

21         Q.    And then Mr. Byrd received a warning, a

22    final written warning in September of 2001?

23              MR. KOSLOWSKY:  Objection.

24         A.    Yes.

340

1              C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    Norfolk, ss.

5

6              I, Maureen Nashawaty, a Registered

7    Professional Reporter and Notary Public in and

8    for the Commonwealth of Massachusetts, do hereby

9    certify that the foregoing transcript of the

10   deposition of **DEBORAH A. EDMUNDS**, having been

11   duly sworn, on Friday, November 19, 2004, is true

12   and accurate to the best of my knowledge, skill

13   and ability.

14             IN WITNESS WHEREOF, I have hereunto set

15   my hand and seal this 2nd day of December, 2004.

16

17

18             Maureen R. Nashawaty
               Registered Professional Reporter

19

20

21   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
22   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
     DIRECTION OF THE CERTIFYING REPORTER.
23

24