EXHIBIT C

1

Volume:    1
Pages:     1 - 227
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


WILLIAM M. BYRD,                )
            Plaintiff,          )
                                )
        v.                      )  C.A. 04-11032-DPW
                                )
AVENTIS PHARMACEUTICALS, INC.   )
and DEBRA EDMUNDS,              )
            Defendants.         )


DEPOSITION OF **CHRISTINE L. LIST**, a

Witness called on behalf of the Plaintiff, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Maureen

Nashawaty, a Notary Public within and for the

Commonwealth of Massachusetts, held at the

offices of Flavin & Koslowsky, 424 Adams Street,

Milton, MA, on Thursday, November 4, 2004,

commencing at 10:15 a.m.


*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

1    A.    Yes.

2    Q.    When you went to hospital sales

3    representative, was that also in Philly?

4    A.    Yes.

5    Q.    Area Manager.

6    A.    Where was that based?

7    Q.    Yes.

8    A.    New York.

9    Q.    Area Manager for hospital sales?

10    A.    Boston.

11    Q.    Area Manager for field sales?

12    A.    Boston.

13    Q.    Regional Account Manager?

14    A.    Boston.

15    Q.    And Regional Sales Director?

16    A.    Boston.

17    Q.    Are you still presently in Boston?

18    A.    Yes, I am.

19    Q.    When did you become Deborah Edmunds'

20    Regional Sales Director?

21    A.    When I became a Regional Sales Director

22    in 1999.

23    Q.    Do you remember in 1999 the month, the

24    time period?

20

1      A.    I don't.

2      Q.    Okay.

3      A.    I believe it was early 1999.

4      Q.    Have you ever had a claim of

5   discrimination against you?

6      A.    No.

7      Q.    Have you ever had a claim or been

8   involved in a claim of discrimination against the

9   company that you are employed with, that you have

10  been involved with?

11     A.    No.

12     Q.    Can you give me a description of your

13  duties as a Regional Sales Director?

14     A.    I manage a region and specifically

15  manage the area managers.

16     Q.    Now, you testified that you are located

17  out of Boston?

18     A.    Yes.

19     Q.    Does your region, has it changed during

20  your time period as a regional sales director?

21     A.    In what way?

22     Q.    You testified that you were out of

23  Boston?

24     A.    Yes.

1      Q.    Is the Boston market the same?

2      A.    It has changed multiple times.

3      Q.    Multiple times?

4      A.    Yes.

5      Q.    So the territory has actually changed?

6      A.    Yes.

7      Q.    Has it changed -- in other words, as a

8   Regional Sales Director, when you have a

9   territory, does the territory stay the same,

10  actually let me rephrase that.

11        When you became a regional sales

12  manager, strike that, a Regional Sales Director,

13  who were your area managers?

14     A.    I don't recall all of them by name.

15     Q.    Can you try to list them?

16     A.    I know Deb Edmunds, Jim DePaulo, George

17  Keefe, Dennis Falci.

18     Q.    How do you spell Dennis' last name?

19     A.    F-a-l-c-i.

20        I can't remember the rest of the names.

21     Q.    Typically how many area managers do you

22  have?

23     A.    Between 8 to 10.

24     Q.    Between 8 to 10?

23

1       A.      The company realigns and reassigns us
2   to different geographies.
3       Q.      In other words, they re-evaluate it and
4   they say you can be more effective if you include
5   this in your territory and you eliminate this, so
6   it is a global thing as opposed to them simply
7   just periodically making changes for change sake?
8               MS. ACKERSTEIN:  Objection.  I am
9   just objecting to the form of the question but if
10  you can answer it, you can go ahead.
11      A.      I don't know always why they change it.
12  That is not my decision to make.
13      Q.      It just changes and you go with the
14  flow?
15      A.      There are lots of different reasons
16  that they can change it.
17      Q.      All right.  As part of your duties as a
18  Regional Sales Director, do you do work-withs at
19  all?
20      A.      Can you be more specific.
21      Q.      Or drive with sales representatives?
22      A.      I do.
23      Q.      When would you do that?
24      A.      That is not my primary responsibility,

1    so it varies.

2         Q.    When would you do it?

3         A.    There is no set pattern.  I mean as I

4    get an opportunity to go out and work with the

5    sales associates I will do it, sometimes at the

6    request of the managers and sometimes at my own

7    personal need to just get out and to work in the

8    area with various area representatives just to

9    see what is going on in the marketplace.

10        Q.    Would an Area Manager request you to do

11   a drive with or a work-with because they wanted

12   you to see how a sales rep was doing?

13        A.    Yes.

14        Q.    All right.  Typically is it to show

15   that they are a good sales rep?

16        A.    Can you define typically?

17        Q.    In other words, under what

18   circumstances would they ask you to do a

19   work-with, in other words to evaluate it because

20   they had concerns with him?

21        A.    There is a multitude of circumstances.

22        Q.    Can you describe for me what those

23   circumstances are?

24        A.    One would be because they are a high

1    performer and the manager would like me to see

2    their level of performance.  One might be because

3    there are issues and concerns with their

4    performance.  One might be because of a market

5    need or a customer circumstance that they would

6    like me to be able to experience or evaluate.

7    There are lots of different reasons.

8         Q.   Is there any others other than the

9    three that you can think of?

10        A.   Not that I can think of.

11        Q.   Can you give me an example of a sales

12   rep that you went out with that was a high

13   performer?

14        A.   There have been numerous.

15        Q.   Can you name me one?

16        A.   Very recently I worked with Ron Senez.

17        Q.   And who asked you to?

18        A.   Ron's Area Manager.

19        Q.   Who is the Area Manager?

20        A.   Kelly Shea.

21        Q.   Anyone else?

22        A.   Julie Wallis.

23        Q.   Who is her Area Manager?

24        A.   Jamie Wilson.

1    become a competent sales associate?

2              MS. ACKERSTEIN:  Objection to the

3    form of the question.

4        Q.    Are you saying that that has occurred

5    numerous times?

6        A.    Yes.

7        Q.    Can you identify how many times it has

8    happened with Deb Edmunds?

9        A.    I -- you asked me, Deb doesn't work for

10   me any more.

11       Q.    How long did Deb Edmunds work for you?

12       A.    A very short period of time.

13       Q.    Approximately how long?

14       A.    I don't know the specific time.

15       Q.    Can you make an educated guess?

16       A.    It was the middle of March to the end

17   of that one year and then I was not her manager

18   for the remaining part of the following year.  I

19   was her manager for subsequent to that for about

20   9 more months.

21       Q.    All right.  So from March to the end of

22   the year?

23       A.    Yes.

24       Q.    And that is in --

Case 1:04-cv-11032-DPW    Document 25-4    Filed 03/18/2005    Page 10 of 57

46

1          A.    Three weeks she was on maternity leave.

2          Q.    That was in 1999?

3          A.    Yes.

4          Q.    And not that year but the following

5    year for a nine-month period for 2001 I believe?

6          A.    The tail end of 2001 to 2002.

7          Q.    All right.  During that time period,

8    did Deb share any observations of a sales

9    associate with you, other than that, strike that.

10              Did Deb Edmunds share her observations

11   of a sales associate where you brought the sales

12   associate in and began coaching them?

13         A.    I can't answer the question the way you

14   have it.  What do you mean when you say bring the

15   sales associate in and coaching them?

16         Q.    You said that if a sales, strike that,

17   an Area Manager is having issues with a sales

18   associate, that it is a multi-phased process that

19   Aventis goes through, is that correct?

20         A.    Yes.

21         Q.    How many times and I believe you stated

22   or testified that the Area Manager would first

23   share his or her observations with you about the

24   issues regarding the sales associate?

COPLEY COURT REPORTING

1       A.    Yes.

2       Q.    During the time period that you were

3    the regional sales director in charge of Deb

4    Edmunds, how many times did she come to you or

5    ask you or share observations regarding a sales

6    associate with you?

7       A.    All of the time.

8       Q.    When you say all of the time, maybe if

9    you can help me, I understand as part of your

10   duties possibly as a Regional Sales Director is

11   that an Area Manager would provide you feedback

12   regarding the various different sales associates,

13   is that correct?

14      A.    Correct.

15      Q.    Is that what you are referring to as

16   all of the time?

17      A.    Yes.

18      Q.    All right.  Is the typical feedback,

19   would you refer to that as typical feedback, in

20   other words, that is part of their

21   responsibilities to report to you regarding where

22   everyone is and what they are doing and what they

23   can improve?

24      A.    Yes.

1       A.    I don't remember all of them.

2       Q.    No, I understand.  I just want the ones

3   that you remember?

4       A.    There is actually two with the initials

5   J. S., B. P., D. H. -- those are the ones that I

6   can remember off the top of my head.

7       Q.    And Bill Byrd?

8       A.    And Bill Byrd.

9       Q.    And you can recall any others right

10  now?

11      A.    Not the specific initials.

12      Q.    When you say not the specific initials,

13  you can't recall their names and, therefore, you

14  can't provide me with the initials?

15      A.    Correct.

16      Q.    Who was the first person to notify you

17  that they believed that they were having issues

18  with Bill Byrd?

19      A.    Can you be more specific?

20      Q.    At some point in time did someone

21  notify you that they were having problems with

22  Bill Byrd?

23      A.    In what relationship?

24      Q.    As a sales associate -- any

63

1       relationship?

2            A.    In what capacity, in what was my

3       capacity?

4            Q.    Has anyone ever come to you and

5       notified you that they believed that there were

6       issues with Bill Byrd?

7            A.    Yes.

8            Q.    Who were those people?

9            A.    I can't, I can't specifically recall

10      all of the people involved or the names.  It is

11      more of a general.

12           Q.    Why don't we start with the people that

13      you do recall?

14           A.    Sean Flanders.

15           Q.    Who else?

16           A.    Deb Edmunds.

17           Q.    Who else?

18           A.    I can't recall any other specific

19      names.

20           Q.    When did Sean Flanders notify you that

21      there were issues with Bill Byrd?

22           A.    I don't remember the specific time

23      frame.

24           Q.    What was discussed?

64

1          A.    I don't remember the specifics of what

2    was discussed.  It was more of a general

3    reference.

4          Q.    What was the general reference?

5          A.    To his work performance and his -- just

6    his general day-to-day working in the territory.

7          Q.    What was his comments regarding Bill

8    Byrd's work performance?

9          A.    That they weren't what he had hoped

10   they would be.

11         Q.    Did he have any other comments?

12         A.    I don't remember specifically.

13         Q.    Okay.

14         A.    I think he -- no, I don't remember

15   specifically.

16         Q.    Other than, strike that.

17               You also said working with him day to

18   day, did he have any comments regarding that?

19         A.    I remember a general level of

20   frustration.

21         Q.    He said he was frustrated?

22         A.    Sean was frustrated as his manager.

23         Q.    He told you he was frustrated as Bill

24   Byrd's manager?

65

1       A.      Yes.

2       Q.      Did he tell you why he was frustrated?

3       A.      It related to Bill's not being at the

4   standard that Sean wanted him to be at from a

5   competency perspective.

6       Q.      Do you recall him telling you anything

7   else?

8       A.      I don't recall specifically.

9       Q.      Do you recall when this -- was it one

10  conversation?

11      A.      I don't recall.

12      Q.      Could it have been more than one

13  conversation?

14      A.      Yes.

15      Q.      And do you recall when this

16  conversation took place?

17      A.      I don't.

18      Q.      Did you take any notes regarding this

19  conversation?

20      A.      No.

21      Q.      Do you recall where this conversation

22  took place?

23      A.      I don't.

24      Q.      You also said Deb Edmunds.

1    when there is a problem.

2    Q.    So this is part of the multi phase?

3    A.    Yes.

4    Q.    All right.

5          MS. ACKERSTEIN:  Maybe we should take

6    about a five-minute break and use the rest room,

7    is that all right?

8          MR. KOSLOWSKY:  Sure.

9          (Short Recess, 11:45 to 11:50.)

10   Q.    Can you state for me the reasons that

11   Bill Byrd was terminated?

12   A.    Yes.

13   Q.    Could you please state them?

14   A.    Poor performance in terms of overall

15   job competency and not improving in his

16   performance, policy violations and falsification.

17   Q.    Any other reasons -- when you say

18   falsification, is that falsification of records?

19   A.    Falsification of expense reports and

20   records.

21   Q.    Any other reasons?

22   A.    Not that I recall.

23   Q.    Poor performance, what was his poor

24   performance?

1    us having to counsel him on giving grants

2    directly to physicians or moneys to physicians

3    for charitable donations that was against our

4    policy.   In terms of our expense reporting

5    policy, in terms of how he recorded expenses, his

6    recording of personal mileage, these all fall

7    under various policies.

8        Q.    Anything else that you can recall?

9        A.    Not that I can recall.

10       Q.    Falsification of expense reports and

11   records?

12       A.    Yes.

13       Q.    Can you identify those for me?

14       A.    The expense reporting policy was a

15   situation where he provided false information

16   around an expense that he had put on an expense

17   report, I believe it was related to a golf outing

18   and how he reported that, who was in attendance,

19   the amount of moneys that were spent.   There was

20   issues with all of those areas.

21       Q.    Any other issues?

22       A.    With expense reporting.

23       Q.    With regard to this event?

24       A.    When you say other issues, can you be

1    more specific?

2        Q.    I think you are referring to a specific

3    expense report regarding this golf outing, you

4    said how he, it was he reported on it falsely,

5    one of them is who was in attendance, you claim

6    that that was falsification of records, I believe

7    and the other is the amount of money that he

8    spent?

9        A.    Yes.

10       Q.    Is there any other reason that you

11    consider --

12       A.    How he reported it.

13       Q.    What did you mean by how he reported

14    it?

15       A.    I don't believe he called it a golf

16    outing on his expense report.

17       Q.    Anything else on that expense report?

18       A.    Not that I can recall.

19       Q.    Can you recall any other examples of

20    Mr. Byrd falsifying expense reports?

21       A.    No.

22       Q.    Any other examples of Mr. Byrd

23    falsifying expense, excuse me, falsifying

24    records?

80

1        A.    Yes.

2        Q.    What are those?

3        A.    We identified issues with his call

4    reporting and his call activity.

5        Q.    Anything else?

6        A.    He was recording calls that he wasn't

7    making in his --

8        Q.    What do you mean reporting calls that

9    he wasn't making?

10       A.    In his computer he would record a call

11   that he didn't make.

12       Q.    When -- you are saying that he didn't

13   physically go to the doctor's office or that what

14   you considered to be -- in other words, or he

15   went to the doctor's office but it didn't meet

16   the criteria of Aventis, do you understand the

17   distinction?

18       A.    No.

19       Q.    When you say that he was putting down

20   calls that he wasn't making, can you describe for

21   me what you mean by that?

22       A.    We have a specified definition of what

23   constitutes a call.

24       Q.    Yes.

1    he had been with the company and had been working

2    with those specific products.

3         Q.    Has anyone else at Aventis ever

4    misstated product information either at sales

5    calls or at what did you call them -- in a group

6    setting?

7         A.    In front of his peers?

8         Q.    In front of his peers.

9         A.    Can you ask the question again?

10        Q.    Are you aware of any other sales

11   representative for Aventis that might have

12   misstated product information either at a

13   doctor's office or in front of their peers?

14        A.    Yes.

15        Q.    Is that I don't want to say common but

16   that is not an abnormal occurrence, correct?

17             MS. ACKERSTEIN:    Objection.

18        A.    I am not sure I can answer your

19   question the way you asked it.

20        Q.    These other people that misstated

21   product information, were they terminated?

22        A.    Yes.

23        Q.    All of them were?

24        A.    I can't answer that question the way it

1    knowledge, I believe you testified, well, they

2    are not terminated for lack of product knowledge,

3    it is, I am kind of assuming here you are saying

4    that then we go and try to improve their

5    competency and it is a question of how they

6    respond to the coaching, is that correct?

7        A.    Correct.

8        Q.    Are you aware of any examples of people

9    who have been terminated who didn't adhere to the

10   coaching so to speak?

11       A.    Yes.

12       Q.    Who?

13            MS. ACKERSTEIN:  Just initials or

14   what you can recall.

15       A.    Of the ones that I can recall, J. S.,

16   J. S., B. P.

17       Q.    What about D. H?

18       A.    I don't recall.

19       Q.    All right.  Territory management, what

20   do you mean by territory management?  You said he

21   was terminated for territory management?

22       A.    Are you asking me what is the

23   definition of territory management?

24       Q.    Well, I suppose it is -- one of the

1   reasons you gave for poor performance and

2   competency areas or termination, I guess a lack

3   of competency and you stated that territory

4   management was one of the reasons.

5              I am trying to find out what you

6   considered to be where Mr. Byrd was lacking with

7   regard to territory management which resulted in

8   his termination?

9        A.    Well, first of all, I would want to go

10  on the record and say all of these are not stand

11  alone.  These are all things that he was coached

12  on and did not respond to and that is why in

13  these cases -- in this case it led to

14  termination.  It wasn't the incident itself.

15             In terms of territory management it was

16  the recording of the call activity at the point

17  of the call being made and recording of effective

18  call notes.  It was effective management of his

19  samples.  It was working together effectively

20  with teammates.

21       Q.    Anything else?

22       A.    I think that that covers it.

23       Q.    Recording call activity at point of

24  call.  What is that?

1        A.     It means that the, our policy states

2     that the interaction with the physician should be

3     recorded at the point in time that it occurs

4     including the call notes and the sampling

5     activity.

6        Q.     Okay.

7        A.     It also requires the representatives to

8     transmit on a daily basis.

9        Q.     All right.  So recording call activity

10    at point of call, you include that effectively

11    call notes or was that something separate?

12       A.     That is separate.

13       Q.     All right.  Is it your testimony that

14    the point of call is supposed to be done

15    immediately after the call, is that -- am I

16    hearing you correctly?

17       A.     That is the company policy, yes.

18       Q.     Is there any reason to not do it

19    immediately after the call?

20       A.     I suppose there could be.

21       Q.     Could you give me an example of one?

22       A.     When you say any reason, can you tell

23    me more specifically what you mean by that?

24       Q.     What would be acceptable for you for

1          THE WITNESS:  Yes.

2      A.    J. S., J. S., M. G, F. S.

3      Q.    I'm sorry, what?

4      A.    F. S.

5      Q.    Anyone else?

6      A.    There have been numerous others, I just

7  can't recall their initials.

8      Q.    B. P?

9      A.    No.

10     Q.    D. H?

11     A.    I don't recall.

12     Q.    When you say numerous others, you can't

13  recall their names?

14     A.    Correct.

15     Q.    Were these individuals terminated as a

16  result of this?

17     A.    Which individuals?

18     Q.    Any one of these that you have now

19  named?

20     A.    Can you be more specific in terms of

21  were they terminated because of --

22     Q.    Because of recording call activity at

23  the point of call?

24     A.    As an isolated reason for termination?

1    Q.    As one of -- either an isolated or one

2  of many grounds?

3       A.    Yes.

4       Q.    Who were those?

5       A.    I just gave you their initials.

6       Q.    Is it J. S., J. S., M. G, F. S?

7       A.    Not M. G. or F. S.

8       Q.    They are still with the company?

9       A.    No.

10      Q.    Did they leave?

11      A.    Yes, they did.

12      Q.    So M. G. is no longer with the company

13  and F. S. is no longer with the company?

14      A.    Correct.

15      Q.    Do you recall if they were put on 45

16  day plans, M. G. and F. S?

17      A.    M. G.  was not and F. S. was.

18      Q.    What about the numerous other people

19  that you don't recall, do you know if they were

20  terminated?

21      A.    I don't recall.

22      Q.    Do you recall whether or not they are

23  still with the company?

24      A.    I don't recall.  They may -- as I

1   explained to you before, I moved in and out of

2   various positions so I may not have continued in

3   their developmental process to see it through to

4   the end so I wouldn't know necessarily what

5   evolved.

6        Q.    Are there any of the individuals who

7   you have identified, were any of them minorities?

8        A.    Of those?

9        Q.    Of the ones that you have identified

10  for recording call activity?

11       A.    No.

12       Q.    Were any of them over 40 years of age?

13       A.    Yes.

14       Q.    Which ones?

15       A.    J. S. and B. P.

16       Q.    You also put down effective call notes,

17  not recording effective call notes, what is that

18  -- did I say that right, not recording effective

19  call notes?

20       A.    Yes.

21            Following the conclusion of the call

22  with the physician, the representatives are

23  supposed to include a note in their computer that

24  is shared with their teams that would reflect

94

1       A.    They are records that are provided to

2   us from our internal E.S. Department or

3   I.S. Department that would make those records

4   available to us.

5       Q.    What is the I.S. Department?

6       A.    Our Computer Department.

7              MR. KOSLOWSKY:  I want to take a

8   quick break.  I just want to grab something.

9              MS. ACKERSTEIN:  Sure.

10             (Recess 12:17 p.m. to 12:20 p.m.)

11      Q.    I think you said that the next thing

12  was effective management of samples.  What do you

13  mean by that?

14      A.    It is the management of the samples

15  that the representatives have in hand to

16  distribute to their customer.

17      Q.    And what does it mean -- how does one

18  effectively manage the samples?

19      A.    They record the specific number of

20  samples that they give in any given call and they

21  have to then reconcile that amount on a weekly

22  basis to what the company sends them per FDA

23  regulations.

24      Q.    Has it always been on a weekly basis?

1       A.    They are required quarterly to
2    reconcile.  The weekly reconciliation if -- it
3    depends on if we have had problems with people's
4    ability to reconcile.
5       Q.    And what was Mr. Byrd's issue with not
6    effectively managing samples?
7       A.    In terms of what he would say it was or
8    what the company would say?
9       Q.    What you would say?
10      A.    We would receive notification from the
11   company that he was missing samples and couldn't
12   account for them.
13      Q.    Is that called a sample variance?
14      A.    Yes.
15      Q.    Would you personally receive this
16   notification from the company?
17      A.    Not necessarily.
18      Q.    Who would this notification from the
19   company come from?
20      A.    Who would it come from?
21      Q.    I'm sorry, go to?
22      A.    The Area Manager and to Bill Byrd
23   directly.
24      Q.    And as I understand it, if someone has

109

1       Q.    When he informed you that he entered a

2    call when he did not see the person --

3                MS. ACKERSTEIN:  Asked and answered.

4       Q.    -- can you identify the doctor that he

5    didn't see?

6       A.    Not off the top of my head.

7       Q.    Okay.  I am going to show you a

8    document and ask you if you can recognize it?

9       A.    I don't.

10                MR. KOSLOWSKY:  Actually, can I get

11    this marked as Exhibit No. 3.

12                (Exhibit No. 3, Call Notes/Katz, was

13                     so marked.)

14       Q.    You testified that Bill didn't

15    effectively record call notes?

16       A.    Yes.

17       Q.    Are these the call notes that a sales

18    associate would record?

19                MS. ACKERSTEIN:  Objection.

20       A.    I don't understand your question.

21       Q.    Where would they record their call

22    notes?

23       A.    In their computer.

24       Q.    What is the name of that computer?

110

1          A.      The Jornada.

2          Q.      The Jornada?

3          A.      Yes.

4          Q.      Does that record it?

5          A.      I don't understand your question.

6          Q.      As I understand it, the purpose of

7     recording the call notes is that, and correct me

8     if I am wrong, when a sales associate calls on a

9     doctor, he inputs it into the computer, the call

10    notes and then there is a runny tally of everyone

11    in his team that is going to see the same doctor,

12    so when a teammate wants to look at what type of

13    activities is happening with a particular doctor,

14    he can get the call notes and see what are other

15    sales associate in his team did and what they

16    discussed, etc., etc?

17              MS. ACKERSTEIN:   Objection.

18         Q.      Is that correct?

19         A.      Yes, it can be correct, yes.

20         Q.      What is the purpose of call notes?

21         A.      To share the information that is

22    discussed in the call and it can be to give

23    direction forward to the next associate in terms

24    of what they should be discussing with that

1    physician the next time they see them or for the

2    same person to have a note to remind them of what

3    they would like to talk to them about the next

4    time they see them.

5        Q.    You have testified that Aventis has a

6    criteria for what constitutes a call, correct?

7        A.    For what constitutes a call?

8        Q.    Yes.

9        A.    Yes, yes.

10       Q.    And they need to input that information

11   on the call, is that correct?

12       A.    What do you mean they need to input

13   that?

14       Q.    They need to record it?

15       A.    What do you mean by they need to.

16       Q.    Call note -- what is a call note?

17       A.    A call note is whatever the

18   representative wants it to be.  We give them

19   direction on what it should be but there isn't a

20   written definition of what that call note should

21   be.

22       Q.    Is there a written definition as to

23   what a call is?

24       A.    Yes.

112

1          Q.    And could you identify for me what
2     Aventis' policy is as to what constitutes a call?
3          A.    A call needs to be a face-to-face
4     discussion of the product that would include some
5     component of the marketing message with that
6     customer.
7          Q.    Now, if a person didn't have a
8     face-to-face discussion -- client or physician of
9     the product that would include a marketing
10    message -- would that enter that as a call?
11         A.    They should not.
12         Q.    They should not?
13         A.    Yes.
14         Q.    Are you aware --
15         A.    Can I clarify that?
16         Q.    Yes, sure.
17         A.    They should not enter it as a detail
18    call.
19         Q.    All right.  What is the difference
20    between a detail call as opposed to a call?
21         A.    A call is a general term.  There is
22    lots of things that can occur during a call with
23    a physician.
24         Q.    Can you identify those for me?

113

1        A.    They may leave samples in the office.

2    They may interact with the office staff.  They

3    may interact with the physician but not share

4    product information with the physician.

5        Q.    Okay.

6        A.    When they enter in a detail call on the

7    computer, they are required specifically to check

8    off the products that they talked about and the

9    emphasis that was placed on those products.

10       Q.    So you have a detail call which is a

11   face-to-face discussion with a doctor of the

12   product with a marketing message?

13       A.    Correct.

14       Q.    You have just an interaction with a

15   doctor, that is a type of a call but it is not a

16   detail call?

17       A.    Correct.

18       Q.    And you have interaction with the

19   office staff?

20       A.    Correct.

21       Q.    That is when you don't have any --

22       A.    Correct.

23       Q.    And you have a situation where you

24   leave samples?

114

1        A.    Yes, or any combination of the above.

2        Q.    Or any combination of the above?

3        A.    Yes.

4        Q.    How many detail calls is a sales

5    associate required to make in a day?

6        A.    What do you mean by required?

7        Q.    Is there a quota?

8        A.    No.

9        Q.    So if they don't make any detail calls

10   in a day -- how many calls in a day are they

11   supposed to make?

12       A.    The expectation is that they make

13   eight.

14       Q.    That they make eight?

15       A.    Yes.

16       Q.    And those eight calls can consist of

17   leaving samples?

18       A.    Yes.

19       Q.    Interacting with the office staff?

20       A.    No, the expectation or the goal that we

21   set for them is that they have eight face-to-face

22   interactions that include product discussions.

23       Q.    So is that a detail call then?

24       A.    Yes.

115

1      Q.    So the expectation or goal is to do 8

2   detail calls a day?

3      A.    Yes, the goal.

4      Q.    The goal?

5      A.    Yes.

6      Q.    All right.  I want you to look at

7   Exhibit 3, what has been marked as Exhibit 3?

8      A.    Yes.

9      Q.    And I want you to see where it says

10   note text?

11      A.    Yes.

12      Q.    I understand a portion of this has been

13   cut off, this is what has been produced to us?

14      A.    I don't know.

15      Q.    A portion has been cut off?

16      A.    I don't know.

17      Q.    I think you will see it as we go

18   through it.

19           Can you highlight on here -- go down --

20   actually why don't I do it this way too.

21           Go down this and with the yellow

22   highlighter, highlight the call or the note made

23   here which qualifies under Aventis policy as a

24   detail call?

1     A.    I reviewed the actual detail activity

2  of what he entered into the computer.

3     Q.    Is there a different report that will

4  provide -- in other words, when a sales associate

5  comes out of a doctor's office and he records the

6  call notes, as I understand it, you said that he

7  doesn't necessarily have to put down that he

8  spoke about Allegra  and provide the typical

9  marketing message, is that correct?

10          MS. ACKERSTEIN:  Objection.

11    A.    You need to clarify that question.

12    Q.    What notes is a sales associate

13  required to make for Aventis after they make a

14  call whether it is leaving samples, interacting

15  with the office staff?

16    A.    What is your definition of notes?

17    Q.    I am asking you what your definition of

18  notes is.  Is there a requirement at Aventis?

19    A.    This is the note.

20    Q.    This is the note right there?

21    A.    Yes, that is entered into the computer.

22    Q.    That is entered into the computer?

23    A.    Yes.

24    Q.    Is there any other notes other than

1      this right here that the sale associate is

2      required to enter into the computer?

3          A.    Not notes.

4          Q.    What are they required to enter?

5          A.    Their toggle activity -- that they

6      check off so they know, yes or no, did I make a

7      detail call, and they check off which detail call

8      they made and what product they made it on and

9      they check that box in the computer.

10         Q.    All right.

11         A.    It is not a subjective note that they

12     enter.  And they also enter in the quantity of

13     sample that is left for that particular

14     physician.

15         Q.    So other than checking off these

16     toggles, is there any other message or notes made

17     in connection with the call?

18         A.    I don't believe so.

19         Q.    All right.  So when you entered in the

20     call or the call notes, you don't necessarily put

21     in in detail what the product you discussed and

22     the marketing message was?

23         A.    Yes, you do.

24         Q.    You do?

1    A.    If you enter in a detail call, that

2    means that you discussed the product.

3    Q.    All right.  What I am saying is --

4    A.    You can enter in a call without

5    clicking off a detail call in the call.

6    Q.    Correct.

7    But if Bill Byrd checks off that he is

8    making a detail call and then he puts in his call

9    notes that he discussed the doctor's, you know,

10   weekly fishing trips, etc., etc., would that

11   qualify?  Is that an appropriate note to put in?

12   A.    What is your definition of appropriate?

13   Q.    Of Aventis?

14   A.    Is it useful, no.  Can he put it in,

15   yes.

16   Q.    As I understand it, you said the sales

17   associate can put anything in there that they

18   think would be important?

19   A.    Yes.

20   Q.    And there is no criteria whatsoever as

21   to what the call notes must consist of?

22   MS. ACKERSTEIN:  Objection.

23   A.    What do you been by criteria?

24   Do we suggest to them what they should

121

1    put in there, what would be helpful -- yes, we

2    do.

3        Q.    What does Aventis suggest that they

4    should put in there?

5        A.    The suggestion should be around

6    promoting the product, what was discussed in the

7    promotion of the product and what would be useful

8    to themselves to remind them of what they would

9    like to accomplish the next time or what they

10   would like their teammate to accomplish.

11       Q.    Are you testifying that Bill Byrd did

12   not put in what Aventis suggested?

13             MS. ACKERSTEIN:   Objection.

14       Q.    I'm trying to -- in other words, you

15   have informed me that you reviewed his call

16   activity and based on that, you made the

17   determination that he was recording as detail

18   calls things that were not detail calls?

19       A.    Correct.

20       Q.    How did you determine that?

21       A.    The detail information that I mentioned

22   to you before.

23       Q.    Yes.

24       A.    Well, let me back up.  Can you ask that

125

```
 1                    (Exhibit No. 5, Call Notes, was so
 2                       marked.)
 3                    (Exhibit No. 6, Call Notes, was so
 4                       marked.)
 5                    (Exhibit No. 7, Call Notes, was so
 6                       marked.)
 7                    (Exhibit No. 8, Call Notes, was so
 8                       marked.)
 9                    (Exhibit No. 9, Call Notes, was so
10                       marked.)
11                    (Exhibit No. 10, Call Notes, was so
12                       marked.)
13                    (Exhibit No. 11, Call Notes, was so
14                       marked.)
15          Q.    Exhibit No. 5, I am going to ask you if
16     you recognize that?
17               MR. KOSLOWSKY:  I will give them to
18     you first.
19          A.    What do you mean by recognize?
20          Q.    Is that a report generated by Aventis?
21          A.    Yes.
22          Q.    And Aventis produced it today?
23               MS. ACKERSTEIN:  Well, she doesn't
24     know that.
```

126

1        A.    I have seen other reports like it.

2        Q.    Similar?

3        A.    Yes.

4        Q.    What does that purport to show?

5        A.    There is a couple of different things

6    that it shows.  It shows the date that the call

7    was made.  Who the call was made on, and it shows

8    that secondary and primary detail that we talked

9    about and whether or not there was a recorded

10   detail call and then the last column shows when

11   it says field, that means that they went home,

12   they didn't use their hand held computer in the

13   field, they took all of this information home and

14   recorded it when they got home rather than

15   recording it in the field on their smaller

16   computer.

17       Q.    What does it say?

18       A.    It says field.  That is their large

19   home based laptop computer.

20       Q.    All right.

21       A.    The Tim Jr.  means that they actually

22   recorded it on the small Jornada.

23       Q.    All right.

24       A.    And this column home office means when

127

1    it was transmitted, the date that the

2    transmission occurred.

3        Q.    This is when it was recorded?

4        A.    That is not when it was recorded.  It

5    is when the call was made and the time it was

6    recorded.

7        Q.    If I go in and I have a primary call or

8    a second call with is it Doctor Bloom?

9        A.    Yes.

10       Q.    This records when the call was made?

11       A.    No, it records when it was entered.

12       Q.    Okay.

13       A.    He entered it at home on his home-based

14   computer at 6:15 p.m. on January 3rd and he

15   entered in a secondary and a primary call and we

16   don't know what those secondary and primary calls

17   are based on this report.

18             The question would be why at the home

19   versus his Jornada in the field which is what

20   they were required to do.

21       Q.    But you said there were reasons why

22   they didn't have to do that, is that correct?

23       A.    Exceptions.

24       Q.    And this date right here, 1/4, that is

128

1    when it was transmitted?

2         A.    That is when the home office computer

3    picks it up as a transmission and it is loaded

4    onto the main frame computer.

5         Q.    Are you aware of any other sales

6    associates that would transmit their call

7    activity from their home computer or from the

8    field?

9              MS. ACKERSTEIN:   Objection.

10        A.    I don't understand the question.

11        Q.    Have you ever reviewed these in

12   connection with any other sales associate of

13   Aventis?

14        A.    Yes.

15        Q.    And did those indicate that that sales

16   associate made transmissions from the field or I

17   guess from their home computer?

18        A.    Some did.

19        Q.    And were those sales associates that

20   were, strike that.

21             When would you typically review this

22   type of information on a sales associate?

23        A.    When questions are raised as to their

24   day-to-day activity in the field or their issues

1          A.    So it is pretty evident that he sat and

2     entered these calls in and I think if you went to

3     match it to one of the others, I think you would

4     find he did it on his home computer rather than

5     out in the field.

6          Q.    Okay, all right.  Anything else?

7          A.    I would ask him about that.

8          Q.    Okay.  Anything else?

9          A.    Not on this page.

10         Q.    Okay.  Anything else on Exhibit 8 --

11    and when I say anything else, assuming I

12    understand what that is, are there any other

13    issues aside from that?

14              MS. ACKERSTEIN:  On the first page of

15    Exhibit 8?

16              MR. KOSLOWSKY:  Yes.

17         A.    No, not on the first page.

18         Q.    Okay.  Actually go through and look at

19    Exhibit 9.

20         A.    Yes.

21         Q.    And what is that, Exhibit 9?

22         A.    This is a sample signature

23    verification.

24         Q.    And what information does that tell us?

135

1        A.    This tells us the date and the exact

2    time that the samples signature is gained.

3        Q.    All right.

4        A.    When the physician signs the computer.

5        Q.    Okay.

6        A.    And the other thing it tells us is it

7    will say either order form which all of these do

8    or it will say electronic.

9            Order forms means they got a paper

10    signature which is supposed to be the exception.

11        Q.    All right.

12        A.    They are not supposed to do that unless

13    there is an exception.

14            And they physically and manually enter

15    that into their home computer.

16            This electronic means that this

17    signature -- for instance, this 1/25/01, this

18    signature, I can't see the physician's last name,

19    this signature was gained from this physician at

20    12:03 p.m. and these are the samples that were

21    left with this particular physician.

22        Q.    And that is 12:03 p.m. and that is what

23    was left?

24        A.    Yes.

1        Q.    Being above average, is that it?

2        A.    Probably.  I don't know that I would

3    say above average necessarily.  I would just say

4    that it is something that I would think that they

5    were doing a particularly good job of.

6        Q.    All right.  At some point in time you

7    had a meeting with Bill Byrd and Deb Edmunds.  Do

8    you recall that meeting?

9        A.    Yes.

10       Q.    Was it September 25th, following this

11   mid-year review?

12       A.    It may have been.

13       Q.    Did you have any communications with

14   Deb Edmunds in between the mid-year review other

15   than the one that you just told me and the

16   meeting with Bill Byrd on September the 25th?

17       A.    I don't recall the specifics.

18       Q.    You don't recall having any discussions

19   or you don't recall the specifics of discussions?

20       A.    I don't recall the number of

21   discussions.  I think you asked me how many

22   discussions I had with her.  I don't remember.  I

23   talk to the managers every day.

24       Q.    During that meeting of September 25th,

156

1      Q.   Can you describe for me what opinions
2   he voiced?
3      A.   Can you be more specific?
4      Q.   Bill requested a meeting with you to
5   voice as I understand it concerns he had with Deb
6   Edmunds?
7            MS. ACKERSTEIN:   Objection, that is
8   not what she testified to.
9      Q.   Why do you believe that Bill requested
10   this meeting?
11      A.   Because he didn't agree with the
12   feedback that was given to him in his mid-year
13   review.
14      Q.   And what did he say to you were his
15   issues with the mid-year review?
16      A.   He didn't agree with them.  He didn't
17   agree with Deb's assessment.
18      Q.   Did you go through the mid-year review
19   with him at that meeting?
20      A.   Can you be more specific with your
21   question?
22      Q.   Did you go through it item by item, the
23   mid-year review?
24      A.   No.

1        Q.    How long did this meeting last?

2        A.    About three hours.

3        Q.    Who did most of the talking in the

4    meeting?

5        A.    I encouraged Bill to do that.  You

6    asked the question about who went through it.  I

7    was prepared to go through the review with him

8    point by point but he had requested the meeting

9    so I wanted to him give the opportunity to bring

10   forward his concerns and his issues rather than

11   it being driven by my agenda.  We did review

12   points of the review but I wanted to review the

13   points that he wanted to review.

14       Q.    All right.  Do you recall Bill telling

15   you that he had ongoing concerns with Deb

16   Edmunds?

17       A.    Yes.

18       Q.    Did he express to you what those

19   ongoing concerns were?

20       A.    Not specifically.

21       Q.    Generally?

22       A.    I asked him to be specific and he

23   refused.

24       Q.    Did he discuss them with you generally?

165

1      determine whether or not Bill Byrd it was being

2      discriminated against?

3          A.    There was never an issue that was

4      specifically raised of discrimination that would

5      have required an investigation.

6          Q.    So is the answer no?

7                MS. ACKERSTEIN:  Objection.

8          A.    Again, there was not an issue of

9      discrimination that was raised that would require

10     an investigation.

11         Q.    Did you give a copy of this to Bill

12     Byrd?

13         A.    No, I don't believe so.

14                MR. KOSLOWSKY:  Can I get that

15     marked.

16                (Exhibit No. 14, Memo, 11/11/00, was

17                      so marked.)

18         Q.    In connection with this, when you were

19     taking notes, were you taking down any quotes

20     from Deb Edmunds during the meeting?

21         A.    I don't recall specifically.

22         Q.    Do you recall taking down any notes of

23     your quotes during the meeting?

24         A.    I don't recall specifically.  I believe

1     I reflected my responses to Bill here.

2          Q.    All right.  During that meeting, did

3     you discuss with Bill Byrd possibly doing a day

4     in the field with him?

5          A.    Can you be more specific?

6          Q.    Did you discuss with Bill Byrd doing a

7     day in the field?

8          A.    What do you mean by discuss?

9          Q.    Did the issue come up during this

10    meeting?

11         A.    At Bill's request.

12         Q.    What was Bill's request?

13         A.    Bill's request was that I would come

14    out and spend a day in the field with him.

15         Q.    Did Bill indicate to you that if your

16    assessment of him was in line with Deb Edmunds,

17    then he would happily follow the 45 day plan

18    given to him by Deb Edmunds?

19         A.    I believe so.

20         Q.    All right.  And going back to Exhibit

21    No. 12, just the mid-year review, and you may

22    have already answered this -- you had a

23    discussion with Deb Edmunds about revising the

24    mid-year review, correct?

1    track of your samples?

2        A.    Especially if there are multiple

3    variances, it is an administrative and compliance

4    issue for us.

5        Q.    And after this -- at the meeting on

6    September 25th, Mr. Byrd said to you that he

7    wanted to go to on a ride with you, he wanted you

8    to spend a day with him?

9        A.    Yes.

10       Q.    And he said that he was prepared to

11   accept your judgment about things?

12       A.    Yes.

13       Q.    Did you have a conversation with Miss

14   Edmunds about what Mr. Byrd told you at the

15   meeting on September 25th?

16       A.    Yes.

17       Q.    And you also shared that information

18   with Miss Minassian in H.R.?

19       A.    Yes.

20       Q.    The decision to terminate Mr. Byrd was

21   made by you and Miss Minassian and Miss Edmunds?

22       A.    Yes.

23       Q.    Did somebody have a role and just

24   confirm with your Legal Department?

1      A.    Yes.

2      Q.    But you didn't do that?

3      A.    No, Mailet did, the H.R. generally

4  interacts with the Legal Department.

5      Q.    Okay.  On these terminations?

6      A.    Yes.

7      Q.    Okay.

8            MS. ACKERSTEIN:  Just give me a

9  minute.

10                  (Short Pause.)

11     Q.    What is the issue with the journal

12  clubs?  What is a journal club?

13     A.    The journal club in and of itself is

14  not -- a journal club is where a group of

15  physicians would get together and review data or

16  journal articles and will talk about them.  They

17  may do a case discussion.

18            It is basically an opportunity for them

19  to get together to have a discussion among

20  themselves.

21     Q.    So there is nothing per se wrong with a

22  journal club?

23     A.    Correct.

24     Q.    I gather what you are not supposed to

1          Q.    I take it that they look at the expense

2     reports and the purpose of this is to look at the

3     receipts and make sure it matches up?

4          A.    I can't speak to what they do.  I

5     haven't done that job.

6          Q.    Are you aware -- other than J. S., are

7     you aware of any other sales associate that

8     submitted an expense report where the expense

9     that they put on there did not -- was greater

10    than the receipts that they provided?

11         A.    Yes.

12         Q.    Who else other than J. S?

13         A.    I don't remember the person's first

14    name.  Their last initial is Z.

15         Q.    Was he or she terminated?

16         A.    Yes.

17         Q.    For the same thing?

18         A.    Yes.

19         Q.    Are you aware of anyone else doing

20    that?

21         A.    Yes.

22         Q.    Who else?

23         A.    I don't remember her name specifically.

24         Q.    Can you give me the initial?

223

1      Q.    And at the time you testified, you did

2    not have in front of you performance reviews or

3    warnings or other documentation, is that right?

4      A.    Correct.

5      Q.    So this morning you were testifying

6    just from memory?

7      A.    Correct.

8      Q.    And when you just responded to

9    Mr. Koslowsky, you had in front of you, the

10    warning of November 10th, 2000 and the final

11    warning of September of 2001?

12      A.    Correct.

13      Q.    You are not altering your testimony

14    this morning about the grounds for termination,

15    are you?

16      A.    No.

17      Q.    These are just some additional specific

18    performance issues?

19      A.    Yes.

20      Q.    Mr. Koslowsky also just asked you about

21    the questionable expense reports and you said

22    that there was a golf issue, a fishing issue and

23    also an issue about a program that was over

24    budget that you can recall, do you remember that?

224

1      A.    Yes.

2      Q.    It is true, isn't it, that there were

3   actually two issues involving golf, am I correct

4   about that?

5      A.    Yes.

6      Q.    Because on September 25th, 2000 at a

7   meeting, you discussed one expense report that

8   Mr. Byrd had done improperly with respect to a

9   golf outing, is that correct?  Do you recall

10  that?

11     A.    I recall that we discussed how he was

12  recording these, the golf outings and how he was

13  doing that.

14     Q.    Okay.

15     A.    I don't recall the actual expense

16  report in question.

17     Q.    Okay.  But you did have a discussion

18  presumably because he reported a golf outing as a

19  hospital display?

20     A.    Yes.

21           MR. KOSLOWSKY:  Objection.

22     Q.    And the other report that we discussed,

23  the expense report that I showed you earlier is

24  from June of 2001, is that correct?

1        A.     Correct.

2        Q.     So the one that you discussed in

3    September of 2000 and the one that was dated in

4    June of 2001, are two different incidences?

5        A.     Yes.

6        Q.     And you did discuss and I thought I

7    understood your testimony and then I wasn't sure

8    after Mr. Koslowsky asked you, it is accurate

9    that you had a conversation with Miss Minassian

10   after this meeting with Mr. Byrd and you talked

11   about what transpired?

12       A.     Yes.

13             MS. ACKERSTEIN:   Okay.  I have no

14   further questions.

15             MR. KOSLOWSKY:   That is it.

16             MS. ACKERSTEIN:   Thank you very much.

17

18

19

20

21

22

23             (Whereupon at 4:05 p.m. the
                  deposition ended.)
24

227

1                    C E R T I F I C A T E

2

3     COMMONWEALTH OF MASSACHUSETTS

4     Norfolk, ss.

5

6              I, Maureen Nashawaty, a Registered

7     Professional Reporter and Notary Public in and

8     for the Commonwealth of Massachusetts, do hereby

9     certify that the foregoing transcript of the

10    deposition of **CHRISTINE L. LIST**, having been duly

11    sworn, on Thursday, November 4, 2004, is true and

12    accurate to the best of my knowledge, skill and

13    ability.

14             IN WITNESS WHEREOF, I have hereunto set

15    my hand and seal this 19th day of November, 2004.

16

17             _____

18             Maureen R. Nashawaty
               Registered Professional Reporter

19

20

21    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
      DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
22    ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
      DIRECTION OF THE CERTIFYING REPORTER.
23

24


                  COPLEY COURT REPORTING