# EXHIBIT D

1

1   UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
2         CASE NO. 04-11032-DPW

3

4

5   WILLIAM M. BYRD,

6            Plaintiff,

7        vs.                      DEPOSITION OF:

8   AVENTIS PHARMACEUTICALS,      MAILET MINASSIAN
    INC. and DEBRA EDMUNDS,
9
             Defendants.
10

11

12

13     TRANSCRIPT of the stenographic notes of the

14   proceedings in the above-entitled matter, as

15   taken by and before TABITHA R. DENTE, a

16   Certified Shorthand Reporter and Notary Public

17   of the State of New Jersey, held at Aventis

18   Pharmaceuticals, Inc., 200 Crossing Boulevard,

19   Bridgewater, New Jersey, on Thursday, September

20   30, 2004, commencing at approximately ten

21   o'clock in the morning.

22

23            GAF LEGAL SERVICES, INC.
    COURT REPORTING * VIDEOGRAPHY * INTERPRETING
24          188 Eagle Rock Avenue
         Roseland, New Jersey 07068
25            (973)-618-0500

                    Mailet Minassian

1          A.     I ended in --

2          Q.     You started November of '95 and

3     you ended in June of 2000.

4          A.     Correct.

5          Q.     And where did you go after that?

6          A.     Then I came to Aventis.  So July

7     of 2000.  I came to Aventis.

8          Q.     And what was your position when

9     you came to Aventis?

10         A.     HR Manager.

11         Q.     Have you been promoted since then?

12         A.     Yes.

13         Q.     What was your next promotion?

14         A.     My next promotion was December of

15    2001.

16         Q.     And what was the position?

17         A.     Senior Human Resource Manager.

18         Q.     And have you been promoted since

19    then?

20         A.     I was promoted April of this year,

21    April of 2004.

22         Q.     And what was the position?

23         A.     Director of HR For Specialty

24    Sales.

25         Q.     And have you been promoted since?

Mailet Minassian

1    A.    Can you just ask the question again?

2    Q.    If a district manager called you

3    up and said I wanted to fire or terminate a

4    sales associate, how would you respond to that?

5              MS. ACKERSTEIN:  Objection.

6    A.    Like I said, I don't get calls from

7    managers that say I want to fire or terminate an

8    associate.  Most managers are aware that we have

9    a progressive disciplinary policy in place and

10   they know that the appropriate steps have to be

11   taken, to basically follow the process.

12   Q.    Is that with every employee?

13             MS. ACKERSTEIN:  Objection.

14   A.    Well, I mean, that was a...

15   Q.    General.

16   A.    General question, so I can't say

17   every employee because I've never had that come

18   up before.

19   Q.    And what is that process?

20   A.    Um, the current process is that,

21   um, associates work with the managers, the

22   managers give the associates basically coaching

23   and counselling as a starting point.  If they

24   observe any deficiencies or if the associate is

25   not meeting general expectations, then the

Mailet Minassian

1    manager provides feedback.

2              If no progress is observed based

3    on the expectations that have been set forth,

4    after some period of time, then, you know, the

5    next appropriate step may be, depending on the

6    situation, that we issue a written warning to

7    the associate.  And, again, in the written

8    warning we would outline and reiterate our

9    expectations.

10             If the written warning,

11   expectations are not met, then the next step may

12   be a final written warning, and then finally if

13   the deficiencies continue beyond that point,

14   then the appropriate next step may be

15   termination of employment.

16        Q.    Is it fair to -- when you say

17   coaching of a sales associate, is it fair to say

18   that the first step in the process may be a

19   45-day performance program?

20        A.    I can't say what the number of

21   days would be, that's...

22        Q.    But they put them on some type of

23   plan?

24             MS. ACKERSTEIN:  Objection.  If you

25        can answer.

Mailet Minassian

1          A.       Um-hum.

2          Q.       Could you describe for me what

3     that is?

4          A.       In terms of familiarity, I know

5     that the field sales associates are expected to

6     provide a summary of their daily activity via

7     the call summaries and they have little

8     instruments that they use to report every call

9     and they're expected to do that immediately

10    after each call basically providing a snapshot

11    of what occurred during his or her call with the

12    physician.

13         Q.       Does Aventis maintain those call

14    summaries?

15         A.       Um, I would have to check.  At one

16    point we did, but, honestly, I've been away from

17    the primary care group for well over two

18    and-a-half, three years, so I would have to

19    check to see to what extent those records are

20    maintained now.

21         Q.       Now, if a sales associate failed

22    to input that information immediately following

23    a call, is that grounds for termination?

24         A.       It's --

25              MS. ACKERSTEIN:  Objection.

33

Mailet Minassian

1      A.      It's a grounds for the area manager

2   to coach the associate that this is one of the

3   basic expectations that we have of every sales

4   associate.

5      Q.      So it isn't grounds for

6   termination?

7              MS. ACKERSTEIN:  Objection.

8      Q.      I think she'll -- if she doesn't

9   want you to answer --

10             MS. ACKERSTEIN:  Oh, you can answer.

11   I'm just putting him on notice.

12     A.      Okay.  I would say if that was the

13   only deficiency that the manager observes in and

14   of itself would not be immediately grounds for

15   termination.

16     Q.      Can it be grounds for termination?

17     A.      Possibly.

18     Q.      And when you say 'possibly,' I

19   mean, is it subjective?

20     A.      No.  I mean, it would -- you know,

21   I guess I would say depending on, you know, how

22   terribly it affected the person's ability to

23   manage his or her territory.

24     Q.      Are you stating that if an

25   employee was performing well, had good

Mailet Minassian

1    performance, had success in the industry, yet,

2    failed to comply with that policy, it wouldn't

3    be grounds for termination?

4          A.    No.

5                MS. ACKERSTEIN:  Objection.

6          A.    No, that's not what I'm implying at

7    all.

8                I'm just stating that that's one

9    of the basic expectations that we have of every

10   associate.  Whether, you know, you've got great

11   results or not, that's a basic expectation that

12   we have of you as a sales associate in the

13   field.

14         Q.    But I believe you also testified

15   although it's an expectation, even if a sales

16   associate does not comply with that policy, it

17   isn't necessarily grounds for termination.

18         A.    I believe I stated it could be,

19   but not necessarily.

20         Q.    It would depend on the particular

21   sales associate.

22               MS. ACKERSTEIN:  Objection.

23         A.    Again, in and of itself, not

24   reporting call activity, I have not been

25   involved in a case where that in itself led to

35

Mailet Minassian

1    termination, that one deficiency in and of

2    itself.

3         Q.    Travel and expense reports...

4         A.    Um-hum.

5         Q.    -- does Aventis maintain records

6    regarding travel and expense reports?

7         A.    We maintain records.  Again,

8    that's a separate department, we have a separate

9    T&E Department.  I can't state how far back the

10   records are maintained, but certainly T&E

11   reports are maintained for some period of time.

12        Q.    I believe you testified earlier

13   that BK -- I believe you said BK -- was

14   terminated for falsification of travel and

15   expense reports?

16        A.    Correct.

17        Q.    All right.  In the example you

18   gave with him, he actually, as I understand it,

19   classified a gift as a meal and actually

20   produced um...a bogus receipt for that meal and

21   submitted that to the company, correct?

22        A.    Um-hum.

23        Q.    In the event a sales associate

24   miscategorized an expense -- as I understand it,

25   there's several categories you can input an

36

Mailet Minassian

1     expense, correct?

2         A.     Um-hum.

3         Q.     If a sales associate

4     miscategorizes an expense, is that grounds for

5     termination?

6         A.     If it's -- if the associate is

7     misrepresenting the facts of an expense and

8     falsifying the information, yes.

9         Q.     When you say 'misrepresenting the

10     facts,' what do you mean by that?

11         A.     Well, for example, in the question

12     you just asked me about BK, BK misrepresented

13     the facts of that particular expense, so he

14     falsified information related to that particular

15     expense and that's why he was terminated.

16         Q.     Had BK not submitted I'll call it

17     a bogus receipt and checked off 'gift' by

18     mistake -- excuse me, 'lunch' by mistake and

19     actually it was a gift, but it was a harmless

20     mistake, is that grounds for termination?

21         MS. ACKERSTEIN: Objection.

22         A.     If we deem that the associate is

23     misrepresenting the facts, then it is grounds

24     for termination.

25         Q.     When you say 'misrepresenting the

Mailet Minassian

1    facts,' is there an investigation done into

2    that?

3              A.    Yes.  Typically, yes.

4              Q.    So an error on a travel and

5    expense report isn't necessarily grounds for

6    termination.

7                    MS. ACKERSTEIN:  Objection.

8              A.    It could -- it could be.  You know,

9    again, if the associate is intentionally

10   misrepresenting the facts, then it's grounds for

11   termination.

12             Q.    So it all depends on the intent of

13   the sales associate as opposed to an error?

14             A.    Well, an error could be made and,

15   I mean, the associates are responsible for their

16   expense reports and, you know, they're

17   responsible for whatever information they

18   provide on the expense reports.

19                    I would say that, you know,

20   ignorance or, you know, errors, that's part of

21   their responsibility, to make sure that, you

22   know, when they complete a T&E report that, you

23   know, they take the ten seconds that it requires

24   to review the information to make sure it's

25   accurate before they submit the information.

Mailet Minassian

1       A.    Um --

2       Q.    Or...

3       A.    I would say a falsification or

4  misrepresentation is falsification.  Once, you

5  know -- there's no categories in our minds or in

6  our approach process that says, you know,

7  misrepresenting the color of this pen is any

8  different than misrepresenting the color of this

9  bottle.

10               I mean, we deem all

11  misrepresentation as misrepresentation; there's

12  no categories of seriousness.

13       Q.    Who makes the decision as to

14  whether it's an error or a mischaracterization?

15       A.    Generally we have a discussion

16  with the associate.

17       Q.    And based on that discussion, the

18  determination is made.

19       A.    Um-hum, um-hum.

20       Q.    And if it's determined -- an

21  example, if it's determined that the expense

22  report wasn't just a human error, but, in fact,

23  an intentional act to deceive Aventis as to what

24  -- in other words, to get more money

25  appropriated to a certain event, would that

49

Mailet Minassian

1    field from eight to five every day?

2         A.    As I recall, that was some of the

3    concerns that they had in that he was not

4    reporting activity or he was not in the field at

5    eight a.m. as he was expected to.

6         Q.    If you're not in the field at

7    eight a.m., is that grounds for a termination by

8    Aventis?

9              MS. ACKERSTEIN:  Objection.

10        A.    It could be.

11        Q.    And when you say 'it could be,'

12   can you give an example as to how it could be?

13        A.    Well, if you're getting paid to

14   work a territory from eight to five and you're

15   not meeting that expectation, again, that's a

16   deficiency and you're not meeting your basic

17   responsibilities.

18             And so that could be grounds for

19   termination.

20        Q.    If a sales associate has a

21   function that night with a program or something

22   with doctors and they're expected to work that

23   night, that evening, are they still required to

24   be in the territory from eight to five?

25        A.    Yes.

69

Mailet Minassian

1    was produced in response to discovery.

2        A.      Um-hum.

3        Q.      I believe it's been marked as

4    Exhibit Number 3.  It shows a conference call

5    where the host is Christine List.

6        A.      Um-hum.

7        Q.      And the date of it is September

8    21st, 2000.

9        A.      Um-hum.

10       Q.      Does that refresh your memory as

11   to whether or not you were involved in that

12   conference call?

13       A.      No.

14       Q.      Do you recall when you spoke to

15   either Christine List or Deb Edmunds in

16   September of 2000 whether you talked about

17   Sherry obtaining gas...I think it says gas

18   receipts, either -- fuel reports on Mr. Byrd?

19       A.      I don't know who Sherry is.  I

20   mean, this doesn't sound familiar or look

21   familiar to me.

22       Q.      Do you remember ever talking about

23   obtaining fuel reports on Bill Byrd?

24       A.      Um, it's likely that we did that.

25   I can't honestly specifically recall when or if

Mailet Minassian

1    we obtained gas receipts, but it's likely that

2    we did.

3              Q.      Is that a usual undertaking by

4    Aventis?

5              MS. ACKERSTEIN:  Objection.

6              A.      It's a resource and a tool that we

7    have in terms of tracking an associate's

8    activity in the field, so it's certainly

9    something that we can look at.

10              Q.      When would that resource or tool

11   be utilized by Aventis?

12              A.      It depends.  There's no specific

13   formula for that.

14              Q.      Have you been involved in tracking

15   fuel reports for other associates, sales

16   associates?

17              A.      I have.

18              Q.      Can you identify who those sales

19   associates are?

20   (DIRECTION)  MS. ACKERSTEIN:  Well, I'm not

21         going allow her to testify to anybody's

22         name.  If you can describe an instance...

23              THE WITNESS:  I can't -- I can't

24         recall specific names.

25              MR. KOSLOWSKY:  Can you give me a

Mailet Minassian

1          MS. ACKERSTEIN:  That's fine.

2     That's exactly what I'm going to do.

3         Q.   Do you recall any specific

4   individuals that you sought fuel reports on?

5         A.   I can't honestly recall specific

6   names of -- I've supported hundreds or thousands

7   of associates over the last four years, I can't

8   recall specific names of who I may have asked

9   for gas receipts for or who else.

10        Q.   Do you recall approximately how

11   many fuel reports you sought in your tenure as

12   -- with Human Resources within Aventis?

13        A.   How many times?

14        Q.   Yeah, how many times.  Would it

15   have been five times?

16        A.   I would say, uh, probably more

17   like at least twenty times.

18        Q.   And typically when would you seek

19   these fuel reports on sales associates?

20        MS. ACKERSTEIN:  Objection.

21        A.   Um, typically if we have concerns

22   with respect to the associate's time in the

23   field.

24        Q.   Typically is that done through the

25   Human Resources office?

Mailet Minassian

1         A.    We don't generate the gas

2    receipts, we don't have that information

3    available at our fingertips.  We request that

4    through other internal resources and they

5    generate the reports for us.

6         Q.    If these field reports indicate

7    that a sales associate was not in the territory,

8    sales territory during the day -- the time

9    period and the day they were supposed to, is

10   that grounds for termination by Aventis?

11              MS. ACKERSTEIN:  Objection.

12        A.    If you're not in the field for --

13   can you restate that?

14        Q.    If you're not in the field -- in

15   other words, if these fuel reports indicate that

16   a sales associate is not in the field or their

17   territory between the time period of eight and

18   five, is that grounds for termination?

19        A.    It could be.

20        Q.    Is there any reason, acceptable

21   reason within Aventis, for a sales associate not

22   to be in the territory between the time period

23   of eight and five?

24              MS. ACKERSTEIN:  Objection.

25        A.    There are certainly acceptable

77

Mailet Minassian

1    reports.  Again, it's outside of my immediate

2    area of responsibility.

3         Q.    Yeah.

4         A.    So it really depends on their

5    workload.

6         Q.    You don't know or -- I mean, is it

7    something that can be done in a day if --

8    assuming the person has nothing to do.

9              MS. ACKERSTEIN:  Objection.

10        A.    If the person, you know, is

11   available to run the reports, they could

12   foreseeably -- I've never run the reports, so I

13   don't know what running the report entails.

14        Q.    Okay, that's -- okay.  Who

15   participated in the decision to terminate Bill

16   Byrd's employment?

17        A.    Um, Ms. Edmunds, Ms. List and

18   myself.

19        Q.    Was there a specific telephone

20   conversation where the decision was made?

21        A.    I'm sure we must have had a phone

22   conversation.

23        Q.    Do you recall when that decision

24   was made?

25        A.    Likely shortly before the final

Mailet Minassian

1    the opportunity to explain why the error

2    occurred or why the facts don't match up, so why

3    was the -- why were the facts misrepresented,

4    why did he state that it was, um, a display

5    versus a golf outing.

6         Q.    Maybe I'm wrong.  I understood

7    your testimony to be before that Aventis would

8    do an investigation and if they determined that

9    they were intentionally trying to deceive...the

10   employee sales associate was intentionally

11   trying to deceive Aventis, that would be grounds

12   for termination?

13        MS. ACKERSTEIN:  Objection.  That's

14        not what she said.

15        A.    What I said is that if we determine

16   that there's information that the T&E report has

17   been falsified, we give the associate the

18   opportunity to explain why the information was

19   presented the way he or she presented it.

20        If the associate has falsified the

21   information, then it is grounds for termination.

22        Q.    In -- well, when you say

23   'falsified,' what do you mean by falsified?  You

24   miss -- in other words, if a person doesn't

25   understand the policy within Aventis, is that

88

Mailet Minassian

1    considered falsifying records?

2         A.    Not understanding a policy does

3    not excuse you from the responsibility.

4         Q.    That's not what I'm asking.

5         A.    So that's -- I view that as a

6    completely different question.

7         Q.    Not understanding a policy, is

8    that deemed to be falsification of records by

9    Aventis.

10                MS. ACKERSTEIN:  Objection.

11        A.    If it's your expectation to know the

12   policy.

13        Q.    I'm asking you what -- can you do

14   me a favor?  I'm asking a specific question and

15   you're giving me a completely different answer.

16                I'm asking you if a sales

17   associate does not understand or misconstrues a

18   policy and as a result of that he checks off the

19   wrong box in an expense report, does that -- in

20   Aventis's eyes, is that falsification of

21   records.

22        A.    The answer is it can be because

23   you're expected to know the policy.

24        Q.    So you're saying in every occasion

25   it's considered falsification of records.

Mailet Minassian

1           MS. ACKERSTEIN:  Objection.

2           A.    Again, you know, by December 3rd I

3     was already involved in the process, so it's not

4     unlikely that I would get copied on an e-mail

5     like this.  And as I said a few minutes ago, I

6     get copied on all sorts of e-mails, so it's not

7     necessarily unusual for me to be copied on that.

8           Q.    Was there any discussions

9     whatsoever or do you recall with regard to Julie

10    Nelson, the other person identified in that

11    e-mail?

12          A.    Julie Nelson would have been --

13    what group was she in?  PCP-6?  She would have

14    been outside my, uh, area of responsibility and

15    likely Deb's as well, so...I was assigned to a

16    specific group and that was PCP-2 and she was in

17    PCP-6.

18          Q.    No, I under -- but you don't

19    recall any specific --

20          A.    (Witness shakes head in the

21    negative).

22              MR. KOSLOWSKY:  Can I get that

23          marked Exhibit Number 5.

24

25              (Whereupon, Exhibit P-5 is marked

103
                        Mailet Minassian

1              for identification.)

2

3         Q.      I want to show you a document and

4    ask if you recognize it (handing).

5                   (Brief pause.)

6         A.      Yes, I do.

7         Q.      Okay.  Do you recall receiving

8    that e-mail in December of '01?

9         A.      I recognize the document.  I don't

10   recall when I received it.  Obviously I must

11   have received it on or about December 4th, but I

12   do recognize the document.

13        Q.      Do you recall having any

14   discussions regarding this e-mail with anyone?

15        A.      Again, I don't remember specific

16   discussion, but it's very likely that I did have

17   a discussion with Deb and/or Chris List about

18   this.

19        Q.      Were you involved in crafting that

20   e-mail at all?

21        A.      No.

22                MR. KOSLOWSKY:  Can I get this

23           marked as Exhibit Number 6.

24

25                (Whereupon, Exhibit P-6 is marked

140

Mailet Minassian

1    so that, you know, we can intervene.

2            Q.      I see.

3            A.      Because we're closer to the

4    associate than they are.

5            Q.      You told us about BK who was

6    terminated for the expense report.

7                    What race was he?

8            A.      He's, um, a white male.

9            Q.      Now, you talked to us about how

10   you investigate or how Aventis investigates a

11   T&E expense where it appears that an expense is

12   reported and it might really have been something

13   else and you've said if we find out we

14   investigate.

15                   Right?

16           A.      Um-hum, correct.

17           Q.      If you go to the associate and he

18   says, you're right, it was not a display table,

19   it was a golf outing, isn't that kind of the end

20   of the investigation?

21           A.      There's no need to investigate

22   beyond that.

23           Q.      You referred to something called a

24   help me understand meeting.

25                   Is that a term that Aventis uses?

142

Mailet Minassian

1              MS. ACKERSTEIN:  I have no further

2          questions.

3

4    REDIRECT EXAMINATION

5    BY MR. KOSLOWSKY:

6          Q.      After you changed jobs in December

7    2001, who took over your position?

8          A.      Uh, Kevin Fox.

9          Q.      And is he out of New Jersey?

10         A.      He's current -- yes, he's part of

11   my group.

12         Q.      Is she -- is he still in that

13   capacity with Aventis?

14         A.      Um, well, there's been a lot of

15   realignments, so he's still part of the HR

16   management team.

17         Q.      You also testified with regard to

18   T&E reports regarding falsification of reports.

19              It's my understanding that BK was

20   terminated for one instances of falsification of

21   a report; is that correct?

22         A.      Um-hum, correct.

23         Q.      So that's all it takes at Aventis

24   is one falsification of a report to be

25   terminated?

143

Mailet Minassian

1    A.    Correct.

2    Q.    And you testified that he's a

3    white male.

4          What is his religion?

5    A.    Uh, he's Jewish.

6    Q.    Jewish, all right.  And how old is

7    he?

8    A.    I don't know his age.

9    Q.    Approximately?

10   A.    Late thirties, possibly early

11   forties.

12   Q.    And you testified that you

13   attended a help me understanding meeting with

14   Mr. Byrd?  Is that what you testified to?

15   A.    No.

16   Q.    You said that they have that

17   process.

18   A.    Correct.

19   Q.    Who initiates that?

20   A.    Typically the management.

21   Q.    Management?

22   A.    Um-hum.

23   Q.    And was it done in this instances

24   -- instant?

25   A.    Well, I think the summary notes

151

1            C E R T I F I C A T E

2

3        I, TABITHA DENTE, a Certified Shorthand

4    Reporter and Notary Public of the State of New

5    Jersey, do hereby certify that prior to the

6    commencement of the examination, the witness was

7    duly sworn by me to testify to the truth, the

8    whole truth and nothing but the truth.

9        I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the testimony as

11   taken stenographically by and before me at the

12   time, place and on the date hereinbefore set

13   forth, to the best of my ability.

14       I DO FURTHER CERTIFY that I am neither a

15   relative nor employee nor attorney nor counsel

16   of any of the parties to this action, and that I

17   am neither a relative nor employee of such

18   attorney or counsel, and that I am not

19   financially interested in the action.

20

21                        *Tabitha Dente*

22   _____

23        TABITHA DENTE, CSR NO. 1592

24

25