UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM M. BYRD, <br><br> Plaintiff, <br><br> v. <br><br> AVENTIS PHARMACEUTICALS, INC. and DEBRA EDMUNDS, <br><br> Defendants. | Civil Action No. 04-11032-DPW |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Plaintiff, William M. Byrd (hereinafter the "Mr. Byrd" or "Plaintiff"), hereby submits this Opposition To Defendants' Motion For Summary Judgment. As will be demonstrated below, there are substantial genuine issues of material fact in dispute and, therefore, Defendants' Motion for Summary Judgment must be denied as a matter of law.

### II.     FACTS

A.     BACKGOUND

On or about May 12, 1997, Plaintiff William M. Byrd (hereinafter "Mr. Byrd" or "Plaintiff") was hired by Hoechst Marion Roussel, Aventis Pharmaceuticals, Inc.'s (hereinafter "Aventis") predecessor, as a Professional Sales representative. (Pl. Tr. 97).

Mr. Byrd is African American, who was born on October 29, 1948. (Pl. Tr. 10).

On or about May 1, 1999, Deborah Edmunds hired by Aventis as an Area Manager, and became Plaintiff's supervisor. (Edmunds Tr. 34).

Despite having prior excellent reviews, from approximately 2000 through his

termination, administrative policies were selectively enforced against Mr. Byrd for issues common to many sale representatives. (Boland Aff'd, ¶4). Plaintiff was singled out for particularly excessive scrutiny in regard to several administrative matters. (Boland Aff'd, ¶4).

Despite Mr. Byrd's increased efforts to comply and despite the lack of enforcement as to other sales representatives for the same infractions, Aventis management continued to harass Mr. Byrd. (Boland Aff'd, ¶16). Even though he attempted stick it out, improve, and do things above and beyond any other sales rep, his dismissal was seemingly inevitable once he was placed under the microscope. (Boland Aff'd, ¶16).

Ms. Edmunds testified at her deposition that the beginning of the process to the end of the process was about a year and-a-half. (Edmunds Tr. 72).

On February 4, 2002, at 53 years of age, Aventis terminated Plaintiff's employment. Aventis hired M.M., a Caucasian female in her late 20s to replace Mr. Byrd. (Edmunds Tr. 34).

B.     Mr. Byrd's Performance History.

In its employee review forms, Aventis specifically requests its Area Managers to provide a "general summary of performance (one or two paragraphs) accompanied by a list of the associate's strengths and **areas of opportunities**." (Edmunds Dec., ¶ 8, Ex G).

1.     Performance Review, dated March 6, 1998, by Sean Flanders (Edmunds Dec., ¶ 8, Exhibit G) noted the following:

- "Bill was hired on 5/12/97. ... In seven short months, Bill has done a good job in identifying the needs of his major customers, he is working towards learning his new products and how to impact his customers against the competition.

- "Bill treats everyone he comes into contact with dignity and respect. He has already developed a reputation as being credible, reliable, and trustworthy with his customers. He is a good listener and has adapted to change very quickly. He communicates with me on a regular basis to discuss territory opportunities and changes. His previous sales experience has given him a head start on cultivating relationships with his customers. I would say this is a strength area for Bill."

- "Bill is a very hard worker. He maintains very hard standards for himself and his professional and behavior. He is a very strong negotiator, seeking the win/win at all times."

- "Bill has some very strong selling skills, based on his experience. He knows how to probe and interact with his customers. The only thing holding him back is his product knowledge and the knowledge of his competitor. As he gets better command of his products in the marketplace, Bill will be a very strong sales associate."

- "Bill is working very hard to enhance his product knowledge. He has a good understanding of all his promoted products.

- "Bill is a very organized sales associate. He is timely in all his administrative duties, he keeps accurate territorial records, adheres to policies and procedures, utilizes samples effectively and effectively uses territory computer and voice mail. His car has all the available resources in an organized manner within his trunk."

- "Bill is committed to the team approach from the word go. He worked well with his PCP1 Associates to build relationships, enhance his access, and to hear opportunities throughout 97."

- "Bill has jumped right into his territory full speed ahead. He has a very good knack at moot benefit, selling and rapport building team. He spent much of 97 getting up to speed in the pharmaceutical industry. His further development of product knowledge and the knowledge of key influences in his territory, Bill will become a very effective and successful sales associate. I look forward to helping enhance his core competencies and meet his 98 goals of ring and maximum bonus."

2.    Performance Review, dated July 6, 1998, by Sean Flanders (Edmunds

Dec., ¶ 8, Exhibit G) noted the following:

Aventis' Mid-Year reviews provide for rating employees on a scale of 0 to 4, with

3

the rating of 4 being "mastery," 3 "high," 2 "moderate," 1 "basic," and 0 "below basic expectations." In his 1998 mid-year review, in six of the eight classifications, Mr. Byrd received six ratings of 3 (or high rating), one ratings of 2.5 (being between high and moderate), and only one rating of 2 (moderate). Mr. Byrd never received a basic rating or a below basic expectation rating. In addition, the comments about Mr. Byrd were very positive.

     3.    Performance Review, dated April 5, 1999, by Sean Flanders (Edmunds Dec., ¶ 8, Exhibit G) noted the following:

- "Bill increases knowledge of managed care and group practice organizations within his territory in 1998. He began to develop advocates (Farad, Coakley, DeNoyers, and Coughlin), and he leveraged these advocates to localized speaker programs. He utilized his resources (OPP $, M & S and Samples) very well. His call activity was good at 8.3 calls per day."

- "Bill has good interpersonal skills. He developed a good reputation as a reliable and credible associate towards his key customers. He spent 1998 developing key relationships with Coakley, Coughlin, New Bedford Health and Cape Cod IPA."

- "Bill is professional in his image and behavior. He sets high standards for himself. He remains calm during adverse situation and responds to change very well. He was very outspoken at district meetings."

     4.    Performance Review, dated August 5, 1999, by Deborah Edmunds (Ackerstein Dec., ¶ 9, Exhibit H) noted the following:

Mr. Byrd's 1999 Mid-Year review was very incomplete, due to the fact that Deb Edmunds was Mr. Byrd's District Manager for a few months prior to this review. Of the eight areas contained in the performance review, Ms. Edmunds only provided an assessment in three of the areas.

Mr. Byrd received one rating of 3 (or high rating), one rating of 2.5 (being

4

between high and moderate), and one rating of 2 (moderate). Mr. Byrd never received a

basic or a below basic rating. In addition, the review noted that Mr. Byrd scored a 96%

on the Allegra QD/Pediatric/Urticaria test, which is an excellent barometer of product

knowledge. Ms. Edmunds also notes that Bill has a strong rapport with many offices in

the territory and that Bill treats people with dignity and respect.

     5.    Performance Review, dated May 4, 2000, by Deborah Edmunds

(Ackerstein Dec., ¶ 9, Exhibit 4) noted the following:

- "Bills team finished the year at 103% of their Allegra family goal and 118% of their Amaryl, therefore achieving 110% ring index. Bill is assertive in the offices and knows most of the key personnel. A particular strength for Bill is that he consistently asks for the business. He has been working on improving several SSD skills during the past year."

- "Bill has been working on his clinical knowledge and has improved in his understanding of Amaryl. His goal this past year was to read more diabetes trade magazines and to review clinical. His Amaryl knowledge has improved and his Allegra knowledge is good. He has been proactive in obtaining the product monographs for the competitors Avandia and Actos, so he can continue to educate himself on the diabetic market."

- "Bill treats customers and peers with dignity and respect. He has a good rapport with his quad teammates and actually participates and initiates programs within his territory. An example of this is a plaque from the Greater New Bedford Community Health Center's Sixth Annual Golf Tournament that Bill was responsible for organizing."

- "Bill has a through understanding of his territory and is knowledgeable about the managed care business in his area. He utilizes Allegra's preferred status to enhance his sales calls. He has done a very good job of developing advocates for both Allegra and Amaryl. Bill's territory has a very high Allegra volume and therefore requires a large number of samples."

- "This is an area of strength for Bill. He has specific position list of Amaryl and Allegra targets. He does a very good job of calling on the high decibel positions to drive his business. He uses CIF and DSS effectively to develop sales strategies …"

- "Bill is a cooperative member of his quad team in the district. He meets monthly with his group as required and more often if needed. He has shared success stories with his peers, so they may be above to benefit from his sales ideas in their territory."

- "Planning and organization is another strong competency for Bill. He is able to plan his day and week to revolve around the most important position. This allows Bill to achieve 8.4 calls per day on positions."

- "Bills immediate goal is to become an MDA, which we have discussed with the regional director during a field visit. Bill comes to Aventis with previous management experience and telesales. An area of opportunity for Bill is to become more of a leader in his quad team and the district."

- "Bill is very goal oriented and has written down his objectives and goals for the year."

- "Bill has high expectations of himself as a sales person. He sets goals and objectives that he strives to meet through teamwork and territory planning. Bill and his quad grew their business while beginning the year with an extremely high base. His product knowledge was noticeably improved throughout the year. Bill needs to more towards his goal of becoming an MDA by focusing on taking his skill set to the next level."

Ms. Edmunds testified that at the time she sat down with Mr. Byrd and provided him with this Performance Review on May 4, 2000, she was having performance issues with Mr. Byrd. (Edmunds Tr. 193). Ms. Edmunds also testified that this was around the time she brought Mailet Minassian, a Human Resource Manager at Aventis, was brought in with regard to preparing a 45-day plan for Mr. Byrd. (Edmunds Tr. 193).

C    Discrimination and Retaliation Against Mr. Byrd

Prior to the 2000 mid-year review, Ms. Edmunds started to investigate the three (3) oldest sales representatives reporting to her: Mr. Byrd, Ernie Simone and Robert Santori. (Edmunds Tr. 34). At the time Mr. Simone was around 50 and Mr. Santori was in his late 40s, and the other sales reps reporting to Ms. Edmunds were in there 20s or early 30s. (Byrd Aff'd, ¶ 3).

In addition, Ms. Edmunds admits she conducted a further investigation into Mr. Byrd, which she does not recall ever doing on any other sales representative including: i)

6

pulling records to see if he was in his territory; (Edmunds Tr. 53) ii) pulling fuel reports

on him; (Edmunds Tr. 196-197); and iii) and pulling physician's signature verification

reports. (Edmunds Tr. 197-198). Mr. Byrd was singled out and subjective to excessive

scrutinized unlike any other sale representative. (Boland Aff'd, ¶ 4; Pearlstein, Aff'd ¶

4-5).

At the time, Ms. Edmunds was in contact with her supervisor, Ms. List, and

Mailet Minassian, a Human Resource Manager at Aventis regarding Mr. Byrd's

performance. (Edmunds Tr. 193). Ms. Edmunds acknowledges that when an Area

Manager wants to terminate a sales representative, the first thing they do is talk to their boss

and Human Resources. (Edmunds Tr. 74).

On September 18, 2000, Bill Byrd received his mid-year performance review

from Debra Edmunds, who sought to put him on a Performance Plan. (Ackerstein Dec., ¶

10, Exhibit I) In short, this mid-year review by Ms. Edmunds was completely inaccurate

and completely negative. (Byrd Aff'd, ¶ 4).

Ms. Edmunds claims that this investigation was initiated because in July, 2000,

Mr. Byrd failed to report personal miles on his mileage reimbursement form after a

personal trip to New York. (POC, ¶31). However, this incident did not occur until the

last week of September, 2000, after Ms. Edmunds initiated the investigation against Mr.

Byrd. (See copy of expense report produced by Defendants in this litigation attached as

Exhibit A of the Affidavit of Attorney John C. Koslowsky [hereinafter "Koslowsky

Aff'd"]).

After reviewing this Performance Review, Ms. List requested that Ms. Edmunds

do it over and make it more positive. (Edmunds Tr. 263, 276; and Byrd Aff'd, ¶ 4).

D.    Requested Meeting with Ms. List

As a result of this Mid-Year review by Ms. Edmunds, and the fact he was being singled out and treated differently than other employees of Aventis, Mr. Byrd requested a meeting with the Regional Director of Aventis, Christine List.

On September 25, 2000, Mr. Byrd first met with Ms. List, and subsequently with Ms. List and Ms. Edmunds. Although discrimination is a very sensitive issue, particularly for a current employee to raise, Mr. Byrd informed Ms. List at their meeting that he was being discriminated against. Mr. Byrd informed Ms. List that he was being treated differently because of his color, that he was required to do things other people were not, that he was being held to a higher standard and that he was being criticized for that things that others were not. Mr. Byrd also asked for a transfer to a new District Manager, which Ms. List denied. (Koslowsky Aff'd, ¶ 3, Exhibit B). As African American, Mr. Byrd was required to excel above and beyond other employees at Aventis; otherwise he would be targeted and disciplined. Id. During this meeting, Ms. List acknowledged that she informed Ms. Edmunds that her Mid-Year review was too negative against Mr. Byrd. (Byrd Aff'd, ¶ 4).

E.    Retaliation Against Mr. Byrd

As a direct result of requesting the meeting with Christine List, on November 14, 2000, Deb Edmunds provided Mr. Byrd with a written warning in an effort to eliminate him from Aventis (Pl. Tr. 184). Thereafter, Mr. Byrd was scrutinized even more closely than the other sales representatives at Aventis, and constantly singled out and disciplined for precisely the same things other sales representatives were allowed to do. (Boland Aff'd, ¶ 4; and Pearlstein, ¶ 4-5).

8

Although Mr. Byrd went to great lengths to try and save his job, Aventis selectively enforced different policies to find fault with his performance. (Boland Aff'd, ¶ 16). After receiving a final written warning placing him on probation on September 5, 2001, Aventis stopped paying Mr. Byrd his bonus/commissions. Mr. Bryd asked Ms. Edmunds what he had to do to get off probation, and Ms. Edmunds informed him that he would never get off probation.

In January, 2002, Mr. Byrd attended an award ceremony in San Diego where Aventis presented him with a prestigious award, the National Allegra Marketshare leader, Ranked #5 overall. (Byrd Aff'd, ¶6).

On February 6, 2002, Aventis terminated Mr. Byrd.

F.    Awards and Achievements in 2000 and 2001

During the years 2000 and 2001, Mr. Byrd received several awards and accolades from Aventis including the following:

1.    National Marketshare leader in 2000, Ranked # 2 overall;

2.    Ring attainment for "Exceeding Sales Goals" in 2000, and he was presented with a Ring by Aventis;

3.    National Marketshare leader in 2001, Ranked # 5 overall;

4.    Growth and overall Marketshare leader in 2001, Ranked # 2;

5.    Allegra Marketshare growth leader in 2001, Ranked # 1 in Northeast; and

6.    Accomplished Amaryl highest quota attainment of 110% in 2001. (Byrd Aff'd, ¶ 6).

In contrast, after Mr. Byrd was terminated, his replacement dropped to last or second-to-last in the Region, and her sale numbers dropped to 68% for Lantus and 98% for Amaryl compared to the District Average of 101% and 102% respectively. (Edmunds

Dec., ¶ 10, Exhibit I).

G.    There Are Several Instances Of Mr. Byrd Of Being Treated Differently

There are several pretextural reasons given for terminating Mr. Byrd, which all contain inaccurate information.

1.    NFL Alumni Golf Event.

On June 8, 2001, the NFL Alumni held a charitable golf tournament, which would group a former NFL player with every foursome that participated.  The cost of the event was $1,000.00 per foursome, which included breakfast, lunch and dinner, a round of golf for a five-some that included a celebrity, tee packages for each player, signage for Aventis, and prizes for closest to the pin and longest drive.   Plaintiff sought and obtained permission from Ms. Edmunds to participate in the event and, at the request of Ms. Edmunds, Plaintiff gave information regarding this event to both PCP2 and PCP6 sale groups at Aventis. (Ms. Edmunds claims she does not recall giving Mr. Byrd permission) Three (3) sales representatives from PCP2 and PCP6 committed to the event, but their physicians dropped out.  Another sales representative from Aventis, Gerald Graham, based on the information Plaintiff provided him, also participated in this event with only one physician and paid $1,000.00.   Plaintiff had three (3) physicians attend the event. [1] Although Mr. Graham only showed-up with one physician, there was never an investigation into his group, and he recorded on his expense report that there were four physicians.  Gerard Graham was never reprimanded by Aventis.  (Boland Aff'd, ¶ 5; Byrd Aff'd, ¶¶ 10-14;  and Edmunds Tr. 109-110).

2.    POD Meetings.

---

[1]    Plaintiff's brother, a former NFL player, was the celebrity assigned to his group, and one of the doctors brought his daughter.

Plaintiff was informed by other district team members (including Ernie Simone, David Pearlstein and Bob Santoni) that they were often late and sometimes missed follow-up with monthly team meetings but were never written up for this in any performance review. (Pl. Tr. 205-207). Ms. Edmunds acknowledged that other sales representatives reporting to her failed to send her pod notes. (Edmunds Tr. 94-98). Also, Plaintiff's POD had two people in his group who were responsible to record and e-mail meeting notes to all participants' Area Managers, but failed to do so. Brenda Kurvinicki and Kelly Shea admitted that at times they did not transmit the reports to their Area Managers, but simply kept copies in the event the Area Manager asked for the report. Neither was investigated or reprimanded. (Pl. Tr. 154).

      3.    <u>Expense Reporting.</u>

Jen Riley and Annette Bohan had a dinner program at the Ritz Carlton which went over budget because of no-shows. (Edmunds Tr. 286-287). Ms. Edmunds took are of this for them. This was consistent with how Edmunds selectively took care of some of her younger, non-minority employees.

On another occasion Jen Riley sponsored a Christmas party for a physician's office which violated Aventis policy but she was not disciplined because Ms. Edmunds took care of it. (Pl. Tr. 207)..

Debra Edmunds set-up a meeting which was to be attended by several physicians at a cost of $3,000.00 to Aventis, but only two physicians showed-up at the event. (Edmunds Tr. 285-286). This also was in violation of Aventis policy, however there were no repercussions for Ms. Edmunds. (Edmunds Tr. 286).

      4.    <u>Recording Notes - Sample Administration.</u>

A lot of the reps had large sample variances, including Carolyn Pooling, David Thurell and others. (Boland Aff'd, ¶¶ 13-14, Pl. Tr. 207-208). These variances would happen a number of times during the year, with no repercussions against the other sales representatives. Mr. Byrd was singled out for particular scrutiny. Ms. Edmunds admits verifying doctors' signatures obtained by Mr. Byrd but also admits in her deposition testimony of having no recollection of performing this verification for signatures obtained by other sales representatives. (Edmunds Tr. 197-198).

## III.    ARGUMENT

A.    Plaintiff's Charge Was Timely Filed Under Both State And Federal
      Claims Because The Violations Continued Until February 6, 2002.

In this case, Mr. Byrd has alleged a long pattern of Defendants unfairly scrutinizing his performance placing him under a magnifying glass because of his race and age, resulting in selective enforcement of policies against him in order to orchestrate grounds to terminate him. Although the discrimination against Mr. Byrd apparently began in 2000, it culminated in the discrete discriminatory act of his termination on February 6, 2002.

Until this litigation, Mr. Byrd was unaware that, prior to his negative evaluation of September 18, 2000, Ms. Edmunds had initiated an investigation through Human Resources involving the three (3) oldest sales representatives reporting to her, which included Mr. Byrd and two (2) other sales representatives over the age of forty. (Edmunds Tr., p. 64).

Simultaneously, Mr. Byrd went from having received an excellent performance evaluation by Ms. Edmunds on May 6, 2000, to receiving a completely negative performance evaluation, which sought to put Mr. Byrd on a "performance plan". In fact,

Ms. List informed Ms. Edmunds that the review was too negative and she was to redo it to make it more positive (Edmunds Tr. 263, 276).

Mr. Byrd recognized that he was being unfairly treated and, in accordance with Aventis policy, requested a meeting with Ms. Edmunds' supervisor, Ms. List. At this meeting, Mr. Byrd informed Ms. List that he was being treated differently because of his color, that he was required to do things other people were not, that he was being held to a higher standard and that he was being criticized for that things that others were not. (Koslowsky Aff'd, ¶ 3, Exhibit B). Ms. List did not conduct any investigation into Mr. Byrd's complaint. (List Tr. 164-165).

Instead, as a direct consequence of requesting the meeting and lodging the complaint, Ms. Edmunds issued a written warning to Mr. Byrd. Thereafter, despite excelling as a sales representative and receive awards for his achievements, Mr. Byrd was targeted through selective enforcement of company policies to establish a paper trail to ostensibly justify his subsequent termination on February 6, 2002.

B.    Aventis Has Failed To Articulate Legitimate Nondiscriminatory Reasons For Terminating Plaintiff, And The Reasons Proffered Are Pretextual.

It is well recognized that proof of unlawful discrimination rarely can be established by direct evidence and that an employer's seemingly arbitrary action or pretext explanation for a particular action should not be permitted to justify conduct that is in fact unlawfully discriminatory. Wheelock College v. Massachusetts Commission Against Discrimination, 371 Mass. 130, 137-138 (1976). Therefore, Courts have adopted the principal that once a plaintiff establishes a prima facie case of unlawful discrimination the burden shifts to the defendant. Wheelock College, 371 Mass. at 138; citing, McDonnell Douglas Corp. v. Green; 411 U.S. 792, 802 (1973).

13

After establishing a prima facie case, the defendant must then (a) articulate a legitimate non-discriminatory reason for the adverse treatment accorded the plaintiff, and (b) produce credible evidence to show that the reason or reasons advanced were the real reasons. Wheelock College, 371 Mass. at 138; Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441-42 (1995).

If the defendant meets its burden, the plaintiff must then demonstrate that the employer's proffered reason is actually a pretext for discrimination.

1.     Legitimate Non-discriminatory Reasons:

An employer must not only give a lawful reason for its employment decision, but must also produce credible evidence to show that the reason advanced was the real reason. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441-42 (1995).

The defendant's articulation must be clear and specific and not vague. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 258 (1981); Oliver v. Digital Equip. Corp., 846 F.2d 103, 109 (1st Cir. 1988); Leob v. Textron, Inc., 600 F.2d 1003, 1011-12 n.5 (1st Cir. 1979).

The requirement imposed on employers to proffer a supported and detailed articulated reason is not an onerous one; however, it is more onerous under G.L. c. 151B than under the ADEA. Woods v. Friction Materials, Inc., 30 F.3d 255, 263 (1st Cir. 1994); Blare v. Husky Injection molding Sys. Boston, Inc., 419 Mass. at 443 (citing Wheelock Coll. v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 138 (1976).

The defendant's failure to articulate the specifics of its reasons for termination and its failure to provide records supporting its decision to terminate may reflect on the

credibility of its articulated reasons.  Hidalgo v. Overseas Condado Ins. Agencies, Inc.,

120 F.3d 328, 336-37 (1st Cir. 1997);  Duratnte v. E. Props., Inc., 18 M.D.L.R. 1, 4

(1996).

In their memorandum, Defendants assert that Plaintiff had a long history of

performance problems at Aventis such as lack of product knowledge, significant sample

variances and failure to provide call notes immediately after sales calls.  Defendants also

refer to a charitable golf outing which they claim were outside of Aventis' expense

policy, as a fraudulent expense report.

However, Defendant does not provide credible records to support their assertion

of a legitimate reason for Plaintiff's termination.  Instead, Defendants' Memorandum

misstates the Plaintiff's deposition testimony in an effort to support their orchestrated

position.

For example, Plaintiff's pod designated a secretary to send team meeting updates

to all the Area Managers, but apparently the designated secretary was not sending the

updates to any of the Area Managers. (Pl. Tr. 154).  When Ms. Edmunds brought it to

the attention of Mr. Byrd, he made sure she received all the update (Pl. Tr. 154), which

was acceptable to Ms. Edmunds with her other sales representatives.  (Edmunds Tr. 97-

98).  Mr. Byrd was the only sales representative singled out and given a hard time about

this despite the fact that the updates were not being sent to any Area Manager by the

designated secretary such that each other sales representatives were not complying with

this purported requirement.  Moreover, this alleged requirement of providing such

updates is no longer required at Aventis (Edmunds Tr. 98).

Aventis alleges that Mr. Byrd's call notes were not recorded immediately after

15

each call.   Aventis' policy required recordation of the call notes at the earliest time

possible. (Pl. Tr. 100).  Although singling Mr. Byrd out for not recording call notes

timely, defendants admit that there were justifiable reasons that a sales representative

could not record the call notes immediately after calls. (Edmunds Tr 207). Furthermore,

although Plaintiff occasionally could not record his call notes immediately after the call,

he had legitimate reasons.  Notwithstanding, this asserted policy was never enforced

against any other salesperson despite the fact that many sales representatives would

record their call notes at the end of the day when they had more time to accomplish the

task.    (Boland Aff'd, ¶ 9).

Most, if not all, sale representatives provide the "detail call" information being

enforced by Ms. Edmunds against Mr. Byrd.  (Edmunds Tr. 102; and Pl. Tr. 203-204).

No other sales rep had their call notes read with the detail or scrutiny that Deb Edmunds

did of Mr. Byrd's call notes. (Boland Aff'd, ¶ 11).

In the last week of September, 2002, Mr. Byrd forgot to record personal mileage

for a trip he took but recorded it on the following week. (Pl. Tr. 127).  This was merely

an oversight by the Plaintiff that he immediately rectified.  Id.  Nevertheless, Defendants

seized upon this event (when Mr. Byrd mentioned, in social conversation, to Ms.

Edmunds he had visited his mother) to augment their reasons for scrutinizing Mr. Byrd's

performance more than others.

In an effort to further misrepresent Mr. Byrd's computerized work performance,

Defendants provide the Court with half-truths.  Although occasionally Mr. Byrd's

administrative work was not timely this was because of problems with Aventis'

computers.  (Pl. Tr. 157;  and Edmunds Tr. 207-208).  The hand held computers were

16

always on the "fritz." (Boland Aff'd, ¶ 14).

As with all the other sales representatives of Aventis, Mr. Byrd had sample variances (Pearlstein Aff'd, ¶ 3; and Boland Aff'd, ¶¶ 13-14) including Carolyn Paulin and Dave Thorell. (Pl. Tr. 207-208). Among the reasons for sample variances is the computer being on the "fritz". (Boland Aff'd, ¶ 14). When variances occurred, sales representatives would simply reconcile the variance, which is what Mr. Byrd did. However, Mr. Byrd is once again singled out from other younger, non-minority sales representatives at Aventis. Again, Defendants misstate the testimony of Mr. Byrd to support their position. Mr. Byrd never refused to target high volume physicians as suggested by Defendants. When Mr. Byrd was in the field with Deb Edmunds, she asked him why they were seeing a physician listed by an outside marketing company as a "decile 3 physician" (the scale ranged from 1 to 10), Mr. Byrd simply informed her that the physician was in fact a high volume Amaryl user and that was the end of the discussion. Ms. Edmunds never instructed him not to call on that physician. Furthermore, Mr. Byrd was merely calling on the same physicians as his pod mates, which was required under Aventis' pod system. (POC, ¶ 11).

2.      The Reasons Advanced by Defendants were Pretextual

Under Chapter 151B, the plaintiff generates an inference of discrimination sufficient to prevail at the Rule 56 or Rule 50 stages solely by demonstrating that the reason advanced by the defendant was a pretext (not the real reason) for the termination. Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 118 (2000). Thus, it is said that Massachusetts is a "pretext only" jurisdiction. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 443 (1995).

In contrast, under the ADEA, proof of a prima facie case and proof of pretext alone may, but will not necessarily, generate an inference of discrimination sufficient to withstand a summary judgment motion. <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000).

Termination based on patently ridiculous rationales, or on very old or stale job criticisms, may be deemed pretextual. See <u>Malloy</u> v. <u>Blanchard</u>, 115 F.3d 86, 93 (1st Cir. 1997).

Assuming the Defendants could articulate a legitimate nondiscriminatory reason for terminating plaintiff, the plaintiff must then demonstrate that the defendant's proffered reasons for the adverse employment decision are "pretextual." <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. at 511.

Under Massachusetts law, "in an indirect evidence case, if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind." <u>Lipchitz</u> v. <u>Raytheon Co.</u>, 434 Mass. 493, 501 (2001).

Also, in an indirect evidence case of employment discrimination, if the fact finder is persuaded that one or more of the employer's reasons is false, it may, but need not, infer that the employer is covering up an unlawful discriminatory intent, motive or state of mind; permitting but not requiring the fact finder to draw the inference strikes the proper balance by holding the plaintiff to her ultimate burden without requiring her to produce direct evidence of discriminatory animus, a form of evidence that rarely exists. <u>Lipchitz v. Raytheon Co.</u>, 434 Mass. 493, 501 (2001).

The Plaintiff's burden to prove that the basis of the employer's decision was

unlawful discrimination may be satisfied by showing that the reason advanced by the employer is false; in other words, showing that the employer's reason is untrue may give rise to an inference that the basis for the employer's decision was unlawful discrimination. Id.

Whether proceeding under state or federal law, a plaintiff's showing is usually made by circumstantial evidence. In some cases, circumstantial evidence alone, even in the face of evidence supporting a contrary determination, is enough to support the finding of discrimination. See City of Salem v. Mass. Comm'n Against Discrimination, 44 Mass. App. Ct. 627 (1998). Plaintiff clearly demonstrates that he was selectively singled out for particular scrutiny compared with other younger non-minority sales representatives.

The most probative means of establishing that the plaintiff's termination was pretext for discrimination is to demonstrate that similarly situated employees, whose race is different from the plaintiff's, were treated differently than the plaintiff. Matthews v. Ocean Spray Cranberries, Inc. 426 Mass. 122, 129 (1997). Specifically, the court stated that the plaintiff must "identify and relate specific instances where persons similarly situated in all relevant aspects were treated differently." Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. at 129.

When judging whether the plaintiff has demonstrated that the defendant's actions were a pretext for race discrimination, the fact finder may take into account :weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." City of Salem v. Mass. Comm'n Against Discrimination, 44 Mass. App. Ct. at 643.

Where employees have different duties and responsibilities, or duties that are not

comparable, they are not similarly situated. <u>Suffolk County Sheriff's Dep't</u> v. <u>Mass.</u>
<u>Comm'n Against Discrimination</u>, 19 M.D.L.R. 187 (supervisory employee not similarly
situated to employees in entry level positions) (citing <u>Williams</u> v. <u>Frank</u>, 757 F.Supp.
112, 117 (D. Mass. 1991), gaff's, 959 F.2d 230 (1st Cir. 1992).

A plaintiff is not required to produce "smoking gun" evidence prevailing in a
discrimination suit. <u>Mesnic v. General Electric</u> Company, 950 F.2d 816, 824 (1st Cir.,
1991).

"It is apodictic that evidence of past treatment toward other similarly situated
could be used to demonstrate intent in a race discrimination suit." See <u>Dartmouth</u>
<u>Review v. Dartmouth College</u>, 889 F.2d 13, 19 (1st Cir., 1989) (Citations omitted). "To
put flesh upon the bare bones of this theory, plaintiff's obligation was to identify and
relate specific instances where persons situated similarly 'in all relevant aspects' were
treated differently, instances which have the capacity to demonstrate that the plaintiff was
'singled ... out for unlawful oppression.'" <u>Id</u>. (Citations omitted).

"In general, this requires that the other incidents, circumstances be 'reasonably
comparable' to those surrounding plaintiff suspensions, and that 'the nature of the
infraction and the knowledge of the evidence by defendant officials be sufficiently
similar to support a finding of facial inconsistency.'" <u>Id.</u>

"The test is whether a prudent person, looking objectively at the incidences,
would think them roughly equivalent and the protagonists similarly situated." <u>Id</u>. Much
as in the lawyers art of distinguishing cases, the 'relevant aspect' are those factual
elements which determine whether reasoned analogy supports, or demands, a like result."
<u>Id</u>. "Exact correlation is neither likely nor necessary, but the cases must be fair

congeners. In other words, apples should be compared to apples."

Defendant argues that to compare Plaintiff's situation to other sales representatives at Aventis, Plaintiff must compare himself with representatives who had each of the same alleged performance issues as Mr. Byrd. This proposition is untenable as Mr. Byrd's performance issues were created from being scrutinized more than other sale representatives who are similarly situated. The other sales representatives are similarly situated because they were subject to the same administrative policies as Mr. Byrd, but they were not singled out for excessive investigation, reprimand, and eventual termination.

The credible and unimpeachable evidence in this case is that the reasons proffered by the Defendants for plaintiff's termination were pretextual for discrimination.

It is abundantly clear from Mr. Byrd's former co-workers and manager at Aventis, Marcia Boland and David Pearlstein, that Mr. Byrd was as good, or better, sales representative as anyone else in Aventis. (Pearlstein Aff'd, ¶ 2; and Boland Aff'd).

That Mr. Byrd demonstrated a good work ethic, was an iatrical part of his sales pod, and his product knowledge was very good. Mr. Byrd was well qualified, and maintained good relationships with doctors, his managers, and co-workers. (Boland Aff'd, ¶ 2).

That all sales representatives were required to pass product tests with a high percentage score, and Mr. Byrd scored highly on these tests. (Boland Aff'd, ¶ 3).

From approximately 2000 through his termination, administrative policies were selectively enforced against Mr. Byrd for issues common to many sale representatives.

Unquestionably, Mr. Byrd was singled out for particularly excessive scrutiny in regard to several administrative matters. (Boland Aff'd, ¶ 4).

Mr. Byrd was accused of falsifying expense reports by identifying a golf outing as a "roundtable". Aventis and Ms. Edmunds were aware of this golf outing as a promotional tool as Marcia Boland and another sales representative, Gerard Graham who has since been promoted, also participated. This golf outing, which involved breakfast, lunch, dinner and accompanying discussions with participating doctors would constitute a description as a "roundtable" on an expense report. (Boland Aff'd, ¶ 5).

At the time Ms. Edmunds began to strictly enforce administrative policies against Mr. Byrd and find fault with his performance, Mr. Byrd was a high producing sales representative whose numbers were excellent and who was well received by and considered very knowledgeable amongst the doctors in his territory. (Boland Aff'd, ¶ 6).

Subsequent to his initial negative review on September 18, 2000, Mr. Byrd became a better sales representative and worked very hard to improve on adhering to the policies, which were being selectively enforced against him. (Boland Aff'd, ¶ 7).

The assertion that Mr. Byrd "falsified" an expense report by submitting a request for reimbursement of eleven hundred dollars, when only one thousand thirty six dollars in receipts were submitted, is not falsification of records. (Boland Aff'd, ¶ 8). Ms. Edmunds carefully reviewed and approved the reimbursement request in the entire amount for this expense. Boland Aff'd, ¶ 8; and Edmunds Tr. 122). If Ms. Edmunds had any issue with Mr. Byrd not having a receipt for the sixty-four dollar portion of the request, Ms. Edmunds could simply have denied that portion or given Mr. Byrd an opportunity to locate a receipt. (Boland Aff'd, ¶ 8). The subsequent review of six (6)

<u>month old previously approved</u> expense reimbursement is highly unusual and therefore of suspect motivation. (Boland Aff'd, ¶ 8).

The recording of call notes immediately following the customer call was never enforced against any other salesperson. (Boland Aff'd, ¶ 9; and Pearlstein Aff'd, ¶ 3). Many sales representatives would record their call notes at the end of the day when they had more time to accomplish the task. (Boland Aff'd, ¶ 9).

Additionally, finding fault with the quality of or identification of a visit as a detail call made by Mr. Byrd was also a selectively enforced administrative policy. (Boland Aff'd, ¶ 10). The running joke among sales representatives is that if you make eye contact with a doctor it constitutes a detailed call. Any sales representatives that spoke to a doctor would note it as detailed call. (Boland Aff'd, ¶ 10).

No other area manager read or reviewed pod members' call notes with the detailed scrutiny that Deb Edmonds did to Bill Byrd's. (Boland Aff'd, ¶ 11).

All sale representatives did not supply monthly pod meeting recap notes to all area managers. (Boland Aff'd, ¶ 12; Edmunds Tr. 97-98; and Plaintiff's Tr. 204-205). Ms. Edmunds selectively enforced this requirement against Bill Byrd, as opposed to a company wide requirement that was enforced uniformly as to all sales representatives.

Sample variances were common and sales representatives were expected to reconcile the variances. (Boland Aff'd, ¶ 13-14; Plaintiff's TR. 207). It was also common and acceptable under Aventis' policy to ask fellow Pod members for additional samples when a sales representative ran out. (Boland Aff'd, ¶ 13; and Edmunds Dec. ¶ 4, Exhibit C).

Another example of selective enforcement of administrative policies is finding issue with not having the doctor sign the electronic devise upon receipt of samples. In that case, a paper form was utilized. The hand held devices were continually on the "fritz", regularly necessitating the use of the paper form signature by many sales representatives. Mr. Byrd was singled out for criticism. (Boland Aff'd, ¶ 14; and Edmunds Tr. 207).

The requirement that sales representatives be in their area each and every business day from 8:00 a.m. to 5:00 p.m. is not routinely enforced. A sales representative is not typically in their sales territory one hundred percent of the time between 8:00 am to 5:00 pm on every business day. Pod mates had a rotation of what doctors they would see on a given day and for the most part, after they made their calls their day was done. Co-workers would get mad at you if you saw a doctor out of rotation, because that effects their ability to meet their quotas. (Boland Aff'd, ¶ 15).

Mr. Byrd was singled out and targeted for selective enforcement of administrative policies. Despite Mr. Byrd's increased efforts to comply and despite the lack of enforcement as to other sales representatives for the same infractions, Aventis management continued to harass Mr. Byrd. Even though Mr. Byrd attempted to stick it out, improve, and do things above and beyond any other sales representative, his dismissal was seemingly inevitable once he was placed under the microscope. (Boland Aff'd, ¶ 16).

The issues that Aventis had with Mr. Byrd's performance, including sample variances; call notes not being entered immediately following an office visit; the allegation that Bill Byrd falsified an expense report by referencing a golf outing as a

24

"roundtable"; utilization of a paper form for a signature rather than the hand held computer device; and strict submission of monthly pod reports are quite subjective matters, infractions which could occur on a daily basis to any sales representative at Aventis. To place a sales representative, performing as well as Mr. Byrd was performing, under such selective scrutiny created the impression that Aventis was looking to get rid of Mr. Byrd. (Pearlstein Aff'd, ¶ 4).

The paper trail that Aventis created in its scrutinization of Mr. Byrd's performance could be created on any sales representative's job performance if placed under the same magnifying glass. The particular scrutinization that Aventis put Mr. Byrd under was not commonplace and was utilized in this case to eventually terminate Mr. Byrd. (Pearlstein Aff'd, ¶ 4-5).

If any other sales representative with Aventis was put under the same scrutiny Mr. Byrd was put under, because of the supposed violation of administrative policies such as those set forth herein, most if not all of the thousands of other sales representatives employed by Aventis would be subject to termination. (Boland Aff'd, ¶ 17).

C.    Retaliation Claim Legitimate

After Plaintiff complained to Ms. List that he was being discriminated against by Deb Edmunds, the Defendants began to unfairly scrutinize Plaintiff and orchestrate reasons for eventually terminating him on February 6, 2002.

For the reasons stated above, Plaintiff has a valid claim for retaliation against the Defendants.

D.    M.G.L. c. 151B is not exclusive remedy.

G.L. c. 151B was first enacted in 1946. The common law claims asserted by

25

Plaintiff existed prior to the enactment of G.L. c. 1518. G.L.c. 151B does not bar a plaintiff from filing common law claims that preexisted the enactment of the relevant provision of G.L.c. 151B. Horney v. Westfield Gage Co., 95 F. Supp. 2d 29 (D. Mass.2000); Chapin v. Univ. of Mass. at Lowell, 977 F.Supp. 72 (D. Mass. 1997); Weber v. Cmty. Teamwork, Inc., 424 Mass. 761 (2001); Comey v. Hill, 387 Mass. 11,20 (1982); DuPuis v. Con-Test, 4 Mass. App. Ct. 511 (1985), aff'd, 397 Mass. 1004 (1986) (claims for wrongful discharge in violation of public policy were created after the enactment of G.L.c. 151B, and are therefore barred).

Furthermore, under Aventis' discrimination policy, once Mr. Byrd complained to Ms. List she was obligated to perform an investigation into the Compliant. Ms. List never conducted an investigation (List Tr. 164-165). This failure constitutes a breach of contract on the part of Aventis.

E.    Plaintiff Has Valid Claim Against Ms. Edmunds For Tortuous And Intentional Interference With Advantageous And/Or Contractual Relations Because A Reasonable Jury Could Find She Acted With Actual Malice.

As is evident from the facts stated above, Ms. Edmunds unfairly scrutinized Mr. Byrd's performance under a magnifying glass and selectively enforcing policies against him in order to orchestrate grounds to terminate him on February 6, 2001. Accordingly, a reasonable jury could find that Ms. Edmunds acted with actual malice, i.e., "for a spiteful, malignant purpose, unrelated to an [employer's] legitimate corporate interest."

## V.    CONCLUSION

Based on the foregoing points and authorities, Mr. Byrd submits that Defendants' Motion for Summary Judgment must be denied.

Respectfully submitted,

WILLIAM M. BYRD,

By his attorneys,

Paul K. Flavin
BBO No.  171145
John C. Koslowsky
BBO No.  561616
Flavin & Koslowsky
424 Adams Street
Milton, MA  02186
(617) 698-3000

Dated: April 8, 2005
2002-17P

27