# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11032-DPW

WILLIAM M. BYRD,

       Plaintiff,

v.

AVENTIS PHARMACEUTICALS, INC.
and DEBRA EDMUNDS,

       Defendants.

## AFFIDAVIT OF JOHN C. KOSLOWSKY

I, John C. Koslowsky, under oath depose and say as follows:

1.      I am a partner at Flavin & Koslowsky a firm located in Milton, Massachusetts, and  I have been involved in the prosecution of this action since the inception thereof.

2.      In response to Plaintiff's Request for the Production of Documents, defendants produced an expense report with the Bates Number DEF00082 stamped thereon.  A true copy of said expense report is attached hereto as Exhibit A.

3.      On September 25, 2001, Plaintiff met with Ms. List and Ms. Edmunds, and Ms. List prepared a Memorandum described in the events of the day.  A true and accurate copy of the Memorandum, marked as Exhibit 13 to Ms. List's deposition is attached hereto as Exhibit B.

4.      Plaintiff was deposed on October 18, 2004.  True and accurate photocopies of excerpts from his deposition transcript are attached hereto as Exhibit C.

5.      Deborah Edmonds, plaintiff's supervisor and area manager of Aventis,

was deposed on October 26, 2004 and November 19, 2004.  True and accurate

photocopies and excerpts of her deposition transcript from both days are attached hereto

as Exhibit D.

6.    Christine List, Ms. Edmunds' supervisor and regional manager, was

deposed on November 4, 2004.  True and accurate photocopies of excerpts from her

deposition are attached hereto as Exhibit E.

Signed under the pains and penalties of perjury this _____ day of April, 2005.

_____

John C. Koslowsky

2002-17P

**"EXHIBIT A"**

| | | Total Expenses | 190.2 |
|---|---|---|---|
| Associate Name | Bill Byrd | Company issued cash advances- | 0.0 |
| Associate # | 10547 | Expenses directly billed to Co.- | 0.0 |
| Trip Dates | 09/24/00-09/30/00 | Amount due Employee= | 190.2 |
| | | Amount applied to charge card- | 190.2 |
| Purpose | Group Selling | Net due Employee= | 0.0 |

Approved by (as required): _____

NOTE: (c)=Charged.Credit Card, (d)=Directly billed to company

| Dates | Sun 9/24 | Mon 9/25 | Tue 9/26 | Wed 9/27 | Thu 9/28 | Fri 9/29 | Sat 9/30 | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Purpose | Group... | | | | | | | | | |
| Lunch | (c) 36.70 | (c) 27.50 | | (c) 46.75 | | (c) 79.30 | | | | 190.25 |
| TOTALS $ | 36.70 | 27.50 | | 46.75 | | 79.30 | | | | 190.25 |

**General Trip Items**

| Item | Comment |
|---|---|
| Group Selling | Date:9/24 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/25 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/26 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/27 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/28 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/29 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Group Selling | Date:9/30 Product(Allegra) Expense(ROUNDTABLE) Project(Hospital, Institutio) Speaker(Bill Byrd) Topic(Allergy) Explain(Power Surge) Facility(Hawthorn Med) Professional Att.(15) Other Att.(220) CME Hrs(No) |
| Travel Agency | Non-Travel Related - Approved Agency(YES) |
| Company Car | Miles End(55321) - Start(54321) - Personal(0) = Business(1000) |
| Profile Information | Territory(B1CE) |

**Comments**

| Subject | Comment |
|---|---|
| Purpose-Mon, Sep 25 | Pictures for Hawthorn Annual Pinic |
| Lunch-Mon, Sep 25 | Dr D. Charles Medical Director NBCHC |
| Breakfast-Sun, Sep 24 | Dr Potts,Hope and Asso |
| Lunch-Fri, Sep 29 | Dr R. Hanna and asso |

*Bill was supposed to put personal mileage from NY trip on this report. rec'd v/mail on 10/1/00 that he forgot & will be on next exp report*

Ref: 10547  093000 190.25        Page 1        Printed on 09/30/0

DEF00082

**"EXHIBIT B"**

CONFIDENTIAL

EXHIBIT
CL
#13
11/4/04 mL

Problem Solving Meeting
Bill Byrd - B1CE
September 25, 2000

As a result of feedback received on September 18, 2000 during his midyear review with Deb Edmunds (his area manager), Bill Byrd requested a meeting to discuss his concerns. The following are notes taken during the meeting held on September 25. The first hour and a half of the meeting consisted of Bill and myself. Deb joined us for the second hour of the meeting. Amy Turpin was at her desk during the meeting. Paula Sicard, Bill Eicholzer and Jim Free were present in the office at the time, although not directly involved in the meeting.

I opened the meeting by explaining the problem solving process to Bill and offering to him that I wanted to have a better understanding of his concerns, to be better able to resolve them to everyone's satisfaction. Bill was aware of my knowledge of the situation, gained through previous discussions with Deb.

Bill explained that his concerns were ongoing, although he was motivated to call me based on the outcome of his mid-year review discussion with Deb, which he wished to dispute. When asked to elaborate on "*ongoing concerns*" he said that he was "*not comfortable in the existing situation.*" When asked to be more specific, he said he didn't want to say anymore or to bring "*viewpoints into the discussion*" – the only additional comments he would make were that it was "*The way Deb is - she has an agenda for herself outside of company.*" He would not discuss any further.

Simply put, Bill and Deb are at odds regarding Deb's management style and expectations. Bill claims that Deb has "*had it in for me since Day 1.*" "*In reviews past with my previous manager Sean, I was acceptable. I knew that there were areas that I needed to improve upon.*" Bill "*refused to accept the feedback given in his review - it is unacceptable for a number of reasons.*" "*There were no positive comments in it, it was inaccurate and contained untruths in places.*" In addition, Bill was concerned that Deb had spoken to me about her concerns before discussing it with him. I shared with him that Deb felt that she had addressed it with him on numerous occasions – workwith's, previous reviews, etc and that Bill had been unresponsive to the feedback. He acknowledged that Deb had provided feedback in the past and did not elaborate on why he had chosen not to respond to it.

I let Bill determine the course of the conversation, which he drove through a discussion of the individual competencies of the midyear review. He had detailed notes regarding each of the competencies and proceeded to discuss his "*interpretation of his skills for each area.*" Interestingly, he was given the opportunity to provide written input to the review process prior to his discussion with Deb and did not provide input that was as detailed. His actual comments are included with the review. "*I don't like to blow my own horn.*"

In response to Deb's observations regarding his product knowledge, "*Deb told me that she sought out people on my team and asked them if I have leadership ability and they said no. She wouldn't tell me who said it. I feel that it is unfair for her to approach people I work*

10/06/2000                                    DEF00563

1

with and don't believe that anyone would tell her that". "Deb implied that I was living off of the efforts of my counterparts. Dave Thorell and I arranged how we would work together and who would call on which specialists before Deb came on board." "When I asked her how she explained the good results in my area, she implied that Mike Thibault had been the driving force behind Amaryl and that I was hiding behind my team." Bill did not agree with the direction Deb gave to the team regarding targeting and call expectations because he questions the validity of CIS. " *The company changes that values every year, it is a flavor of the day approach and I think I have a better understanding of who is important to see." "I like to do it the way it works for me.*" He admitted to not calling on a number of his targets and to not following Deb's direction to target high volume doctors.

The question of Bill's listening skills were raised in the review and Bill explained that he was "*hard of hearing – I hear 95% of what I need to.*" He then started to discuss his working relationship with Deb and described it as a "*Venus and Mars thing. I am sure you can understand that*". "*I don't want to say anymore because I don't want it to be held against me.*" He concluded by saying that "*our outlook on life comes from two different places.*" He again refused to elaborate, but did explain it as follows: " *When a person of color is hired, they are looked at as a superstar and are expected to succeed where others fail. I am held to a higher standard. I am criticized for things that others are not.*" I asked him if he could give me an example – what was the standard and how did he know it differed from the rest of the team? He didn't have anything to compare it to nor had he discussed any specifics with any one else in his district. "*I just know.*"

The evidence Bill provided regarding selling skills related to what he felt was strong market share performance for five of his top customers. Throughout the conversation, Bill continually reverted to the argument that the territory was performing well and therefore was not indicative of Deb's views of his skill level. Regarding his ability to effectively use clinical studies, "*Deb saw me use Highmarch with Dr. Ostro. If I misspeak in a call it is because I am nervous, not because I don't understand.*" Bill agreed that Deb's expectation of the team to target based on volume was clear, yet he "*didn't agree with the process or the expectation. I prefer decile coverage.*" "*Dr. Cochelia, Dr. Freedman, etc – won't see reps, take anything in hallways. Yet they do see me.*" "*I do go to the hospital to see docs, despite other reps telling me it's a waste of time. I am the only one in my quad who goes to the hospital and deals with their rules.*" "*I have good rapport with 75-80% of my physicians.*" "*One of my customers recently attended the PriMed meeting in Boston and could not find a hotel room. I let him stay at my house and took him out to dinner. I copied Deb on the message.*" "*Dr.Bogusky has been to my home – I have had dinner with him and will be going sailing with him. His family is attending my son's football game. I have targeted him for market share increase and he is willing speak for us as an advocate.*" "*I have access where other members of my team do not – Dr. Taylor, Dr. Versace.*"

Regarding questions of territory management – Bill states that the team is meeting every month." When asked why Deb is under the impression that they are not, "*I am not following up with her after meetings, like she asked because other members of my team are not required to do that for their managers. I didn't think it would be such a big deal.*" He did acknowledge understanding Deb's expectation.

On a review point regarding hospital displays, Bill shared that *"Sean had asked me to record golf outings with customers as hospital displays."* When I asked him if he had confirmed this process with Deb as well, he said that he had. (Deb says that he did not). *"I am not returning the required ROI documentation for opportunity dollars yet because I spent the money primarily in the second quarter and we don't have the data yet."*

Regarding teamwork, *"I had no district manager for a year and a half after Sean left to go to PCP4. I had very little direction."* When asked about the animosity between himself and Tiffany, the PCP6 rep, he acknowledged the animosity but felt that it was improving. (Deb and Joe Ferney have had to intervene in the situation). The issue originated when Bill planned a dinner with Dr. Bogusky and invited Tiffany. *"Dr. Bogusky didn't want Tiffany to attend – he told me he didn't have anything in common with her and couldn't see them sharing conversation over dinner."* Bill shared this with Tiffany. He also told her that Dr. V. Reddy only wanted one rep to call on her and requested that it be Bill. *"Tiffany felt that I overstepped my bounds and made a big deal out of it. I have gone through other individuals to let her know that there are no problems."* Bill was unsure if the issues were resolved but said that he and Tiffany would be attending a program together at the end of the week.

In the area of planning/organization – Bill admits to not entering calls into the computer immediately after their completion, as well as to not entering acceptable call notes. *"I work at very quick pace. There are more reps than ever and I need to see the doctors quicker. I work better in morning than late in the afternoon. I like to work early in the morning"* yet later admitted to me that he is dropping his children off at school each morning between 7:45 and 8:00, which is over an hours distance from his territory.

*"Administrative items are never more than two to three days late – Deb and I have discussed it many times. I sometimes try to e-mail her and she receives it two days after I send it."* I asked Bill if he knew of anyone else with this problem or what he had done to resolve it. He attributed it to *"a glitch in the system and was confident that if you checked the dates sent it would show inaccuracies"*. Bill had not checked with the help desk.

At this point in the discussion, Bill became noticeably more agitated and nervous. *"The discussion of my leadership is what really set me off It pissed me off quite honestly."* Referencing Deb's comments regarding appropriate behavior, Bill stated *"I wasn't in the mood to talking to her at this point in the review, so I didn't say anything"*. Bill expressed concern that his goal to become an area manager had been ignored and that Deb had prevented it from happening. When I asked him how he defined leadership, he said *"that is a hard one to answer. I am not sure of a definition."* When I asked him how Deb would know that he was a good leader Bill stated, *"I don't know how she would know. She said I ask inappropriate questions at meetings. That's all the feedback I've gotten."* Regarding a recent presentation at a district meeting, *"I confused the group because I was discussing how I use the Campbell study. I don't discuss sensitizing because Amaryl doesn't do that, no matter what anyone says."*

*"I'm not the brightest – I told Sean that when he hired me. It takes me a long time to pick up technical information. I am good at having conversations with doctors. Deb tries to force me to do things, like call on no-see doctors, even if I am uncomfortable. I know my customers better."* Again, when asked if he had discussed his feelings with Deb, he said he had not.

Late last year, Mark Miles and Deb conducted a piggyback work-with with Bill, where three incidents occurred that placed Bill's judgment in question. The first was a situation regarding discussion of sexually explicit details of a sexual harassment case that one of his customers was involved in. Deb gave Bill feedback, in Mark's presence, that it was an inappropriate discussion.  She sited it in his review as evidence of questionable judgment. Bill questioned it, stating, " *I didn't think it was inappropriate – I was providing information regarding one of my customers and I feel that we should be informed on all details."* The second situation occurred on the same day, again in Mark's presence. Bill was speeding in a clearly marked school zone. When Deb suggested that he slow down for safety reasons, he responded *"there was no cop in sight to catch me. No big deal". I don't agree that my response qualified as insubordination"*. Bill also questioned why it was in this year's review when it had happened last year. Lastly, when working with Mark and Deb in the rain, Bill referred to himself as *"brown sugar that melts in the rain."* He did not understand why this remark was inappropriate since it was one that he made regarding himself.

At this point, Bill was done refuting the specifics of the review and we moved on to discuss his overall concerns with working with Deb as his manager. When asked if he had discussed his concerns with Deb, he said it is *"Something I've been amiss at"*. *"I am hurt because she feels that Mike does the job and I don't." "If I contradict her, it would seem that I was being belligerent, so I say nothing."* Bill has never, in 18 months, discussed his feelings with Deb or expressed disagreement with her philosophies directly to her. He has, however, discussed it with others on his team and in his area. When I asked him why he hadn't pursued his concerns, Bill said, *"It wouldn't be good. I know me and I think I know Deb."* *"We may just not get along – if we can't I would like to request to move to PCP6. I am getting older – I will be 52 next month.  I don't need this type of review. No one will hire a 52 year old."* When I asked Bill what he thought his opportunity areas were and what would have been a better assessment of his skills, he stated, *"I know I have opportunities – room to grow and earn. I can be more specific related to product knowledge in diabetes and bridging to other patient types."* He did not agree with the assessment of his readiness to be an MDA – I supported Deb's assessment of lack of participation in his own development as well as a lack of a a self-starter approach.

I asked Bill to describe his understanding of Deb's role as an area manager. He described it as *"one who observes, helps, improves"*. When I asked how she could best do that he responded that he *"wonders if she knows what she's talking about – who knows?"* When asked what Bill felt the barriers were, he said that their discussions were confrontational – *"interpret what I hear, I am often misunderstood?" "I just have it set up in my mind that Deb is not user friendly" "I can not talk to her based on her black or white way of doing things, there is no other acceptable way. Others support me on this"*.

DEF00566

10/06/2000

4

Regarding the forty-five day performance plan that Deb developed for Bill, he stated, "*I cannot agree to the plan based on Deb's evaluation. I don't think I can do what she has asked me to do*". When I asked him to offer a solution, he suggested that I work with him for a day in the field. "*If you agree with Deb's evaluation, I will agree to the plan she developed and will follow it to the letter*". I challenged him as to why my opinion would be acceptable when Deb's was not. His response was "*when I first started working with you as an account manager, I checked you out with Sean. He said I would be able to work with you because you were above board. You were OK*."

I asked Bill what he had done to take ownership in his own development and what type of plan he had in place. He has no personal plan in place –"*I am waiting for her to set out a plan, for someone to tell me what to do*."

I asked Bill why the obvious distrust of Deb and her motives. "*I don't trust her attitudes*". When I asked him to explain further, Bill referenced a time when Sean asked him to conduct two days-in-the-field in preparation for becoming a sales trainer. At the same time, Sean was transitioning to a new role and Deb stepped in as the new area manager. Staffing became her responsibility and she continued the interview process for the two potential candidates. Based on the day-in-the-field, Bill recommended that we hire one and not the other. Based on the continuation of the process, Deb did not hire either. Bill was offended that Deb had not hired the person he recommended who was later hired by another pharmaceutical company. He was also concerned that each of the three people she hired was female. Bill now questions her reasoning for not hiring males for her team. "*That sent a message to me. I don't think Deb would hire me. I look around and I don't see you hiring people like me.*" When asked to be more specific, he referenced people his age.

This is the point in the conversation where Deb joined us. Deb asked Bill if he felt that the Standards and expectations of him were clearly outlined? Bill stated, "*You think I am too laid back, but that's not true. I just keep things inside – when things hurt me you wouldn't know it.*" "*I'm 52 years old & I felt that if I confronted you, I felt that it would reflect on job*"." *I am too old to look for another job.*" *The first thing I thought of when I saw the review was that when you want to get rid of someone, you create a paper trail. I have seen it done in my previous job.*" When asked when he chose not to respond to specific expectations, he stated, "*I was being obstinate – said the hell with it*". Bill agreed to take ownership of his development plan in the future. " *My perception is that error is not well tolerated by you.*" Bill questioned whether or not he is allowed to make mistakes and if he is evaluated fairly.

My response to Bill was that his development needed to be 90% about him and 10% about us. He needed to participate in his own development and would be held to a standard that was consistent and fair. I also shared with Bill that it was up to Deb, based on company policy and expectations, to set the standard. Not liking it or feeling that his way was better was not an acceptable reason for noncompliance. I supported Deb in her evaluation and shared with Bill that it was necessary due to his previous unresponsiveness to her coaching efforts, as well as due to many of the personal observations that he shared with me during our discussion. He was responsible, along with Deb, to work constructively to solve problems and

10/06/2000

issues. I also shared with Bill that I felt there was a need for better communication between he and Deb. He agreed that he had not felt the need to update her regarding his activity and accomplishments, and that it was very possible that she was not aware of many of the ongoing initiatives in his territory. The last part of our discussion centered on the need for Bill to meet basic job expectations in order for us to be willing to work with him in improving his performance. I asked him to help me to understand discrepancies we were seeing in his call activity, given that he stated earlier that he was working within the company guidelines for an expected day in territory. The trends typically show sampling signatures and activity between 10am and 2pm, with rare days closer to the expected activity between 8am and 5pm. Never was a signature gained or a call entered into the Tim Jr. before 9am. He admitted to not entering the appropriate information after each call and stated he would do so in the future. Bill also insisted that he was working the expected hours each day. I reiterated that the expectation was a full day worked for a full day paid. He did not admit to any falsification of calls, although he did state, "*I never get signatures after hours, even at a dine-and-dash or at the end of a day of golf.*" He acknowledged the expectation of call entry following each call, as well as the use of effective call notes following every call. We will monitor activity to insure that he is working throughout the day.

He did not acknowledge the late sample signatures, such as Dr. Jaffee at 10pm. We will follow up on those with Raphael Gonzalez. I also confronted him on the issue of dropping his kids off at school at 7:45 and whether or not this was something that had been approved by Deb. He stated, "*I didn't think I had to be in my territory until 9:00 am.*" Deb then questioned him regarding a gas receipt that we obtained for the July 4th Holiday weekend. Bill filled the tank of his company car in Latham, NY yet recorded no personal mileage for the weekend. "*I always record it when I go to visit my mother in Latham. I must have forgotten. I will enter it in next week.*" Deb also shared her concern that there frequently was no, or very little, personal mileage recorded. We will monitor these areas in the future as well.

Regarding follow-up, Deb and I discussed a number of steps;
- A regional director day-in-the-field, scheduled for October 23, 2000
- A follow-up meeting between Deb, Bill and myself to discuss feedback and observations from the day
- A letter that clearly outlines performance expectations and compliance with company policy
- A performance plan that Bill will follow under Deb's guidance
- Contact with Raphael Gonzalez to verify late night sample signatures
- Periodic monitoring of call activity to assure full day's coverage
- Regional Director Physician satisfaction survey of offices in Bill's area

10/06/2000

6

DEF00568

**"EXHIBIT C"**

1        A.    Not that I'm aware of.

2        Q.    Are you taking any medication today which

3   would interfere with your ability to testify

4   truthfully?

10:10:39  5     A.    No.

6        Q.    Have you ever testified in a courtroom?

7        A.    No.

8        Q.    What is your date of birth?

9        A.    10/29/48.

10:10:51 10     Q.    Do you have children?

11       A.    Yes.

12       Q.    How many children do you have?

13       A.    Two.

14       Q.    Who is the oldest child?

10:11:07 15     A.    You want her name?

16       Q.    Yes.

17       A.    Mercedes.

18       Q.    Last name is Byrd?

19       A.    Yes.

10:11:14 20     Q.    What is her date of birth?

21       A.    4/19.  She's 21.  I can't do the math.

22       Q.    1983.

23       A.    Yes, around there.

24       Q.    Is she working or in school?

97

1      Q.    Your pod mates were calling on the same

2  physicians that you were generally?

3      A.    No.

4      Q.    Who were they calling on?

12:04:51  5      A.    I can't tell you each physician they were

6  calling on.  With diabetes, I called on

7  endocrinologists.  They wouldn't call on

8  endocrinologists.  I called on some cardiovascular

9  people, which I don't believe they did either.

12:05:14 10      Q.    What was the concept of the pod, Mr. Byrd?

11      A.    More voice, more volume, more business.

12  The more people you have talking about a product,

13  the more business you should get.

14      Q.    Did you have monthly meetings with your pod

12:05:40 15  mates?

16      A.    Yes.

17      Q.    The purpose of the meetings was to talk

18  about what?

19      A.    To talk about strategy.

12:05:45 20      Q.    Strategy for selling?

21      A.    Yes, territories, situations.

22      Q.    You worked for Aventis from May of 1997

23  until your termination in 2002?

24      A.    Yes.

1  information immediately after the call, didn't you?

2      A.    That's not necessarily true, no.  If you

3  look at the policy, it says something similar to --

4  how can I put this -- at the earliest means

12:08:45  5  possible.

6      Q.    So you acknowledge that you did not

7  immediately record your calls?

8      A.    Sure.

9      Q.    Is this the first you are hearing that the

12:09:03 10  time of the recording shows up?

11      A.    Yes.

12      Q.    Didn't Ms. Edmunds --

13      A.    I can't hear you.

14      Q.    Didn't Ms. Edmunds talk to you about the

12:09:13 15  fact there was concern that your calls were being

16  recorded between 10:00 a.m. and 2:00 p.m.?

17      A.    She mentioned that, yes.

18      Q.    Didn't you understand at that time that the

19  time of the calls were showing up --

12:09:26 20      A.    I didn't put that together.  I'm not that

21  type of devious person to start thinking about how

22  she knew what the times were.  I didn't even ask

23  her.

24      Q.    She said to you that you are recording your

```
 1    to whether you were reporting all the personal

 2    miles?

 3         A.    You could say that.

 4         Q.    If somebody knows you've gone to visit your

 5    mother in New York on a week when there are no

 6    personal miles recorded or not substantial miles,

 7    someone may have a concern as to whether you were

 8    honestly reporting the miles?

 9         A.    You could say that.

10         Q.    In fact, on that occasion, didn't you tell

11    Ms. Edmunds that you forgot about the trip?

12         A.    No.

13         Q.    What did you say?

14         A.    I said I forgot to put the miles in.  And

15    that was corrected.

16         Q.    How many miles is it to where your mother

17    was in New York?

18         A.    167.

19         Q.    One way?

20         A.    Yes.

21         Q.    That would be about 330 miles round trip?

22         A.    Yes.

23         Q.    You drove it in the Aventis car?

24         A.    Yes.
```

154

1    Q.    She also says that you were not sending

2  updates on the meetings to her as she had requested.

3  That's true, isn't it?

4    A.    At the beginning it was, but in our pods,

5  we had designated secretaries to send the

6  information to all the area managers.

7    Q.    So you were not objecting to providing

8  Ms. Edmunds with the reports of the monthly

9  meetings?

10    A.    No.

11    Q.    She says that you are first or second in

12  the district for the amount of opportunity funds

13  spent.  I'm assuming that opportunity funds are

14  Aventis money that's used to either host an event

15  for some physicians or a display table; is that what

16  it means?

17    A.    Entertainment, yes.

18    Q.    Did you disagree with that, that you were

19  first or second in the district?

20    A.    I didn't question it.

21    Q.    When she says that she has not seen clear

22  documentation of ROI on these programs, what's ROI?

23    A.    Return on investment I believe.  And I

24  believe you did, if you look at -- where is it

184

1      A.    Yes.

2      Q.    They wanted you to send weekly E-mails to

3 Deb Edmunds with your previous call activity, do you

4 see that?

14:54:05 5      A.    Yes.

6      Q.    If a manager has concerns about what a

7 sales rep was doing and whether they were in the

8 territory the full time, you would not have an

9 objection to their saying, "Send me your previous

14:54:22 10 week's call activity on a weekly basis," do you?

11      A.    No.

12      Q.    When you got this warning, did you believe

13 it was an appropriate warning?

14      A.    No.

14:54:48 15      Q.    Why did you think you got it?

16      A.    Why did I think I got it?

17      Q.    Yes.

18      A.    Because Ms. Edmunds was trying to eliminate

19 me from the company.

14:54:57 20      Q.    Because of your race and age?

21      A.    Yes.

22      Q.    You thought that at the time you got it?

23      A.    At this time (indicating)?

24      Q.    Yes.

157

1    physician said, "I don't want a particular sales rep

2    calling on me"?

3        A.    It could happen.   This is the only one that

4    I know.

14:19:01 5        Q.    You deny that there was a meeting with Joe

6    Forney, together with you and Deb Edmunds and

7    Ms. Johnson?

8        A.    No, right.

9        Q.    It never happened?

14:19:10 10        A.    No.

11        Q.    Look at the bottom of page 182.   It says,

12    "Bill does not consistently recall pre/post call

13    notes immediately following a call."   That's true,

14    isn't it?

14:19:27 15        A.    Occasionally.

16        Q.    "His notes seldom include pertinent

17    detailed information."   That's true, isn't it?

18        A.    Occasionally.

19        Q.    Ms. Edmunds did talk to you about that

14:19:39 20    during your work-withs with her?

21        A.    Yes.

22        Q.    Sometimes your administrative work was not

23    always timely; isn't that true?

24        A.    Probably due to the computers, yes.

162

1      A.     No.

2      Q.     What would you do in your territory before

3   you went on a call?

4      A.     There were a number of things I would do.

14:26:30  5   There were grand rounds.  I would try to see doctors

6   at hospitals...

7      Q.     Seeing a doctor at a hospital doesn't

8   constitute a call?

9      A.     Sure it does, if you talk to him.

14:26:44  10      Q.     That's what I'm asking you.  If you don't

11   start doing the calls until nine o'clock, what would

12   you do between eight and nine?

13      A.     I just told you.

14      Q.     Going to grand rounds you just said could

14:26:58  15   be a call?

16      A.     Yes.  That's at seven o'clock, 7:30,

17   eight o'clock in the morning.  I don't understand

18   what you are saying.

19      Q.     I must have missed something, Mr. Byrd.  I

14:27:07  20   thought you told me that you might have said to her

21   you didn't start your calls until 9:00 a.m.

22      A.     Not that I recall.

23      Q.     You went with Ms. List on October 27, 2000?

24      A.     If that's the date.  I don't know the date.

203

1    should have been.

2       Q.   Which was what?

3       A.   I can't recall word for word.

4       Q.   You went on line every day and read --

15:30:07 5       A.   No.   Excuse me.   You don't go on line.   The

6    Velo is a handheld computer that everyone that is

7    using or on the system gets synchronized in your pod

8    so you can see what they did with the previous

9    doctor that you may be calling on.   They list it as

15:30:29 10   a call, call note, and whatever comments they had to

11   make.   That's how you read it.   That's how you

12   follow up.

13      Q.   You were reading Brenda's on a daily

14   basis --

15:30:40 15      A.   Brenda's, Dave's --

16      Q.   I have to finish.   We can only speak one at

17   a time.

18      A.   I thought you were finished.

19      Q.   You read Brenda's on a daily basis?

15:30:47 20      A.   Uh-huh.

21      Q.   Yes or no?

22      A.   Yes.

23      Q.   You believed that they did not comply with

24   company policy?

         1      A.    According to what Deb Edmunds and Chris

         2  List were implying to me.

         3      Q.    Did Brenda report to Deb?

         4      A.    No.

15:31:02 5      Q.    You didn't report Brenda to anybody, did

         6  you?

         7      A.    No.

         8      Q.    Who else's call notes did you read?

         9      A.    Sorry?

        10      Q.    Who else's call notes did you read?

        11      A.    Dave Thorell.

        12      Q.    Who else?

        13      A.    Mike Thibeault.

        14      Q.    Who else?

15:31:14 15     A.    Kelly Shea.

        16      Q.    Who else?

        17      A.    Julie Nelson.

        18      Q.    Who else?

        19      A.    Dave Pearlstein.

15:31:22 20     Q.    Who else?

        21      A.    Marcia Boland.

        22      Q.    These are your pod mates?

        23      A.    Associates, yes.

        24      Q.    They were recording their calls on a daily

205

1    basis?

2         A.    They were supposed to be, yes.

3         Q.    You were reading them on a daily basis?

4         A.    I was reading what was there on the

15:31:46 5    physician that I was calling on.

6         Q.    Who else was doing things that you were

7    being charged with wrongdoing for?

8         A.    Probably everyone.

9         Q.    I'm asking who you know of.

15:31:59 10        A.    Are you finished with the question?

11        Q.    Yes.    I asked who do you know of.    I'm

12    asking for specifics.    You are making an allegation

13    that other people did things that you did.    I'm

14    asking who?

15:32:12 15        A.    As far as other aspects of the job?

16        Q.    Whoever you think was doing things that you

17    were getting criticized for.    Who are they?

18        A.    Bob Santorie, Ernest Simone.

19        Q.    What did Bob do?

15:32:30 20        A.    I was accused of not sending out pod notes

21    in a timely manner.

22        Q.    How do you know that?

23        A.    They told me.

24        Q.    When did they do that?

206

1      *A.    On the car trip, when I felt I was being

2    targeted by Deb Edmunds, I asked them if they were

3    ever written up for not sending in pod notes in a

4    timely manner.  They both said, "No."  I said, "Did

15:32:59  5    Deb ever call you" to let them know that she didn't

6    receive the pod notes.  They said, "Yes."  Deb never

7    called me.

8      Q.    Bob Santorie, and who was the other one?

9      A.    Ernie Simone.

15:33:15  10      Q.    So you did, in fact, talk to people about

11    Deb Edmunds?

12      A.    Let's back up here.  When I talked to Ernie

13    and Bob, I wanted to know if they were being written

14    up for not having pod notes.  That's not discussing

15:33:38  15    Deb Edmunds.

16        MS. ACKERSTEIN:  Excuse me, let's read back

17    the answer where he talked about saying to them that

18    Deb is targeting him.

19          *(Answer read)

15:34:10  20      A.    I said I felt I was being targeted.  I

21    didn't say that I spoke to them about being

22    targeted.

23      Q.    They told you that sometimes they were late

24    with their pod notes and that they were not written

207

1    up?

2        A.    Yes.

3        Q.    Who else?

4        A.    Let's see here, car mileage, Dave Thorell.

15:34:39 5    Q.    What did Dave say?

6        A.    He put in five to ten miles per weekend, or

7    whatever, for personal miles.

8        Q.    He told you that?

9        A.    Yes.

15:34:54 10    Q.    Who else?

11        A.    Overspending on expenses, Jen Riley,

12    Annette Bohan.

13        Q.    What did they do?

14        A.    Overspend at the Ritz Carlton.  Jen Riley

15:35:25 15    provided a Christmas party for physicians office.

16        Q.    Who else?

17        A.    I can't think of anything else right now.

18    Oh, excuse me, sample variances, Carolyn Paulin,

19    Dave Thorell.

15:35:51 20    Q.    How much was Carolyn's?

21        A.    I don't know.

22        Q.    How about Dave, do you know what his --

23        A.    I don't know.

24        Q.    You don't know if they were as large as

208

```
 1   yours?

 2        A.   I don't know.  They would have to be large

 3   for them to get a letter.

 4        Q.   They got a letter?

 5        A.   Yes.

 6        Q.   They got a letter about their variance?

 7        A.   Yes.

 8        Q.   Anything else?

 9        A.   Not that I can think of at the present

10   time.

11        Q.   You didn't supervise anybody at Aventis?

12        A.   That's correct.

13        Q.   You didn't manage any of these people?

14        A.   No.

15        Q.   You never saw all of their documents, did

16   you?

17        A.   Just the ones that I needed to see.

18        Q.   The ones you told us about?

19        A.   Yes.

20        Q.   Where did the meeting on February 4th take

21   place?

22        A.   Waltham.

23        Q.   Who was present for that?

24        A.   Deb and Chris.
```

15:36:01  5
15:36:19 10
15:36:24 15
15:36:33 20

**"EXHIBIT D"**

1      Q.    What does that actually mean?

2      A.    He called on endocrinologists and

3  hospitals.

4      Q.    Since you were hired in May of 1999,

5  has your position with Aventis been changed?

6      A.    Could you clarify as far as --

7      Q.    Has your job -- have you always been an

8  Area Manager?

9      A.    Yes, I am Area Manager or District

10 Manager managing people, yes.  I mean products

11 change if that is what you want to know.

12     Q.    When products change, do your sales

13 reps change?

14     A.    Not usually, it can.

15     Q.    Who are your present sales reps?

16     A.    Russ Mayo, M-a-y-o, Sari Pomponio.

17     Q.    Could you spell that.

18     A.    S-a-r-i P-o-m-p-o-n-i-o, Bob Santori,

19 Amy Turpin, Tim Zerbe.

20     Q.    How do you spell the last name?

21     A.    Z-e-r-b-e.

22     Q.    Okay.

23     A.    Kevin Sturtevant.

24     Q.    Can spell the last name?

CONFIDENTIAL TESTIMONY    72

1    Byrd was terminated?

2        A.    Somewhat.

3        Q.    Do you recall who made the decision to

4    terminate Bill Byrd?

5        A.    It was a mutual decision.

6        Q.    Who was involved in the decision?

7        A.    Christine List, Mailet Minassian and

8    myself.

9        Q.    Who was the first to recommend

10    termination of Bill Byrd?

11        A.    It was a mutual decision really.

12        Q.    Are you saying all three of you had the

13    thought at the same time?

14        A.    No.  We don't have the thought at the

15    same time but we all recognized that there were

16    competencies that we tried to work with Bill to

17    get better on and they never improved or they

18    didn't improve to the standard that we needed.

19        Q.    When did you recognize this?

20        A.    I don't know what date.

21        Q.    Approximately?

22        A.    I believe the beginning of the process

23    to the end of the process was about a year

24    and-a-half.

COPLEY COURT REPORTING

*C O N F I D E N T I A L    T E S T I M O N Y*          74

1      A.      That Bill's selling skills were not

2    adequate.   His product knowledge was not

3    adequate.   He had administrative issues, and he

4    was very difficult to coach to try to bring those

5    issues up.

6              We were trying to help him meet certain

7    standards and he was very reluctant to do that,

8    to take any feedback.

9              So that is when I asked my boss to come

10   out and make sure that what I was doing was

11   correct and see if there was anything else I

12   could do to help.

13     Q.      Is there a policy with Aventis when an

14   Area Manager or District Manager wants to

15   terminate an employee -- the method that they

16   must follow?

17     A.      That would probably be more of an H.R.

18   question.

19              What usually happens is if a manager

20   sees consistent behaviors or areas that a rep is

21   leading towards termination, the first thing they

22   will do is talk with their boss, the Regional

23   Director and then also get H.R. involved.

24              So all three people are involved

1    Quad meetings that he would have with his

2    teammates and that is the best way I would get

3    informed about his territory and I would rarely

4    get notes from those monthly meetings.

5         Q.    So the lack of communication that you

6    have identified for me is regarding -- you would

7    get expense reports after the fact?

8         A.    If they exceeded guidelines.

9         Q.    If they exceeded guidelines?

10        A.    Yes.

11        Q.    Were there any occasions after the

12    first written warning that Mr. Byrd contact you

13    and inform you that he was going to exceed

14    guidelines on a particular function or expense?

15        A.    Not that I recall.

16        Q.    What is the journal club?

17        A.    That is when a group of physicians get

18    together and usually a group of allergists or

19    endocrinologists, a group of specialists usually,

20    and talk about different journal articles and

21    clinical reprints.

22             It is very clear in our policy that you

23    are not to pay people to do that and Bill wanted

24    to pay the physician's to read our clinical in

1    You can look it up.

2         Q.    I am trying to find these categories.

3         A.    Yes.

4         Q.    You said there is a list here in this

5    written warning?

6         A.    Yes.

7         Q.    Of the areas that you wanted Mr. Byrd

8    to improve on?

9         A.    Yes.

10        Q.    And I think you testified that he

11   improved on some but not on others?

12        A.    Yes.

13        Q.    And the ones that he didn't improve on

14   were the basis or part of the basis for his

15   termination, is that correct?

16             MS. ACKERSTEIN:  Objection.

17        A.    I'm sorry, could you restate your

18   question?

19        Q.    I believe you stated that you provided

20   this written warning to Mr. Byrd to get him to

21   improve on different areas?

22        A.    Correct.

23        Q.    And some of them he improved on to your

24   satisfaction, is that correct?

1    detail and record it correctly and give me a

2    heads up on it, then that is okay.

3        Q.    Do you have any examples, other than

4    Bill Byrd, of sales reps who didn't do that?

5        A.    Who didn't?

6        Q.    Give you a heads up as you have stated.

7        A.    I can't recall.

8        Q.    Do you have any other -- other than

9    Bill Byrd, are you aware of any of your sales

10   reps who initiated a program that may have

11   violated the anti-kickback policy of Aventis?

12       A.    No, anti-kickback policy, no, not that

13   I am aware of.

14       Q.    Did you have any sales reps other than

15   Bill Byrd who did not send you notes on the Quad

16   meetings?

17       A.    If they missed a month or so, I would

18   bring it to their attention and they would start

19   doing it again.

20            It wasn't consistent as was Bill's with

21   consistent lack of giving me team notes.

22       Q.    Can you identify any individual who

23   didn't provide you --

24       A.    It was nothing that stood out.

98

1          As I said, people miss things, little

2     administrative things here and there, you know.

3     Maybe they missed one of the months and I tell

4     them copy me next time and they do.  It wasn't

5     consistently --

6          Q.    I am not asking if it was consistent.

7          I am asking for the names of

8     individuals whether it was consistent or not

9     consistent?

10         A.    I don't know.  We haven't done it in

11    years so I call recall who it would be if there

12    was one.  Nothing that stands out in my memory --

13    obvious.

14         Q.    So as we sit here today, you have no

15    recollection of anyone else not submitting

16    monthly meetings to you on the Quad meetings?

17         A.    Like I said, I am sure there were a few

18    people that didn't send me a monthly Quad meeting

19    note but as soon as I brought it to their

20    attention, it wasn't an issue where every time I

21    would have to ask for it that was stuck in my

22    head.  This was years ago.  We don't do this

23    anymore.

24         Q.    Lack of entering the call notes for

*C O N F I D E N T I A L    T E S T I M O N Y*    102

1    speak to them regarding the call notes?

2        A.    Again, if I did, it hasn't happened in

3    years because when I first took over there were

4    probably several people that weren't putting in

5    good call notes and I told them they had to and I

6    haven't had issues with them since then.

7        Q.    Other than Bill Byrd, have you

8    requested call reports for any of your other

9    sales reps?

10       A.    That goes -- call reports -- what -- to

11   see if they were putting in call notes?

12       Q.    Correct.

13       A.    Again, I look at it when I get in the

14   car with the rep most of the time and I can see

15   if they are putting in call notes because I look

16   at their computer -- so not that I recall.

17       Q.    Okay.

18       A.    So I probably report -- I am assuming

19   that I pulled Meghan Markle's because she was on

20   written warning, but I can't tell you for sure.

21       Q.    How about Tim's?

22       A.    Again I am in the process -- I haven't

23   pulled his yet.

24       Q.    Are you planning on pulling his?

1        A.      I'm sorry, it is Sandy Burr in Wayland.

2    He had a golf outing that far exceeded the

3    expense guidelines.  And the thousand dollars

4    fishing trip as well by recording it incorrectly.

5        Q.      With regard to the golf at Sandy Burr,

6    did he seek your prior approval for that event?

7        A.      I don't recall.

8        Q.      He may have?

9        A.      He may have.  He may not have.  At that

10   time we were allowed to do a lot of programs with

11   physicians and take them places so.

12       Q.      If he got your prior approval for that

13   golf at Sandy Burr, would it have been a

14   violation of the exceeding expense guidelines of

15   Aventis?

16       A.      I would not have approved it for the

17   amount that he put in for.  And I believe there

18   was also $50.00 missing, unaccounted for from

19   that expense as well, $40.00 or $50.00 which was

20   the other issue.

21       Q.      I think you testified that you don't

22   have any recollection as to whether or not he

23   sought your approval for that?

24       A.      Correct.

110

1    Q.    All right.

2    A.    I am saying that if he did seek my

3    approval, I would not have approved to go over

4    the limit by that much and when the expense

5    report came in and I looked at it after the fact,

6    there is also 50 or 60 bucks that is not

7    accounted for in the expense guidelines.

8    Q.    Do you recall in connection with this

9    activity requesting Mr. Byrd to notify other

10   people in different pods of the activity to seek

11   if they wanted to do it?

12             MS. ACKERSTEIN:  Objection.  What

13   activity?

14   A.    The golf activity?

15   Q.    Yes.

16   A.    If they -- say it again -- if the other

17   people in the pods wanted to golf with them?

18   Q.    Do you have any recollection of asking

19   Mr. Byrd to notify other sales reps within

20   Aventis about this golf activity to see if they

21   wanted to participate in it?

22   A.    I don't recall that.

23   Q.    How did Mr. Byrd inaccurately record

24   the expense of the golf outing?

1          So I had Mark come out and see if I was

2    observing correctly -- if he had any suggestions

3    for me or for Bill.

4        Q.    Did he have any suggestions?

5        A.    He agreed with my assessment.

6        Q.    Did he provide you any writing where he

7    detailed how he felt Bill Byrd was?

8        A.    I don't recall.  It would be in the

9    files that you guys have if he did.

10        Q.    Now, prior to May 4th, 2000, do you

11    recall speaking to anyone at Human Resources

12    regarding Bill Byrd?

13        A.    I don't recall if Mailet was brought in

14    at that point or not but it was in that time

15    frame.

16        Q.    Do you recall when approximately Mailet

17    was brought in?

18        A.    I don't recall.  Obviously sometime in

19    that time frame because after Mark rode with Bill

20    and had the same assessment and we went from

21    there, so...

22        Q.    Was the first time Mailet was brought

23    in with regard to the 45-day plan?

24        A.    I don't recall.  I bring her in if I am

1      A.      I believe so because he told me about

2    visiting his mother and not reporting the

3    personal mileage.

4      Q.      But he is the only one?

5      A.      That I recall.

6      Q.      How about pulling signature

7    verifications?

8      A.      The Sample Department does that

9    automatically as well.

10      Q.      Did you have any involvement whatsoever

11    in pulling signature verifications with regard to

12    Bill Byrd?

13      A.      I probably did.

14      Q.      Would you have requested that

15    verification?

16      A.      I could have.  Our company does that on

17    a routine basis anyway for everybody.

18      Q.      Do you do it on a routine basis?

19      A.      No.

20      Q.      How many people have you requested

21    signature verification for?

22      A.      I don't know.

23      Q.      Do you know of anyone other than Bill

24    Byrd that you requested signature verification?

*C O N F I D E N T I A L    T E S T I M O N Y*    198

1      A.      I don't know.

2      Q.      Now, whose idea was it -- at some point

3   in time was the first time that you pulled a

4   check for call activity, is that correct?

5      A.      I'm sorry, a what?

6      Q.      You did a check on call activity, is

7   that correct, for the first time?

8      A.      I checked his call activity?

9      Q.      No, just in general -- in other words,

10  at some point in time you checked whether it is

11  Bill Byrd's or some other sales representative's

12  call activity, correct?

13     A.      I can only check my own reps call

14  activity.

15     Q.      How far back can you go in your system?

16     A.      I don't know.  The computer people

17  could tell you that.

18             About a year if I recall, maybe six

19  months or a year, maybe longer -- I don't know.

20     Q.      Now, is, strike that.

21             Now directing your attention to this

22  mid-year review in August -- I do believe you

23  stated that you prepared it in August of 2000?

24     A.      Yes.

1    the new system, do you know the reason for that

2    transfer?

3        A.    No.

4        Q.    Was it performance of the computer?

5        A.    Not that I know of.

6        Q.    Other than the computers not turning

7    on, are you aware of any other difficulties that

8    the sales reps were having with the computers?

9        A.    They sometimes have other glitches in

10   them.

11            I don't recall anything specifically.

12   Nothing major that I can think of.

13       Q.    Difficulty in transmitting information?

14       A.    Once in a while but you then just can

15   just try it again a few hours later and it goes

16   through or the next day and it goes through.

17       Q.    So you could always -- in other words,

18   if something doesn't transmit, does it notify you

19   of that?

20       A.    Yes, it will tell you transmit

21   successfully on your laptop when it is done.

22       Q.    Are you aware of any situations where

23   other sales reps believed that they transmitted

24   information, but, in fact, the information was

1    not transmitted?

2        A.    It is possible.

3        Q.    Okay.

4        A.    But I am not a computer expert.

5        Q.    Other than Bill Byrd, did any of your

6    other sales reps complain about the computers'

7    lack of transmission?

8        A.    I mean, like I said, if they couldn't

9    get through, they would just transmit the next

10   day and it should go through -- the information.

11       Q.    But it wasn't an ongoing problem?

12       A.    No, it is not a major issue, no.  They

13   just call the computer desk and get it supported

14   or they get another computer shipped out and they

15   swap it with you.

16       Q.    But it happens?

17       A.    It sometime happens, but it is nothing

18   that can't be fixed -- and if you transmit every

19   night it is only one day you are lost and you

20   should be able to go back and retrieve that.

21       Q.    Referring you to Exhibit No. 9, I

22   believe it is, did anyone help you prepare this?

23       A.    I don't recall.  I don't recall.

24       Q.    Did you have any discussions with

1     Q.    So after -- did Chris List review the

2    mid-year review with you and based on reviewing

3    it, she said let's revise it?

4     A.    Yes, I sent an e-mail to her.

5     Q.    All right.

6     A.    And she reviewed it and I told her

7    Bill's outcome and she said let's write it a

8    little more encouraging and redo it.

9     Q.    Was that done?

10    A.    I believe it was.  You should have that

11   document.  I believe it was.

12    Q.    Was that ever presented to Bill Byrd?

13    A.    Again, I believe it was.  Again that

14   document you guys should have in your file

15   somewhere.

16    Q.    Do you recall whether or not Bill Byrd

17   signed that document?

18    A.    I don't know.  You would have it.  I

19   would assume he did.

20    Q.    Are these notes based upon a meeting

21   that you had with Chris List?

22    A.    I believe it was, yes.

23    Q.    What is the page number on the bottom

24   right-hand corner?

CONFIDENTIAL   TESTIMONY   276

1          Were you present when he made that

2   statement?

3       A.    What page are you on?

4       Q.    The first page.

5       A.    Oh, Chris met with him first and then I

6   met with him second so I don't believe I was here

7   during the first page of this.

8       Q.    But at some point in time you had a

9   discussion with Christine List and she felt that

10  the mid-year review should include some more --

11      A.    More encouraging comments.

12      Q.    More encouraging comments regarding the

13  strengths?

14      A.    Yes.

15      Q.    And you believe you did that?

16      A.    I am pretty sure I did revise that,

17  yes.

18      Q.    Do you recall seeking out people on

19  Bill's team and asking them if he had leadership

20  ability?

21      A.    No.

22      Q.    You never did it?

23      A.    I don't recall it.

24      Q.    So no one on Bill's team informed you

*C O N F I D E N T I A L    T E S T I M O N Y*    286

1    small number showed because there was a program

2    going on somewhere else.

3        Q.    Was that a violation of Aventis policy?

4        A.    No, because they had confirmed a

5    certain number of people would be there.

6        Q.    Who confirmed it?

7        A.    Paul Brough with me.

8        Q.    Was it written confirmation?

9        A.    I might have an e-mail somewhere with

10   it.  He is in charge of all of the physicians.

11   So again he faxed all of the invites he confirmed

12   and he didn't find out until late in the day that

13   that the hospital was having a program the same

14   day.

15            As long as you attach an attendee list

16   of who was supposed to be there, you are okay.

17       Q.    Are you aware of a dinner program at

18   the Ritz Carleton sponsored by or held by Jen

19   Riley and Annette Bohan?

20       A.    They had several there.

21       Q.    Do you recall this specific one that

22   went over budget because there were no shows?

23       A.    They did talk to me prior because I

24   remember we were at a meeting at a P.O.A., and

1    they said that they were having a program and it

2    was going over budget and I don't remember if it

3    happened or was happening or just happened and

4    they have already confirmed the room and they

5    have to pay a certain amount of money -- and I

6    said as long as you put in who you are expecting.

7    They are expecting enough attendees to cover the

8    cost, but like always not everyone shows.

9         So as long as they, again, fill in the

10   expected attendees in with the actual attendees,

11   then that is okay.

12        Q.    What if they didn't include the

13   expected attendees in the expense report?

14        A.    Then the Expense Department would ask

15   them for that.

16        Q.    Would you consider that to be a

17   fraudulent expense report?

18        A.    No, because they expected the

19   appropriate number of people to be there.

20        Q.    But what I am saying is if on the

21   expense report itself it didn't designate

22   invitees and attendees -- would you consider that

23   fraudulent?

24        A.    That is up to the Expense Department.

**"EXHIBIT E"**

163

1    you and tells you, actually let me give you a

2    document and have you look at it.

3              Do you recognize that document?

4              MR. KOSLOWSKY:   Can I get that

5    marked.

6              (Exhibit No. 13, Document, 9/25/00,

7                   was so marked.)

8    Q.    I ask you to turn to Page 2.

9    A.    Yes.

10   Q.    The second paragraph halfway down.   It

11   starts with -- right there, "When a person"?

12   A.    Yes.

13   Q.    Can you just read that?

14   A.    "When a person of color is hired, they

15   are looked at as a superstar and are expected to

16   succeed where others fail.   I am held to a higher

17   standard and criticized for things that others

18   are not".

19   Q.    All right.   As I understand it, those

20   are quotes that you are saying are attributable

21   to Bill Byrd, is that correct?

22   A.    Yes.

23   Q.    Now would you agree with me that he is

24   informing you that he is being held to a higher

164

1    standard in his opinion?

2         A.    No.

3         Q.    Would you agree with me that he

4    believes he is being criticized for things that

5    others are not?

6         A.    He made it as a reference -- as a

7    third-party reference.  He didn't say it

8    specifically in reference to himself.  It was

9    just a general thought that he shared, a

10   philosophy.

11        Q.    So based on this, it wasn't your

12   impression that Bill was informing you that he

13   was being discriminated against or was implying

14   that?

15        A.    I thought it was odd that he brought

16   that up and that is why I included that in here.

17        Q.    All right.  But you didn't, it wasn't

18   your perception that Bill Byrd was complaining to

19   you that he believed that he was being

20   discriminated against?

21        A.    I wasn't sure what he was complaining

22   about.  That is why I asked him to clarify it a

23   number of times.

24        Q.    Did you conduct any investigation to

COPLEY COURT REPORTING

1  determine whether or not Bill Byrd it was being

2  discriminated against?

3       A.    There was never an issue that was

4  specifically raised of discrimination that would

5  have required an investigation.

6       Q.    So is the answer no?

7            MS. ACKERSTEIN:  Objection.

8       A.    Again, there was not an issue of

9  discrimination that was raised that would require

10 an investigation.

11      Q.    Did you give a copy of this to Bill

12 Byrd?

13      A.    No, I don't believe so.

14            MR. KOSLOWSKY:  Can I get that

15 marked.

16            (Exhibit No. 14, Memo, 11/11/00, was

17                 so marked.)

18      Q.    In connection with this, when you were

19 taking notes, were you taking down any quotes

20 from Deb Edmunds during the meeting?

21      A.    I don't recall specifically.

22      Q.    Do you recall taking down any notes of

23 your quotes during the meeting?

24      A.    I don't recall specifically.  I believe