## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11032-DPW

WILLIAM M. BYRD,

          Plaintiff,

v.

AVENTIS PHARMACEUTICALS, INC.
and DEBRA EDMUNDS,

          Defendants.

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to the local rule 56.1, Plaintiff William M. Byrd, hereby responds to defendant's Rule 56.1 Statement of Material Facts Not In Dispute as follows:

1.     Plaintiff, William M. Byrd, was employed by Aventis as a sales representative until February 4, 2002, when his employment ended. (Complaint, ¶ 32; Ackerstein Dec., ¶ 6, Exhibit E). He began his employment in 1997, being hired at age 48. (Compliant, ¶ 4; Ackerstein Dec., ¶ 6, Exhibit E; Pl. Tr. 10).

**Response No. 1**

Admitted.

2.     Aventis is a pharmaceutical company which manufacturers and "sells" pharmaceuticals. (Complaint, ¶ 2; Ackerstein Dec., ¶ 6, Exhibit E).

**Response No. 2**

Admitted.

3.    Ms. Edmunds is a resident of Wayland, Massachusetts.  (Edmunds Tr. 7)[1]

She has been employed by Aventis as an Area Manager since her hiring in May, 1999,

and was Plaintiff's supervisor.  (Edmunds Tr. 34;  Complaint, ¶ 13;  Ackerstein Dec., ¶ 6,

Exhibit E).

### Response No. 3

Admitted.

4.    In bringing his claim of discrimination, Plaintiff contends that the

employee at Aventis who discriminated against him based on his age and race is Ms.

Edmunds.  (Pl. Tr. 132-134).

### Response No. 4

Admitted.

### Plaintiff's Hiring

5.    On or about May 12, 1997, Plaintiff was hired by Hoechst Marion

Roussel, Aventis' predecessor, as a Professional Sales representative. (Pl. Tr. 97).

Plaintiff represented that he had a B.S. in Business Administration, as is set out in the

"Field Sales New Hire Information Form." (Edmunds Dec., ¶ 3, Exhibit B).  In fact, as

discovered at his deposition, Plaintiff did not graduate from college and does not have a

B.S: degree. (Pl. Tr. 241). Accordingly, he misrepresented his credentials and he does not

meet the educational requirements for the Sales Representative position, which requires a

college degree. (Edmunds Dec., ¶ 2, Exhibit A).

---

[1] Photocopies of excerpts of the deposition of Deborah Edmunds are attached to the Declaration
of Joan Ackerstein as Exhibit B.

**Response No. 5**

Plaintiff admits that he was hired by Hoechst Marion Roussel on or about May 12, 1997, and that he does not have a college degree. Plaintiff denies that he misrepresented his credentials to Hoechst Marion Roussel and denies that he did not meet the educational requirements for his position when he was hired at Hoechst Marion Roussel,. (Byrd Aff'd, ¶ 8).

<b>Plaintiff's Duties As A Sales Representative</b>

6.    Pharmaceutical sales representatives at Aventis do not actually sell pharmaceuticals, but rather, communicate with physicians through office visits, with the goal of educating physicians regarding Aventis' products so that they prescribe those products. Accordingly, as a sales representative, Plaintiff was responsible for calling on physicians in his territory to speak with them and their staff about Aventis' products. (Pl. Tr. 98-99) Plaintiff was primarily responsible for promoting Allegra, Amaryl and Lantus, medications prescribed for diabetes or respiratory problems. (Pl. Tr. 95-96).

**Response No. 6**

Plaintiff admits the last two sentences of the paragraph but disputes that sale representatives do not actually sell pharmaceuticals. Although not direct sales, Plaintiff was responsible for selling Physicians in his territory on prescribing Aventis' products to their patients.

7.    Aventis outlined the duties of the Sales Representative in a document entitled "Core Competencies." (Pl. Tr. 238-239; Ackerstein Dec., ¶ 7, Exhibit F). Core competencies for the sales representative position included, for example, product knowledge, selling skills,

interpersonal skills, territory management and customer targeting/analysis. (Id.) Plaintiff was

familiar with this document and the competencies required (Pl. Tr. 239).

### Response No. 7

Admitted.

8.      At the time he was hired, Plaintiffs manager was Sean Flanders, an Area

Manager. (Pl. Tr. 93-94)  In or about May 1999, Ms. Edmunds became an Area Manager and

Plaintiff's direct supervisor. (Pl. Tr. 94-96) At that time, Ms. Edmunds reported to Christine

List, who was then Regional Sales Director. Ms. Edmunds reported to Ms. List from May

1999 through the fall of 2000 and then again after approximately November 2001. (List Tr.

19-20, 45-46; [2] Edmunds Tr. 28)

### Response No. 8

Plaintiff disputes the dates when Ms. Edmunds reported to Ms. List, but admits

the remaining allegations in the paragraph.  (Byrd Aff'd, ¶ 2).  In addition, David

Pearlstein was Plaintiff's temporary Area Manager during portions of Plaintiff's

employment.  (Byrd Aff'd, ¶ 2).

9.      As Area Manager, Ms. Edmunds had responsibility for approximately eight

sales representatives, who had territories in New England. (Edmunds Tr. 22-23). It was Ms.

Edmunds' responsibility to monitor sales activities in her area, including the performance of

all the sales representatives who reported to her. (Edmunds Tr. 58-59).

### Response No. 9

Admitted.

---

[2] Photocopies of excerpts of the deposition of Christine List are attached to the Declaration of Joan Ackerstein
as Exhibit C. 3

10.    As Regional Sales Director, Ms. List managed the eight to ten Area Managers who worked in her region, including Ms. Edmunds. (List Tr. 20-21) Like the other Area Managers who reported to Ms. List, Ms Edmunds communicated with Ms. List regarding the performance of the sales representatives who worked for her. (List Tr. 23-25, 46-47) Mailet Minassian was a Human Resource Manager at Aventis in 2000 through December 2001, when she was promoted to Senior Human Resource Manager, a position she held until April, 2004. (Minassian Tr. 14).

**Response No. 10**

Plaintiff does not dispute.

11.    At the time Plaintiff worked for Aventis, Aventis utilized a "pod" (or team) system for promoting Aventis products in a given area. Under this pod system, a group of sales representatives worked together toward common goals, calling individually on the same group of physicians. The members of pods often reported to different Area Managers. Plaintiff's pod consisted of four or five sales associates at various times, each of whom reported to a different Area Manager. (Pl. Tr. 95, 97).

**Response No. 11**

Admitted.

**The Honor System**

12.    At Aventis, sales representatives work independently.  They are assigned territories and they are supposed to spend their days calling on physicians in their territories. They make their own schedule of visits and they generally make their sales calls alone.  (Pl. Tr. 59-60; Edmunds Tr. 318)  The Area Manager has to trust the sales representative because they are working on their own.  (Pl. Tr. 59-60; Edmunds Tr. 319)

The Sales Representatives were on an honor system, recognizing that their managers expected them to be truthful in reporting their activities. (Pl. Tr. 60)

**Response No. 12**

Denied. Although Aventis sales representatives typically made calls independently, they worked in a "pod" (team) system for promoting Aventis products in their territory. (POC, ¶ 11). Under this pod system, a group of sales representatives worked together toward common goals, calling individually on the same group of physicians. Plaintiff's pod members broke up their territory into smaller sections, so sales representatives would call on the physicians in that section and pod mates would rotate the sections amongst themselves. Plaintiff had good access to the physicians in his territory, and no other sales rep had access to a physician that Plaintiff did not also have access.

**Accountability As A Sales Representative**

13.    As a sales representative, Plaintiff had an obligation to perform "detail" calls on physicians. (Edmunds Tr. 260) Only when a sales representative actually had a face-to-face meeting with a physician, during which he or she delivered a marketing message regarding an Aventis product, would the visit qualify as a detail call. (Pl. Tr. 60, 115-116; List Tr. 113) Sales representatives were to report calls that did not rise to the level of a primary detail call as service calls. (Pl. Tr. 116; List Tr. 113)

**Response No. 13**

Denied. What constituted a detail call was extremely subjective and, moreover, Aventis allowed calls failing to meet the strict definition above as being classified as detail calls. (Boland Aff'd, ¶ 10). The running joke among sales representatives is that if you make eye contact with a doctor it constitutes a detail call. (Boland Aff'd, ¶ 10). For

the most part, detail calls were recorded when a sales representative had a face-to-face conversation with a physician.

14.    Like all sales representatives; Plaintiff was required to make a record of a sales call immediately following the call, if possible, on a hand-held computerized device. (Pl. Tr. 99, 115-116;List Tr. 86-87, 109-12, 119-20)  Sales representatives were expected to record call activity on the device as a detail call only if the call qualified as one.(PI. Tr. 99, 115-116; List Tr. 113-115; 118-20;  Minassian Tr. 32).  Otherwise, the call was not to be entered as a detail call, but rather as a service call.  (Pl. Tr. 99, 115-116; List Tr. 113-115, 118-120)  The call entry on the device would reflect the date of the call, the sales representatives' notes regarding the call, and whether the call constituted a primary, secondary or reminder detail call, or simply constituted a service call. (List Tr. 119-120, 125-128).

**Response No. 14**

Denied.  Sales representatives were not required to record calls immediately after the call.  Many sale representatives would record their call notes at the end of the day when they had more time to accomplish the task, and it was not enforced against other sales representatives. (Boland Aff'd, ¶ 9).  Furthermore, there could be back-to-back calls in which you would be unable to record the first call immediately after the call.

15.    Members of a pod read one another's call notes in order to educate themselves on what the others had communicated to the doctors at issue. (Pl. Tr. 202; List Tr. 120-121).

**Response No. 15**

Admitted. In further answering, calls notes of other sales representatives did not meet the criteria of the "detail calls" being enforced against the Plaintiff. (Boland, ¶ 10) Sales representatives Jen Riley, Brenda Kurvinicki and Kelly Shea reported the call notes the same way plaintiff did. (Pl. Tr. 270-271).

16.    In addition to reviewing each other's call notes, members of a pod were expected to communicate with one another regarding sales strategies for achieving their common goals. (Pl. Tr. 97)  Members of a pod were expected to meet monthly. (Pl. Tr. 97).

**Response No. 16**

Admitted.

17.    Like all sales representatives, Plaintiff was required to work in his territory between 8:00 a.m. and 5:00 p.m. each day. (Pl. Tr. 183; Edmunds Tr. 104-105) A failure to be in the territory between 8:00 a.m. and 5:00 p.m. daily could be grounds for termination of employment. (Minassian Tr. 49, 72)

**Response No. 17**

Denied. Aventis' written policy only required sales representatives to be in their territory eight hours per workday, and it was recommended to be between 8:00 a.m. and 5:00 p.m. The purported requirement that sales representatives be in their area each and every business day from 8 am to 5 pm is not routinely enforced. (Boland Aff'd, ¶ 15). A sales representative is not typically in their sales territory one hundred percent of the time between 8:00 am to 5:00 pm on every business day. (Boland Aff'd, 15). Pod mates had a rotation of what doctors they would see on a given day and for the most part, after they

8

made their calls their day was done. (Boland Aff'd, ¶ 15).  Co-workers would get mad at you if you saw a doctor out of rotation, because that effects their ability to meet their quotas. (Boland Aff'd, ¶ 15).

18.    Sales representatives also distributed samples of Aventis' products to physicians when they made sales calls. (Pl. Tr. 116-117)  As the sales representatives distributed samples, they were to record the physician's signature on an electronic device. The device recorded the physician's signature, the date and time of the sales call and the number of samples left with the physician. (Pl. Tr. 116-117)  If the device was not working, sales representatives were required to report their sampling activity on paper forms.  They were further expected to rectify the problem with the device so that as few paper forms as possible were utilized. (List Tr. 134-135)

**Response No. 18**

Admitted.

19.    Like all sales representatives, Plaintiff was required to comply with Aventis' Samples Policy.  (List Tr. 94-95)  The Sample Policy required that the number of samples in the sales representative's possession together with the number of samples that the sales representative distributed to physicians reconciled to the total number of samples provided to the sales representative.  If the number did not reconcile, then the discrepancy was attributed a dollar value; based on the number of samples and the price of the product.  This discrepancy was called a sample variance. (Edmunds Tr. 42; Edmunds Dec., ¶ 4, Exhibit C).

**Response No. 19**

Denied.  The sample policy was selectively enforced against plaintiff.  (Boland, ¶ 4).  Sample variances, were common and sales representatives were simply expected to reconcile the variances.  (Boland Aff'd, ¶ 13).

20.    Sales representatives were expected to keep their sample variances to a minimum and, according to Aventis' Sample Policy, sales representatives and Area Managers were held accountable for following all sample policy requirements.  The sample policy further stated that compliance with it was considered in evaluating performance and that disciplinary action up to and including termination could result for sample policy violations. (Edmunds Tr. 42; Edmunds Dec., ¶ 4, Exhibit C)

**Response No. 20**

Admitted.

21.    When sales representatives spent money on work-related expenses, they were to comply with Aventis' Promotional Guidelines, which set forth spending guidelines for their promotional sales efforts. They submitted expense reports to obtain reimbursement for the expense. The purpose of the expense report was to explain the expense, the sales effort involved, the parties in attendance or involved in the expense and the amount spent.    The promotional guidelines explicitly stated that ignorance of policy was not an acceptable excuse for not following policy.  (Minassian Tr. 87-88; Edmunds Dec., ¶ 5, Exhibit D)  It further provided that "Aventis will not tolerate promotional guideline violations. When promotional guideline violations occur, the [sales representative] can expect disciplinary action up to and including termination." (Minassian Tr. 36-7; 140;142-3).

**Response No. 21**

Admits that Aventis had Promotional Guidelines, but denies that it as strictly enforced.  Sales representatives regularly exceeded the expense guidelines without any ramifications.  In addition, if a sales representative knows they're going to exceed the expense guidelines, they can get prior approval from their area manager.  Ms. Edmunds assisted young Caucasian sales representatives who exceeded the expense guidelines, but targeted Plaintiff despite his obtaining prior approval for exceeding the same.  (Edmunds Tr., P. 112).  In addition, the expense report was to list the invitees not the attendees, because the sales representative had no control over no shows causing him or her to exceed the expense guidelines.  (Edmunds Tr. ¶ 285-286).

22.    Plaintiff was provided with an Aventis company car. Like all sales representatives, he was expected to follow the Company Vehicle Policy.  The Company Vehicle Policy states that "Drivers . . . must always operate the vehicle in a safe manner adhering to state and local laws."  Violations of this policy could also result in disciplinary action up to and including termination. The policy also required that sales representatives report the number of miles they drove the car for personal purposes each week and money was deducted from their paycheck, based on the number of personal miles they recorded. (Pl. Tr. 118, 126;  Edmunds Dec., ¶ 6, Exhibit E)

**Response No. 22**

Plaintiff admits that he was provided a company car and expected like anyone to adhere to state and local laws.  Plaintiff denies that each week money was deducted from their paycheck based on the number of personal miles they recorded, but that a flat $40.00 charge per month for personal mileage.  (Pl. Tr. 126).

23.    Sales representatives were expected to report call activity and expense reports

accurately.  (Pl. Tr. 60, 306-307)  Indeed, Aventis' Business Conduct Policy expressly states

as follows:

> ...all associates are expected to record and maintain the company's
> records, data and information so that they accurately reflect the
> company's business activities. These records, data and information are
> relied upon to produce reports to management ...government entities,
> regulatory agencies and others...The following are examples of
> unethical (and in some cases illegal) actions with respect to company
> records that are strictly prohibited by company Policy:...
> [i]ntentionally recording false or misleading account entries (such as
> hours worked, or expenses to be reimbursed, or samples disbursed...
> [f]alsifying data .... Any action that is in violation of this Policy ...may
> result in appropriate disciplinary action up to and including
> termination.

(Edmunds Dec., ¶ 7, Exhibit F)

### Response No. 23

The plaintiff admits that the business conduct policy provides, in part, what was

quoted by Defendants, but denies he testified in the manner stated by Defendants.  In

further answering, sales representatives were provided leeway with regard to report call

activity and expense reports.  (Edmunds Tr. 65-66, 97-98 and 102).

24.    Aventis had a coaching and counseling policy, which set forth corrective

actions in the event an employee was not meeting performance expectations. (Minassian Tr.

21-22; Ackerstein Dec. ¶ 8, Exhibit G)

### Response No. 24

Admitted.

### Plaintiffs Sustained Performance Problems

25.    From the inception of his employment, Plaintiffs managers noted certain

deficiencies in Plaintiffs performance. Plaintiff's 1997 and 1998 evaluations stated that he

needed to improve his sales presentations and product knowledge. Moreover, his 1998

performance evaluation noted some problems with sample reconciliation and an unexplained

sample variance of $1,500. (Edmunds Dec., ¶ 8, Exhibit G)

### Response No. 25

Denied.  Plaintiff had excellent performance evaluations up until the September

18, 2000 performance evaluation performed by Deb Edmunds.

26.    Plaintiff's August 1999 evaluation reflects that he continued to have

difficulties with product knowledge.  This evaluation also noted another significant sample

variance, this time for $7,000. (Pl. Tr. 140;  Ackerstein Dec., ¶ 9, Exhibit H)

### Response No. 26

Denied.  The August 1999 evaluation provided that plaintiff scored a 96% on his

exam regarding product knowledge.  Furthermore the evaluation didn't note a sample

variance of $7,000.00.  The sample variance referred to therein was reconciled by

plaintiff in the normal course of business with Aventis.  (Pl. Tr. 146).

27.    Prior to Ms. Edmunds becoming Plaintiff's supervisor, Ms. List had heard

about performance issues regarding Plaintiff from Sean Flanders, Plaintiffs first supervisor at

Aventis. (List Tr. 62-65) Ms. List also heard about issues with Plaintiff from Mark Miles, her

predecessor as the Regional Manager. (List Tr. 62-b5)

### Response No. 27

Denied.  Plaintiff had a good relationship with Sean Flanders as evidenced by his

performance evaluations.  (Byrd Aff'd, ¶ 9).

28.     Ms. Edmunds began to supervise Plaintiff in 1999.  Because she had some concerns about Plaintiff's performance, she asked her then supervisor, Regional Manager Mark Miles, to spend a day in the field with her and Plaintiff. (Edmunds Tr. 323)

**Response No. 28**

Denied.  Deb Edmunds informed plaintiff that it was company policy for the regional manager Mark Miles to accompany her in the field with her and the plaintiff. During the same week, Mark Miles also rode with plaintiff and other sales representatives in the field.  At the time Mark Miles rode with plaintiff, Mark Miles never got out of the car.  After the day in the field, Mark Miles provided Mr. Byrd with a positive feedback letter with regard to the day.  (Byrd Aff'd, ¶ 2, Exhibit A).

29.     Plaintiff's evaluation dated May 4, 2000, reflected continuing issues. (Pl. Tr. 143, 146-147)  It counseled Plaintiff to focus on physicians who generated a relatively high volume of business.  It also noted that Plaintiff continued to demonstrate difficulty with samples management, noting that he had the most sample variances within his district in that year.  It further noted that he used the highest percentage of paper forms in the district. (Pl. Tr. 146-47; Ackerstein Dec., ¶ 10; Exhibit I)

**Response No. 29**

Denied.  The May 4, 2002 evaluation was extremely positive for the plaintiff.

30.     The May 4, 2000 evaluation also indicated that while on a routine field visit with Plaintiff, Ms. Edmunds observed Plaintiff speeding in a school zone and spoke with him regarding this violation of policy. (Id.) During his deposition, Plaintiff admitted that the negative comments made by Ms. Edmunds in this evaluation were, in fact, true. (Pl. Tr. 144)

**Response No. 30**

Admitted.  Ms. Edmunds also noted in the review that she discussed it with him in detail and he understood the importance of adhering to company policy.

### Events Which Prompted Review of Plaintiffs Reports

31.    An event occurred in July, 2000, which caused Ms. Edmunds to have concerns about Plaintiff's truthfulness. (Edmunds Tr. 321) Plaintiff had used his Aventis automobile to make a visit to his mother in upstate New York, but had failed to report the miles as personal miles on his mileage reimbursement form as he was required by Aventis policy to do. (Edmunds Tr. 321-322)  In fact, Plaintiff acknowledged at his deposition that he failed to report over 330 personal miles for this trip. (Pl. Tr. 127-128)

**Response No. 31**

Denied, the investigation of Plaintiff's reports occurred prior to this incident.  The incident referred to in this paragraph occurred in the last week of September, 2000, after Ms. Edmunds' investigation and a completely negative review of September 18, 2000. Notwithstanding, Plaintiff noted the personal mileage the following month's expense report.  (Pl. Tr. 127).

32.    At about the same time, Ms. Edmunds began to have concerns about whether Plaintiff was in his territory between 8:00 a.m. and 5:00 p.m. as he was required to be. Plaintiff lived in Milton but his territory was Cape Cod and the South Shore between Cape Cod and Plymouth. Plaintiff told Ms. Edmunds he dropped a child at school at 8:00 a.m. thus, making it impossible for him to be in his territory at 8:00 a.m. (Edmund Tr. 224-225)

**Response No. 32**

Denied. Aventis' policy was that sales representatives had to be in their territory for eight hours, and it was only recommended that it was 8:00 a.m. to 5:00 p.m.

33.    As a result of concerns fostered by the July 2000 failure to report miles and Plaintiff's comments about dropping off a child at school, Ms. Edmunds reviewed some of the records Plaintiff submitted to Aventis' corporate office as part of his routine reporting obligations. (Edmunds Tr. 224-225, 320-321)  Ms. Edmunds had done this with other employees from time to time. (Edmunds Tr. 53-54) Ms. Edmunds worked with her supervisor, Ms. List, and her human resources representative, Mailet Minassian, in obtaining these records. (Minassian Tr. 69-70; Edmunds Tr. 222)

**Response No. 33**

Denied. Ms. Edmunds geared her investigation towards the three (3) oldest salesmen assigned to her. (Edmunds Tr. 64; and Byrd Aff'd ¶ 3).

34.    The records obtained by Ms. Edmunds showed a disturbing trend. First, an inordinate percentage of Plaintiff's calls to physicians were recorded as occurring between 10:00 a.m. and 2:00 p.m., which suggested Plaintiff was not in his territory throughout the entire day. (Edmunds Tr. 327-328; Pl. Tr. 100; Edmunds Dec., ¶ 9, Exhibit H)  Second, fuel reports showed that Plaintiff had purchased gas at 3:00 p.m. in Milton, at a time when he should have been in his territory. (Edmunds Tr. 224-225; Edmunds Dec., ¶ 9, Exhibit H) Additionally, the reports showed Plaintiff had a very high use of paper forms for recording physicians' signatures when they received samples.  Plaintiff used paper forms 20 to 30 percent of the time, as compared to other sales representatives who used them 2 to 5 percent of the time. (Edmunds Tr. 268-

269)    They were supposed to record the physicians' signatures on the electronic device, so there would be no dispute as to the date and time the signatures were recorded. (Id.)

**Response No. 34**

Plaintiff disputes this.  Plaintiff always worked full days and often was in his territory doing grand rounds at hospitals at 7:00 a.m., 7:30 a.m., or 8:00 a.m. (Pl. Tr.162). Defendants have failed at provide documentation to support this alleged suspicion, and Ms. Edmunds acknowledges that there were computer problems that often prevented or delayed transmission of call activity.  (Edmunds Tr. 207-208).  Although one (1) field report in 4 ½ years of employment showed that he was in Milton at 3:00 p.m., and Ms. Edmunds acknowledges that there have been Dinner Programs that would justify this. (Edmunds Tr. 225).  Plaintiff used his hand held computer unless it was broken and needed to be repaired, in which case he would use paper copies.  (Edmunds Tr. 225).

35.    As she did with other sales representatives who reported to her, Ms. Edmunds accompanied Plaintiff on some of his sales calls.  These accompanied visits were called "work-withs" and they provided Ms. Edmunds the opportunity to observe Plaintiff's interactions with physicians and performance of his daily duties.  (Pl. Tr. 105-106; Edmunds Tr. 45-46) Ms. Edmunds noted issues with Plaintiff which she addressed with him. For example, Ms. Edmunds spoke with Plaintiff about the fact that the samples stacked in the back seat of his car were blocking his rear window. (Pl. Tr. 183)  She also noted that Plaintiff had compromised safety by allowing his gas tank to overflow. (Pl. Tr. 183)

**Response No. 35**

Admitted.

**Plaintiffs September 18, 2000 Performance Review**

36.     By September 2000, Plaintiff exhibited a number of performance problems that he had been counseled about in the past. These included high sample variances, concerns that he was not in his territory to the extent he should be, that he was not properly recording calls and that he had insufficient selling skills and product knowledge. (Edmunds Tr. 62, 73-74, 100-101; Pl. Tr. 148, 150;   Ackerstein Dec., ¶ 11, Exhibit J;  Ms. Edmunds had also heard some complaints from Plaintiff s  pod-mates, for example, that Plaintiff ran out of samples and would need to ask his pod-mates for samples.  (Edmunds Tr. 166-170)

**Response No. 36**

Denied.  Prior to September 2000, plaintiff had an excellent performance record. Thereafter, Ms. Edmunds began to selectively enforce Aventis' policies against him. (Boland Aff'd, ¶ 4; and Pearlstein Aff'd, ¶ 4-5).  For example, it is common practice and a policy approved conduct for pod mates to exchange samples on an as needed basis, but Ms. Edmunds is trying to use this practice against the Plaintiff.  (Boland, ¶ 13, and Edmunds Dec., ¶ 4, Exhibit C ).

37.     On or about September 18, 2000, Ms. Edmunds met with Plaintiff to go over his mid-year performance evaluation.  (Pl. Tr. 148) Among other issues, Plaintiff's mid-year review dated September 18, 2000, raised issues with Plaintiff's product knowledge. It noted that during a physician visit that Ms. Edmunds observed, Plaintiff confused product names and misstated appropriate usage of a certain product.  During his deposition, Plaintiff claimed

that he did not remember confusing product names, but that he did remember making a misstatement to a physician regarding the use of Amaryl. (Pl. Tr. 149-150)

**Response No. 37**

Plaintiff admits that Ms. Edmunds met with plaintiff on September 18, 2000 to go over his midyear review. Despite being given a very good review four months before, this review was completely negative and was clearly targeting Bill Byrd. Ms. List instructed Ms. Edmunds to redo the evaluation because it was so negative. (Edmunds Tr. 263, 276 and Byrd Aff'd, ¶ 4).

38.    The review also reflected Aventis' concerns that despite being given specific direction to focus on physicians that did a high volume of business with Aventis, Plaintiff continued to call on "low volume physicians." The review also noted the goal that sales representatives make calls on high volume physicians. During his deposition, Plaintiff admitted that he ignored Ms. Edmunds' directives about calling on high volume physicians simply because he did not agree with her. approach. (Pl. Tr.150-152) She noted that she found him "difficult to coach." (Id. at 148; Ackerstein Dec., T 11, Exhibit J).

**Response No. 38**

Denied.  Plaintiff called on high volume doctors which were the same doctors that his pod mates called on as part of their rotation. (Boland Aff'd ¶ 15;  and Pl. Tr. 198). Furthermore, the deposition testimony cited does not state that he ignored Ms. Edmunds regarding calling on high volume physicians.

39.    This review also noted that Plaintiff did not consistently record pre and post call notes immediately following a customer call, as was required of all sales associates.

During his deposition, Plaintiff admitted that he, in fact, did not do so. (Pl. Tr. 100, 157) The review further indicated that Plaintiff was not sending updates on team meetings to Ms. Edmunds, as she had requested on several occasions. Again, during his deposition, Plaintiff acknowledged that the meeting notes were not getting to Ms. Edmunds. (Pl. Tr. 154, 182)

### Response No. 39

Denied.  Sales representatives were not required to record it immediately after the call, and many did it at the end of the workday.  (Boland Aff'd, ¶ 9).  As with all sales representatives Plaintiff testified that it occasionally happened and provided explanation (Pl. Tr. 157).

40.    Finally, the review noted that Plaintiff had made some inappropriate remarks during a field visit.  (Pl. Tr. 304)  During his deposition, Plaintiff admitted that he had, in fact, made the remarks regarding which Ms. Edmunds took issue. He was just of the opinion that they were not inappropriate remarks to be made. (Id.)

### Response No. 40

Admitted.  In further answering, Ms. Edmunds asked Mr. Byrd specifically what a female claimed a physician did that resulted in a sexual harassment case, and Mr. Byrd merely told her of the incident. (Pl. Tr. 304).

41.    At the conclusion of their meeting, Ms. Edmunds presented Plaintiff with a Performance Action Plan that set forth specific actions to be completed, such as increasing Amaryl and Allegra product knowledge; perfecting selling skills; increasing physician calls and calling on high volume physicians; working a full day, 8:04 a.m. to 5:00 p.m.; recording calls immediately following calls; obeying traffic and speed laws; observing sample

guidelines; and keeping samples in the trunk of his car. (Pl. Tr. 148; Ackerstein Dec., ¶12,

Exhibit K) Plaintiff refused to accept this plan (Pl. Tr. 148).

### Response No. 41

Plaintiff admits that Ms. Edmunds presented plaintiff with a performance action

plan which speaks for itself.  At the time, Ms. Edmunds had already gone through human

resources to begin an investigation against the three (3) oldest sales representatives on her

team and, was clearly targeting Plaintiff for termination.  (Edmunds Tr. 64).  Plaintiff did

not refuse to accept the plan but disagreed with it and as a result requested a meeting with

the regional manager Christine List.  Bill Byrd informed Ms. List that at their meeting

about the issues he was having with Deb Edmunds, and stated that after a ride by her if

she agreed with Deb Edmunds he would accept the plan.  After the ride with, Christine

List informed Bill Byrd that he should continue doing what he was doing.  In addition,

Christine List informed Deb Edmunds that her performance review of Bill Byrd was too

negative.

### The Meeting With Ms. List September 25, 2000

42.    After his meeting of September 18, 2000 with Ms. Edmunds, Plaintiff

requested a meeting with Ms. List. (Pl. Tr. 106-107) Ms. List agreed to meet with him,

and the meeting occurred on September 25, 2000, one week later. Ms. Edmunds joined

Ms. List and Plaintiff towards the end of the meeting. (Pl. Tr. 114; List Tr. 152)

### Response No. 42

Admitted.

43.    During the meeting, Plaintiff told Ms. List he disagreed with Ms. Edmunds'

assessment of his performance. (List Tr. I56-157) They agreed that Ms. List would spend a

day in the field with Plaintiff and that if Ms. List saw the same things, Plaintiff would take her word for it. (Pl. Tr. 115)

### Response No. 43

Admitted.  Ms. List informed Ms. Edmunds that the performance review was too negative and she should redo it.  (Edmunds Tr. 263, 276).

44.    Ms. List and Plaintiff also discussed a golf outing Plaintiff had reported improperly as a hospital display on his expense report. Ms. List advised him that it was improper to report a golf outing as something else. (Pl. Tr.134-135, 196; List Tr. 179, 223-225) Ms. List made clear that this was not an acceptable practice. (Pl. Tr. 134-135, 196; List Tr. 179).

### Response No. 44

Denied.  After the NFL Golf Tournament, on one occasion, Ms. List told Mr. Byrd not to follow his prior area manager's instruction of how to categorize a golf outing. (Pl. Tr. 136).

45.    During the meeting with Ms. List, Plaintiff said that he "believed that Deb Edmunds was trying to get rid of [him] and that if she was going to hire someone, she wouldn't have hired [him], something like that." (Pl. Tr. ¶ 11) Ms. List asked him for specifics of why he felt that way but he did not give her any specifics. (Pl. Tr. 111).

### Response No. 45

Admitted in part.  As set forth in Ms. List's Memorandum of the Meeting, Mr. Byrd made it clear that he was being treated differently by Ms. Edmunds because of his race, and he was being asked by her to do things that she was not asking any of her other sales representatives to do.

**Ms. List's Day In The Field With Plaintiff**

46.    On October 27, 2000, Ms. List spent a day in the field with Plaintiff as he had requested she do at their meeting on September 25, 2000. Plaintiff selected the physicians they would call on during that day. (Pl. Tr. 115) Ms. List identified some performance issues which she detailed in her memorandum describing the events of that day: Plaintiff was abrupt with some office personnel; was lacking in product knowledge; made one physician's assistant uncomfortable with his presentation; and was not demonstrating strong selling skills. (List Tr. 165-167; Ackerstein Dec., ¶ 13, Exhibit L)

**Response No. 46**

Plaintiff admits that Ms. List spent a day in the field with plaintiff but denies that he selected the physicians that they would call on during that day. Pod mates split-up their area in the territory for each sales representative to visit on a given day and Plaintiff called on the physicians in the area designated for him that day by his pod mates. (Pl. Tr. 198). After the ride with, Ms. List informed plaintiff he should continue to do what he is doing. (Byrd Aff'd ¶ 5).

**The November 14, 2000 Warning**

47.    With Ms. List now seeing some of the same shortcomings Ms. Edmunds identified in the Performance Improvement Plan ("PP") Plaintiff objected to on September 18, 2000, Ms. Edmunds restated those shortcomings in a warning document. Plaintiff had been offended by the PIP, which required that he perform certain tasks within a specified period, and refused to sign it. (Pl. Tr. 107) The written warning dated November 14, 2000, set forth the issues that Plaintiff had been counseled about and the expectations going forward, but did not include a set time period for accomplishment.

The issues identified included:

- Lack of communication to your manager concerning activities in your territory;

- Lack of monthly team meetings and notes from your monthly Quad [pod] meetings;

- Lack of entering call notes for every detail immediately following the call;

- Lack of and inaccurate recording of personal miles;

- Violation of the anti-kickback policy in regards to your journal club;

- Safety violations with the gas tank overflow incident as well as samples stored in the back seat blocking most of your rear view window;
- Not working in your territory from 8:00 a.m. to 5:00 p.m. Monday through Friday (not including commute time);
- Daily transmission of call activity to home office;

- Weekly e-mail to your manager with the previous week's call activity;

- Satisfactory knowledge of Aventis' promoted products and their competitors, as well as appropriate verbiage during sales presentations.

The warning made clear that a "failure to dramatically improve your administrative responsibilities or to otherwise maintain a satisfactory level of performance may lead to further discipline, up to and including termination." (Pl. Tr. 181; Ackerstein Dec., ¶ 14, Exhibit M)

**Response No. 47**

Denied. Ms. List instructed Ms. Edmunds to redo the evaluation to make it more positive. (Edmunds Tr. 263, 276). Instead, Ms. Edmunds provided the written warning in retaliation to Plaintiff requesting the meeting with Ms. List and informing her that he believed he was being discriminated against by Ms. List. Plaintiff disagrees with the accuracy of the written warning, and it was a clear indication that Deb Edmunds/Aventis was attempting to get rid of him. (Pl. Tr. 182). Prior to receiving the warning, several sales representatives thought Mr. Byrd was fired. (Pl. Tr. 181).

## The September 2001 Warning

48.      By September 2001, almost a year after the written warning of November 14, 2000, Plaintiffs performance still had not improved. Plaintiff's performance evaluation dated September 5, 2001 indicated that while Plaintiff improved in some areas, he continued to have problems performing in accordance with Aventis' guidelines and standards in other areas. (Pl. Tr. 186; Ackerstein Dec., 15, Exhibit N) The appraisal indicated that Plaintiff had not provided monthly meeting recap notes from his team meetings for several, specific months; that he was recording personal miles below 10 miles for most weeks, even though he did not live within a few miles of his territory; that his call summaries were not transmitted for specific days, though. they were a daily requirement; and that he did not inform. his manager of another, significant sample variance in May 2001. The evaluation also noted an expenditure that was outside Company guidelines. (Id.).

**Response No. 48**

Denied.  After plaintiff was targeted for termination by Ms. Edmunds, plaintiff went over and above all other sales representatives in a desperate attempt to keep his job. (Boland Aff'd, ¶ 16).  Notwithstanding, Ms. Edmunds continued to highlight and find fault with this performance which every other sales representative would perform.  This evaluation was not accurate.  (Pl. Tr. 186-191).

49.      On September 5, 2001, Plaintiff was issued a final written warning. (Pl. Tr. 191, Ackerstein Dec., ¶ 16, Exhibit O) The final written warning stated that while

Plaintiff had met <u>some</u> of the expectations set forth in his November 2000 written

warning, several of the expectations remained unmet. Areas mentioned as still below

performance were:

- Lack of monthly team meetings and notes from monthly Quad meeting;
- Daily transmission of call activity and absent weekly call summary reports;
- Inaccurate recording of personal miles;
- Lack of recording call notes following details calls;
- Policy violations;
- Lack of communication with your manager.

**Response No. 49**

Plaintiff admits that he was provided a final written warning but denies that the

contents are accurate. (Pl. Tr. 191-196). Furthermore, plaintiff was put under a

microscope to find any and all reasons in which the Defendants could terminate him, and

the stated reasons contained in the final written warning are common to all sales

representatives. (Boland Aff'd, ¶ 4; and Pearlstein Aff'd, ¶ 4-5).

50.    The final written warning went on to cite a large sample variance that

Plaintiff did not report to Ms. Edmunds and listed several business expenses claimed by

Plaintiff that were outside Aventis' expense policy. (<u>Id.</u>) The final written warning

specifically stated that a "[f]ailure to dramatically improve and sustain your administrative

responsibilities or to otherwise maintain a satisfactory level of overall performance may lead

to further disciplinary action, up to and including termination of employment." (<u>Id.</u>)

**Response No. 50**

The final warning did reference a sample variation which plaintiff experienced at

a time when Ms. Edmunds was in Spain and could not be reached, and it was reconciled

while she was away under normal Aventis' procedure.  (Pl. Tr. 190).  Again, sample

variances are common practice among the sales representatives and when they occur,

sales representatives only need to reconcile it.

51.    On December 4, 2001, Ms. Edmunds met with Plaintiff again. (Minassian Tr.

102-103, Edmunds Dec., ¶ 9, Exhibit H; Pl. Tr. 197) That meeting, which lasted two-hours,

was to address again concerns about Plaintiff's willingness or ability to comply with Aventis

procedures and to fulfill his responsibilities as a Sales Representative. They discussed a

recent program where Plaintiff exceeded expense guidelines and failed to notify Ms.

Edmunds in advance. They also discussed call notes which were not done appropriately and

weeks where call notes had not been submitted. Ms. Edmunds also reviewed with Plaintiff

sample signature reports that reflected Plaintiff's calls on physicians were still occurring

between the hours of 10:00 a.m. and 2:00 p.m. Ms. Edmunds reiterated the meeting in an e-

mail to Plaintiff, sending copies to Ms. List and Ms. Minassian. (Edmunds Dec., ¶ 9, Exhibit

H)

**Response No. 51**

Plaintiff admits that he met with Ms. Edmunds on December 4, 2001, but

disagrees with the assessment stated in this document.  The complaints raised by Ms.

Edmunds were common to other sales representatives or dated information that Ms.

Edmunds sought out to build a case in which to terminate the plaintiff.  The recent

program where plaintiff purportedly exceeded expense guidelines failed to notify Ms.

Edmunds in advance, was not the plaintiff's program but was sales representative Julie

Nelson's program.  Julie Nelson also did not inform her area manager in advance because

it was 11:30 at night when they discovered the same, nor was Julie Nelson disciplined

because of it. The hand-held computers were constantly on the fritz which affected the ability of sales representatives to submit their call notes. Defendant denies that he was only visiting positions between 10:00 a.m. and 2:00 p.m., and to date, Aventis has not produced documentation which supports this allegation.

### Events Leading To Plaintiff's Discharge From Employment

52.    Plaintiff's employment was terminated after a farther meeting regarding Plaintiffs rule infractions. On January 18, 2002, Ms. List and Ms Edmunds met with Plaintiff to discuss some additional infractions. They confronted him about his continuing to record sales calls inappropriately for the purpose of appearing to meet call requirements. They also spoke with him about an additional golf outing which violated Aventis' procedures. Plaintiff recorded the outing as a lunch, which it was not, and he exceeded the guidelines regarding expenditures on social events. (Edmunds Tr. 288; Ackerstein Dec., ¶¶ 17-18, Exhibits P and Q)

### Response No. 52

Denied.  Plaintiff got prior permission for the golf tournament from Ms. Edmunds, and it was in compliance with expense guidelines.  (Byrd Aff'd, ¶¶ 10 and 12). The expense report was properly listed as a "round table".  The golf tournament, which involved breakfast, lunch, dinner and accompanying discussions with participating doctors would constitute a description as a "round table" on an expense report with Aventis.  (Boland Aff'd, ¶ 5, and Pearlstein Afff'd, ¶ 3).  Furthermore, Gerald Graham paid at least $1,000.00 for one physician, and he was never disciplined for violating the expense reports of Aventis.  (Byrd Aff'd, ¶ 13-14).

53.    When Ms. List and Ms. Edmunds asked Plaintiff about his expenses reported as a "hospital round table lunch item," Plaintiff admitted that the event he listed as a hospital display round table lunch was actually a golf outing.  Further, Plaintiff not only mischaracterized the event on the expense report but also misrepresented the number and identity of the attendees. Additionally, the expense report listed $1,100.00 of expenses but he had receipts for only $1,036.00, something which was a violation of policy. (Ackerstein Dec., ¶ 17, Exhibit P;  Pl. Tr. 281-285;  List Tr. 179)

**Response No. 53**

Denied.  Plaintiff properly listed golf tournament, which involved breakfast, lunch, dinner and accompanying discussions with participating doctors would constitute a description as a "round table" on an expense report with Aventis.  (Boland Aff'd, ¶ 5, and Pearlstein Afff'd, ¶ 3).  Notwithstanding, six months after the fact Ms. Edmunds search for reasons pulls out this expense report in an attempt to find fault and testifies that she cannot recall giving prior permission for Bill Byrd to attend this charitable golf tournament.

54.    At the meeting on January 18, 2002, they asked Plaintiff what he would do if he were in their position. Plaintiff stated that he would fire the person. (Pl. Tr. 204; Ackerstein Dec., ¶¶ 17-18, Exhibits P and Q)

**Response No. 54**

Denied.  Plaintiff stated that if a person had done what you alleged and did not have an explanation, he would fire that person.  (Pl. Tr. 204).  However, Plaintiff either did not do it or had an explanation.  Id.

55.     After considering the on-going performance issues, the belief that he was falsifying call reports and expense reports, and Plaintiff's inability to produce a satisfactory explanation, Ms. List, Ms. Minassian and Ms. Edmunds concluded that Plaintiff's employment should be terminated. (List Tr. 74, 78-80, 196-197; Minassian Tr. 77; Edmunds Tr. 72, 92, 108, 134)

**Response No. 55**

Denied.  The decision to terminate Bill Byrd was made when Ms. Edmunds first notified her supervisor and Human Resources and began collecting information on him and placing his work performance under a microscope.  (Edmunds Tr. 74).  Thereafter, it was a matter of the Defendants attempting to create a paper trail to justify the inevitable termination.  (Pearlstein Aff'd, ¶ 4-5;  and Boland Aff'd, ¶ 4 and 16).

**Plaintiff Was Not Treated Differently**

56.     Aventis has terminated employees who are Caucasian for falsification of records. It has also disciplined and/or terminated non-African American, under age 40 individuals for performance issues, hot recording call activity immediately following calls, and various other policy violations. (Minassian Tr. 35-36, 73, 140, 142-143; List Tr. 82, 85, 88-91, 205)

**Response No. 56**

Plaintiff does not dispute that Aventis has terminated employees who are Caucasian for falsification of records or who are under the age of 40 for job performance, but he denies that he falsified records or had job performance issues. Furthermore, Aventis has a history of discriminating against sales representatives.

57.    While Plaintiff charges Ms. Edmunds with holding him to a higher standard due to his race and age, the fact is that Ms. Edmunds also disciplined a Caucasian sales representative under the age of 30 for various performance problems.In particular, this employee reported direc

**Response No. 57**

The termination of Bill Byrd occurred at a time when he was receiving an accommodation from Aventis for his accomplishments. (Byrd Aff'd, ¶ 6). In contrast, the Caucasian sales representative under 30 who Ms. Edmunds also purportedly disciplined, was Mr. Byrd's replacement. After Bill Byrd was terminated and replaced by her, the sales territory went from first place to last place. (Edmunds Dec., ¶ 10, Exhibit J).

58.    In evaluating this employee, among other things, Ms. Edmunds reviewed her call reports to determine whether she was within her territory between 8:00 a.m. and 5:00 p.m. as required. (Edmunds Tr. 64,233; Edmunds Dec., ¶ 10, Exhibit I). The written warning reflects that Ms. Edmunds had counseled her about her lack of impact when delivering product messages; her lack of rapport with physicians; and her low call per day average. (Edmunds Dec., ¶ 10, Exhibit I). The written warning counseled this younger, Caucasian employee to meet expectations such as:

- Be in your territory from 8:00 a.m. to 5:00 p.m. Monday through Friday;

- Provide me with weekly status reports on your call activity, including doctors you detailed each day and their target level (G, S, B, E);

- Transmit weekly call notes no later than 5:00 p.m. on Fridays;

(Edmunds Dec., ¶ 10, Exhibit I).

### Response No. 58

This occurred after Mr. Byrd was terminated.

59.     The written warning further noted that "it is imperative that you, meet these expectations and avoid any other unacceptable performance or behaviors to avid further disciplinary action, up to and including termination of employment. (Edmunds Dec., ¶¶ 13-14, Exhibit I).  The Caucasian employee resigned her employment shortly after receiving the written warning.  (Edmunds Dec., ¶ 10)

### Response No. 59

This occurred after Mr. Byrd was terminated.

60.     In addition to giving written warnings to employees who are under the age of 40, Ms. Edmunds supervises a number of long-term employees, over the age of 40, who are performing well and have not received warnings. A male sales representative, E.S., has been employed since 1976 and was 51 when Plaintiff was terminated.  E.S. is still employed and has not had warnings. Additionally, a male sales representative, R.M., who has been employed since 1970 has reported to Ms. Edmunds since 2003.  He is 67, is performing well and has not had warnings.        (Edmunds Dec., ¶11)

### Response No. 60

E.S. was investigated by Ms. Edmunds with Mr. Byrd and Bob Santori. (Edmunds Tr. 64), and R.M. has only recently been transferred to Ms. Edmunds. (Edmunds Dec. ¶ 11).

## **Timing And Basis of Plaintiffs Claim of Discrimination**

61.     Plaintiff has claimed in this action that Ms. Edmunds discriminated against him on the basis of age and race. However, he is not sure why she would do that. Plaintiff testified that Ms. Edmunds treatment of him changed after she returned from maternity leave but that he "had no idea why things went 360 degrees." (Pl. Tr. 2b0-2b1)

**Response No. 61**

Admitted.

62.     As to the timing of Plaintiff's belief that Ms. Edmunds was treating Plaintiff differently due to his age and race, Plaintiff testified that he began to believe that when she gave him his 1999 evaluation. (Pl. Tr. 141-143) By September 18, 2000, when Ms. Edmunds gave him the PIP, he concluded she was treating him differently due to his age and race. (Pl. Tr. 141-143)

**Response No. 62**

Admitted.

63.     Plaintiff began to think when he received the November 14, 2000 warning that it was because he complained about Ms. Edmunds on September 25, 2000. (Pl. Tr. 230-232}  He certainly concluded by the warning on September 5, 2001 that he was receiving the warning because he complained about Ms. Edmunds. (Pl. Tr. 230-232)

**Response No. 63**

Admitted.

33

## Charge of Discrimination

64.    Plaintiff filed a charge of age and race discrimination with the Massachusetts Commission Against Discrimination on August 2, 2002. (Pl. Tr. 249-250;  Ackerstein Dec., ¶  19, Exhibit R)  This is the only charge Plaintiff filed in connection with his employment at Aventis.

### Response No. 64

Admitted.

Respectfully submitted,

WILLIAM M. BYRD,

By his attorneys,

Paul K. Flavin
BBO No.  171145
John C. Koslowsky
BBO No.  561616
Flavin & Koslowsky
424 Adams Street
Milton, MA  02186
(617) 698-3000
(617) 698-3001 FAX

Dated: April 8, 2005
2002-17P