UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WILLIAM M. BYRD,

       Plaintiff,

v.

AVENTIS   PHARMACEUTICALS,   INC.
and DEBRA EDMUNDS,

       Defendants.

Civil Action No. 04-11032-DPW

## MEMORANDUM OF DEFENDANTS IN SUPPORT OF
## THEIR MOTION FOR SANCTIONS

Defendants, Aventis Pharmaceuticals, Inc. ("Aventis") and Deborah Edmunds ("Ms.

Edmunds") (Aventis and Ms. Edmunds together, "Defendants"), moved to dismiss Plaintiff's

Complaint pursuant to the Court's inherent authority to sanction litigants for engaging in

fraudulent conduct during the discovery process. This memorandum and the Declarations of

Lisa Ferrara and Samia M. Kirmani[1] are submitted in support of that motion.[2]

## INTRODUCTION

Plaintiff was employed by Aventis as a Sales Representative until February 4, 2002,

when his employment ended because of significant, sustained performance problems, for which

Plaintiff received warnings on multiple occasions, and after Aventis learned that he had not been

truthful in reporting call activities and completing an expense report.

On April 15, 2004, Plaintiff filed a nine-count Complaint in connection with the

termination of his employment, naming as defendants both Aventis and Deborah Edmunds, his

former supervisor. The gravaman of his Complaint is that Ms. Edmunds discriminated against

---

[1] Hereafter, the Declaration of Lisa Ferrara will be referenced as "(Ferrara Dec.)" and the Declaration of Samia M.
Kirmani will be referred to as "(Kirmani Dec.)." In addition, excerpts from Plaintiff's deposition are attached to the
Kirmani Dec., Exhibit P. Hereafter, reference to the transcript from Plaintiff's deposition will be made as "(Pl. Tr.
___)."

[2] On March 18, 2005, Defendants moved for summary judgment on the Complaint in its entirety. That motion is
pending.

him on the basis of race (African-American) and age (51) when she warned him about performance issues and ultimately, agreed with others that his employment should be terminated. Specifically, Plaintiff alleged "race/age discrimination and/or retaliation" in violation of state (M.G.L. c. 151B) and federal (Title VII and 42 U.S.C. § 1981) law. Plaintiff also recast his discrimination and retaliation claims as common law causes of action for wrongful termination, breach of contract, breach of the implied covenant of good faith and fair dealing, tortious and intentional interference with advantageous and/or contractual relations, and violations of the Massachusetts Civil Rights Act and 42 U.S.C. 1983.

The basis of Plaintiff's claim of race and age discrimination is that Ms. Edmunds rated him too harshly and unfairly and that his negative review, Performance Improvement Plan, warnings and ultimate termination were not justified because he was a good performer. However, Plaintiff lied in discovery responses and testified falsely at his deposition about his employment history, deliberately concealing that he had virtually identical issues with prior employers. Further, Plaintiff's untruths in the discovery process are not limited to concealing the same performance issues at previous employers. Plaintiff also has not been truthful about his educational experience, notes maintained while he was employed and other businesses in which he was engaged during and after his employment with Aventis. As a result of Plaintiff's actions, which strongly indicate that Plaintiff has no respect for the judicial process' search for truth and an obvious inability to proceed with his claims in a fair and proper manner, Defendants respectfully submit that the Court should dismiss the Complaint or otherwise sanction Plaintiff.

## I.    Plaintiff's Significant Sustained Performance Problems At Aventis

Plaintiff was a sales representative at Aventis from May 1997 until February 2002. (Pl. Tr. 97)  As a sales representative, Plaintiff visited doctors' offices and hospitals to promote Aventis' products. (Pl. Tr. 98-99)  Beginning in May 1999 through his termination, Plaintiff reported to individual defendant Deborah Edmunds, an Area Manager. (Pl. Tr. 94, 96)

In September, 2000, after supervising Plaintiff for 18 months, Ms. Edmunds gave Plaintiff a performance appraisal which noted some significant shortcomings. (Pl. Tr. 148-150)

2

Ms. Edmunds also attempted to put Plaintiff on a Performance Improvement Plan ("PIP"), a plan which outlined tasks Plaintiff needed to accomplish over a 60 day period to improve his performance. (Pl. Tr. 148)  Plaintiff balked at being put on a PIP and refused to sign it. (Pl. Tr. 148) After Ms. Edmunds' supervisor spent a day in the field with Plaintiff at Plaintiff's request and confirmed his shortcomings, Ms. Edmunds outlined those performance shortcomings in a written warning to Plaintiff dated November 14, 2000. (Pl. Tr. 181)   The written warning outlined performance issues such as the need to improve knowledge of Aventis' promoted products and of the appropriate verbiage for sales presentations and the failure to communicate with his manager concerning activities in his territory. (Kirmani Dec., Exhibit N)

In September 2001, ten months after Plaintiff received a written warning, Ms. Edmunds gave Plaintiff a final written warning because the performance issues were still on-going. Ms. Edmunds outlined the performance issues in the Final Written Warning and they were the same issues described ten months earlier in the November 2000 warning. As stated this time, the performance issues included, for example, a significant sample variance and the failure to follow expense guidelines or to transmit call activity on a daily basis. (Pl. Tr. 186; Kirmani Dec., Exhibit O)

On February 4, 2002, Aventis terminated Plaintiff's employment due to significant, sustained performance issues and because it learned Plaintiff had not accurately reported call reporting activity and expenses. (Edmunds Tr. 72, 92, 108, 134)[3]

## II.    **Plaintiff Concealed His Employment History During Discovery**

In an effort to discover Plaintiff's education and employment history as part of their defense of this matter, Defendants served interrogatories which inquired about that history. Defendants also asked Plaintiff about his employment history at his deposition. In both forums, Plaintiff was untruthful about his employment experience, concealing that he had virtually identical performance issues with prior employers.

---

[3] True and accurate copies of excepts of the transcript of the deposition of Deborah Edmunds are attached to the Kirmani Declaration as Exhibit Q. Hereafter, reference to the transcript from Ms. Edmunds deposition will be made as "(Edmunds Tr. ____)."

### A.    Interrogatories Propounded To Plaintiff

In August, 2004, Plaintiff served answers to Defendants' interrogatories, signing them under the pains and penalties of perjury. In Interrogatory No. 4, Defendants asked Plaintiff to detail his prior employment, including stating, "the reason for the termination, including, but not limited to, a statement of whether the severance of such employment or relationship was voluntary or involuntary...." Plaintiff named three such employers and provided the reason for separation for each. Included among the employers he named were Ross Laboratories ("Ross Labs") and Dictaphone Corporation ("Dictaphone"). (Kirmani Dec., Exhibit L)

As to Ross Labs, Plaintiff stated that he was employed from April 1983 to November 1993, that he "left [his] environment voluntarily, my supervisor was John Boise, and [his] position was Territory Manager." (Id.)

As to Dictaphone, Plaintiff stated that he was employed from December 1993 to November 1996, and that his "employment ended when the company went out of business...." (Id.) These answers are not truthful, as is demonstrated below. In fact, Plaintiff had performance issues at both and was terminated for performance reasons by Dictaphone.

### B.    Deposition Inquiries

During his deposition on October 18, 2004, Plaintiff again was asked about his prior employment. One of the employers Plaintiff testified about was Ross Labs, where Plaintiff worked as a sales representative, primarily selling infant formula to hospitals in the New England area. (Pl. Tr. 35) Like at Aventis, Plaintiff called on hospitals and doctors. (Pl. Tr. 36) His supervisor at Ross Labs was John Boisse. (Pl. Tr. 35-36)

During his deposition, when asked whether he had performance issues while working at Ross Labs, Plaintiff unequivocally responded that he did not:

> Q:    Did you have any performance issues at Ross Labs?
> A:    No.

(Pl. Tr. 39) In fact, Plaintiff testified that he never had any performance issues at any of his previous employers:

> Q: Is it your testimony that from the time you started at Foster Grant [prior to Ross Labs] and the time you leave Universal Hospital Services in 1997 [after Dictaphone], you never had performance issues at any of those employers you told us about?
>
> A: True.
>
> Q: Were you ever put on a performance improvement plan at any of those employers?
>
> A: No.

(Pl. Tr. 48-49)

Thus, Plaintiff swore at his deposition and in answers to interrogatories that he did not leave any job involuntarily and that he had no performance issues at a prior employer.

### C.    Plaintiff's Performance Issues At Ross Labs And Dictaphone

On or about October 8, 2004, Defendant served subpoenas *duces tecum* on some of Plaintiff's prior employers, including Ross Labs (now Abbot Laboratories) and Dictaphone. The records produced in response to Defendants' subpoena *duces tecum* from both, however, tell a different story than did Plaintiff. (Kirmani Dec., Exhibits A-K; Ferrara Dec., Exhibits A-F) The records from Ross Labs and Dictaphone plainly demonstrate that, like at Aventis, Plaintiff's employment at Ross Labs and Dictaphone was rife with performance problems, many of them virtually identical to those at Aventis.

<u>Performance Problems At Ross Labs</u>

Plaintiff's personnel record at Ross Labs contains document after document relating to performance problems Plaintiff had as a sales representative there:

1.    In February 1990, Plaintiff was advised that he failed for the second time to pass a test of product knowledge for a particular product. Plaintiff was to stop promoting the product. He was told by a supervisor: "I would like to confirm the seriousness of this matter and ask that you do whatever is necessary to make sure you pass the retest at the Regional Meeting." (Kirmani Dec., Exhibit B)

2.    Four months later, in June, 1990, Plaintiff's supervisor, John Boisse, met with him to discuss performance issues and then outlined those issues in a letter. Mr. Boise

advised Plaintiff that they were disappointed to learn they had recently lost a hospital client in Plaintiff's territory and speculated the loss was due to Plaintiff's lack of "a broader base of support from either purchasing, nursing or physicians...." Mr. Boisse also stated that "there appears to be a similarity in a pattern of your lack of ability to gain the necessary support to increase and enhance business where we are either locked out of a situation or to hold onto our existing business." He concluded by saying there were "strong concerns relative to your effectiveness and ability to achieve positive desired results" and that they would meet again in two weeks "to again attempt to pinpoint specific strategies or ideas to help you gain additional support and business within your territory." (Kirmani Dec., Exhibit C)

3.      Similarly, a July 26, 1990 memorandum from Mr. Boisse states that Plaintiff "certainly knows I am not pleased with him. . . . He realizes that other people are aware of what has happened and that such things as the [product] test have not added to the confidence Ross Labs has in him." (Kirmani Dec., Exhibit D)

4.      A letter to Plaintiff from Mr. Boisse dated February 13, 1992 discusses an inability on Plaintiff's part to follow direction with respect to his use of product samples, an issue he faced at Aventis. (Kirmani Dec., Exhibit E) Specifically, the letter notes that he was to leave cases of samples completely open in physicians' offices. (Id.) The letter further directed Plaintiff to alter his sales methodologies and directed him to track his sales calls and to call on all, rather than some, of the doctors in his territory. (Id.)

5.      Plaintiff's July 1992 evaluation from Ross Labs reflected a continued "inability to gain . . . rapport needed" in his territory and a direction to "improve his working relationships and rapport with hospital based nurses." (Kirmani Dec., Exhibit F) It went on to state that "[u]ntil he decides he wants to be a success based upon an improved image and attitude, Bill will never realize his potential" and that "Bill has been a TM [Territory Manager] for nearly 10 years . . . Bill has not achieved greater income because of his lower ranking." (Id.)

6.      On September 25, 1992, just two months after receiving a marginal evaluation, Plaintiff's supervisor wrote him about a recent issue regarding "standard procedure

relative to sampling...products." (Kirmani Dec., Exhibit G)  The letter reflects that Plaintiff twice failed to open and display the product as he had been directed.  (Id.)  The letter goes on to state that "I have repeatedly asked you to do so.  However, you continue to bring in product and simply drop it off without even making the effort to open it.  This behavior is unacceptable and goes against the procedures and policies of this district."  (Id.)

       7.    On April 14, 1993, a visit report states that Plaintiff "does not demonstrate ownership and initiative."  (Kirmani Dec., Exhibit H)

       8.    On May 3, 1993, Mr. Boisse reiterated concerns he had with Plaintiff's performance.  Specifically, he commented on Plaintiff's "lack of preparation" and lack of "thoroughness" on his sales presentations.  (Kirmani Dec., Exhibit I)  Mr. Boisse also advised Plaintiff that he was "extremely disappointed in [his] performance . . . ."  (Id.)

       9.    Despite Plaintiff's deposition testimony that he never had been on a Performance Improvement Plan prior to Aventis, the records received from Ross Labs include a Performance Improvement Plan in the form of a letter dated August 23, 1993.  This document states that it serves "to confirm that effective today, you are being placed on Unsatisfactory Performance status for sixty (60) days."  (Kirmani Dec., Exhibit J)  The letter goes on to describe Plaintiff's considerable performance problems, including a failure to use a five part sales presentation and a failure to present the features/benefits of the products and states "I have also been very disappointed with your pre-call planning."  It further notes issues with a "lack of customer coverage" in his territory.  (Id.)

      10.    Plaintiff resigned from employment just one week short of the 60-day term of the Performance Improvement Plan. A separation report signed by Mr. Boisse on or about October 15, 1993, attaches a separation summary that characterizes Plaintiff's performance at Ross Labs as "marginal" and states that he had an "[i]nability to develop close working relationships and rapport with key customers."  (Kirmani Dec., Exhibit K)  It concluded that "[w]e employed interaction management skills as well as regularly scheduled work-withs and written communication relative to performance and progress for his feedback."  (Id.)

<u>Plaintiff's Performance Record at Dictaphone</u>

After Ross Labs, Plaintiff worked for Dictaphone. (Pl. Tr. 40-41)  In October 2004, Defendants received documents from Dictaphone in response to their subpoena *duces tecum*. On March 22, 2005, Defendants received additional documents from Dictaphone that had been located on that day by Dictaphone's Vice President of Human Resources. (Ferrara Dec., ¶ 5)[4] From these documents, Defendants learned that Plaintiff's performance at Dictaphone was just as problematic as his performance at Ross Labs and Aventis. Like at Ross Labs and Aventis, Plaintiff's employment record at Dictaphone contains multiple writings that highlighted performance problems which ultimately resulted in a performance improvement plan and termination:

1.      In October 1995, Plaintiff's supervisor at Dictaphone, Barry Jones, spoke with Plaintiff about his failure to achieve an acceptable sales quota. During this conversation, he gave Plaintiff the choice of transferring to a different position or being placed on a "Work Plan for Success." (Ferrara Dec., ¶ 7, Exhibit B)

2.      On November 1, 1995, Mr. Jones gave Plaintiff a 90 day "Work Plan for Success," which detailed Plaintiff's performance problems regarding his failure to achieve sales results. (Ferrara Dec., ¶ 8, Exhibit C)

3.      Apparently failing to improve his performance, Plaintiff's career at Dictaphone culminated in a Performance Improvement Plan in March 1996. The Dictaphone PIP detailed Plaintiff's problems including his substandard performance, mis-handling of certain customer accounts and customer complaints regarding his product knowledge. (Ferrara Dec., ¶ 9, Exhibit D)

Thus, despite Plaintiff's deposition testimony to the contrary, it is clear from the records received that Plaintiff had significant performance problems at Ross Labs and Dictaphone and that he was placed on Performance Improvement Plans there. Moreover, his performance problems at Ross Labs and Dictaphone were almost identical to those he exhibited at Aventis.

---

[4] Lisa Ferrara is Vice President of Human Resources of Dictaphone.

Like at Aventis, Plaintiff's performance problems at Ross Labs and Dictaphone were sustained and repeated. Like at Aventis, Plaintiff received feedback over several years and ultimately received a performance improvement plan, strikingly similar to the written warning and final written warning Plaintiff received at Aventis.

Plaintiff's performance issues at Ross Labs and Dictaphone – and the effort to conceal them - are critical for two reasons. First, since the basis of Plaintiff's discrimination claim is that Ms. Edmunds' assessment of him was inaccurate and unfair, he apparently concluded that he needed to portray her as the first supervisor who failed to recognize his talent as a sales representative. Clearly, we now know she was not. Second, Plaintiff testified that he did not think he was treated differently due to his race at Ross Labs or Dictaphone. Accordingly, while Plaintiff's claim is that Ms. Edmunds found fault with his performance because she discriminated, neither Ross Labs' nor Dictaphone's assessment of him was so tarnished. That is information Defendants and this Court should have had from Plaintiff.

### D.    Plaintiff's Termination From Dictaphone

Plaintiff's manifest untruths regarding Dictaphone do not end with his performance record. During his deposition, Plaintiff, under oath, repeated the answer supplied to Defendants' interrogatory, that he voluntarily left Dictaphone because it went out of business. (Pl. Tr. 42, 47) Records produced by Dictaphone in response to Defendants' subpoena *duces tecum* reflect otherwise. (Ferrara Dec., Exhibits A-F)

First, Dictaphone has never gone out of business. (Ferrara Dec., ¶ 2)  Additionally, among the Dictaphone records initially produced pursuant to the subpoena was a Dictaphone "Employee Change Authorization" form reflecting Plaintiff's termination from Dictaphone. (Ferrara Dec., Exhibit F)  The form reflects that the "termination" was recorded as a "code 30." (Id.)  Termination  Reason  Code  30  at  Dictaphone  represents  "involuntary termination/performance." (Ferrara Dec., ¶ 11-13)  Despite being faced with this record from Dictaphone, during his deposition Plaintiff continued to maintain the untenable position that he resigned from Dictaphone because it went out of business:

Q:      On the form, there's an X for termination.  There's not an X for layoff.
        Does this alter your testimony earlier today about the reason for your
        termination?
A:      What termination?
Q:      The reason for your leaving Dictaphone?
A:      No.
Q:      You told us that Dictaphone was going out of business?
A:      That's what I was told . . .
Q:      This says, "Termination was pre-approved by human resources, including
        Sean Colt Hunt and Tony Procops."  Do you see that on the front page?
A:      (Examines document)  Yes.

Q:      It's still your position that you didn't have any performance issues there?
A:      None that were written up.
Q:      Were there any that you were told about?
A:      No.  Sales were down.   Mr. Nardi came on board for a month or six
        weeks before I left.

(Pl. Tr. 212-13)

   In answers to interrogatories and at his deposition, Plaintiff claimed he left Dictaphone

because it was going out of business. Clearly, Plaintiff did not want Defendants to know he had

been terminated for performance reasons. Moreover, like at Ross Labs, despite his termination,

Plaintiff did not believe he was discriminated against on the basis of race. (Pl. Tr. 42-43)

   Plaintiff's failure to disclose the true facts could not have been inadvertent. Plaintiff

certainly understood the significance of the oath he took at the beginning of the deposition:

Q:      You understand that you have sworn to tell the truth today?
A:      Yes.
Q:      You understand that testifying here today is like testifying in a courtroom?
A:      Yes.
Q:      You understand that if you are not telling the truth today, that that's going
        to amount to perjury?
A:      Yes.
Q:      I assume that you are planning to tell us the truth today?
A:      Of course.

(Pl. Tr. 5-6)

   The fact is that Plaintiff deliberately concealed from Defendants that he had performance

problems at both Ross Labs and Dictaphone. Surely he did that because those problems undercut

his claim of discrimination at Aventis. Plaintiff has put Defendants to considerable expense and

effort of defending his claims. Plaintiff took depositions of Deborah Edmunds and Christine List

for over approximately seven hours and nearly six hours, respectively.  He deposed Mailet Minassian, an Aventis Human Resource Manager, in Bridgewater, New Jersey. He also served 18 interrogatories and 37 document requests on each of Aventis and Ms. Edmunds. Despite this effort to develop evidence, Plaintiff blatantly interfered with and attempted to thwart Defendants' ability to discover relevant information.  Plaintiff should not be permitted to litigate in this fashion.

## III.    Untruths In Discovery Were Not Limited To His Employment Experiences

Plaintiff's efforts to conceal information in discovery were not limited to his performance issues at prior employers. Plaintiff also was not truthful about his educational background, notes he maintained while employed and businesses in which he was engaged during and after Aventis.

### A.    Educational Experience

Plaintiff lied regarding his receipt of a Bachelor's degree from New Mexico State University. (Pl. Tr. 240-41) In his answers to Interrogatories, when asked about his educational background, Plaintiff plainly stated "I attended and graduated with a Bachelors Degree from New Mexico State University, 1967-1971." (Plaintiff's Answer to Interrogatory No. 2; Kirmani Dec., Exhibit E)  However, Defendants learned that answer was untrue. During his deposition, Plaintiff admitted that this was not, in fact, the case:

> Q:    Exhibit 14 is a photocopy of a resume that your counsel provided to us.  Is this a resume that you are currently using?
> A:    I believe so.
>
> Q:    Down at the bottom where it says, "'Education, B.S., business administration New Mexico State University,'" that's not true is it?
> A:    No, it is not true.
> Q:    You are using a resume which has a degree which you don't have?
> A:    True.
> Q:    You don't think that's inappropriate?
> A:    Oh, yes, I do.
> Q:    But you are doing it anyway?
> A:    Yes.

(Pl. Tr. 240-41)

This untruth is significant because without a college degree, Plaintiff did not meet the qualifications for the sales representative position at Aventis. That position required a college degree. (Kirmani Dec., Exhibit Q)

### B.    Plaintiff's Failure to Produce Handwritten Notes

Plaintiff's effort to conceal was not limited to his employment history and educational background. In their document request served on July 9, 2004, Defendants asked Plaintiff to produce notes, correspondence files, chronologies and other documents which were maintained while he was employed at Aventis. (Kirmani Dec., ¶ 17) At Plaintiff's deposition, he testified that he had no notes of meetings with Ms. Edmonds, Ms. List or Mr. Kaisel and it was implied that there were no other notes which had not been produced. The testimony was as follows:

> Q:  The document we just marked is a copy of your response to the Defendants' request for the production of documents. Have you seen that previously?
>
> A:  (Examines document) Yes.
>
> Q:  I jut want to be clear because I didn't get any notes that you kept at the time you worked at Aventis
>      Is it fair to say you don't have notes of any meeting that you had with Ms. Edmunds or Ms. List or Mr. Kaisel?
>
> A:  Yes, sure.
>
> Q:  Look at Request No. 26 on Page 10. We asked for diaries, calendars, chronologies, correspondence files, notes, meetings, tape recordings, other records maintained between May 12, 1997 through the present.
>      There's an objection to this. This says that, "Plaintiff will produce responsive nonprivileged documents."
>
> Ms. Ackerstein:  Are there privileged documents that relate to this?
>
> Mr. Koslowsky:  Are you asking me?
>
> Ms. Ackerstein:  Yes.
>
> Mr. Koslowsky:  I think any communications between Bill Byrd and myself would be considered privileged documents. Are you saying outside of that?
>
> Ms. Ackerstein:  Are there any documents that have been withheld other than his communications to you?
>
> Mr. Koslowsky:  Not that I'm aware of.

(Pl. Tr. 194-195)

To Defendants' surprise, on March 28, 2005, long after the close of discovery and after Defendants filed their motion for summary judgment, they received from Plaintiff's counsel a

stack of handwritten notes not produced previously. The documents total 102 pages. (Kirmani Dec., ¶ 16) As these documents were not produced during discovery and prior to Plaintiff's deposition, Defendants did not have an opportunity to examine Plaintiff about these records.

### C.    Plaintiff's Operation of Businesses During And After His Employment With Aventis

Plaintiff also was not candid about businesses he claimed on his tax return while employed by Aventis and after his employment ended. This is significant because Plaintiff had a business while employed, which may have distracted him from his sales representative duties and after his employment, which may impact claimed lost wages.

During his deposition, Plaintiff testified that the business expenses he listed on his tax return in 1999, when he was employed by Aventis, were for his business called Byrd Enterprises. However, he then tried to change his testimony to state that though he claimed business expenses for Byrd Enterprises in 1999, it was not really a business:

> Q:    Look at the page [of Plaintiff's 1999 tax return] with Schedule C, Profit or Loss from Business, which is about the fifth or sixth page in, do you see that?
> A:    (Examines document) Yes.
> Q:    It says the name of the proprietor is William M. Byrd. What business was this for?
> A:    It looks like my Herbalife.
> Q:    Were you running your Herbalife business in 1999?
> A:    I don't remember. And I never ran it as a business either, as I explained to you. It never happened.
> Q:    It's your tax return, Mr. Byrd. I'm trying to figure out what it is.
> A:    What would you like to know?
> Q:    For starters, there's an entry for supplies listed, $2,500. What supplies?
> A:    I don't remember.
> Q:    There's a deduction of $1,469 for car and truck expenses. What are those?
> A:    That could be a leasing expense on my wife's car. I'm not sure. I don't know.
> Q:    Your wife uses her car to drive to school?
>
> A:    Yes. I'm sorry.
> Q:    What business would your wife be using the car for?
> A:    She wouldn't. I would use it.
> Q:    It's your testimony I guess that you really don't know what this profit and loss from business form is?'
> A:    I don't remember, no.

Q:    While you were working as a sales rep for Aventis in 1999, you also had your own business selling Herbalife products?

A:    As I mentioned, it was not a business.

Q:    What was it?

A:    I never sold any Herbalife.

Q:    It's on your return in 1999. It's on your return in 2003.

A:    That's right.

Q:    Did you have a business or didn't you?

A:    No.

(Pl. Tr., p. 247-249)

On his 2003 tax return, Plaintiff admitted to listing deductions for business expenses for Byrd Enterprises but he was unwilling to disclose what that business was. Similarly, on his 2003 tax return, Plaintiff admitted to listing deductions for business expenses for Byrd Enterprises, but again changed his story mid-testimony:

Q:    There is a form here [on Plaintiff's 2003 tax return] for profit or loss from a business sole proprietorship. It says the name of the proprietor is William M. Byrd. What business is this that is reflected on this form?

A:    Well, I believe it's what I called "Byrd Enterprises."

Q:    What is Byrd Enterprises?

A:    It's nothing. Let's see here . . .I spent some money buying Herbalife products. I was going to try to sell Herbalife.

Q:    What are Herbalife products?

A:    They are nutritional products, weight loss products.

Q:    When you list car and truck expenses, $8,995, what is that?

A:    I have no idea.

Q:    When you list the office expense of $2,234, what is that?

A:    Computers, fax machines.

Q:    You actually took in, I take it, $740?

A:    Yes, I guess.

Q:    You told the truth, didn't you? You made $740.

A:    Yes. . .

Q:    Well, did you or didn't you?

A:    It says it there, yes.

Q:    Is that the truth?

A:    I believe so.

Q:    So Byrd Enterprises is a business –

A:    No – excuse me – Byrd Enterprises did not make any money.

14

> Q:   Byrd Enterprises was a business that was yours, self employment.  You
>      bought $1,500 of nutritional supplements, you sold $740 worth, and you
>      didn't tell us in the interrogatories, did you?
>
> A:   Excuse me, but I didn't sell any of it, first of all.  I believe this money
>      came from Mapleleaf – RX, the commission that I made, okay?  Byrd
>      Enterprises is not a business.
>
> Q:   This is your tax return, Mr. Byrd, so don't let me put words in your mouth.
>      You told me this was the nutritional business.  Are you now changing your
>      testimony?
>
> A:   No.
>
> Q:   What business is this from?
>
> A:   You had asked about the profit and loss from the business, Byrd
>      Enterprises is what I claimed as a business, but it is not a business.  What I
>      put down here for income was from Mapleleaf.

(Pl. Tr. 70-74).

On his 2003 tax return, Plaintiff also represented that he drove 24,985 miles on his personal car for business purposes. (Pl. Tr. 76)  He testified that those nearly 25,000 miles were miles he put on his car, traveling locally, one to one and a half days per week for Mapleleaf – RX, a business soliciting physicians to prescribe Canadian drugs with which Plaintiff claimed a casual relationship beginning in 2003. (Pl. Tr. 60-66)  When pressed, Plaintiff attempted to blame his accountant for the above inconsistencies in his tax returns and testimony:

> Q:   Does this page, Profit or Loss From Business 2003, have anything to do
>      with the nutritional supplements?
>
> A:   No.
>
> Q:   You are telling me this all relates to Mapleleaf?
>
> A:   I guess so.
>
> Q:   Do you have a territory that you call on for Mapleleaf?
>
> A:   No.  I go wherever I want to go.
>
> Q:   Do you travel overnight?
>
> A:   No.
>
> Q:   It's all local traveling?
>
> A:   Yes.
>
> Q:   On the next page of this Profit or Loss From Business, there's a Question
>      No. 44:  "Of the total number of miles you used your vehicle for
>      business," and it says, "24,985."
>
> A:   Yes.
>
> Q:   What business is that?
>
> A:   Mapleleaf.
>
> Q:   You told us you call on physicians, right?
>
> A:   Right.
>
> Q:   A day or day and a half a week?
>
> A:   Yes.

. . .

> Q:    You say you drove 25,000 miles for Mapleleaf?
> A:    Yes.

(Pl. Tr. 75-79)  This testimony is odd since Plaintiff claimed he earned no money from Mapleleaf in 2003 and was actively seeking other employment. (Pl. Tr. 81-85)

Defendants do not know from this testimony whether Plaintiff is effectively mitigating or not. If he drove 25,000 miles in 2003, Mapleleaf would appear to be full-time employment, something Plaintiff disclaimed.

**IV.    Defendants Are Entitled To Sanctions As A Result Of Plaintiff's Effort To Conceal Prior Employment Issues**

**A.    The Court Should Exercise Its Inherent Powers To Sanction Plaintiff For His Blatant Untruths**

It is a fundamental tenet of federal court jurisprudence that district courts have inherent powers to sanction parties for litigation abuses as a necessary component of their ability to establish orderly processes and manage their own affairs.  Young v. Gordon, 330 F.3d 76, 81 (1st Cir. 2003), citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991).  The First Circuit recognized this principle in Aoude v. Mobil Oil Corporation, 892 F.2d 1115 (1st Cir. 1989), where the Court reviewed the dismissal of two related actions which were initially filed with reliance on a fabricated purchase and sale agreement for a service station. The Court noted as "elementary" that a federal district court "possesses the inherent power to deny the Court's processes to one who defiles the judicial system by committing a fraud on the Court." Id. at 118. The Court also set the standard for fraud:

> A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

Id.; see also McMunn v. Memorial Sloan-Kettering Cancer Center, 191 F.Supp. 2d 440, 445 (S.D.N.Y. 2002) ("when a party lies to the court and his adversary intentionally, repeatedly, and

about issues that are central to the truth-finding process, it can fairly be said that he has forfeited his right to have his claim decided on the merits").

The Court followed <u>Aoude</u> in affirming the dismissal of a personal injury action in <u>Hull v. Municipality of San Juan</u>, 356 F.3d 98, 101-102 (1st Cir. 2004). There, the plaintiff sued a municipality and private parties for injuries he sustained when he fell on a sidewalk. However, the plaintiff failed to disclose three prior injuries when asked at his deposition, injuries which overlapped with injuries claimed in the suit. The Court noted "that all three [prior injuries] would have been forgotten through happenstance or distraction strains belief" and instead, found a "pattern of deceit" which justified dismissal. <u>Id.</u> at 101-102.

This principle has been applied in cases involving employment discrimination. <u>See</u> <u>Knapp v. Convergys Corp.</u>, 209 F.R.D. 439, 442 (E.D.Mo. Jul. 17, 2002), <u>citing</u> <u>Chambers</u>, 501 U.S. at 43; <u>Martin v. DaimlerChrysler Corp.</u>, 251 F.3d 691, 694 (8th Cir. 2001). In <u>Knapp</u>, a Title VII sexual harassment case, the plaintiff claimed in answers to interrogatories and in deposition testimony that she had been unemployed for a period of time. Through independent investigation, the defendant discovered that the plaintiff worked as an exotic dancer during the time she claimed to be unemployed. <u>Id.</u> In addition, the defendant discovered that while the plaintiff was working as an exotic dancer, she lodged complaints about customers and staff members inappropriately touching her. <u>Id.</u> Noting that the discovery deadline had passed and summary judgment had been filed and ruled upon, the court ruled that a lesser sanction would neither repair the harm done to the defendant "nor remedy the 'direct affront to the court,' occasioned by Plaintiff's willful perjury," and sanctioned the plaintiff by dismissing her claims with prejudice. <u>Id.</u>, <u>quoting</u> <u>Chrysler Corp. v. Carey</u>, 186 F. 3d 1016, 1021 (8th Cir. 1999). The court concluded that "[b]ased on Plaintiff's repeated acts of perjury, to which she admitted only when confronted with the truth by [defendant], this Court has no confidence that Plaintiff would conduct herself in a manner commensurate with fair and just proceedings should it permit this case to proceed to trial." <u>Id.</u>; <u>see also</u> <u>McMunn v. Memorial Sloan-Kettering Cancer Center</u>, 191

F.Supp. 2d 440, 460-62 (S.D.N.Y. 2002) (former employee's disability claim dismissed and fees awarded where Plaintiff repeatedly lied and otherwise acted in bad faith during discovery process).

Similarly, in <u>Martin</u>, the Court of Appeals for the Eight Circuit upheld a dismissal of a Title VII sexual harassment, sex discrimination and retaliation action. There, the employer discharged the plaintiff after she received poor performance reviews for two consecutive years. During her deposition, the plaintiff twice testified that she had never been a party to another lawsuit, specifically denying that she had been involved in litigation while at her previous job. <u>Id.</u> at 693. The employer subsequently learned that the plaintiff had sued her previous employer for sexual harassment, discrimination and wrongful termination. The plaintiff also lied in her interrogatory answers with respect to mental health treatment she had received in the past, an issue central to her claim for emotional distress. <u>Id.</u> at 694. After holding that the plaintiff did in fact lie, the court assessed the level of sanctions to impose. The court concluded that dismissal was the only sanction that would effectively punish the plaintiff, lessen the prejudice to the defendant and protect the integrity of the proceeding. <u>Id.</u>

Here, Plaintiff's deceit goes to the very heart of his case. The crux of the claim is that Plaintiff did not have performance issues and that Ms. Edmunds inappropriately targeted him. As set forth above, Defendants presented clear and convincing evidence that Plaintiff deliberately concealed the existence of performance problems at Ross Labs and Dictaphone, previous employers where he held comparable positions and performed comparable duties. Plaintiff clearly did not want Defendants to know that two prior employers who did not discriminate identified the same problems Ms. Edmunds noted and took the same action of putting him on a performance improvement plan.

Moreover, Defendants have demonstrated, clearly and convincingly, that Plaintiff misrepresented the reason for his termination at Dictaphone, both during his deposition and in his answers to interrogatories. While he stated in answers to interrogatories and testified that his employment with Dictaphone ended because Dictaphone went out of business, Defendants have

established with clear and convincing evidence that Dictaphone has never gone out of business and that his employment ended involuntarily due to performance issues.

Plaintiff's proclivity for telling manifest untruths also is revealed in his insistence on representing that he graduated from the University of New Mexico with a Bachelor of Science degree, even though he did not. That untruth has particular significance here because Aventis' sales representative position requires that the employee be a college graduate. It also is revealed in his failure to produce handwritten notes in discovery and his inability or unwillingness to describe the sole proprietorships in which he has been engaged. As in Aoude, Hull, Knapp, Martin, and Nichols, Plaintiff's claims should be dismissed as a sanction for his deliberate concealment of relevant information.

### B. In The Alternative, The Court Should Order Plaintiff To Pay Attorneys Fees And Costs Or Enter Another Appropriate Sanction For The Abuse Of The Discovery Process

In the event that, in exercising its discretion to determine the appropriate sanction, the Court declines to dismiss Plaintiff's claims as an appropriate sanction as in Knapp and Martin, the Court should exercise its inherent authority to sanction misconduct during the discovery process by ordering attorneys' fees and costs or some other appropriate sanction. Morris v. McMaster-Carr Supply Corp., 2002 U.S. Dist. LEXIS, at * 6 (N.D.Ill. Jun. 10, 2002); Crumpton, 174 F.R.D. at 495.

For example, in Morris, a race and gender discrimination case, the Court sanctioned a plaintiff who lied in his answers to interrogatories and during his deposition regarding his previous employment history and involvement in prior proceedings. 2002 U.S. Dist. LEXIS, at * 3. The court sanctioned the plaintiff by awarding fees and costs incurred in connection with the investigation of the plaintiff's answers to interrogatories and the filing of the motion for sanctions. Id. The Court further ruled that all facts associated with the plaintiff's false information should be deemed to be true, precluding the plaintiff from disputing that he was terminated from the prior employer because his performance was poor. Id. at *12; see also

Premier Homes and Land Corp. v. Cheswell, Inc., 240 F.Supp. 2d 97, 99-100 (D. Mass. 2002) (sanction of fees and costs awarded under court's inherent powers where fraudulent documents offered in prosecution of claim); Scholastic, Inc. v. Stouffer, 221 F.Supp. 2d 425, 444 (S.D.N.Y. 2002) (same).

      Here, if the Court declines to dismiss Plaintiff's Complaint, it should enter some sanction for Plaintiff's egregious and deliberate misconduct in concealing significant facts in discovery.

## Conclusion

      For all of the foregoing reasons, Defendants request that the Court allow their motion for sanctions and dismiss Plaintiff's Complaint for his fraudulent conduct. Alternatively, Defendants request that the Court exercise its authority to order some other appropriate sanction.

Respectfully submitted,

AVENTIS PHARMACEUTICALS, INC. and
DEBORAH EDMUNDS,


/s/ Joan Ackerstein
Joan Ackerstein (BBO# 549872)
Samia M. Kirmani (BBO# 634699)
JACKSON LEWIS LLP
75 Park Plaza
Boston, Massachusetts 02116
(617) 367-0025; FAX: (617) 367-2155

Dated: April 11, 2005