# EXHIBIT P

1

Volume I
Pages 1 to 315
Exhibits 1 to 28

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
WILLIAM M. BYRD,                :
          Plaintiff,            :
                                :
     vs.                        :   Civil Action
                                :   No. 04-11032-DP
AVENTIS PHARMACEUTICALS,        :
INC., and DEBRA EDMUNDS,        :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

        DEPOSITION OF WILLIAM M. BYRD, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Ken A. DiFraia, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jackson Lewis LLP,
75 Park Plaza, Boston, Massachusetts, on Monday,
October 18, 2004, commencing at 10:05 a.m.

PRESENT:

    Flavin & Koslowsky
         (by John C. Koslowsky, Esq.)
         424 Adams Street, Milton, MA 02186,
         for the Plaintiff.

    Jackson Lewis LLP
         (by Joan Ackerstein, Esq.,
         and Samia Kirmani, Esq.)
         75 Park Plaza, Boston, MA 02116,
         for the Defendants.

                * * * * *

1     A.   Uh-huh.

2     Q.   You are going to have to answer with a yes

3 or no.

4     A.   Yes.

5     Q.   A couple of things are difficult for

6 witnesses.  One is what you just did.  You have to

7 answer with a response.

8         The other is even though you know what my

9 question is, you need to allow me to finish the

10 question and then answer, so that our court reporter

11 can take down both the full question and the full

12 answer.

13     A.   Okay.

14     Q.   You understand that you have sworn to tell

15 the truth today?

16     A.   Yes.

17     Q.   You understand that testifying here today

18 is like testifying in a courtroom?

19     A.   Yes.

20     Q.   You understand that if you are not telling

21 the truth today, that that's going to amount to

22 perjury?

23     A.   Yes.

24     Q.   I assume that you are planning to tell us

6

1    the truth today?

2        A.    Of course.

3        Q.    Thank you.  If at any time you don't

4    understand a question that I've asked you, will you

5    let me know that.

6        A.    Yes, I will.

7        Q.    If I ask you a question and you answer it,

8    I'm going to assume that you did understand it,

9    okay?

10       A.    Okay.

11       Q.    If you need a break at any point, will you

12   let us know that.

13       A.    Yes, I will.

14       Q.    Can you give me your residential address,

15   please.

16       A.    38 Meadowview Road, Milton, Mass. 02186.

17       Q.    How long have you lived at that address?

18       A.    Approximately 16 years.

19       Q.    Are you married?

20       A.    Yes.

21       Q.    What is your wife's name?

22       A.    Gladys.

23       Q.    Last name Byrd?

24       A.    Her last name?

35

1     A.   Oh, geez...

2     Q.   Local?

3     A.   Yes.

4     Q.   In Boston?

5     A.   Yes.

6     Q.   What position did you get?

7     A.   WIC specialist.

8     Q.   What is a WIC specialist?

9     A.   They called on the I guess you could call

10 it government programs for Women Infant and

11 Children.

12    Q.   What did Ross Labs do?

13    A.   Sold infant formula.

14    Q.   Were you basically a sales rep of infant

15 formula?

16    A.   Yes.

17    Q.   How long did you do that for?

18    A.   Ten years.

19    Q.   Where did you do that?

20    A.   Right here in the Boston North Shore area.

21 Excuse me, I was also promoted during that time, so

22 I was not just a WIC specialist for ten years.

23    Q.   Who did you report to as a WIC specialist?

24    A.   John Bosie.

36

1      Q.    How is the last name spelled?

2      A.    B-o-s-i-e, I believe.

3      Q.    What was his position?

4      A.    He was the district manager.

5      Q.    Did you have a territory?

6      A.    Yes.

7      Q.    What territory was that?

8      A.    Boston and the North Shore.

9      Q.    Are you telling us then at some point, you

10  got a promotion?

11     A.    I was promoted to a territory manager, yes.

12  Let me back up.  I was the local WIC specialist,

13  then promoted to the state WIC specialist, then to a

14  territory.

15     Q.    About how long were you working before you

16  became a territory manager?

17     A.    I think two years.

18     Q.    After you became a territory manager, were

19  you supervising people?

20     A.    No.

21     Q.    What did you do as a territory manager?

22     A.    Managed the territory.  I called on

23  hospitals, doctors.

24     Q.    Still selling infant formula?

1    becoming a district manager?

2        A.    No.

3        Q.    Did you ever apply for a promotion?

4        A.    No.

5        Q.    Did you have any performance issues at Ross

6    Labs?

7        A.    No.

8        Q.    When you were selling Foster Grants in the

9    New England region, were you aware of who some of

10   the other retail and wholesale salespersons were?

11       A.    No.  That was the only one, in retail.

12       Q.    You were supervising some retail --

13       A.    That was as a district manager, as a

14   wholesale.

15       Q.    As a district manager, were you aware of

16   who some of the other sales reps were?

17       A.    Yes.

18       Q.    Are you African-American?

19       A.    Yes.

20       Q.    Were there other sales reps at Foster Grant

21   who were African-American?

22       A.    No.

23       Q.    You were the only one that you knew of?

24       A.    Yes.

40

1      Q.   Did you feel that you were treated
2   differently in any way at Foster Grant due to your
3   race?
4      A.   No.
5      Q.   How about at Ross Labs, did you know any
6   other African-American sales representatives?
7      A.   One.
8      Q.   The other sales reps that you knew were
9   white?
10     A.   Yes.
11     Q.   Did you feel that you were treated any
12   differently at Ross Labs because there was only one
13   other African-American salesperson there?
14     A.   No.
15     Q.   You did not collect unemployment after you
16   left Ross Labs?
17     A.   Not that I recall.
18     Q.   How much time elapsed between your leaving
19   Ross Labs and your going to Dictaphone?
20     A.   Maybe a month or two.  I'm not sure.
21     Q.   If you had the job already at Dictaphone
22   when you left Ross Labs, why would you take a month
23   or two off?
24     A.   I have no idea.

1    Q.    As a hospital specialist at Dictaphone, did
2    you have a territory?
3    A.    Yes.
4    Q.    What territory was that?
5    A.    Boston.
6    Q.    You were calling on hospitals?
7    A.    Yes.
8    Q.    Were you also calling on physicians?
9    A.    No.  Well, I take that back.  If you
10   consider a radiologist a physician, then yes, I was.
11   Q.    Don't you consider a radiologist a
12   physician?
13   A.    Yes, I guess so.
14   Q.    You called on hospitals and radiologists?
15   A.    Radiology departments and pathology
16   departments and emergency rooms.
17   Q.    You called on hospitals, and within the
18   hospital, you would call on radiology, pathology,
19   emergency room departments?
20   A.    Yes.
21   Q.    Who did you report to?
22   A.    Barry Jones.
23   Q.    What was his title?
24   A.    District manager.

42

1    Q.    How long did you work as a sales rep at

2  Dictaphone?

3    A.    I think three to four years.

4    Q.    Did you get any promotions?

5    A.    No.

6    Q.    Was Barry Jones your district manager the

7  whole time?

8    A.    Yes.

9    Q.    Are you aware of any other African-American

10  salespeople at Dictaphone?

11    A.    No.

12    Q.    Did you feel that you were treated any

13  differently due to your race there?

14    A.    No.

15    Q.    Did you have any performance issues at

16  Dictaphone?

17    A.    No.

18    Q.    Why did you leave Dictaphone?

19    A.    They went out of business.

20    Q.    So what happened?

21    A.    What happened where?

22    Q.    When they went out of business.

23    A.    What happened to whom, the business or me?

24    Q.    You.

43

1    A.    I went to work for --

2    Q.    Well, I mean, how did you know that they

3  were going out of business?

4    A.    We were told.

5    Q.    You all were told at once?

6    A.    No, individually.

7    Q.    Who told you?

8    A.    I think it was Barry Jones.

9    Q.    Barry Jones met with you and told you

10  Dictaphone was going out of business?

11    A.    Yes.

12    Q.    Did they pay you severance?

13    A.    I believe so.

14    Q.    How long a severance period did you get?

15    A.    I don't know.

16    Q.    Where did you work after Dictaphone?

17    A.    Universal Hospital Services.

18    Q.    Located where?

19    A.    They are not located anyplace anymore.

20  They went out of business.

21    Q.    Where were they located?

22    A.    Burlington, Massachusetts.

23    Q.    Where was Dictaphone located?

24    A.    Burlington, Mass.

47

1    Q.    Did other people get let go at the same
2    time you did?
3    A.    I was not let go.  People started leaving
4    the company at different times, yes.
5    Q.    I'm sorry, but I thought you told us that
6    they were going out of business at Dictaphone.
7    A.    Uh-huh.
8    Q.    Did you quit?
9    A.    Yes.
10    Q.    You quit Dictaphone --
11    A.    Yes.
12    Q.    -- because they were going out of business?
13    A.    Right.
14    Q.    It was a voluntary choice on your part?
15    A.    Yes.
16    Q.    I guess I'm confused.  I thought you told
17    me you met with Barry Jones, that Barry Jones told
18    you that they were going out of business.
19    A.    Right.
20    Q.    And that you believe you got some
21    severance?
22    A.    I believe I got what was coming to me,
23    bonus checks.
24    Q.    Barry Jones told you that the company was

1   going out of business, and you said, "I quit"?

2       A.   It was not that quick, no.

3       Q.   Well, what was it?

4       A.   He had said that they were going out of

5   business and that basically we all should look for

6   another position with another company.  He gave us

7   an opportunity to look for other work.

8            I believe he left before everyone else

9   left.

10      Q.   How long did you work there after he told

11  you that they were going out of business?

12      A.   I can't recall.  It could have been a

13  month, six weeks.  I don't know.

14      Q.   About when did you leave Universal Hospital

15  Services?  What time was that?

16      A.   1997.

17      Q.   Is it your testimony that from the time you

18  started at Foster Grant until the time you leave

19  Universal Hospital Services in 1997, you never had

20  performance issues at any of those employers that

21  you told us about?

22      A.   True.

23      Q.   Were you ever put on a performance

24  improvement plan at any of those employers?

1      A.   No.

2      Q.   You never encountered any form of race

3  discrimination at any of those --

4      A.   None that I could determine.

5      Q.   There was never a period of time when you

6  were out of work for a long period of time?  You

7  were always able to get another job?

8      A.   Yes.

9      Q.   Your testimony is that Foster Grant went

10 out of business, Dictaphone was going to go out of

11 business, and Universal Hospital Services were going

12 out of business?

13     A.   Yes.

14     Q.   At none of these jobs, Foster Grant, Ross

15 Labs, Dictaphone, Universal Hospital Services, at

16 none of them were you selling prescription

17 medications?

18     A.   Let's see here...  I think at Ross

19 Laboratories we sold Rondec, which could have been

20 prescription.  I'm not sure.

21     Q.   What's that?

22     A.   An antihistamine, liquid.

23     Q.   I thought you were selling infant formulas?

24     A.   Yes.  That was one product, the main

60

1      Q.    Would you agree with me that when you

2   worked as a sale rep at Aventis, you were on

3   something of an honor system?

4      A.    Yes.

5      Q.    You had to do reports of your activity

6   during the day?

7      A.    Yes.

8      Q.    Your manager had you on an honor system,

9   understanding that you would do your best to tell

10  the truth?

11     A.    Yes.

12     Q.    Did you interpret policy at Aventis the way

13  you just interpreted my question?

14     A.    No.

15     Q.    You didn't want to tell me about that

16  part-time job, did you?

17     A.    Part-time job doesn't pay me.  There are no

18  1099's.

19     Q.    The question is you did not want to tell me

20  about that part-time job, did you?

21     A.    That's not true.  You asked what I did for

22  a living.  What I do for a living is I drive a

23  limousine.  That's what pays me.

24     Q.    I said to you do you currently have any

1    employment and have you had any employment since you

2    left Aventis other than this, and you said, "No."

3        A.    I said no, right.

4        Q.    You got commissions from this part-time

5    job, have you not?

6        A.    $110.

7        Q.    Mr. Byrd, you took an oath today to tell

8    the truth, the whole truth and --

9            MR. KOSLOWSKY:  I would object to this.

10   You are badgering him at this point.  Can you ask a

11   question.

12       Q.    Will you assure me you will tell the truth?

13       A.    I have already done that.

14       Q.    Who are you working for on a part-time

15   basis?

16       A.    It's called "Mapleleaf-RX."

17       Q.    What is Mapleleaf-RX?

18       A.    It's a company that provides the service to

19   import drugs from Canada.

20       Q.    How did you become acquainted with

21   Mapleleaf-RX?

22       A.    I was recommended by a doctor.

23       Q.    Who was that?

24       A.    Dr. Ronald Bogusky.

62

| | | |
|---|---|---|
| 1 | Q. | Where's he located? |
| 2 | A. | Dartmouth, Mass. |
| 3 | Q. | When did he recommend you? |
| 4 | A. | 16 months ago maybe. |
| 5 | Q. | That would be approximately July of 2003? |
| 6 | A. | Could be. |
| 7 | Q. | Well, was it? |
| 8 | A. | I don't know the time or the date. |
| 9 | Q. | Did Dr. Bogusky talk to you about |
| 10 | Mapleleaf-RX? | |
| 11 | A. | No. |
| 12 | Q. | Did somebody contact you? |
| 13 | A. | Yes. |
| 14 | Q. | Who was that? |
| 15 | A. | John Chacago. |
| 16 | Q. | How is the last name spelled? |
| 17 | A. | C-h-a-c-a-g-o.  It's almost like Chicago. |
| 18 | Q. | What is his position? |
| 19 | A. | He's the owner. |
| 20 | Q. | Where's he located? |
| 21 | A. | Randolph, Mass. |
| 22 | Q. | What is it that his business does? |
| 23 | A. | Imports drugs from Canada. |
| 24 | Q. | Where's the business located? |

1      A.    Randolph, Mass.

2      Q.    Is there actually a facility in Randolph?

3      A.    No.

4      Q.    He operates from his home?

5      A.    Yes.

6      Q.    Are there any other independent contractors

7   other than you?

8      A.    Not that I know of.  There may be.

9      Q.    Is there anybody else in the business other

10   than John Chacago and you?

11      A.    His wife.

12      Q.    You've been working with him for the past

13   16 months?

14      A.    He approached me 16 months ago.  I started

15   probably in January of 2003.

16      Q.    January of 2003 is more than 16 months ago.

17      A.    If you say so.

18      Q.    I'm just asking you.  You started in

19   January 2003?

20      A.    Yes, I believe so.

21      Q.    Do you have some kind of written agreement

22   with him?

23      A.    No.

24      Q.    What is it that your job is?

64

1        A.    Call on physicians to offer our services

2   for their patients to save money by importing drugs

3   from Canada.

4        Q.    Do you have any ownership interest in the

5   business?

6        A.    No.

7        Q.    You do actually call on physicians, don't

8   you?

9        A.    Yes.

10       Q.    About how many days a week do you call on

11  physicians?

12       A.    That varies.  Again, it depends on what I

13  do with the limousine company.  I try and get in

14  maybe a day and a half during the week.

15       Q.    What physicians do you call on?

16       A.    All.

17       Q.    You call on the physicians you used to call

18  on for Aventis, don't you?

19       A.    Yes, and others.

20       Q.    Are there particular drugs that you are

21  trying to sell?

22       A.    No.

23       Q.    Is this generic drugs?

24       A.    This is a service.  We don't sell drugs.

65

1      Q.    What is it that you are selling?

2      A.    A service.

3      Q.    How does the service work, Mr. Byrd?

4      A.    It works voluntarily for the patient if

5   they want to save money by importing drugs from

6   Canada.

7      Q.    What is it that you are selling to the

8   physician?

9      A.    A service.

10      Q.    Could you be more descriptive.

11      A.    That's what it is.

12      Q.    You meet with the physician and say what?

13      A.    "We have a service that you can offer your

14   patients if they are having financial difficulties

15   if they need to import drugs from Canada."  We give

16   them a form that the patient can fill out if they

17   choose to fill it out if they choose the service.

18   That's what it is.

19      Q.    You have literature that relates to the

20   services that Mapleleaf provides?

21      A.    Yes.

22      Q.    Because you hand literature to physicians,

23   right?

24      A.    Yes.

1      Q.    Do you know how many customers have

2    subscribed with Mapleleaf?

3      A.    No.

4      Q.    Do you know if there are any that do?

5      A.    Excuse me?

6      Q.    Are there any that have subscribed?

7      A.    Yes.

8      Q.    How do you get paid?

9      A.    By those who subscribe.

10     Q.    What is the total that you have received

11   thus far?

12     A.    Oh, I think maybe $1,000.

13     Q.    You've been doing this since January 2003,

14   calling on physicians a day or day and a half, and

15   you have gotten $1,000?

16     A.    Yes.

17     Q.    Does Mr. Chacago -- am I saying his name

18   right?

19     A.    "Chacago."

20     Q.    Does he know that you were formerly

21   employed by Aventis?

22     A.    Yes.

23     Q.    What did you tell him about the reason your

24   employment ended?

1    Q.    The date is 3/8/04, do you see that?

2    A.    Uh-huh.

3    Q.    Does that mean you signed the tax return on

4    or about March 8, 2004?

5    A.    Yes.

6    Q.    You indicate your occupation is sales, do

7    you see that?

8    A.    Yes.

9    Q.    What sales were you doing that you were

10   calling your occupation?

11   A.    That probably is what I have done all my

12   working career, sales.   That's what I would consider

13   myself, as a salesman.

14   Q.    Where it says, "Under the penalties of

15   perjury, I declare I've examined this return and

16   accompanying schedules and statements, and to the

17   best of my knowledge and belief, they are true,

18   correct and complete," you understood that you were

19   telling the truth when you said your occupation was

20   sales?

21   A.    Yes.

22   Q.    There is a form here for profit or loss

23   from a business sole proprietorship.   It says the

24   name of the proprietor is William M. Byrd.   What

1    business is this that is reflected on this form?

2         A.    Well, I believe it's what I called "Byrd

3    Enterprises."

4         Q.    What is Byrd Enterprises?

5         A.    It's nothing.  Let's see here...  I spent

6    some money buying Herbalife products.  I was going

7    to try to sell Herbalife.

8         Q.    When did you do that?

9         A.    Oh, geez, maybe a year ago.

10        Q.    What are Herbalife products?

11        A.    They are nutritional products, weight loss

12   products.

13        Q.    How much did you spend?

14        A.    Around $1,500.

15        Q.    Have you sold them anyplace?

16        A.    No.

17        Q.    You would agree with me in the document

18   marked as Exhibit 1 when we asked for periods of

19   self-employment, you didn't tell us anything about

20   Byrd Enterprises, did you?

21        A.    No, I didn't.

22        Q.    This tax return was prepared by Norman

23   Clement?

24        A.    Uh-huh.

72

1      Q.    Is that yes?

2      A.    Yes.  I'm sorry.

3      Q.    Is he an accountant?

4      A.    Yes.

5      Q.    On this profit or loss from business, you

6   gave this information to Mr. Clement, which he

7   filled out?

8      A.    Yes.

9      Q.    With all due respect, isn't this a fraud on

10  the Internal Revenue Service?

11     A.    No.  How is that a fraud?  I couldn't sell

12  the Herbalife.  I tried.  I don't understand what

13  you are calling "a fraud."

14     Q.    Do you have a business or don't you?

15     A.    No, I don't.

16     Q.    Sometime in 2003, you spent $1,500 for

17  nutritional products, and you could not sell them?

18     A.    True.  You can come to my home and see it.

19  They are still sitting there.

20     Q.    What effort did you make to sell them?

21     A.    Phone calls, fliers, meeting people.

22     Q.    To whom were you trying to sell these

23  products?

24     A.    The general public.

1     Q.    Where you list car and truck expenses,
2   $8,995, what is that?
3     A.    I have no idea.
4     Q.    When you list the office expense of $2,234,
5   what is that?
6     A.    Computers, fax machines.
7     Q.    Are these in your home?
8     A.    Yes.
9     Q.    You don't have an office anyplace, do you?
10    A.    No.
11    Q.    Then you deducted or you claimed $500 in
12  meals and expenses?
13    A.    Yes.
14    Q.    You actually took in, I take it, $740?
15    A.    Yes, I guess.
16    Q.    You told the truth, didn't you?  You made
17  $740?
18    A.    Yes...
19    Q.    Well, did you or didn't you?
20    A.    It says it there, yes.
21    Q.    Is that the truth?
22    A.    I believe so.
23    Q.    So Byrd Enterprises is a business --
24    A.    No -- excuse me -- Byrd Enterprises did not

1  make any money.

2      Q.    Byrd Enterprises was a business that was

3  yours, self-employment.  You bought $1,500 of

4  nutritional supplements, you sold $740 worth, and

5  you didn't tell us in the interrogatories, did you?

6      A.    Excuse me, but I didn't sell any of it,

7  first of all.  I believe this money came from

8  Mapleleaf-RX, the commission that I made, okay?

9  Byrd Enterprises is not a business.

10     Q.    This is your tax return, Mr. Byrd, so don't

11  let me put words in your mouth.  You told me this

12  was the nutritional business.  Are you now changing

13  your testimony?

14     A.    No.

15     Q.    What business is this from?

16     A.    You had asked about the profit and loss

17  from the business.  Byrd Enterprises is what I

18  claimed as a business, but it is not a business.

19  What I put down here for income was from Mapleleaf.

20     Q.    So what is the car and truck expenses of

21  $8,885?

22     A.    I don't know.

23     Q.    What is the $2,234?

24     A.    As I explained, that was a computer and fax

1  machine.

2      Q.    Does the computer and fax machine work for

3  Mapleleaf?

4      A.    I use the computer for Mapleleaf, yes.

5  Well, let me explain that.  There's nothing that I

6  communicate for Mapleleaf to an individual, except

7  for John.  I also receive E-mails and faxes for

8  messages over the computer.

9      Q.    From John?

10     A.    John, yes, and our answering service.

11     Q.    Does this page, Profit or Loss From

12  Business 2003, have anything to do with the

13  nutritional supplements?

14     A.    No.

15     Q.    You are telling me this all relates to

16  Mapleleaf?

17     A.    I guess so.

18     Q.    Do you have a territory that you call on

19  for Mapleleaf?

20     A.    No.  I go wherever I want to go.

21     Q.    Do you travel overnight?

22     A.    No.

23     Q.    It's all local traveling?

24     A.    Yes.

1     Q.   On the next page of this Profit Or Loss
2   From Business, there's a Question No. 44:  "Of the
3   total number of miles you drove your vehicle, enter
4   the number of miles you used your vehicle for
5   business," and it says, "24,985."
6     A.   Right.
7     Q.   What business is that?
8     A.   Mapleleaf.
9     Q.   You told us that you call on physicians,
10   right?
11     A.   Right.
12     Q.   A day or day and a half a week?
13     A.   Yes.
14     Q.   You are going to expect us to believe that
15   you drove 25,000 miles?
16         MR. KOSLOWSKY:  Objection.
17     A.   You don't have to believe it.
18         MR. KOSLOWSKY:  You can ask your questions,
19   but you are getting very accusatory here.
20         MS. ACKERSTEIN:  I'm sorry.  It's just
21   incredulous.
22     Q.   You say you drove 25,000 miles for
23   Mapleleaf?
24     A.   Yes.

1    Q.    Driving one day a week?

2    A.    A day and a half, weekends.  If you work

3    out the mileage between Boston and to the Cape and

4    then ride around the Cape, that's over 200 to 300

5    miles a day.  You can do the math.

6    Q.    Let me press you, because I'm trying to get

7    to the truth, Mr. Byrd.

8    A.    Certainly.

9    Q.    You told us earlier that you travel a day

10   or day and a half a week for Mapleleaf, was that

11   your testimony?

12   A.    That's true.

13   Q.    Where does the weekend come in?  Are you

14   also traveling on the weekend for Mapleleaf?

15   A.    Well, I'm sorry, but probably occasionally

16   I've done that, but not -- what's the word I'm

17   looking for -- not every weekend.

18   Q.    Just so I understand it, this 25,000 miles

19   of business travel is all Mapleleaf?

20   A.    Yes.

21   Q.    Do you get any reimbursement from Mapleleaf

22   for your commuting?

23   A.    No.

24   Q.    It says, "When did you place your vehicle

1    in service for business purposes," and it says,

2    "May 5, 2003."

3        A.    What page are you on?

4        Q.    Question No. 43.

5        A.    Okay, I see it.

6        Q.    You started driving for Mapleleaf --

7        A.    Excuse me, this is not me.  This is the

8    accountant.  I did not answer this question.  As a

9    matter of fact, he fills it out for us.

10            For me to say that's when I started or

11    agree with you that is when I started it, it would

12    be a lie.

13       Q.    You signed the tax return, didn't you?

14       A.    Yes, I did.  All I look at when I get the

15    return back is the front page, do we get money back.

16    Then I will sign it and send it off.

17       Q.    Are you telling me that --

18       A.    I have not reviewed this.  I have not

19    reviewed the others either.

20       Q.    So you do not review your tax returns

21    before you sign them?

22       A.    No.

23       Q.    If I wanted to know where the information

24    came from on this business and why Mr. Clement put

1   May 5, 2003 --

2        A.   You can ask him.

3        Q.   I assume you would not object if I did ask

4   him?

5        A.   No, I would not.

6                  (Document marked as Byrd

7                   Exhibit 3 for identification)

8        Q.   Exhibit 3 is a photocopy of your 2002

9   return that was provided to us by your counsel.  I

10  see that Mr. Clement did these tax returns as well?

11       A.   Yes, he did.

12       Q.   I take it you know Mr. Clement?

13       A.   I know him?  You have to define what you

14  mean by "know."  I'm acquainted with him.

15       Q.   This tax return bears Mr. Clement's

16  signature, but it does not bear the signature of you

17  or your wife.  Can I assume there's an original tax

18  return that you did sign and filed?

19       A.   I thought this was it.  This is the copy

20  that I was provided with.

21       Q.   Look at the profit or loss from business in

22  2002.

23       A.   What page are you on?  Oh, I have it.

24       Q.   This says, "Name of proprietor, William M.

1    the tax return, and Mr. Clement would be the best

2    one to speak to about what is in them?

3         A.    If you like, yes.

4         Q.    Since you left Aventis, have you had any

5    job interviews?

6         A.    Yes.

7         Q.    Where have you interviewed?

8         A.    Numerous places.

9         Q.    Like where?

10        A.    You want the names?

11        Q.    Do you keep a calendar?

12        A.    Calendar?

13        Q.    Yes.

14        A.    No.

15        Q.    You don't have a listing someplace of the

16   places that you interviewed at?

17        A.    No, I don't have a list.  I have -- I gave

18   him the copies of people I contacted, who I talked

19   with (indicating).

20             Off the top of my head, there was the

21   Westin Hotel.

22        Q.    Let me make the question clearer so you

23   know what I'm looking for.

24        A.    Go ahead.

1      Q.    I'm interesting in knowing about any

2    interviews that you had for a position since you

3    left Aventis.

4      A.    Okay.

5      Q.    When you tell me the name of an employer, I

6    will ask you some questions, so you tell me in

7    whatever order the interviews that you remember.

8      A.    Sure.  First Line Screening.

9      Q.    Where are they located?

10     A.    I don't know.

11     Q.    Did you interview with someone?

12     A.    Yes.

13     Q.    Who was that?

14     A.    I don't know.

15     Q.    Where did you interview?

16     A.    At the hotel over here (indicating).  I

17   can't think of the name of the hotel.  It could be

18   the Radison or the Tremont Hotel.  I don't know.

19     Q.    When was this interview?

20     A.    Last year.

21     Q.    Sometime in 2003?

22     A.    Excuse me?

23     Q.    Sometime in 2003?

24     A.    Yes.

1    Q.    What was the position for?

2    A.    Sales.

3    Q.    What do they sell?

4    A.    Service.  I believe, if I can remember

5    correctly, they wanted people to call on churches,

6    community centers, to provide some type of screening

7    for osteoporosis, lung cancer, I don't know,

8    something like that.

9    Q.    You did not get an offer?

10   A.    No.

11   Q.    What's the next interview you remember?

12   A.    Norvatis.

13   Q.    Where did you interview?

14   A.    Another hotel on the South Shore -- oh, I

15   take it back.  It was at the Marriott Courtyard in

16   Mansfield.

17   Q.    Was that also for a sales position?

18   A.    Yes.

19   Q.    When was the interview?

20   A.    Last year.

21   Q.    Sometime in 2003?

22   A.    Yes.

23   Q.    Did you get an offer?

24   A.    No.

1      Q.   Where else did you interview?

2      A.   Geez, Johnson & Johnson.

3      Q.   Where was that?

4      A.   In my home, telephone interview.

5      Q.   I'm talking about in-person interviews

6    right now.

7      A.   Let's see here...  I believe Lilly.  That

8    was at the hotel in Waltham.

9      Q.   When was that?

10     A.   I think 2001, 2002.  I don't know.

11     Q.   Sales job?

12     A.   Excuse me?

13     Q.   A sales job?

14     A.   Yes.

15     Q.   Did you get an offer?

16     A.   No.

17     Q.   Your attorney did provide to us documents

18   relating to your job search effort.  Would anything

19   relating to these interviews be in those documents?

20     A.   Could be.  I'm not sure.

21     Q.   Did you give your attorney all the

22   documents that relate --

23     A.   Yes.

24     Q.   You have to let me finish the question.

1       A.    Go ahead.

2       Q.    Did you give your attorney all the

3   documents that relate to your job search effort?

4       A.    I believe so, but I'm not sure.

5       Q.    Do you recall any other interviews?

6       A.    M-Lynn.

7       Q.    What was it?

8       A.    M-Lynn.

9       Q.    When was that?

10      A.    Probably two years ago, or last year.  I

11  don't know.  They all run in together.

12      Q.    No job offer?

13      A.    No.

14      Q.    Have you had a job offer from anybody?

15      A.    No -- oh, I take that back.  An insurance

16  company.

17      Q.    When was that?

18      A.    2002, I believe.

19      Q.    Which insurance company was it?

20      A.    Prime America.

21      Q.    What kind of position did they offer you?

22      A.    Sales.

23      Q.    What were you going to be selling?

24      A.    Insurance.

1      A.    Sean Flanders.

2      Q.    Who was an area manager?

3      A.    He was a district manager, which now they

4    call it an area manager.

5      Q.    Was there a period of time between

6    Mr. Flanders and Deb Edmunds when you didn't have a

7    direct manager?

8      A.    There was an interim manager.

9      Q.    There was a what?

10     A.    Interim manager.

11     Q.    Who was that?

12     A.    Dave Pearlstein.

13     Q.    Is that because Mr. Flanders was reassigned

14   and Ms. Edmunds hadn't yet come?

15     A.    Yes.

16     Q.    What was that period of time between

17   Mr. Flanders and Ms. Edmunds?

18     A.    What do you mean?

19     Q.    You said David Pearlstein was the interim

20   manager.  How long was that for?

21     A.    Until Deb Edmunds filled in the job.

22     Q.    I'm trying to figure out how long a period

23   of time that was.

24     A.    It could have been a couple of months.  I

1    Amaryl and Lantus.

2        Q.    When Deb Edmunds came and she became

3    your -- was it area manager when she arrived in '99?

4        A.    It was district manager.  They changed it

5    later.  It was the same, though.

6        Q.    Your pod members did not report to

7    Ms. Edmunds, did they?

8        A.    No.

9        Q.    They reported to different area managers?

10       A.    Yes.

11       Q.    Did you have a territory?

12       A.    Yes.

13       Q.    What territory was it?

14       A.    South Shore.

15       Q.    That's what it was called?

16       A.    Yes.  It was actually called "South

17   Boston."

18       Q.    What did it consist of?

19       A.    Starting from Norwell, Whitman, Abington,

20   down to the Cape, over to Dartmouth.

21       Q.    Did it also include New Bedford?

22       A.    Yes, same area.

23       Q.    Did it include Fall River?

24       A.    No.

1      Q.    Your pod mates were calling on the same
2    physicians that you were generally?
3      A.    No.
4      Q.    Who were they calling on?
5      A.    I can't tell you each physician they were
6    calling on.  With diabetes, I called on
7    endocrinologists.  They wouldn't call on
8    endocrinologists.  I called on some cardiovascular
9    people, which I don't believe they did either.
10     Q.    What was the concept of the pod, Mr. Byrd?
11     A.    More voice, more volume, more business.
12   The more people you have talking about a product,
13   the more business you should get.
14     Q.    Did you have monthly meetings with your pod
15   mates?
16     A.    Yes.
17     Q.    The purpose of the meetings was to talk
18   about what?
19     A.    To talk about strategy.
20     Q.    Strategy for selling?
21     A.    Yes, territories, situations.
22     Q.    You worked for Aventis from May of 1997
23   until your termination in 2002?
24     A.    Yes.

1      Q.    Are you aware of any other employees at

2   Aventis who were terminated while you were there?

3      A.    Terminated, no; quit, yes.  I take that

4   back.  There was a gentleman, but I can't think of

5   the name.  I believe he was from Connecticut.  I

6   don't know.

7      Q.    Do you have a recollection that he was

8   terminated?

9      A.    No.  I just knew that he was.

10      Q.    That's what I'm asking you.  You understood

11   that somebody got terminated?

12      A.    Yes.

13      Q.    Do you know why he got terminated?

14      A.    No.

15      Q.    Do you know his name?

16      A.    No.

17      Q.    Do you know his race?

18      A.    White.

19      Q.    He was a sales rep?

20      A.    Yes.

21      Q.    You heard that he was terminated, but you

22   don't know why?

23      A.    Right.

24      Q.    When you went out into your territory on a

1    daily basis, it was your responsibility to call on

2    various medical practices to talk to the doctors and

3    their staff about the drugs that you were selling?

4        A.    Yes.

5        Q.    You had a device to record those calls?

6        A.    Uh-huh.

7        Q.    Does that device have a name?

8        A.    I believe it was Velo.

9        Q.    Sorry?

10       A.    Velo.  There were two different types.

11       Q.    How are you spelling that?

12       A.    I believe it was spelled V-e-l-o.  I'm not

13   sure.

14       Q.    The device enabled you to put in

15   information about the call you had just made?

16       A.    Yes.

17       Q.    And you know as an electronic device, it

18   recorded the time that you entered the call?

19       A.    I would assume so.

20       Q.    Well, you knew that, didn't you?

21       A.    No.  I knew there was a signature stamp,

22   but I didn't know it recorded the time of my putting

23   in the information.

24       Q.    You knew you were supposed to record the

1      Q.    Did you solve the problem so that you

2    wouldn't have to use this much paper?

3      A.    I think so, yes.  I don't remember.

4                (Document marked as Byrd

5                Exhibit 6 for identification)

6      Q.    Exhibit 6 is a photocopy of a midyear

7    assessment.  It's dated September 18, 2000.  This is

8    the review that Ms. Edmunds gave you at the Dedham

9    Hilton?

10      A.    (Witness reviews document)  I believe so.

11                (Document marked as Byrd

12                Exhibit 7 for identification)

13      Q.    Exhibit 7 is a photocopy of the 45-day

14    performance improvement plan that was accompanying

15    this review.  Is this Exhibit 7 the plan that she

16    showed you at the Dedham Hilton that you said you

17    were not going to sign?

18      A.    Yes.

19      Q.    I take it at the Dedham Hilton, you met

20    with her in the lobby of the hotel?

21      A.    Yes.

22      Q.    Did she give you a chance to read the

23    midyear performance plan assessment that she had

24    completed?

1     A.    Yes.

2     Q.    The way this works is that you actually

3   prepare the Associate Assessment section first?

4     A.    I don't know if I prepared it first, but I

5   prepared part of this, yes.

6     Q.    The part that says, "Associate Assessment"

7   is the part that you did?

8     A.    Yes.

9     Q.    You make that assessment of yourself, and

10  then you give it to your manager?

11    A.    Yes.

12    Q.    And she incorporates it into the review?

13    A.    Yes.

14    Q.    On the first page at the bottom, she says

15  that she was on a field visit with you and you

16  referred to a clinical trial or report as Allegra

17  versus Loratadine when it was really Allegra versus

18  Sertazine.  Did that happen?

19    A.    She said it happened, yes.

20    Q.    You have no recollection of it?

21    A.    No.  That's why I asked her, "Did I say

22  that?"  She took offense to it.

23    Q.    At the time when she corrected you, you

24  didn't realize what you had done; is that it?

1     A.    I didn't think I said it the way she said
2  it.
3     Q.    How about on the next page, she said that
4  you said a physician could use Amaryl in connection
5  with insulin or Amaryl instead of saying in
6  conjunction with insulin or Metphormin.  Do you
7  recall doing that?
8     A.    Yes.
9     Q.    You made a misstatement?
10    A.    Uh-huh.
11    Q.    You have to say yes, if that's true.
12    A.    Yes.
13    Q.    On Page 177, at the bottom she said she
14 didn't feel you are being persistent in targeting
15 the key physicians.
16          It is the case, isn't it, that you were
17 provided with information about the physicians who
18 you were better off targeting than others?
19    A.    Yes.
20    Q.    But you did sometimes have your own opinion
21 on that, didn't you?
22    A.    Yes.
23    Q.    On occasion, you would call on doctors that
24 you felt were more appropriate targets rather than

1   wanted to transfer?

2       A.    Right.

3       Q.    Other than Bill and Jim, you didn't talk to

4   anybody else about Deb Edmunds?

5       A.    No.  I didn't discuss Deb Edmunds in detail

6   either.  It was just that I was having a problem.

7       Q.    Then did you say you had some meeting with

8   your pod mates where they said they thought you were

9   fired?

10      A.    It was our quad meeting.  As I arrived,

11  they said they thought I was fired.

12      Q.    You don't know where they heard that from,

13  do you?

14      A.    No, I don't know where they heard the rumor

15  from.

16              (Document marked as Byrd

17               Exhibit 8 for identification)

18      Q.    Exhibit 8 is a photocopy of the warning

19  dated 11/14/00.  I take it you have seen this

20  before?

21      A.    (Witness reviews document)  Yes.

22      Q.    How did you get this?

23      A.    I believe at a meeting with Deb Edmunds and

24  Chris List.  I don't remember exactly.

186

1      A.    No.

2      Q.    What warning was he present for?

3      A.    Whatever warning they gave me at that time,

4    whatever Deb wanted to give me, if she gave me

5    anything.  I don't have any memory that she gave me

6    anything.

7      Q.    Do you have any specific recollection of

8    the meeting with Mr. Kaisel present?

9      A.    Yes.

10     Q.    What happened?

11     A.    He said he was there to observe.  Basically

12   that was it.

13     Q.    Do you remember what Ms. Edmunds said to

14   you at the meeting?

15     A.    No, I don't.  It might have been a review

16   or a warning.  I don't remember.

17                  (Document marked as Byrd

18                   Exhibit 9 for identification)

19     Q.    Exhibit 9 is a photocopy of something

20   called "Performance Status Discussions."  It's dated

21   September 5, 2001.  Have you seen this document

22   before?

23     A.    (Examines document)  Yes.

24     Q.    Are those your initials on the front page?

1      A.    Yes.

2      Q.    Where was the fishing trip?

3      A.    Plymouth, Mass, or Marshfield, Mass.

4      Q.    Well, was it Plymouth or Marshfield?

5      A.    The boat was located in Marshfield.

6      Q.    Who did you take on the fishing trip?

7      A.    Doctors and Julie Nelson.

8      Q.    Who were the doctors?

9      A.    The one I recall is Johnson, who owned the

10    boat, and Coughlin.  Coughlin gave the talk.

11     Q.    Dr. Johnson owned the boat?

12     A.    Yes.

13     Q.    You used his boat?

14     A.    Right.

15     Q.    Dr. Coughlin gave a talk of some sort?

16     A.    Yes.

17     Q.    I guess there was a fishing trip for five

18    physicians, so there were three other doctors other

19    than --

20     A.    No.  Due to inclement weather, they didn't

21    show up.

22     Q.    So it was just two people on the boat?

23     A.    Two physicians.

24     Q.    Two physicians, Julie Nelson and you?

1      A.    And one other person.

2      Q.    Who was that?

3      A.    I think it was Julie's boyfriend.

4      Q.    You spent $1,000 on this?

5      A.    That's what the charter was, yes.

6      Q.    Well, it was the doctor's boat, wasn't it?

7      A.    Yes.

8      Q.    You paid him $1,000 to use his boat?

9      A.    He has a charter business.

10     Q.    You recognized that that exceeded the

11   expense guidelines?

12     A.    I got permission, again, from Deb Edmunds

13   to do this.

14     Q.    When did you get permission?

15     A.    Whenever I asked her.  I couldn't tell you

16   the date or the time.

17     Q.    She charges you with wrongdoing for

18   exceeding the expense guidelines.

19     A.    And she's done that before.

20     Q.    You are saying she's lying?

21     A.    I'm saying she gave me permission.

22     Q.    You don't have anything in writing, I

23   assume?

24     A.    No.

212

1   Dictaphone is in business, because we served them

2   the subpoena and we got records.

3       A.   Okay.

4       Q.   Is that a surprise to you?

5       A.   Yes, it is.

6       Q.   The front page of this form has the name

7   "Bill Byrd" and the Social Security No. 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.

8   Is that your Social Security number?

9       A.   Yes, it is.

10      Q.   This front page of the form indicates a

11  hire date of January 17, 1994.  Does that sound

12  right to you?

13      A.   Yes.

14      Q.   It says that the last day worked is May 3,

15  1996.  Does that sound right to you?

16      A.   Yes.

17      Q.   On the form, there's an X for termination.

18  There's not an X for layoff.  Does this alter your

19  testimony earlier today about the reason for your

20  termination?

21      A.   What termination?

22      Q.   The reason for your leaving Dictaphone.

23      A.   No.

24      Q.   You told us that Dictaphone was going out

1  of business?

2        A.    That's what I was told by Barry Jones.

3        Q.    This says, "Termination was preapproved by

4  human resources, including Sean Colt Hunt and Tony

5  Procops," do you see that on the front page?

6        A.    (Examines document)  Yes.

7        Q.    Do you know those people?

8        A.    No.

9        Q.    This says on the front page the title of

10  the position was Healthcare Specialist.  Does that

11  sound right to you?

12       A.    Yes.

13       Q.    It says you reported to a Bob Nardi, Health

14  Care District Manager.  Is that right?

15       A.    Yes.

16       Q.    So you know Mr. Nardi?

17       A.    Yes, I did.

18       Q.    It's still your position that you didn't

19  have any performance issues there?

20       A.    None that were written up.

21       Q.    Were there any that you were told about?

22       A.    No.  Sales were down.  Mr. Nardi came on

23  board for a month or six weeks before I left.

24       Q.    Did you have reason not to like him?

1    before a program in order to receive approval when

2    the program is outside the expense guidelines, do

3    you see that?

4        A.    Uh-huh.

5        Q.    Is that what you are talking about when you

6    said previously that Deb treated you differently

7    because she asked you to get approval before the

8    program?

9        A.    Yes.

10                    (Document marked as Byrd

11                    Exhibit 14 for identification)

12        Q.    Exhibit 14 is a photocopy of a resume that

13    your counsel provided to us.  Is this a resume that

14    you are currently using?

15        A.    I believe so.

16        Q.    It says, "Employment History" down at the

17    bottom, "Byrd Enterprises, May 2002 to the present."

18    What is that?

19        A.    This is what we discussed earlier on the

20    W-2 Form.

21        Q.    Was that the nutrition supplement --

22        A.    Yes.

23        Q.    It says, "Nutrition and weight consultant,

24    Byrd Enterprises, April 2002."

241

1      A.    It's a typo.

2      Q.    It's the same thing?

3      A.    Yes.

4      Q.    Where it says, "Selected Awards,

5  Achievements, Aventis," these are all awards that

6  you received in your capacity as a sales rep?

7      A.    I believe so, yes.

8      Q.    You would not put these here if you didn't

9  get them, would you?

10     A.    No, I would not.

11     Q.    Down at the bottom where it says,

12  "Education, B.S., business administration New Mexico

13  State University," that is not true, is it?

14     A.    No, it is not true.

15     Q.    You are using a resume which has a degree

16  which you don't have?

17     A.    True.

18     Q.    You don't think that's inappropriate?

19     A.    Oh, yes, I do.

20     Q.    But you are doing it anyway?

21     A.    Yes.

22     Q.    Because you want to get a job, so you put

23  down that you have a B.S.?

24     A.    True.

247

1    Q.    Belinda Lawrence?

2    A.    I don't know.

3    Q.    Do you have a computer at home?

4    A.    Yes.

5    Q.    Do you send E-mails to people?

6    A.    Yes.

7    Q.    Have you had any E-mail communications with

8    Yvette Daniels, Donna Glave, or any of these other

9    people we mentioned?

10    A.    No.  The only thing I got by E-mail was

11    this letter (indicating).

12                  (Document marked as Byrd

13                  Exhibit 16 for identification)

14    Q.    Exhibit 16 is photocopy of your 1999 tax

15    return which your counsel provided to us.

16    Mr. Clement, again, was the accountant.

17          This does not bear your signature, but I

18    assume that the original probably did; is that

19    correct?

20    A.    I would assume so.

21    Q.    Look at the page with Schedule C, Profit or

22    Loss from Business, which is about the fifth or

23    sixth page in, do you see that?

24    A.    (Examines document)  Yes.

1       Q.   It says the name of the proprietor is
2   William M. Byrd.  What business was this for?
3       A.   It looks like my Herbalife.
4       Q.   Were you running your Herbalife business in
5   1999?
6       A.   I don't remember.  And I never ran it as a
7   business either, as I explained to you.  It never
8   happened.
9       Q.   It's your tax return, Mr. Byrd.  I'm trying
10  to figure out what it is.
11      A.   What would you like to know?
12      Q.   For starters, there's an entry for supplies
13  listed, $2,500.  What supplies?
14      A.   I don't remember.
15      Q.   There's a deduction of $1,469 for car and
16  truck expenses.  What are those?
17      A.   That could be a leasing expense on my
18  wife's car.  I'm not sure.  I don't know.
19      Q.   Your wife uses her car to drive to school?
20      A.   Uh-huh.
21      Q.   Is that yes?
22      A.   Yes.  I'm sorry.
23      Q.   What business would your wife be using the
24  car for?

249

1     A.   She wouldn't.  I would use it.

2     Q.   It's your testimony I guess that you really

3 don't know what this profit and loss from business

4 form is?

5     A.   I don't remember, no.

6     Q.   Were you operating any business in 1989

7 other than Aventis?

8     A.   I didn't operate the Aventis business.  I

9 believe I had this Byrd Enterprises.

10    Q.   The Herbalife business?

11    A.   Yes, but I'm not sure.

12    Q.   While you were working as a sales rep for

13 Aventis in 1999, you also had your own business

14 selling Herbalife products?

15    A.   As I said mentioned, it was not a business.

16    Q.   What was it?

17    A.   I never sold any Herbalife.

18    Q.   It's on your return in 1999.  It's on your

19 return in 2003.

20    A.   That's right.

21    Q.   Did you have a business or didn't you?

22    A.   No.

23          (Document marked as Byrd

24          Exhibit 17 for identification)

315

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                   )

3      I, Ken A. DiFraia, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that there came before me on the 18th day of Oct.,

7  2004, at 10:05 a.m., the person hereinbefore named,

8  who was by me duly sworn to testify to the truth and

9  nothing but the truth of his knowledge touching and

10 concerning the matters in controversy in this cause;

11 that he was thereupon examined upon his oath, and

12 his examination reduced to typewriting under my

13 direction; and that the deposition is a true record

14 of the testimony given by the witness.

15     I further certify that I am neither attorney or

16 counsel for, nor related to or employed by, any

17 attorney or counsel employed by the parties hereto

18 or financially interested in the action.

19     In witness whereof, I have hereunto set my hand

20 and affixed my notarial seal this 2nd day of

21 November, 2004.

22                    Ken A. DiFraia

23                    Notary Public

24                    My commission expires 4/3/09



DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813